Pages 1 - 66

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG

```
GGGC, LLC                          )
                                   )
                                   )
              Plaintiff,           )
                                   )
    vs.                            ) No. C 17-6799
                                   )
DYNAMIC LEDGER SOLUTIONS, INC., et )
al                                 )
                                   ) San Francisco, California
              Defendants.         ) Thursday
                                   ) March 15, 2018
_____) 1:30 p.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff GGCC:**    LITE DEPALMA GREENBERG, LLC
        570 Broad Street
        Suite 1201
        Newark, New Jersey 07102
        BY:  **JOSEPH J. DePALMA, ESQ.**


        THE RESTIS LAW FIRM, P.C.
        550 West C Street
        Suite 1760
        San Diego, California 92101
        BY:  **WILLIAM RICHARD RESTIS, ESQ.**


**For Movant Anvari:**    HGT LAW, PLLC
        250 Park Avenue
        Seventh Floor
        New York, New York 10177
        BY:  **HUNG G. TA, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
      *Official Reporter - US District Court*
      *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Movants Lang**           ROBBINS GELLER RUDMAN & DOWD, LLP
**Gaviria and Coffey:**        655 West Broadway
                               Suite 1900
                               San Diego, California 92101
                      BY:  **DANIELLE SUZANNE MYERS, ESQ.**
                           **LUKE OLTS, ESQ.**


**For Tezos Investor**         LEVI &KORSINSKY, LLP
**Group & Okusko:**            1101 30th Street, NW
                               Suite 115
                               Washington, DC 20007
                      BY:  **DONALD J. ENRIGHT, ESQ.**


**For Trigon and**             BLOCK & LEVITON, LLP
**MacDonald:**                 155 Federal Street
                               Suite 400
                               Boston, Massachusetts 02110
                      BY:  **JOEL ANDERSON FLEMING, ESQ.**


**For MacDonald:**             HAGENS BERMAN
                               715 Hearst Avenue
                               Suite 202
                               Berkeley, California 94710
                      BY:  **DANIELLE SMITH, ESQ.**


**For Defendant**              COOLEY, LLP
**Dynamic Ledger**             3175 Hanover Street
**Solutions:**                 Palo Alto, California 94304
                      BY:  **SAMANTHA ANNE KIRBY, ESQ.**



(APPEARANCES CONTINUED ON FOLLOWING PAGE)

1   **APPEARANCES (CONTINUED)**

2

   **For Defendant**          DAVIS POLK & WARDWELL
3   **Tezos:**              1600 El Camino Real
                        Menlo Park, California 94025
4                 BY:  **NEAL ALAN POTISCHMAN, ESQ.**
                   **SERGE VORONOV, ESQ.**

5

6

7   **For Defendant**          MANATT PHELPS & PHILLIPS, LLP
   **Draper:**             One Embarcadero Center
8                      30th Floor
                   San Francisco, California 94111
9                 BY:  **CHRISTOPHER L. WANGER, ESQ.**

10

11

   **For Defendant**          COBLENTZ, PATCH, DUFFY & BASS LLP
12  **Schmitz-Krummacher:**  One Montgomery Street
                   Suite 3000
13                     San Francisco, California  94104
              BY:  **DAVID C. BEACH, ESQ.**
14

15                    –   –   –

16

17

18

19

20

21

22

23

24

25

1    <u>Thursday - March 15, 2018</u>                              <u>1:33 p.m.</u>

2                        P R O C E E D I N G S

3                           ---000---

4          THE CLERK:  Case calling C 17-06779 GGCC versus

5    Dynamic Ledger Solutions.

6          Counsel, please state your appearances.

7          MR. ENRIGHT:  Good afternoon, Your Honor.  Donald J.

8    Enright with Levi and Korsinsky.  I represent plaintiff Okusko

9    in one of the component actions that's sought to be

10   consolidated today, and I represent for the purposes of the

11   lead plaintiff motions here today the group that's been called

12   the Tezos Investors Group.

13         THE COURT:  Good afternoon.

14         MR. FLEMING:  Good afternoon, Your Honor.  Joel

15   Fleming of Block and Leviton.  We are counsel primarily today

16   for Trigon Trading Party, one of the movants in the PSLRA case.

17   We're is also counsel to MacDonald in the *MacDonald* action.

18   Nice to see you again.

19         THE COURT:  Good afternoon.

20         MS. MYERS:  Good afternoon, Your Honor.  Danielle

21   Meyers of Robbins Geller Rudman and Dowd on behalf of lead

22   plaintiff movants David Lang, Ryan Coffey and Alejandro

23   Gaviria.

24         And with my in the courtroom is my partner Luke Olts, also

25   of Robbins Geller, and Dave Silver of the Silver Miller firm.

```
 1              MS. SMITH:  Good afternoon, Your Honor.  Danielle
 2   Smith.  I'm here on behalf of plaintiff Bruce MacDonald with
 3   Hagens Berman.  Good afternoon.
 4              MR. TA:  Good afternoon, Your Honor.  My name is Hung
 5   Ta from HGT Law, and I'm here with my colleague Enoch Liang
 6   from LTL Lawyers.  And we're here on behalf of lead plaintiff
 7   movant, Arman Anvari.
 8              THE COURT:  Good afternoon.
 9              MR. DE PALMA:  Good afternoon, Your Honor.  Joseph
10   DePalma of Lite, DePalma, Greenberg for GGCC.
11              THE COURT:  Good afternoon.
12              MR. DE PALMA:  William Restis, my colleague.
13              MR. RESTIS:  Good afternoon, Your Honor.
14              THE COURT:  Good afternoon.
15              MR. RESTIS:  I'm William Restis, Restis Law Firm, on
16   behalf of GGCC supporting Mr. Anvari's motion.
17              THE COURT:  Good afternoon.
18         Anybody left on this side?
19         (No response.)
20              THE COURT:  Okay, go ahead.
21              MR. POTISCHMAN:  Good afternoon, your Honor.  Neal
22   Potischman from Davis Polk.  With me is Serge Voronov.  Here
23   behalf of the Tezos.
24              THE COURT:  Good afternoon.
25              MR. WANGER:  Good afternoon, Your Honor.  Chris
```

1    Wanger from Manatt on behalf of Draper Associates and Tim

2    Draper.

3              **THE COURT:**  Good afternoon.

4              **MS. KIRBY:**  Good afternoon, Your Honor.  Samantha

5    Kirby from Cooley on behalf of Dynamic Ledger Solutions.  Also

6    with me at counsel table is Jeff Kaban also from Cooley.

7              **THE COURT:**  Good afternoon.

8              **MR. BEACH:**  Good afternoon, Your Honor.  David Beach

9    of Coblentz, Patch, Duffy and Bass for defendant

10   Schmitz-Krummacher.

11             **THE COURT:**  Good afternoon.

12        So everybody, all ashore who is going to ashore.  Anybody

13   else want to state their appearance?

14        (No response.)

15             **THE COURT:**  Okay.  Well, welcome to all of you.

16        Let me give you some tentative comments and then tell you

17   what areas I'm not.  I'm not giving a tentative ruling.  I'm

18   just going to hear what you have to tell me.

19        With respect to the consolidation question, I am inclined

20   to consolidate the *MacDonald* action with the other two actions

21   that are pending.  I think that's the appropriate way to go.

22   I've read the arguments that the *MacDonald* case has state

23   claims and, therefore, shouldn't be formally consolidated, but

24   I really do think that's the appropriate way to go.

25        I'm not precluding discussion about it, but my tentative

1  view is to consolidate date those cases.

2      With respect to the Baker case which has been stayed

3  pending some guidance by the Supreme Court on a matter, case

4  that has already been argued, as I understand it, and is on

5  their -- presumably on their list to resolve this term.  I'm

6  inclined to leave that in its stay capacity; to coordinate, if

7  you will, that case such that if the Supreme Court gives us

8  guidance that indicates the case should remain here, then it

9  can be consolidated with the other cases.  If the Supreme Court

10  tells us that it should go elsewhere, then it will go

11  elsewhere.

12      So that's my view on those questions.  And I realize there

13  is some implication to the lead plaintiff question that

14  dovetails with the consolidation issue, but we can deal with

15  that as we go.

16      So then with respect to the lead plaintiff issue, I am

17  just going to hear from the parties on that question.  I have a

18  great deal of material that's been submitted to me about who

19  stands in the best position and how we should proceed.

20      One thing that doesn't appear to be in dispute, perhaps

21  somebody can advise me to the contrary, is that at least if the

22  sole question is who has got the biggest stake in the game, it

23  does appear that Mr. Anvari is in that position.

24      Now, I understand there are arguments as to why he should

25  not be lead plaintiff and it follows his counsel should not be

1    the lead plaintiff's counsel, but there doesn't seem to be a

2    factual dispute -- actually, there doesn't seem to be a factual

3    dispute on the ranking of the plaintiffs in terms of the

4    magnitude of the interest that they hold.  But if I'm reading

5    that wrong, somebody can tell me.

6         I know there are different issues with respect, as you go

7    down the list on the Australian issue and Trigon and some other

8    questions, but it did appear to me that factually for PSLRA

9    purposes, there didn't seem to be a factual dispute.

10        So that said, let me start with -- while I've given you my

11   tentative conclusion, as I say, I won't preclude discussion.

12   If people want to tell me something -- you know, you hear this

13   from judges all the time and I will say this as well.  You

14   know, something beyond what's already in the briefing papers,

15   because I have seen the -- spent some time with what you've

16   submitted, so just repeating the briefing doesn't help me

17   particularly.  But if there is something that someone wants to

18   say on the consolidation question, now would be the time to do

19   it.

20        So who, if anyone, would like to speak on that question:

21            MR. FLEMING:  Joel Fleming of Block and Leviton, and

22   speaking in my capacity as counsel to Mr. MacDonald.

23            THE COURT:  Okay.

24            MR. FLEMING:  Understanding, I think, we gave Your

25   Honor our best arguments for why we would oppose consolidation,

1   I would just ask that if the Court does enter that

2   consolidation order, that it leave open the possibility of

3   filing separate complaints solely for the purpose of giving

4   Mr. MacDonald the ability to make a motion or some further

5   motion, but why he should get discovery rather than being

6   subject to the PSLRA stay.

7          Now, it's possible Your Honor has just decided that you

8   want to stay everything.  If so, maybe it doesn't matter.  To

9   the extent the Court still does have an open mind on that

10  question, I think it becomes harder for us once --

11          **THE COURT:**  I thought I had resolved that question by

12  virtue of the fact that you made a motion -- someone made a

13  motion for accelerated discovery and I denied it.

14         And I can tell you that I do think that what will come

15  with a -- the conclusion to consolidate is that I will not

16  entertain the idea of some -- I mean, it would be -- I

17  understand if people think that I shouldn't consolidate and

18  you've made your argument, but to then consolidate but, say,

19  you have two separate complaints and you then go ahead with

20  discovery is saying I'm consolidating with one hand and

21  reversing my decision with the other.  It rises other falls

22  together.  So, no.

23          **MR. FLEMING:**  That's fair.  I -- I thought I would

24  try.  I think, at least if we're appointed lead in the PSLRA

25  cases, we will be trying to lift the discovery stay.

1          THE COURT:  That's a separate question.

2          MR. FLEMING:  But that's a separate question and we

3     might brief the fact that Mr. MacDonald has those state law

4     claims, depending on how that all shakes out.

5          THE COURT:  I don't think that anyone is precluded,

6     even in the event of consolidation, from arguing why, if there

7     is an argument -- I will tell you, and I'm perfectly prepared

8     to take a look at whatever comes in, but -- but I am not

9     contemplating an endless process of motion practice.  And as we

10    all know, the PSLRA is telling me that discovery doesn't start

11    until we've got the final complaint in place.

12         And so I -- I am going at it with the inclination that I

13    don't think there is much of a basis for arguing it should

14    be -- that it has to go before we get that all resolved, but

15    I'm not prejudging that question.

16         MR. FLEMING:  That's fair.  I just wanted to clarify

17    and I appreciate it.

18         THE COURT:  Very well.

19    Anybody else on the consolidation question?

20    (No response.)

21         THE COURT:  Okay.  So let's talk about the lead

22    plaintiff issue.

23         And as I indicated before, we have different issues with

24    different groups.  And as I am used to now, it's -- you know,

25    it's not a band of brothers and sisters.  You all have views

1    about each other and your abilities and the like.  So there we

2    are.

3         I do ask that people -- and I think you will because you

4    are all professionals -- keep it on the very high level.  I

5    mean, these are -- all of you are officers of the court.

6    Nobody is lying, cheating and stealing.  And so I will expect

7    that there is not a lot of -- to put it in one way, not a lot

8    of pot-shots and shots in any way of each other because I don't

9    think that's very productive.

10        So I would like to encourage you to talk about why a

11   particular plaintiff and their counsel are the best, as opposed

12   to why somebody else on the -- who is proposing to serve in

13   this capacity is, you know, less than perfect.

14        So why don't we start with -- well, I'll just go down the

15   list.  Let me ask, first of all, if anyone wants to speak on

16   the tentative comments that I made about what's not in factual

17   dispute?  Is there -- is there any factual dispute about the --

18   just the objective question of who has the biggest interest and

19   who's next and who's next?

20        (No response.)

21             **THE COURT:**  Okay, all right.

22        So with that, let me just go ahead and start the Anvari

23   contingent.  And you can begin.

24        And again, Mister?

25             **MR. TA:**  Ta, Your Honor.

1          THE COURT:  Okay.  Very good.

2          MR. TA:  Thank you, your Honor.

3      Good afternoon, Your Honor.  Thank you, your Honor.

4      Your Honor, we think this is pretty straightforward.  As

5  the other competing movants have conceded, it's undisputed that

6  Mr. Anvari has the largest financial interest in this

7  litigation of all the competing movants, and under the PSLRA

8  he's entitled to a runnable presumption that he's the most

9  adequate plaintiff and, therefore, the lead plaintiff.

10         Now, Mr. Anvari's motion, as indicated by counsel for

11  GGCC, has their support, but the other three competing movants,

12  whom I'll call Trigon, the Robbins Geller Group, and the Levi

13  Korsinsky Group oppose that motion.  And, your Honor, they make

14  essentially two arguments why Mr. Anvari should not be

15  appointed lead.

16         Their first argument is that we filed in the wrong case.

17  We filed in the *MacDonald* case, which is not a PSLRA case, and

18  that we should have filed instead in the GGCC case, but that

19  argument is erroneous for several reasons, Your Honor.

20         First, it is undisputed that Mr. Anvari filed on time on

21  the lead plaintiff --

22         THE COURT:  In the *MacDonald* case.

23         MR. TA:  In the *MacDonald* case, correct, Your Honor,

24  on January 25th, 2018.

25         It is also undisputed that at the time he filed his

motion, the *MacDonald* case was -- had been deemed related to

all the other cases by order of this Court back in December of

2017.

And it's also undisputed that at the time he filed his

motion for lead plaintiff status, other movants had already

moved to consolidate *MacDonald* with the other cases.

And most importantly, Your Honor, at the time he filed his

complaint -- filed his motion, Mr. Anvari was responding to a

PSLRA notice published by the Hagens Berman firm in the

*MacDonald* case.

THE COURT:  But can you really rely on -- as I

understand it, as I look through their chain of notification,

if you will, you actually are saying you were relying on

something that was posted on the Hagens Berman site.

MR. TA:  Correct.

THE COURT:  Why should you -- that's not the

triggering notice, if you will.  It's announcing the notice.

And, granted, if you go all the way through and you end up

at the Hagens Berman site that there was reference to the

*MacDonald* case.  But why should you be entitled to rely on

that?

MR. TA:  Well, for these reasons, Your Honor.

The notice, first of all, stated:  "Hagens Berman" -- I'm

quoting from the notice:

"Hagens Berman notifies Tezos investors of

1        January 25, 2018 class action lead plaintiff

2        deadline."

3        And then the notice was undoubtedly a PSLRA notice because

4    it notified investors of the claims in question being claims

5    under the Securities Act.  It didn't mention anything about the

6    California Corporations Code.

7            **THE COURT:**  Don't you have to drill back down?

8    You're proposing to be counsel.  Isn't it your job -- you don't

9    just accept that at face value.  Maybe they -- you know, maybe

10   it's -- it was erroneous, as you indicate, that it makes

11   reference to *MacDonald* instead of the PSLRA issue.  Isn't it

12   your job to then kind of go back and figure out what the

13   triggering notice is and respond to it in a timely fashion?

14       I mean, they -- they, frankly, say I should take into

15   account in terms of the general ability of counsel that, from

16   their perspective, you kind of blew it.

17       So even if one is to say, well, you rectified it in 24

18   hours and while it's a -- you know, it is a deadline, equity

19   might kick in.  But they are also suggesting that I should take

20   into account you're proposing to lead the fight here and that

21   you right out of the gate kind of drop the ball, if you will,

22   not to mix my metaphors.

23           **MR. TA:**  Well, the PSLRA doesn't tell you when there

24   are a number of class actions that have been filed, which of

25   the class actions you have to file in.  And that's important to

1    keep in mind.

2        But importantly, your Honor, the Hagens Berman notice

3    directed investors to their website, to a dedicated website,

4    which then instructed, explicitly told investors to file in the

5    *MacDonald* case.  It listed the *MacDonald* case action number.

6        So I think it's sort of unfair to ask an investor who is

7    responding to a notice to then try to unravel everything.

8        Sure, you know, I'll concede --

9        **THE COURT:**  It's more than an investor here

10   because here -- granted, I'm choosing lead plaintiff and from

11   that under PSLRA I will be choosing lead plaintiff's counsel.

12   But it's more a question of counsel's role in digging down to

13   figure out what they need to do, as opposed to Mr. Anvari, who

14   is in the role of investor.  I understand that.

15       So why shouldn't I effectively say -- not that you, you

16   know, should be somehow sanctioned or what-have-you, but that I

17   shouldn't look at it from the perspective of does this instill

18   in me a sense that you're going to be in a position to do this.

19       **MR. TA:**  For this reason, Your Honor.  I think, at

20   most, if your Honor is -- finds that to be problematic, that we

21   filed in the *MacDonald* case, we would say that that's a foot

22   fault.  The question is:  How were the other competing movants

23   prejudiced?  They weren't.  They also -- that we filed in the

24   *MacDonald* case.

25       And just to be absolutely sure, we filed -- in less than

1   24 hours, the very next day, we filed in the GGCC case.  And no

2   one has contended that they were in some way prejudiced.

3        In fact, if we look at the Manual for Complex Litigation,

4   it describes the situation where class action firms file PSLRA

5   notices after the initial one and that it's -- it's a problem

6   because it creates confusion amongst investors.  And I think

7   this is one situation where, if there was one PSLRA notice,

8   then there wouldn't have been an issue.

9        But I think it comes back down to, your Honor, the point

10  were these other competing movants prejudiced?  I'll concede

11  that if we had filed in the right case, this wouldn't be an

12  issue and I wouldn't be spending so much time talking about it,

13  but there was no prejudice to the other competing movants.

14       The PSLRA doesn't discuss this particular situation, and

15  we filed within the deadline.  And we submit that that should

16  be sufficient.

17       Your Honor, let me address the second argument -- you've

18  touched on it -- which is, does this reflect on the adequacy of

19  counsel?

20       Your Honor, the answer to that is pretty straightforward

21  and it lies in the PSLRA and it lies in the *Cavanaugh* decision.

22  The PSLRA requires that to -- in order to rebut the presumptive

23  status of a lead plaintiff, you have to rebut with proof using

24  evidence.  And here they haven't submitted any evidence.  None

25  of the competing movants have submitted any evidence as to our

```
 1   own adequacy.  It's all assertions and insinuations in their

 2   briefs.

 3        In fact, if you look at the evidence, it goes entirely the

 4   other way.  I submit in my reply declaration we have had

 5   securities class action experience both, prosecuting them and

 6   defending them when I was at Milbank Tweed.

 7        And in terms of class actions that we have handled from

 8   beginning to end, I've personally handled at least two, *Shuffle*

 9   *Master* and *American Dental*, those class actions, and I've

10   defended a number of class actions.

11        While my co-counsel, LTL Lawyers, have not had class

12   action experience in the securities litigation space, they have

13   been appointed class action -- they have been appointed class

14   counsel in a number of class actions.  And, you know, speaking

15   for them, they are a pure litigation 30-lawyer firm.  They did

16   seven trials and arbitrations last year.  These are -- we are

17   highly qualified, Your Honor.  We are alumni of big firms.  I

18   clerked for the High Court of Australia before I started at

19   Milbank Tweed.

20        So I think, you know, it's very easy in briefs to make

21   insinuations and cast dispersions about counsel, and we tried

22   in our response, your Honor, to keep it very high level, as

23   your Honor insisted.  And I think the important point is --

24   that's the important point.  PSLRA has a mechanism for

25   rebutting a plaintiff's presumptive lead status.
```

1          Your Honor, *Cavanaugh* I think is the other important

2     point.  *Cavanaugh* explains very, very clearly what a competing

3     movant has to do.  A competing movant can't just attack the

4     opposing counsel and question their adequacy.

5          The central question under *Cavanaugh* is:  Is the

6     inadequacy of counsel somehow reflective of the inadequacy of

7     the lead plaintiff?  That is the central inquiry.

8          And the competing movants here should be familiar with

9     *Cavanaugh* because a lot of them, or their firms, are actually

10    progeny of the old Milberg Weiss firm.  It was Milberg Weiss in

11    *Cavanaugh* which argued the exact opposite of what they are

12    arguing now.

13         The Ninth Circuit agreed.  The Ninth Circuit said -- and I

14    quote, Your Honor.  It said:

15              "At the lead plaintiff stage, the Court must keep

16         firmly in mind that the inquiry is not into the

17         adequacy or fitness of counsel, but into the adequacy

18         of plaintiff and the choice of counsel is only an

19         indicator, and a relatively weak one at that, of

20         plaintiff's fitness."

21         And so the Ninth Circuit explained, Your Honor, that the

22    situations in which the adequacy of counsel will rebut the

23    adequacy of the lead plaintiff are extremely limited.  And

24    those situations are where evidence is presented that the

25    choice of counsel is, and I quote again from *Cavanaugh*:

1          "So irrational or so tainted by self-dealing or

2      conflict of interest so as to cast genuine and serious

3      doubt on that plaintiff's willingness or ability to

4      perform the functions of lead plaintiff."

5          And by the same reasoning, the Ninth Circuit explained

6   that in the situation where a Court has questions about the

7   adequacy of lead counsel, the Court should advise the lead

8   plaintiff of the Court's concerns and then leave it up to the

9   lead -- to lead plaintiff, the presumptive lead plaintiff, to

10  re-select counsel.

11         So that's the framework under the PSLRA --

12         THE COURT:  Let me ask you.  In that regard, the

13  Hagens Berman firm is suggesting that -- and this is where it

14  does dovetail a little on the consolidation question.  If, as I

15  am inclined to do, I consolidate the *MacDonald* action in with

16  the PSLRA actions, they are suggesting that they ought to be --

17  they would prefer the non-consolidation route.  But if it is

18  consolidated, they should be interim class counsel on the state

19  claims, if you will.

20         What's your reaction to that proposition?

21         MR. TA:  I don't see any role for that, Your Honor.

22  I don't think that makes sense practically.  Your Honor has

23  expressed your Honor's doubts about that, that course, earlier

24  this afternoon.

25         THE COURT:  Well, I expressed some doubt about

1   whether or not there would be arguments available to accelerate

2   the discovery and carve it out of the PSLRA status, but I

3   didn't necessarily say that there is no -- there is no

4   distinction between the *MacDonald* claims and the PSLRA claims

5   that would, perhaps, not warrant additional counsel appointment

6   to focus on those claims.

7           **MR. TA:**  Well, I would say that the classes overlap.

8   The California class is completely subsumed by the class, the

9   federal class.

10      And I would say this, Your Honor.  The idea that the state

11  claims, the state plaintiffs can go ahead and get discovery in

12  advance of the federal plaintiffs, I think that's -- that's

13  really a phantom argument because Your Honor has already

14  questioned the sensibleness of going ahead and giving discovery

15  in the state case when there are questions about jurisdiction,

16  whether personal jurisdiction or whether the securities laws of

17  the United States extend to some of these claims.

18      So they are going to be behind anyway waiting for those

19  jurisdictional questions to be answered.  So I don't think they

20  are going to get any discovery that's going to be advantageous

21  compared to the federal case.

22      So I think that's the response we would make, Your Honor.

23          **THE COURT:**  Do you think once discovery is opened

24  after the PSLRA process is done, and assuming a consolidated

25  complaint survives and the case proceeds, then you think there

is no -- because the claims overlap in terms of the state claims and the federal securities claims, that then you don't need any separate counsel.

      **MR. TA:**  That's right, Your Honor.  That's correct.

      **THE COURT:**  Okay.

      **MR. TA:**  Your Honor, on the adequacy point.  I know I've taken up a bit of your time, but I would like to be absolutely candid with Your Honor.

      You know, were there some careless drafting errors in our notice of motion where we referred, for example, to the Exchange Act instead of Securities Act?  Sure, there were.  And I'm going to own those.  I'm going to own that.  They shouldn't have been made.

      But, again, the question under the PSLRA and under *Cavanaugh* is:  Do those typographical errors in our notice of motion rise to the level where they cast doubt on the adequacy of Mr. Anvari?  And I don't think the competing movants have discharged that burden.

      I would say this, Your Honor.  The opposing law firms clearly resent the fact that someone different, someone outside the usual suspects stands to be appointed lead plaintiff, and you can see that from the -- what I would describe, the viciousness of some of the statements that were made in their competing motions.

      But the PSLRA is not a weapon to be used to lock out

```
 1   competing plaintiffs.  It is not -- its purpose was not to

 2   entrench before the federal court, entrench a securities class

 3   action group of firms before the federal courts of this

 4   country.

 5        What it's entire purpose was was to take the litigation,

 6   class action securities actions out of the hands of lawyers and

 7   put them in the hands of sophisticated plaintiffs.  And that's

 8   what Mr. Anvari is in this case.  He's a lawyer.  He's a

 9   corporate lawyer.  He's worked at big firms, has an acute

10   understanding of Tezos currency and then other

11   cryptocurrencies.  He's a full-time cryptocurrency trader now.

12        And in contrast, Your Honor, some of the competing

13   movants, they are groups.  They are groups of individuals who

14   have been cobbled together by their attorneys and presented to

15   this Court as a cohesive group.  And the attorneys have put

16   them on conference calls to give them the semblance of having

17   even spoken to each other prior to the motion for lead

18   plaintiff status.

19        And let's call it for what it is.  It's a sham.  It is a

20   complete sham.  It is an end run around the purpose of the

21   PSLRA, which was designed to curtail lawyer-driven litigation.

22        And here we've got Mr. Anvari, who is sophisticated.  He's

23   analogous to an institution -- a sophisticated institutional

24   lead plaintiff.  Counsel was adequate and highly skilled and

25   we're motivated, Your Honor.
```

1        And we think that for all the reasons I've discussed and

2   the reasons set forth in our brief Mr. Anvari should be

3   appointed lead plaintiff and his counsel should be appointed

4   co-lead counsel.

5        And those are my submissions, Your Honor, unless you have

6   any further counsel.  Thank you.

7            **THE COURT:**  Thank you.

8        Let me go to the Block and Leviton.

9            **MR. FLEMING:**  Thank you, your Honor.  My firm Block

10  and Leviton represents Trigon, which is second again.  There is

11  no kind of dispute in the ranking.

12       So there are sort of two questions that you have to answer

13  for us.  The first is whether Mr. Anvari is disqualified by

14  these issues we have been discussing.  The second is Trigon's

15  Australian citizenship, are, I think, the two key issues.

16       I will spend more of my time on Mr. Anvari because we

17  didn't get the explanation for the late filing until the reply,

18  so that's not addressed as thoroughly in our papers.

19       Mr. Ta suggested a moment ago the PSLRA doesn't tell you

20  which case to file in and, respectfully, that's not true.  The

21  language of the statute, this is 15 U.S.C. 77(z)(1)(A)(i) says:

22            "The provisions of the subsection shall apply to

23       each private action arising under this subchapter."

24       In other words, the Securities Act of 1933.

25       So the provision requiring that a lead plaintiff motion be

1    filed by the 60-day deadline from the notice applies to cases

2    arising under the PSLRA.

3            THE COURT:  Let's step back for a moment.  The whole

4    point of this is to protect the plaintiff investors in the

5    PSLRA case.

6            MR. FLEMING:  Absolutely.

7            THE COURT:  This -- at its worst here, this defect,

8    if you will, was rectified within about 24 hours.  So to invoke

9    this as some sort of bar is to, I don't think, particularly

10   protect the plaintiff investors.  It's for some grander concept

11   of the deadline is the deadline.

12       But in the cases in which there -- there has been

13   litigation, I know there may be one or two where it's this

14   short a period, most of the time there are longer periods in

15   which there has been a failure to perform consistent with the

16   statute.

17       Here, this is a bit of a "gotcha" game here of, oh, you

18   missed it by 24 hours, so you're out.  And that doesn't seem to

19   me to be consistent with the policy of the statute.

20           MR. FLEMING:  I agree that ordinarily a

21   one-day-deadline -- missing a deadline by one day isn't fatal

22   and perhaps it's not consistent with the policy of the statute,

23   but it is consistent with the words of the statute.

24       And so in the *Schwartz* decision from the Southern District

25   of New York, which is cited in our papers and, I think, the

1   other papers, someone did miss it by one day and the Court

2   said:  It may be a harsh result.  It may be, you know, not in

3   accord with sort of broader notions of equity, but the statute

4   is very clear.  But it's -- Courts have used the words

5   "mandatory," "unequivocal," words like that; "strict," words

6   like that.

7           **THE COURT:**  Of course, though, it's not because other

8   Courts have, in certain circumstances, found that the -- that

9   they have concluded that in an application of the time deadline

10  they are not going to do.

11      So there is an out around it.  I mean, it's certainly not

12  the case that Courts have taken the position that they won't

13  even look at the circumstances.

14          **MR. FLEMING:**  So I think Courts do look at the

15  circumstances.  I think the circumstances that Your Honor is

16  referring to involve someone who filed a complaint before the

17  deadline but didn't move, and I think that does bring you

18  within the language of the statute.  It involves someone who

19  did file a motion, but there was an issue where a signature was

20  missing on an accompanying certification or something like

21  that.

22      I don't think, and I don't think Mr. Anvari has cited,

23  that there has ever been a case where someone just utterly

24  failed to file in the case.

25      And I think there is -- there was a suggestion that there

1    was no prejudice to movants.  I'm not entirely sure that that's

2    correct.  People do -- are entitled to make decisions at the

3    time that they move of who the other movants are.

4         And so here Trigon just moved on its own, but other

5    plaintiffs sometimes will make decisions about whether they

6    choose to move individually or as part of a smaller group,

7    recognizing that Courts don't always allow groups.  They do do

8    that with the information that they have about the motions that

9    have already been filed.

10        **THE COURT:**  But in this case no one is prejudiced

11   because at most somebody would say:  Oh, now I see these people

12   in there.  I will take myself out.  As opposed to:  Oh, I would

13   jump in if I had known.

14        That's not the case here because where would anyone have

15   been disincentivized from putting their name forward because of

16   this particular problem.

17        **MR. FLEMING:**  It's possible two people would have

18   decided to join together in order to aggregate their losses.

19   It's -- it's --

20        **THE COURT:**  That's pretty farfetched.

21        **MR. FLEMING:**  I -- but this is what the language of

22   some of the cases say.  Your Honor may not agree, but some

23   cases do say that there is a prejudice and that that's why the

24   notice requirement is there.

25        But I agree, our stronger argument is simply it is the

```
 1   language of the statute.  Other Courts have said it is
 2   mandatory and unequivocal.
 3        Even if Your Honor does consider the circumstance, I do
 4   think the real argument -- Mr. Ta used the words most
 5   importantly was this idea that Anvari and his counsel were
 6   somehow misled by the Hagens Berman press release.  I'll defend
 7   the honor of our co-counsel in the MacDonald action.  There is
 8   nothing misleading about either the release or the website.
 9        The release, if you look at the language, is talking about
10   the PSLRA cases.  It's saying a case has been filed, which is
11   true under the Securities Act of 1933, talking about this case
12   or the Okusko case.  And then the release is talking about our
13   case in MacDonald.  And if you read the language of the -- I'm
14   sorry, the website.  If you read the language of the website,
15   it says that this is a case filed under, quote, California's
16   Corporate Securities Law of 1968, California's Unfair
17   Competition Law.
18        So just reading the website, nothing else, that should be
19   enough to sort of have the light bulb go off.
20        But it goes beyond that because the local rules of this
21   district, 3.7(c) say that when you have a movant like
22   Mr. Anvari, who hasn't filed a complaint, they are not required
23   to file a full certification.  You saw that in the papers.  But
24   what they are required to do is say:  I've reviewed the
25   complaint that I'm filing in and I either adopt all of its
```

allegations or I adopt some of the allegations and not others.

So it's not -- they were simply not entitled under the local rules of this district to rely on a website.  So even if it was confusing or ambiguous, Anvari and his counsel were required to go read the language of the complaint in the case that they were moving in.

Had they done that very basic step that's required by the rules, they would have seen, oh, the *MacDonald* case is filed only under state securities claims.  I don't think there is any dispute that the PSLRA didn't apply in the first instance there and they would have filed in the right case.

So I do think the far more likely inference is that this was a mistake borne of, I'll say high level.  But a mistake borne of inexperience with not having filed a lot of PSLRA cases.  I think that's the more likely inference.  Not that it was anything nefarious with respect to the Hagens Berman release.

THE COURT:  Under the PSLRA criteria for assessing the -- first the lead plaintiff and then the lead plaintiff's selection of counsel, it isn't just a question -- and I think you agree with this -- of who convinces the Court they are the most skilled counsel.  It is whether or not the counsel that the lead plaintiff has selected is, for want of a better way to describe it, within the bounds of competent, able counsel.  And isn't that my inquiry?

1          I mean, no one disputing, and Mr. Ta I think acknowledged,

2     that there isn't as much experience perhaps on their side as

3     some of the other counsel that are proposing to act as lead

4     counsel.  But that's not the question, right?

5          Do they pass the threshold test of being attorneys who are

6     in a position to represent the lead plaintiff if Anvari was

7     chosen as the lead plaintiff.

8              MR. FLEMING:  I agree.  I think *Cavanaugh* sets that

9     sort of a binary test.  Are they good enough, not who is the

10    best.  I would agree with that.

11         Our papers didn't raise the *Cavanaugh* -- I think it's kind

12    of ugly.  Your Honor has -- Your Honor has enough information

13    about and I think is required by *Cavanaugh* to make that call.

14    I don't know that there is anything I'm going to add on that.

15         I think Anvari's counsel clearly do have less experience

16    than the other firms.  I don't want to cast dispersions, but I

17    do think -- the one thing I will say on that, and other counsel

18    do argue *Cavanaugh* and I think will come up here and may have

19    more to say on that.

20         I do think that you can consider that when you consider

21    MacDonald's request to appoint Hagens as co-lead for the state

22    law class.  So if we are appointed -- if Block and Leviton is

23    appointed to lead the PSLRA cases, we would like Hagens as our

24    co-counsel.  We have a lot of securities law experience and we

25    have a California office but we chose to partner with Hagens

1   Berman because we have a lot of respect for that firm.  Reed

2   Kathrein has been doing this for 30-plus years and has had

3   great success.

4        If you appoint Anvari and his counsel to lead the class, I

5   think the force of the requirement, I think the class would be

6   even better served by having Hagens Berman there, a firm that

7   does have extensive experience.

8            **THE COURT:**  Again, I think you're touching on a good

9   point.  We heard the initial arguments about why the state

10  claims should be out from under the PSLRA.  Okay.  Once that

11  issue is called one way or the other, then there is overlap

12  between the California securities claims and the federal

13  claims.  In fact, indeed, the California courts look to the

14  federal court.

15       So I'm not sure what special expertise -- this is not a

16  case where you have a -- one set of claims which really are,

17  you know, a whole host different than the other set

18  necessitating counsel with different skill sets and experience.

19  I don't really see that here.

20       I mean, if you -- if you can do a federal securities case,

21  probably you get up to speedy pretty quickly.  You read a

22  different set of decisions, California state decisions, the

23  Supreme Court of California maybe as opposed to the Ninth

24  Circuit.  But, you know, at the end of the day I'm not sure

25  we're that specialized in terms of counsel.

1          **MR. FLEMING:**  I agree that there is -- I'm not saying

2    Hagens has any specific -- California specific.  I'm just

3    saying that they are a good firm with securities generally --

4          **THE COURT:**  I'm willing to stipulate that they are a

5    very fine firm.

6          **MR. FLEMING:**  What I will say -- you're welcome,

7    Daniel.

8        What I will say is that there is significant overlap

9    between the federal and California claims.  But because this is

10   very new technology and the statutes are written differently,

11   sometimes one statute might reach one particular defendant and

12   not another.

13       And so, frankly, we haven't seen the arguments defendant's

14   are making.  We haven't briefed it, but I do think there are

15   differences in the way the statutes are written; that the

16   California claims might reach out and grab a defendant who

17   participated more tangentially that the federal statute might

18   not or vice-versa.

19       So I do think that there is value in having separate

20   representation for those claims.

21          **THE COURT:**  Let me direct you to the Australian

22   question.

23          **MR. FLEMING:**  Yes.

24          **THE COURT:**  And let me just ask you first, and you

25   can tell me if the analysis that I think I have to do is --

1   whether I'm understanding it correctly.

2      The question is not ultimately if a defendant would

3   prevail in the argument that -- if I can put a label on it, the

4   extra territoriality argument, but, rather, whether or not it's

5   a significant enough defense even if I, upon looking at it,

6   think that the -- that the plaintiffs would prevail on the

7   defense.  If it's a defense that's going to cause litigation of

8   any consequence, that that is something I can take into account

9   in determining whether or not that plaintiff is perhaps not the

10   best plaintiff to be the lead plaintiff.

11       **MR. FLEMING:**  Yes.  I don't know that I agree that

12   the test is litigation of any consequence.  I think it's sort

13   of a sliding so --

14       **THE COURT:**  Well, you tell me what it is.

15       **MR. FLEMING:**  I think it's sort of a sliding scale.

16   I think as the defense becomes more significant, the

17   atypicality concern becomes -- becomes more significant.

18      So, and there are really two Australian issues.  There's

19   *Morrison* and then there's this idea that no foreign investor.

20   So I will take those in order.

21       **THE COURT:**  Okay.

22       **MR. FLEMING:**  With *Morrison*, it is a case -- I expect

23   defendants to cite it.  I genuinely don't think there is much

24   merit to the argument.

25      People have been appointed, foreign investors have been

1    appointed post *Morrison*, as long as it's a domestic

2    transaction.  And I don't really think there is much question

3    about the analysis that this Court will apply to determine

4    whether it's a domestic transaction.

5        The Ninth Circuit has given -- it's not a holding, but

6    it's pretty strong guidance that this Court should look to the

7    Second Circuit's decision in *Absolute Activist*.  And that's

8    been applied outside of the Second Circuit in sort of token ICO

9    sort of scenarios.

10       What the Second Circuit said in *Absolute Activist* is that:

11           "A transaction is domestic for *Morrison* purposes

12           if a seller incurs irrevocable liability to deliver a

13           security in the U.S."

14       The only analysis of the facts that anyone has offered as

15   to who the seller is and what the security is is that the

16   security -- and defendants will say it's not a security at all,

17   but leaving that aside, it's the token.  It's the token that

18   exists on the Tezos block chain, which is often in the ether.

19       But the company that owns all of the source code for the

20   Tezos block chain.  The company that owns all of the

21   intellectual property.  The company that has committed that it

22   will create and release and issue the tokens before it can get

23   any funds from the foundation is DLS, Dynamic Ledger Solutions,

24   California headquartered, Delaware incorporated.

25       Perhaps defendants are more creative than the folks on our

1    side, but no one has -- we put that in our opposition precisely

2    to sort of tee it up and give people the opportunity to come in

3    in their reply and say:  No, no, no.  There is this other case.

4    No, no, no.  This is how you look at the facts.  Nobody did

5    that.  We put it in our opposition and in the reply they just

6    say *Morrison*, *Morrison*, *Morrison*.  Kind of pound the table and

7    don't go any farther.  They don't suggest who the other seller

8    might be.  They don't suggest what else, the other security

9    being delivered might be.

10       If you looked at the -- at *Traffic Monsoon* decision out of

11   the District of Utah that we cite, I think it's close.  Every

12   token is a little different.  It's pretty close on point.

13       In *Internet Security* the Court found because the issuer

14   was based in Utah -- this was a domestic transaction -- that

15   there was no *Morrison* problem.

16       Unless Your Honor has other questions on that?

17           THE COURT:  No.

18           MR. FLEMING:  The second sort of Australian issue was

19   this idea that foreign investors are always atypical.  And

20   these are citing a handful of cases where competing movants

21   came in with affirmative evidence.  It's their burden.  They

22   came in with affirmative evidence that this particular country,

23   Cypriot or France doesn't recognize U.S. judgments.  No one has

24   done that here.

25       In fact, the only evidence we have about whether Australia

 1   recognizes U.S. judgments is that we've put in some treatises

 2   saying yes, they do.  It's a common law country.  So I don't

 3   think that is a concern.

 4        The one other thing I will say, that there were some sort

 5   of minor quibbles about our certification, the fact that we

 6   didn't list the officers, who happen to be Australian lawyers.

 7   We mooted all of those.  We've cited a bunch of cases that say

 8   you can do it.

 9        If Your Honor has concerns or questions, I'm happy to

10   address them.

11             THE COURT:  You've rectified those issues.  Thank

12   you.

13             MR. FLEMING:  Fair enough.  Thank you.

14             THE COURT:  Okay.  Let's go to the Gaviria Group.

15   Robbins Geller, Silver Miller folk.

16        MS. MYERS:  Danielle Myers of Robbins Geller.  Good

17   afternoon again, Your Honor.

18             THE COURT:  Good afternoon.

19        MS. MYERS:  I want to stay high level, big picture

20   for you and, also, respond as to a couple of the Court's

21   comments that I think are kind of driving it, where maybe the

22   inflection points are going to be in this decision.

23        I want to start first with my clients.  I wanted to point

24   out that only one movant has challenged our ability to serve as

25   lead plaintiff.  Anvari did not challenge us or oppose our

1    motion.  Neither did Trigon, other than the fact that we don't

2    have the largest financial interest.

3         I want to point out that this Court in the *Sun Power*

4    decision, as your Honor knows, said that a pre-litigation

5    relationship is not required.

6              **THE COURT:**  Not required, that's true.

7              **MS. MYERS:**  Correct.

8              **THE COURT:**  But I did go on to note that it's --

9    you've got some explaining to do if it is an amalgam of

10   otherwise unconnected people.

11             **MS. MYERS:**  Right.  And respectfully, your Honor, we

12   think we've done the explaining to do.  We explained the basis

13   for three.

14        They purchase both -- or they exchanged both Bitcoin and

15   the Ethereum in the Tezos offering, which was a natural reason

16   for why you need both.

17        And stepping back, I think Your Honor has heard a lot

18   about this case today and the California claims and the federal

19   claims.  And we respectfully submit to Your Honor that at the

20   end of the day in any consolidated complaint you're going to

21   see in 60 days or 45 days, you are going to see three

22   plaintiffs.  You're going to see a lead plaintiff and two

23   additional plaintiffs.  And here is the reason why.

24        You're going to need a Bitcoin investor.  And both of the

25   top two investors only purchase one type of the cryptocurrency

 1    here.

 2            THE COURT:   Why can't someone who invested with

 3    Ethereum, why can't they also represent the interests of

 4    Bitcoin?   That's simply the funding source.   And it will have

 5    some valuation issues, obviously, but it doesn't seem to drive

 6    the essential claims of whether or not there was unregistered

 7    securities, fraudulent conduct, all the rest of it.

 8            MS. MYERS:   Right.   So this is kind of unchartered

 9    territory, Your Honor.   No one has brought these cases before.

10    These are brand new securities or not securities, as you're

11    going to hear a lot about I'm sure.   And we don't know how this

12    is going to break.

13            THE COURT:   I recognize that, but just -- and you can

14    speculate for me on this.   Why would the funding source, which

15    is what this is, Bitcoin or Ethereum is in this instance, am I

16    correct in characterizing it as the funding of the investment?

17            MS. MYERS:   Right, right.

18            THE COURT:   Why does that matter?   If you pay in

19    euros and somebody paid in dollars, I mean, would you then say:

20    Oh, we need a euro group and we need a dollars group?   I can't

21    imagine that you would.

22            MS. MYERS:   Different values, different exchanges.

23    There is variations.   And based on our experience in securities

24    litigation generally, we've seen things develop many years down

25    the line where no one even thought of it on day one.

1          I was talking to my colleague preparing for the hearing

2     today and we were talking about the mortgage backed securities

3     cases, which is a perfect example, very analogous to this

4     situation, where on day one when those cases broke and people

5     started filing 1933 Act cases, no one knew that eight years

6     later you needed to have tranche-based standing in this big

7     mortgage backed security.  No one knew that.  No one had

8     developed that law yet.  You're talking about 80-year-old law

9     that you're trying to fit to something that -- cryptocurrency

10    didn't exist back in 1933, just as mortgage backed securities

11    didn't.

12         So we're suggesting to you on day one the best interests

13    of the class is to have a broader representation.  Any of these

14    lead plaintiffs, they represent the class.  They are a

15    fidicuary for absent class members.  It's in their interest to

16    protect everyone.

17         **THE COURT:**  Well, I understand.  But drawing the

18    distinction -- the general premise you set forth I don't have a

19    problem with, but, you know, the -- each of these investors

20    there are all sorts of distinctions between them because they

21    are different people.  And you're drawing a distinction that

22    I'm not saying you're wrong, but I just am trying to think

23    where the Bitcoin versus Ethereum use of funding is ever going

24    to be an issue under any circumstances.  And you say:  Well, we

25    don't know.

1     Well, we don't know if, you know, all sorts of other

2 distinctions between these plaintiffs might somehow some day be

3 of some consequence.  And I'm just having trouble seeing where

4 that could really be a determinant factor on how the case

5 resolves, but maybe -- I'm not saying you're wrong.

6     The case you just -- when you're talking about mortgage

7 backed securities, we can, with hindsight, see why there are

8 certain different postures of plaintiffs that will have some

9 effect, but here I just -- I don't --

10     **MS. MYERS:**  To the extent Your Honor, somewhat

11 analogous as well, although not perfectly again because this is

12 unchartered territory, you know, take your regular 10(B) case.

13 You've got a case on behalf of purchasers of securities.

14 You've got someone that has options that are tied to stock, but

15 you also have stock.  Trade at different values.  You've got

16 different concerns.  Different variables where when you get to

17 the end of a settlement, as your Honor is well aware, you've

18 got plan of allocation issues because the dates are different

19 at which the value is different.  They fluctuate.  They don't

20 trade in tandem, I guess is what I'm saying.

21     **THE COURT:**  If you had a securities case, I can't

22 imagine that you would make any kind of subclass or distinction

23 between, say, people who use U.S. dollars and people who used

24 some other currency.

25     I just would never say:  Oh, I need counsel who will

1    represent the euro investors, as opposed to the dollar

2    investors.

3            MS. MYERS:  Well, we can't any more because of the

4    gift of *Morrison*, but your analogy --

5            THE COURT:  You know what I mean.

6            MS. MYERS:  I do.  And the problem is that class

7    certification and settlement, Your Honor, if you take my

8    options and stock analogy, you do need a representative.

9            THE COURT:  Options and stock are very different.

10           MS. MYERS:  Correct.  So I'm suggesting that it could

11   be that this develops that way.

12       I want to bring it back to the point that there was a

13   rationale for why there is more than one.

14           THE COURT:  Let me ask you on a slightly different

15   issue, but just so that I understand again just the objective

16   facts.

17       The amalgam that we're talking about here of the group

18   that you're proposing Lang, Coffey and Gaviria, what -- if I do

19   agree they can all be taken together, the effect of that is not

20   that you move up in terms of just skin in the game, if you

21   will, above Trigon and Anvari.  It means you move up ahead of

22   Tezos investors and GGCC.

23           MS. MYERS:  We are already above them individually or

24   collectively, your Honor.

25           THE COURT:  So what does the amalgam matter here?

1          MS. MYERS:  It doesn't, Your Honor.

2          THE COURT:  Okay.

3          MS. MYERS:  It doesn't at the end of the day.

4    Individually or collectively, every single one of our

5    plaintiffs or movants have a larger financial interest than the

6    group behind us.

7          THE COURT:  So I don't really even have to reach the

8    question of whether or not you can go as a group or go alone.

9          MS. MYERS:  We submit no, you don't.  We advocate

10   that we are a good group, but you don't have to get there.

11         THE COURT:  I suppose if I thought it was disabling

12   to have a group that didn't have any pre-relationship, then I

13   would just pick one of your three.

14         MS. MYERS:  Correct, Your Honor.

15         THE COURT:  I understand.

16         MS. MYERS:  Correct.

17         THE COURT:  Go ahead.

18         MS. MYERS:  And the next three movants behind Anvari

19   and Trigon are groups of three investors.  So if you decide

20   that we're not a good group, so goes the rest.

21         And then, yes, within our group we have the largest

22   individual financial interest.  So -- and then we also have the

23   second largest.  So it would be us regardless.

24         The final reason on the group was for the California

25   claims, and this hasn't been made, this point yet.  You will

1    need a California resident to assert those claims.  Obviously,

2    *MacDonald* is in the mix.  That assumes that someone will be

3    willing to work with *MacDonald* and their counsel.  I'm assuming

4    that *MacDonald* will not want to abandon their choice of Hagens

5    Berman as counsel.

6         So that gets a little bit more to your consolidation

7    concerns and can we just have all this together.  Mr. Anvari,

8    as I understand it, is a resident of Chicago.  So he cannot

9    bring those claims directly.  He can partner with *MacDonald*, if

10   he so chooses and they so choose.

11        One of our group members --

12            **THE COURT:**  Ultimately the -- if that is the route

13   that's chosen, there could be a request to substitute a new

14   class representative for California claims.

15            **MS. MYERS:**  Absolutely, Your Honor.  I just want to

16   point out that one of our group members is a resident of San

17   Diego.  So he also has standing for that, that claim.

18        I also wanted to touch on just a few things that the Court

19   mentioned earlier today.

20        The issue with Mr. Anvari, the Court kind of said right

21   out of the gate:  You dropped the ball, and isn't that the

22   focus.

23        And they said:  Look, it's not about prejudice.  Right?

24   It was one day late and we filed first thing in the morning.

25        And I admit it's not about prejudice.  It's not.  It's

1    about the baseline eligibility under the statute.

2         And he also said that we have to come forward with proof

3    to rebut the assumption.  And I respectfully submit, Your

4    Honor, they have to show they are eligible for the presumption

5    first.  They have to trigger it.  And the very first thing --

6         THE COURT:  Well, in a way what they say -- not

7    entirely, but in a way what they say is there can be a spirited

8    argument on whether or not there was a mistake or not a

9    mistake, but it's not as if they did nothing until 24 hours

10   after and then suddenly something happened.  They did act.

11        Your argument and the argument of some of your colleagues

12   is they screwed it up when they did it, but this is different

13   than a situation where the time ran and then they come and say:

14   Oh, forget about the time.  Just ignore that.  We're here.

15        They did something.  One can argue they didn't do the

16   right thing, but in the grand scheme of lawyers making mistakes

17   that's a pretty small one frankly.  I see a lot worse pretty

18   regularly.  So there we are.

19        MS. MYERS:  Right.  So turning back, also, to what

20   *Cavanaugh* says.  *Cavanaugh* says that the District Court must

21   follow the words of the statute.  And just because the District

22   Court thinks that another arrangement might fit the goal of the

23   statute, the Court has to follow what the statute says.

24        And there has been a lot said about, you know, the fact

25   that the Hagens Berman notice was not the statutory notice.  It

```
1   did not tell anyone to file in the MacDonald case.  And
2   the practical point --
3            THE COURT:  Don't you think -- it's a very different
4   proposition.  That would be a stronger argument if nothing had
5   been done and its 24 hours too late they come into the fore.
6   And then you say:  Well, as a matter of equity, 24 hours.  But
7   your argument there would be:  Listen, the statute says what it
8   says.  You know, that's just the way it is.
9        This is a slightly different case where they did take
10  action.  One can argue their action was not -- turned out to be
11  not the right choice, if you will, but that's where it's --
12  where they didn't sit on their rights.  They did something and
13  it's more akin then to those cases where you have effectively
14  been able to relate back.
15           MS. MYERS:  I agree, Your Honor.  It's not as if --
16  it's not as egregious as if they had done nothing.
17       I have two points to that point that are pretty practical,
18  I think.  Your Honor had six other motions that were properly
19  filed.  So six other movants and law firms were able to figure
20  it out.  They were not.
21           THE COURT:  Well, candidly, as we just heard, they
22  acknowledged that they had to fix their certification.  They
23  didn't include all the Australian entities or whatever.  Those
24  things do happen.  And so --
25           MS. MYERS:  They do, your Honor.
```

1            **THE COURT:**  So that's two of the firms had to repair

2    some of what they did.

3            **MS. MYERS:**  They do, Your Honor, but I want to step

4    back and give Your Honor another perspective.

5        Your Honor has to see all kinds of cases, civil cases,

6    criminal cases, everything under the sun.  And most of us at

7    both of these tables specialize in securities class action

8    litigation specifically.  This is all we do.  We get into the

9    weeds about it.  We're geeky about it.  We love it.  We know

10   everything about it.

11       I have personally been practicing in the lead plaintiff

12   area for a decade.  I've seen approximately 2,000 lead

13   plaintiff motions, give or take.  I have never seen this

14   scenario with Mr. Anvari where it was misstep after misstep

15   after misstep after misstep, to the point where there was even

16   a sur reply set of declarations filed five days after our reply

17   brief deadline where they still couldn't quite get it right.

18       And that's the bigger *Cavanaugh* point.  That's the bigger

19   PSLRA point, Your Honor, is that every single step of the way

20   they fumbled the ball.  Every single step.  And as the lead

21   plaintiff movant, they are asking to be charged with that

22   precious ball on behalf of the class and not fumble it.

23       And, Your Honor, if we're vigorously fighting for the case

24   as plaintiff's lawyers, can you imagine what will happen to

25   that lead plaintiff when the defense team gets a crack at it?

1    They are very accomplished lawyers.  If we have been able to

2    point this out to the detriment of the class, already at day

3    one when no one else is relying on them, what's going to happen

4    when you give them the real ball?

5         And that's the concern I think you're hearing from the

6    rest of us, Your Honor, is you've got a chance on day one to

7    say:  Yes, you have the greatest financial interest.  However,

8    you have fumbled at every opportunity.  And they are not

9    meaningless fumbles.  They are basic fumbles.

10        And so if you're being charged with a significant case

11   that's the first of its kind that will set the law for the rest

12   of these kinds of cases, you should have some experience in

13   securities litigation.  You should not bungle it out of the

14   gate and then out of the next gate and out of the next gate.

15        And that's the adequacy point, Your Honor.  That's what

16   *Cavanaugh* talks about.  *Cavanaugh* says when you select a lawyer

17   who is fresh out of law school, that reflects on your adequacy.

18        Now, obviously, that's not the case here, but that is the

19   broader theme, is the selection of counsel reflects on the lead

20   plaintiff's adequacy.  And we submit, Your Honor, that it does

21   reflect on his adequacy in this case because of the series of

22   bungles from start to finish, Your Honor.

23             **THE COURT:**  Okay.

24             **MS. MYERS:**  Thank you.

25             **THE COURT:**  Thank you.

 1          Levi Korsinsky, or should I say Tezos Investor Group.

 2              **MR. ENRIGHT:**  Donald Enright, Your Honor.  Pleasure

 3    to be before you again.

 4          Your Honor, a lot of what I had intended to say has

 5    already been covered by other counsel, so I'm going to try to

 6    keep it to the high points.

 7          First, I'd like to talk a little bit about my clients.

 8    You've talked about the order of -- the pecking order, so to

 9    speak, in terms of the numbers.  And I agree there is no

10    dispute that out of five, the Tezos Investors Group has the

11    fourth largest nominal interest in this litigation.

12          But this isn't just about the numbers, obviously, as we

13    have been discussing here today.  The Court has serious

14    obligations at this point to look at the Rule 23 issues,

15    particularly in a complex case that's going to have some novel

16    issues to make sure that the --

17              **THE COURT:**  Well, let me stop you.

18              **MR. ENRIGHT:**  Okay.

19              **THE COURT:**  If you're writing the statute afresh,

20    maybe you would say that that ought to be the law.  But

21    isn't -- isn't the law in the PSLRA world that no matter how

22    novel, no matter how unique the case may be, I'm not looking at

23    the same criteria I would look at in a -- in a case that's not

24    PSLRA.

25          By that I mean once we determine who the biggest -- who's

 1   got the biggest stake, then the analysis of the counsel that

 2   individual or group has chosen is really a threshold question,

 3   not a who is going to take this really unique case forward.

 4          **MR. ENRIGHT:**  I agree, Your Honor.  It's not a beauty

 5   contest.  It's a threshold issue.

 6          **THE COURT:**  Yes.

 7          **MR. ENRIGHT:**  And do you pass this threshold.

 8       But it's not just the law firms that have to pass the

 9   threshold.  It's also the lead plaintiffs themselves or the

10   proposed lead plaintiffs themselves.

11       So my argument here today, Your Honor, is that the three

12   movants that are ahead of us, not necessarily just because of

13   their counsel, but either because of the lead plaintiffs

14   themselves or -- or a combination of the lead plaintiffs and

15   their counsel, are disqualified as either atypical or

16   inadequate or both.

17       Now, the Tezos Investors Group that I'm here representing

18   today is comprised of Nicolas Andreasson, Paul Martin and

19   Richard Reckenbeil.  They have a pre-existing relationship, two

20   of them do.  Mr. Reckenbeil and Mr. Andreasson had a

21   preexisting relationship.  They have been friends and they

22   actually coordinate their cryptocurrency investments.

23       So they do have a pre-existing relationship, Your Honor.

24   And I think it's important to note that together the two of

25   them with the pre-existing relationship do have a larger

1    financial interest than anybody in the Gaviria Group.  And I

2    don't think there is any question that it would be appropriate

3    to aggregate their losses.

4         Moreover, Your Honor, this group of three, when they came

5    to us, we asked them:  Well, what is your interest?  Given the

6    size of your losses, we don't know that it's going to be enough

7    to be competitive for lead.  Do you want to talk to other

8    plaintiffs about putting together a group?  And they said yes.

9    And that's how Mr. Martin came into it.  Mr. Martin has a

10   substantial loss himself.  And he's a highly experienced

11   cryptocurrency trader.

12        They got together.  They had conference calls both with

13   counsel on the line and themselves.  They put together, with

14   our help, a joint declaration stating that they have exchanged

15   phone numbers.  They have connected in social media.  They have

16   exchanged email addresses.  They are all here today in the

17   courtroom.

18        Can you gentlemen just stand up and say hello for a

19   moment?

20        (Nicolas Andreasson, Paul Martin and Richard

21         Reckenbeil rise.)

22             **MR. ENRIGHT:**  They are all three of them here today.

23   They all flew in last night.  They had dinner together last

24   night without counsel present.  They are a cohesive coherent

25   group that will supervise this litigation in a meaningful way

1    so that it's guided by the plaintiffs themselves, not in a

2    lawyer-driven way.

3         And that is going to distinguish them from the other

4    groups before the Court today.

5         They also satisfied the *Silicon Storage* requirements for a

6    cohesive grand group because they set up a decision-making

7    process, where they agreed that any decision where they don't

8    have unanimity will be based on a majority rule.  The other

9    groups have not submitted anything saying they did that.  The

10   other groups' joint declarations don't say anything about the

11   *Silicon Storage* issues that the Tezos Investors Group has

12   addressed.

13        And so all groups are not the same, Your Honor.  So the

14   Court can treat these groups differently based on those *Silicon*

15   *Storage* criteria.

16        So having discussed why the Tezos Investors Group is

17   adequate and is typical and does have a very significant

18   financial interest in this litigation, let's talk about the

19   Anvari application and why it should be rejected.

20        First, as counsel just noted a moment ago, everybody else

21   got it right.  Everything else filed their other motion within

22   the time -- the allotted time in the correct action.  Except

23   for Mr. Anvari.  Okay?

24        His motion that was filed on the 60th day was filed in a

25   non-PSLRA case that was not consolidated.  That motion was a

 1    nullity as soon as it was filed.  Okay?  The next day, a day

 2    late, they filed a motion in the correct case.  But that motion

 3    is late.

 4         Now, let me give Your Honor a fact pattern that I believe

 5    is analogous.  And that is, let's say that somebody before Your

 6    Honor gets a decision on a summary judgment motion and doesn't

 7    like it and they lose.  And then within the -- the time period

 8    for filing a notice of appeal, they file a notice of appeal,

 9    but they file a notice of appeal in the wrong case.  And then a

10    day after that deadline has run, they file it in the right

11    case.  What's the outcome there?  I guarantee you they are out.

12         **THE COURT:**  I don't think -- I really don't think you

13    should use that analogy because I often get a request to

14    relieve them.  They made a mistake and they filed a day late on

15    an appeal.  And generally, not always, those are granted.

16         **MR. ENRIGHT:**  Your Honor --

17         **THE COURT:**  So I could tell you I have had --

18    personally, that I have granted that when it's -- when that's

19    happened.

20         Now, I'm willing to -- I don't want to get into the weeds.

21    Sometimes that will involve, say, prisoner appeals and others

22    where it's, you know, pro se litigants and the like.

23         So I'm sure you can come back to me and say:  Well, show

24    me where there are counsel of record that have done that.  And

25    I don't have it off the top of my head, but I actually do think

1    there is relief given for -- if it's within a very short period

2    of time, where you have blown the right to file your appeal.

3    Sometimes the Circuit sends it back to me to decide that

4    question, but it does get decided.

5         So I'll relieve you of that example.

6              **MR. ENRIGHT:**  Fine, Your Honor.  In my experience --

7              **THE COURT:**  I understand your point.

8              **MR. ENRIGHT:**  -- if you miss an appellate deadline,

9    you're out.

10             **THE COURT:**  Yes, yes.

11             **MR. ENRIGHT:**  And then there is the *Cavanaugh* issue,

12   Your Honor.  And I think, again, counsel ably said, first off

13   they have to establish that they are entitled to this

14   presumption.  And once they get that presumption, in order to

15   knock them out, we have to produce proof.

16        Here, Your Honor, number one, I don't think they have

17   qualified for the presumption for all the stumbles that counsel

18   have enumerated.  And, second, I think the proof is in what

19   they have done.  They filed in the wrong case.  They missed the

20   deadline.  They filed a certification with the Court that was

21   signed by the lawyer when the statute explicitly says it is has

22   to be filed by the lead plaintiff or proposed lead plaintiff

23   him or herself.

24        You can't have those executed by attorneys by permission.

25   That's -- I've never seen that in 20 -- over 20 years of

1    practice.

2         They misconstrued the *MacDonald* case.   They conflate the

3    Exchange Act and the Securities Act.   And if you look past the

4    puffery in their firm resumes and in their papers, Anvari's

5    counsel really simply do not have substantive meaningful

6    experience in this field.

7              **THE COURT:**   I shouldn't introduce a subject that

8    nobody has brought up and now may have a whole new round of

9    discussion, but I thought that I might get the argument after I

10   indicated the tentative with respect to consolidating in the

11   *MacDonald* action that somebody was going to argue to me, well,

12   when you have a consolidated action with the state claims, that

13   even though it's consolidated with a PSLRA claim, the PSLRA

14   presumption doesn't necessarily apply to now the new

15   consolidated action because a portion of it, or state law

16   claims, were the old style criteria of assessing who should be

17   lead counsel comes into play.   And nobody has argued that to me

18   yet explicitly.

19        But my question is:   In cases that you have all seen where

20   there is an amalgamated PSLRA part with a part that's not

21   PSLRA, has there been any discussion of whether or not the

22   *Cavanaugh* PSLRA presumption kicks in or not?

23             **MR. ENRIGHT:**   Your Honor, in my experience, in those

24   kind of mixed cases I've seen Courts appoint the lead plaintiff

25   for the whole magilla, including the state law claims, and I've

1    seen cases where Courts have appointed separate lead counsel to

2    litigate the state law claims.  I've seen both.

3             THE COURT:  You think, though, there is leeway?  Now

4    that the case being a hybrid, does the Court have the leeway to

5    use the more qualitative analysis that we traditionally use as

6    opposed to the PSLRA presumption, or because there is a PSLRA

7    part of it, that I use -- that the presumption kicks in?

8             MR. ENRIGHT:  Your Honor, I think the PSLRA criteria

9    and analysis has to apply to the PSLRA claims and cases.

10            THE COURT:  Okay.  I think you're probably right.  I

11   appreciate -- it's a candid response.  I appreciate that.

12            MR. ENRIGHT:  Your Honor, I'm not here to --

13            THE COURT:  Right, right, right.

14            MR. ENRIGHT:  -- to try to mislead you.  I'm here to

15   try to obtain the best results for my clients and for the class

16   that they seek to represent.  And candidly the Court is

17   important in trying to obtain that.

18        Long story short, Your Honor, again, I don't want to

19   rehash everything that everybody else has discussed.  I think

20   that the errors that they made in terms of missing the filing

21   deadline, et cetera, I think it's fatal to their application.

22   And for all the reasons that counsel have already said, the

23   Court should not hand this case over to a plaintiff who

24   selected counsel who simply have not litigated this case

25   capably to this point.

1        **THE COURT:**  Let me ask you on an entirely different

2   subject, but I see you're reacting to it.

3        When counsel suggested that there needed to be

4   different -- that the investment, the source of the investment

5   is somehow of consequence in terms of picking lead plaintiffs

6   and that I need somebody who is a Bitcoin investor and then

7   somebody who is an Ethereum investor, what's your review on

8   that?

9        **MR. ENRIGHT:**  Your Honor, my group has Ethereum and

10  Bitcoin investments represented.  So it would be very fast for

11  me to say:  Oh, yes, I think that's very important, Your Honor.

12       I think that's nonsense.  I think your analysis to the --

13  the euro and dollars analogy is dead on right.  I don't think

14  the means by which the -- the investors paid for their

15  investments, whether it's euros or Bitcoin or kroners, I don't

16  think it matters.

17       And I apologize for reacting in a way that drew Your

18  Honor's attention.  I try to remain relatively impassive.

19       **THE COURT:**  It's okay.

20       **MR. ENRIGHT:**  Turning to Trigon, Your Honor.  The

21  *Morrison* issue here is going to become a focus of this

22  litigation.  There is no question about it.  Okay?

23       Now, counsel may be correct that they would ultimately win

24  on that.  I think -- I think they very well might.  I think

25  there is no question, though, that it will become a

```
 1    preoccupying focus of this litigation, which may well result in
 2    a dismissal or in a denial of class certification and that it
 3    would -- the Court would be remiss to hand control of this
 4    litigation to a plaintiff --
 5         THE COURT:  Would you contemplate that it would
 6    potentially be more than a motion?  In other words, the issue
 7    would be presumably litigated.  The defense would bring it up.
 8    They would bring it up, I guess, on -- well, I suppose there
 9    are different ways that they could bring it up.  Certification
10    or before that in some kind of a Motion to Dismiss.
11         But my point of my question is, is it a -- is it a one-off
12    deal where the Court would be called on to rule on the question
13    and then once that's done, would it continue to permeate the
14    case in some fashion or another?
15         MR. ENRIGHT:  I think it's highly likely that it
16    would because the Court's determination on the Motion to
17    Dismiss could be based on giving the plaintiff the most
18    favorable inferences available, as the Court is required to do,
19    on a 12(b)(6) motion.
20         But the Court isn't required to give those same inferences
21    at class certification or at summary judgment.  So I think that
22    that would be the gift that would keep on giving throughout the
23    case, Your Honor.  It's not something that be would a one-off,
24    I don't think by any stretch of the imagination.  I think that
25    would be -- would be a focus throughout the pendency of the
```

 1    case here and likely on appeal.

 2         It would absolutely prejudice the plaintiff class to have

 3    a plaintiff litigating this case on their behalf who is subject

 4    to those issues, when it simply doesn't have to be that way.

 5         And that's why Courts always hold that where there is a

 6    unique claim or defense that would rise to the level of

 7    rendering a plaintiff atypical, they should not be appointed as

 8    lead counsel.

 9         And the standard is -- as your Honor noted during the

10    colloquy with one of the prior counsel, the standard isn't

11    whether or not defendants would win.  The standard is whether

12    or not it would become a focus of the litigation that would

13    preoccupy the Court's and the parties' time and efforts and

14    whether or not it would prejudice the class.  And I think

15    unquestionably it would do both of those things here.

16         And, Your Honor, just in terms of the facts on that.  I

17    think it's worth pointing out it's not just an Australian

18    entity buying the -- these token interests, which, by the way,

19    the tokens still haven't been issued.

20         It's buying them from a Swiss foundation, that the

21    defendants are clearly going to argue that the issuer here is a

22    Swiss foundation, not DLS.  DLS essentially had nothing to do

23    with that.

24         And the -- the documents here actually stipulate that the

25    transaction takes place for the purposes of any legal

1   questions.  In *Alderney*, which is in the bailiwick of *Guernsey*,

2   a British dependency -- which, by the way, until this I had

3   literally had never heard of.  The defendants are clearly going

4   to make an issue of this.  They already have reviewed the issue

5   in the *MacDonald* case and on the TRO papers.

6        Now, the prior counsel noted that the *Absolute Activist*

7   decision set the standard of whether or not -- that it would be

8   qualified as a domestic transaction for the purposes of

9   *Morrison* if the defendants undertook an irrevocable liability

10  to deliver securities within the United States.

11       Your Honor, defendants are clearly going to argue that

12  they never undertook an obligation of irrevocable liability to

13  deliver the securities to anyone, let alone within the United

14  States.

15       And here they are going to argue that to the extent they

16  did that, they did that in Switzerland or in Guernsey or in

17  Australia.

18       And beyond the *Morrison* issue, Your Honor, Trigon has

19  issues with regard to Ann Dupont.  Her signature on the

20  certification that was submitted within the 60-day time period

21  did not ever state that she had authority or what her role was

22  with Trigon.  That renders that certification deficient.  And,

23  frankly, there is a rafter of case law out there saying that

24  they should not be allowed to supplement or cure that

25  afterwards.

1        Similarly, the Trigon certification is -- was not

2   submitted properly under penalty of perjury.  28 U.S.C. 1746

3   requires that certifications signed outside of the United

4   States have different language specifying that they are making

5   the statement under penalty of perjury under U.S. law, and the

6   Trigon certification doesn't say that.  And it was signed in

7   Australia.  Again, that renders that certification deficient

8   and I think it is disqualifying.

9        Turning to the Gaviria Group, Your Honor.  I'm trying to

10  talking about things that we haven't already talked about at

11  length.

12       The Gaviria Group is a group of three, but as I noted

13  earlier, they did not satisfy the *Silicon Storage* requirements

14  for presenting a cohesive, coherent group the way that the

15  Trigon investors group has --

16            THE COURT:  The significance to you of that is that

17  if they are disaggregated and you say at the very least two out

18  of your three should be combined, then you have more stake than

19  they.

20            MR. ENRIGHT:  Correct.  So two things.

21       Number one, they should be disaggregated because they are

22  not a cohesive group.  Our group, the Tezos Investor Group is a

23  coherent, cohesive group and, therefore, they can be and should

24  be aggregated.  It shouldn't be one-to-one or even one-to-two.

25  It should be our entire group against any one of theirs.

1          THE COURT:  Okay.

2          MR. ENRIGHT:  Moreover, as I did note, there is a

3    preexisting relationship between Mr. Andreasson and

4    Mr. Reckenbeil.  So that, I believe, would under any

5    circumstances allow their losses to be aggregated.

6          Beyond that, Your Honor, there has been serious problems

7    with Gaviria and his counsel's prosecution of this case as

8    well.  As your Honor, I'm sure, is aware from the papers, they

9    filed a case in Florida.  That case was -- was, frankly, a

10   bigger mess than the Anvari application here.

11         They filed a complaint without a certification.  They

12   alleged claims under Sections 5 and Section 17(a), for which

13   there is no private right of action.  They never did the PSLRA

14   notice that they were required to do by statute.  They,

15   frankly, simply did not litigate these claims in a way that the

16   Court can find that they would be adequate counsel here.

17         THE COURT:  That sort of means that Mr. Ta and the

18   LTL attorneys' mistakes, kind of in context, everybody else has

19   made mistakes, too.

20         MR. ENRIGHT:  Not everybody else, Your Honor.

21         THE COURT:  You claim you're the ones that haven't,

22   but this is sort of not an elite set of, oh, this one set of

23   counsel did -- did these failures that I should then say is

24   disabling to them, but the other -- the other ones ahead of you

25   did mistakes, too.

1    So I'm just -- I mean, I'm just trying to put this all

2    into some perspective.

3         **MR. ENRIGHT:**  Yeah.  I think it's correct.  They made

4    mistakes that I believe are disqualifying.  Yes, I think that's

5    correct.

6         But I -- and I don't think the fact that the Gaviria Group

7    made mistakes somehow makes it more acceptable than Anvari did.

8         **THE COURT:**  So I -- I think that's a fair point, but

9    it doesn't mean that it's somehow out of the -- out of the norm

10   that some mistakes are made from time to time even by the most

11   skillful counsel.

12        **MR. ENRIGHT:**  Sure, Your Honor.  I'm living in a

13   glass house.  I'm reluctant to throw stones.  It's not like I

14   have never made an error.  However, these rise to the level of

15   being of genuine concern about adequacy to litigate these

16   claims.

17        **THE COURT:**  Fair enough.

18        **MR. ENRIGHT:**  Your Honor, with regard to GGCC, they

19   appear to have essentially given up the ghost and are

20   supporting Anvari.  So I think they essentially should --

21   should essentially not be given serious consideration at this

22   point.

23        Moreover, their financial interest is tiny compared to all

24   of the other movants.

25        **THE COURT:**  Well, I'll hear from them momentarily.

1          **MR. ENRIGHT:**  I believe that's all I have for you,

2     Your Honor.

3          **THE COURT:**  Very good.  Thank you.

4      So the GGCC Group.

5          **MR. RESTIS:**  Mr. Restis, Your Honor.  Bill Restis on

6     behalf of Restis Law Firm.  Again, we're supporting the Anvari

7     application.

8      I think there has been a lot of talk about who is the most

9     competent counsel here.  There is a lot of firms saying that

10    our resumes are better.  We filed more securities class actions

11    than anyone else.

12     But this, as everyone recognizes, is the first of its

13    kind.  There is no wise old man in the cryptocurrency world, so

14    -- and this is not a typical 10(b)(5) action.  And I think that

15    is one of the reasons why the GGCC Group supports the Anvari

16    application, is because we had serious disagreements with the

17    way the other two cases, the *MacDonald* case and the Okusko

18    case, were litigated in front of Your Honor.  For example, with

19    respect to the injunctions that were sought to freeze all of

20    the assets, which would actually have harmed a significant

21    portion of the class to which these plaintiffs and counsel seek

22    to represent.

23          **THE COURT:**  Because of the fluctuation of the value

24    of the --

25          **MR. RESTIS:**  No.  No, your Honor.  Because as we put

1    in our papers, no.

2         When we were talking with potential lead plaintiff

3    applicants, there was significant pushback from investors in

4    the Tezos project that said, frankly -- I will take out the

5    expletives -- that we think that these class actions are a

6    problem.  We want the project to succeed.  We want the Tezos

7    tokens to be issued.

8         And so we view this case as being one where there is a

9    discrete group within the investors and in the Tezos project

10   that would like to have rescission, and we would like to have

11   the option for rescission; that this isn't a bull in the china

12   shop where we're trying to break up an entirely new project

13   based on entirely new technology that everyone seems to agree

14   is very important.

15        And I think it's also important to note that Mr. Anvari is

16   the only applicant who has the support of another group.

17   That's us.  We have -- we have spoken with Mr. Anvari's counsel

18   and find them to be extremely competent and support them on

19   that basis.

20        The second point I'd like to make is with respect to the

21   need for interim class counsel on potential state law cases.  I

22   think that that's very problematic because it creates the wrong

23   types of incentives for counsel.  We all know situations where

24   there are multiple class actions pending in either -- in

25   different jurisdictions and there seems to be a race to settle.

1    It puts pressure on all counsel that is not beneficial to the

2    interests of the class.  Reverse auctions and things of that

3    nature.  Not that any of the counsel in this case would engage

4    in that.  Everyone is of the utmost professionalism, of course,

5    but incentive structures matter and they matter in this case.

6        And the last point is that with respect to Trigon, you

7    know, everyone has talked about *Morrison* and, you know, the

8    extra territoriality issue.

9        But I think there is another problem with the fact that

10   they are a foreign plaintiff, and that's predominance.  It's

11   hard enough, Your Honor, to get a 50 state class certified, you

12   know.  There -- there -- we have some other cases that have

13   pled a global class and, you know, when you deal with

14   predominance and manageability, it very well may end up that

15   there is a U.S. class only because we're dealing with the

16   federal securities laws and we don't want to have a situation

17   where there is a class with a plaintiff who is not a member of

18   it.  Obviously, that is fundamentally disabling in its own

19   right.

20       We will submit on that.  Thank you, your Honor.

21           **THE COURT:**  Thank you.

22       Anybody on the defense side want to say anything, or I

23   should --

24           **MR. POTISCHMAN:**  No, your Honor.

25           **THE COURT:**  Okay, very good.

1          Any further comments by anybody on the other side?

2                  THE COURT:  Yes.

3                  MS. SMITH:  Danielle Smith for plaintiff Bruce

4     *MacDonald*.

5          I'm just going to add that Mr. MacDonald and his counsel

6     have demonstrated a willingness and ability to vigorously

7     prosecute the action.

8          And, also, as we added, the state law claims require

9     special attention.  The claim under the California Corporations

10    Code 25110 is not exactly analogous to a claim under Section 5

11    of the 1933 Securities Act.

12         So we just like the Court to take those two things into

13    consideration.

14                 THE COURT:  Let me ask you on that question.  There

15    has been, as you know well, some litigation or motion practice

16    relative to accelerated discovery and the like, and that's now

17    been resolved.

18         What would be the -- going forward once it is, if it is,

19    linked up with the PSLRA case and once we have an operative

20    complaint -- I know they are different claims, but your

21    argument is, well, we need different -- we need a specialized

22    structure where the counts -- there is going to be counsel

23    there to look after the state claims.  And I'm wrestling with

24    why that's so.

25         So I wanted to give you a chance to tell me why is it that

1   we need -- at that point.  Right now you can say, well, we want

2   to disengage from the PSLRA's constraints and I know you have

3   been trying to do that.  But once we're over that, I don't know

4   where I see that the -- the need for these two different

5   counsel.

6          MS. SMITH:  Okay.  Well, we'll leave it to the

7   Court's discretion about consolidation.

8      We believe the individuals who -- asserting state law

9   claims as opposed to federal claims might be unfairly

10  prejudiced by the PSLRA discovery stay.  And there is a

11  different set of facts to look into and a different set of

12  defenses and a different set of claims associated with the

13  California Corporations Code that don't necessarily apply to

14  Section 5 of the 33 Act.

15         THE COURT:  Okay.

16         MS. SMITH:  So that's it.

17         THE COURT:  Thank you.

18     Okay.  I will at that time matter under submission and get

19  an order to you and we'll go from there.

20     Thank you.

21     (Proceedings adjourned.)

22

23

24

25

### CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, March  27, 2018