**LTL ATTORNEYS LLP**
Enoch H. Liang (SBN 212324)
601 Gateway Boulevard, Suite 1010
South San Francisco, California 94080
Tel:  650-422-2130
Fax:  213-612-3773
enoch.liang@ltlattorneys.com

James M. Lee (SBN 192301)
Caleb H. Liang (Bar No. 261920)
300 S. Grand Ave., 14th Floor
Los Angeles, California 90071
Tel:  213-612-8900
Fax:  213-612-3773
james.lee@ltlattorneys.com
caleb.liang@ltlattorneys.com

**HUNG G. TA, ESQ. PLLC**
Hung G. Ta
JooYun Kim
250 Park Avenue, 7th Floor
New York, New York 10177
Tel: 646-453-7288
hta@hgtlaw.com
jooyun@hgtlaw.com

*Lead Counsel for Court-Appointed Lead Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TEZOS SECURITIES LITIGATION | Master File No.  17-cv-06779-RS |
| | **CLASS ACTION** |
| This document relates to: | **DECLARATION OF HUNG G. TA IN FURTHER SUPPORT OF LEAD PLAINTIFF ARMAN ANVARI'S MOTION TO STAY *BAKER* ACTION** |
| ALL ACTIONS. | |
| | Date:     May 25, 2018 |
| | Time:     10:00 a.m. |
| | Crtrm:    3 |
| | Judge:   Hon. Richard Seeborg |

1    I, Hung G. Ta, declare under penalty of perjury as follows:

2    1.    I am the principal of the law firm Hung G. Ta, Esq. PLLC ("HGT Law"), Co-Lead

3    counsel to Lead Plaintiff Arman Anvari and the putative class in the above-captioned action (the

4    "Action").  I am an active member in good standing of the bar of the State of New York and have

5    been admitted *pro hac vice* in this matter.  I submit this declaration in further support of Lead Plaintiff

6    Anvari's Motion to Stay the *Baker* Action.

7    2.    Attached hereto as Exhibit A is a true and correct copy of the complaint filed on April

8    24, 2018 in *Trigon Trading Pty. Ltd., and Bruce MacDonald v. Dynamic Ledger Solutions, Inc., et*

9    *al.*, No. 18-civ-02045 (Cal. Superior Court, San Mateo Cty.).

10   3.    Attached hereto as Exhibit B is a true and correct copy of the article John C. Coffee

11   Jr., *Class Actions: Interjurisdictional Warfare; Corporate Update; Corporate Securities*, NEW YORK

12   LAW JOURNAL (Sept. 25, 1997).

13   I declare under penalty of perjury that the foregoing is true and correct, this 9th day of May,

14   2018.

15

16                                         */s/ Hung G. Ta*

17                                         Hung G. Ta

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF HUNG G. TA IN FURTHER SUPPORT OF
LEAD PLAINTIFF ANVARI'S MOTION TO STAY *BAKER* ACTION
3:17-CV-06779-RS

**EXHIBIT A**

1   Reed R. Kathrein (State Bar No. 139304)
    Peter E. Borkon (State Bar No. 212596)
2   Danielle Smith (State Bar No. 291237)
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
3   715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
4   Telephone:  510-725-3000
    Facsimile:  510-725-3001
5   reed@hbsslaw.com
    peterb@hbsslaw.com
6   danielles@hbsslaw.com

7

8   *Attorneys for Plaintiff*
    *[Additional counsel listed on signature page]*

9

**FILED**
**SAN MATEO COUNTY**

APR 2 4 2018

**Clerk of the Superior Court**
By _____
       DEPUTY CLERK

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**COUNTY OF SAN MATEO**

| | |
|---|---|
| TRIGON TRADING PTY. LTD., AND BRUCE MACDONALD, Individually and on Behalf of All Others Similarly Situated, | Case No.  **18 C I V 0 2 0 4 5** |
| | **CLASS ACTION** |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) VIOLATION OF SECTIONS 5(A) 5(C), AND 12(A) OF THE SECURITIES ACT OF 1933** |
| DYNAMIC LEDGER SOLUTIONS, INC., a Delaware corporation, TEZOS STIFTUNG, a Swiss Foundation, KATHLEEN BREITMAN, an Individual, ARTHUR BREITMAN, an Individual, TIMOTHY COOK DRAPER, an individual, DRAPER ASSOCIATES V CRYPTO LLC, and DOES 1-100, INCLUSIVE, | 18 – CIV – 02045 CMP Complaint 1108481 |
| Defendants. | **JURY TRIAL DEMANDED** |

File By Fax

CLASS ACTION COMPLAINT
010721-11 1028766 V1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION..................................................................................................1

II.     NATURE OF THE PROCEEDING AND RELIEF SOUGHT ...........................4

III.    JURISDICTION AND VENUE...........................................................................5

IV.     PARTIES ..............................................................................................................5

V.      SUBSTANTIVE ALLEGATIONS ......................................................................8

        A.      Background on Distributed Ledger or Blockchain-Enabled Means For Capital Raising (aka "ICOs")..........................................................................................8

        B.      The Tezos ICO ......................................................................................10

        C.      The Tezos Tokens Are Securities..........................................................18

                a.      Investors in the Tezos ICO Invested Money .....................19

                b.      Investors Had a Reasonable Expectation of Profits ..........20

                c.      Investors Expect Those Profits to Be Derived from the Managerial Efforts of Others ..............................................................25

        D.      Tezos Defendants Were Required to Register Offers and Sales of Securities Unless a Valid Exemption Applies .....................................................................27

        E.      Infighting, Governance Problems, and Delays Emerge ........................27

        F.      Defendants Are Selling, Converting and Dissipating the Consideration Collected From the Class..................................................................................28

VI.     CLASS ALLEGATIONS ...................................................................................30

FIRST COUNT VIOLATION OF SECTIONS 5(A), 5(C), AND 12(A) OF THE SECURITIES ACT OF 1933 (AGAINST ALL DEFENDANTS)...............................................................31

PRAYER FOR RELIEF ..................................................................................................33

JURY TRIAL DEMAND................................................................................................33

Plaintiffs Trigon Trading Pty. Ltd. and Bruce MacDonald, individually and on behalf of all others similarly situated ("Plaintiffs"), by Plaintiffs' undersigned counsel, for Plaintiffs' Complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and based upon information and belief as to all other matters, based on the investigations conducted by and through Plaintiffs' attorneys, which included among other things, a review of public statements issued by Defendants, U.S. Securities and Exchange Commission ("SEC") filings and reports, media reports, interviews, social media information, as well as other commentary, analysis, and information concerning Defendants Dynamic Ledger Solutions, Inc. (DLS), Tezos Stiftung (aka the "Tezos Foundation"), Kathleen Breitman, Arthur Breitman, Timothy Cook Draper, and Draper Associates V Crypto LLC ("Draper Associates"), the blockhain and digital currency/cryptocurrency landscape, and the securities laws.

## I.    INTRODUCTION

*"[Initial Coin Offerings] represent the most pervasive, open, and notorious violation of the federal securities laws since the Code of Hammurabi."*

**- Former SEC Commissioner Joseph Grundfest**

1.      This is a class action brought on behalf of all persons who purchased Tezos tokens (aka "XTZ", "Tezzies" or "tez") by contributing fiat currency (*e.g.,* U.S. Dollars) or other consideration (including the blockchain-based digital currencies Bitcoin ("BTC") and/or Ethereum ("ETC" or "ether")) to the Tezos "Initial Coin Offering" ("ICO") in July 2017.

2.      Tezos tokens are securities within the meaning of the Securities Act of 1933 (the "1933 Act" or "Securities Act of 1933" or "Securities Act").  As such, any offering or sale of such securities are required to be registered with the Securities and Exchange Commission.  But in violation of Section 5 of the Securities Act of 1933, Defendants engaged in an illegal unregistered securities offering by offering and selling Tezos tokens without filing a registration statement with the Securities and Exchange Commission.

3.      In sum, Defendants capitalized on the recent enthusiasm for blockchain technology and cryptocurrencies to raise funds through the ICO, illegally sold unregistered securities, used a

1   Swiss-based entity in an unsuccessful attempt to evade U.S. securities laws, and are now admittedly

2   engaged in the conversion, selling, and possible dissipation of the proceeds that they collected from

3   the Class through their unregistered offering.[1]

4        4.      Purportedly to raise money for the implementation of the Tezos Blockchain —

5   described by Defendants as a "self-amending crypto-ledger"[2] — Defendants held an ICO, which is

6   similar in economic substance to a traditional Initial Public Offering ("IPO").  Through the ICO,

7   Defendants issued Tezos tokens to investors, in exchange for digital cryptocurrencies such as Bitcoin

8   and/or Ethereum.  Investors participated in the ICO with the reasonable expectation that the Tezos

9   tokens would appreciate in value as a result of the efforts of Defendants, including Arthur and

10  Kathleen Breitman—enabling investors to exchange their Tezzies for other tokens, digital currencies,

11  and/or government-issued fiat currency (such as U.S. dollars).

12       5.      The Tezos ICO has been widely reported as the largest ICO to date,[3] with 65,627

13  Bitcoin and 361,122 Ethereum collected.  At the time of the Tezos ICO, the digital currencies paid

14  by investors were valued at an estimated $232 million U.S. dollars.  Today, the digital currencies

15  invested in the Tezos ICO are worth an estimated $1.2 billion U.S. Dollars as of December 11,

16  2017).

17       6.      Defendants have profited, or stand to profit, significantly from the ICO.

18  The shareholders of Defendant Dynamic Ledger Solutions, Inc. ("DLS") include Defendants

19  Kathleen Breitman, Arthur Breitman, Timothy Cook Draper, and Draper Associates.  According to a

20  "Transparency Memo" published on the Tezos website, once the Tezos blockchain is launched and

21  operational, "DLS' shareholders [*i.e.*, the Breitmans, Draper, and Draper Associates] will receive

22

---

23      [1] *Diversifying the portfolio of the Tezos Foundation*, Tezos.ch,
24   https://www.tezos.ch/diversifying-the-portfolio-of-the-tezos-foundation.html (last visited Apr. 20,
     2018).

25      [2] L.M. Goodman, *Tezos — a self-amending crypto-ledger*, previously posted at Tezos.com (Sept.
26   2, 2014), https://www.tezos.com/static/papers/white_paper.pdf (last visited Dec. 1, 2017).

27      [3] Stan Higgins, *$232 Million: Tezos Blockchain Project Finishes Record-Setting Token Sale*,
     Coindesk.com (July 13, 2017), https://www.coindesk.com/232-million-tezos-blockchain-record-
     setting-token-sale/.

28

8.5% of the contributions made during the fundraiser" and "a 10% allocation of the tokens" issued over a period of 48 months.[4]

7.     Defendant Tezos Foundation, a Swiss company seeking non-profit status, currently holds the digital currencies paid by Plaintiffs and other investors, and describes itself as simply "an organization dedicated to promoting the Tezos protocol."[5]  The Foundation has no apparent legal oversight or compulsion to do anything at all,[6] and has admitted to gradually converting ICO proceeds into more traditional assets such as "cash, stocks, bonds, and precious metals" in order to "diversify" its assets.[7]

8.     Defendants, keenly aware of the registration requirements of the federal securities laws,[8] have attempted to skirt these laws through use of the Swiss-based Tezos Foundation, as well as the characterization of the sale of the Tezos interests as charitable contributions or donations. Defendants have even called the Tezos tokens the equivalent of "tote bags" received in exchange for donating to a charity.[9]  In reality, the supposed "contributions" or "donations" are, in all material respects, identical to the attributes of the sale and purchase of an ownership interest in the purported Tezos tokens, which are securities within the meaning of the securities laws.

---

[4] *Transparency Memo*, previously posted at Tezos.com, https://www.tezos.com/dls (last visited Dec. 1, 2017).

[5] *Diversifying the portfolio of the Tezos Foundation,* Tezos.ch, https://www.tezos.ch/diversifying-the-portfolio-of-the-tezos-foundation.html (last visited Apr. 20, 2018).

[6] Under Schweizerisches Zivilgesetzbuch (Swiss Civil Code), Art. 84 C. Augsicht (Supervision), a supervisory authority shall ensure that a foundation's assets are used for its designated purposes. However, as of August 2017, no supervision authority was designated for the Foundation.

[7] *Diversifying the portfolio of the Tezos Foundation,* Tezos.ch, https://www.tezos.ch/diversifying-the-portfolio-of-the-tezos-foundation.html (last visited Apr. 20, 2018).

[8] Sales of unregistered securities are prohibited by the Securities Act of 1933 unless they are subject to an exemption from registration.  The Tezos tokens were not, and are still not subject to an exemption from registration.

[9] Alice Lloyd George, *Behind the scenes with Tezos, a new blockchain upstart,* TechCrunch (Jul 12, 2017), https://techcrunch.com/2017/07/12/behind-the-scenes-with-tezos-a-new-blockchain-upstart.

9. In short, the ICO for the Tezos tokens was an illegal offer and sale of securities for which no registration statement was filed or then in effect, and as to which no exemption from registration was sought or available. The ICO was a generalized solicitation made using statements posted on the Internet and distributed throughout the world, including in California and the United States, and the securities were offered and sold to the general public.

10. Therefore, pursuant to Section 5 and Section 12(a)(1) of the Securities Act of 1933, Plaintiffs and the Class are entitled to recover the consideration paid for the Tezos tokens, receiving back their Bitcoin and Ethereum, with interest thereon, with any corresponding appreciation in value of invested assets, or the equivalent in monetary damages or as restitution.

11. Moreover, unless the Defendants are permanently restrained and enjoined from dissipating the proceeds of the ICO, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint, including, but not limited to, the conversion, selling, and dissipation of ICO proceeds collected from the Class.

## II. NATURE OF THE PROCEEDING AND RELIEF SOUGHT

12. Plaintiffs bring this action pursuant to Sections 5 and 12 of the Securities Act of 1933 (15 U.S.C. §§ 77e & 77l), and seek a judgment: (a) declaring that this action is properly maintained as a class action pursuant to California Code of Civil Procedure section 382 and California Rule of Court 3.760 et seq.; (b) certifying the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel and Plaintiffs as class representatives; (c) imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class; (d) awarding Plaintiffs and the members of the Class the remedy of rescission of their investment to the Tezos ICO including any appreciation of the contributed Bitcoin and Ethereum, and/or awarding compensatory damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; (e) awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees, expert fees, witness fees and electronic discovery fees as permitted by law; and (f) granting such other and further relief as this Court may deem just and proper.

### III.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 5 and 12 of the Securities Act of 1933 (15 U.S.C. §§ 77e and 77l).  This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the 1933 Act (15 U.S.C. § 77v), which explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States." Section 16(c) of the Securities Act does not bar State court jurisdiction and does not authorize the removal of this action.

14.     Each Defendant has sufficient contacts within California, or otherwise purposefully avails itself of benefits from California, or has property in California, so as to render the exercise of jurisdiction over each by California courts consistent with traditional notions of fair play and substantial justice.  A substantial amount of the violations of law complained of herein also occurred in California.

15.     Venue is proper in this Court because Defendant Timothy Draper and/or Draper Associates' operations are based in this County at 55 E. 3rd Avenue, San Mateo, CA 94401 and many of the acts and transactions giving rise to the violations of law complained of herein occurred in this County.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce to offer and/or sell Tezos tokens through the ICO, including but not limited to mail, electronic mail, interstate phone communications, interstate travel, and/or internet service providers, in promoting, offering and selling Tezos tokens through the ICO complained of herein.

### IV.     PARTIES

17.     Plaintiff Trigon Trading Pty. Ltd. is an Australian entity that invested approximately 18.9999 Bitcoin on July 3, 2017 in the Tezos ICO (the equivalent of approximately $47,821.04 USD at the time) to purchase Tezos tokens.

18.     Plaintiff Bruce MacDonald is is a California resident and a citizen of the United States who invested approximately 18.145 Ethereum in the Tezos ICO from a computer within the United States to purchase Tezos tokens.

19.     Defendant Dynamic Ledger Solutions, Inc. ("DLS") is a Delaware corporation with its principal place of business in Mountain View, California, at the home of Defendants Arthur and Kathleen Breitman (at 111 North Rengstorff Ave #78, Mountain View, CA, 94043). DLS is owned and controlled by Defendants Arthur Breitman, Kathleen Breitman, Draper, and Draper Associates. The Tezos.com website, which is based in the United States, has stated that DLS "owns all of the Tezos-related intellectual property (IP), including the source code of the Tezos cryptographic ledger, logos, and trademark applications associated with the name Tezos, domain names, and goodwill arising from a set of a relationships with several contractors and potential customers in the financial technology market."[10]

20.     Defendant Tezos Stiftung (a.k.a. the "Tezos Foundation" or the "Foundation") is a Swiss foundation based in Zug, Switzerland, that is seeking not-for-profit status, but has not yet been granted such under Swiss law. Defendant Tezos Foundation was created to store the consideration raised from investors in the Tezos ICO. Since the ICO, the Foundation has shared funds with DLS. In addition, according to Foundation President Johann Gevers, "they [DLS] control the Foundation's domains, websites and email servers, so the Foundation has no control or confidentiality in its own communications."[11] The Foundation and DLS have negotiated a contractual agreement in which the Foundation will acquire DLS, along with its IP, existing business relationships with contractors and

---

[10] *Transparency Memo*, previously posted at Tezos.com, https://www.tezos.com/dls (last visited Dec. 1, 2017).

[11] Anna Irrera, Steve Stecklow and Brenna Hughes Neghaiwi, *Startup Tezos raised $232 million issuing a new digital currency — now key players are fighting*, Business Insider (Oct. 19, 2017), http://www.businessinsider.com/r-special-report-backroom-battle-imperils-230-million-cryptocurrency-venture-2017-10?r=UK&IR=T.

1   potential customers, as well as its trademark applications and domain names.[12]  The Foundation

2   originally named Johann Gevers, Diego Ponz, and Guido Schmitz-Krummacher as its directors.[13]

3       21.    Defendant Arthur Breitman is the developer behind the Tezos cryptographic ledger.

4   On information and belief, Arthur Breitman lived with his wife, Defendant Kathleen Breitman, at

5   their home at 111 North Rengstorff Ave #78, Mountain View, California 94043 during the relevant

6   period.

7       22.    Defendant Kathleen Breitman is the Chief Executive Officer of DLS.  Mrs. Breitman

8   has stated that she handles the operational aspects of the Tezos Blockchain and manages

9   relationships with business partners, attorneys, and the Tezos marketing group.[14]

10      23.    Defendant Timothy Cook Draper is a venture capitalist who owns, operates, and/or

11  controls Draper Associates, a venture capital firm operating out of Menlo Park, California within San

12  Mateo County.  Defendant Draper either personally, or through his firm Defendant Draper

13  Associates V Crypto LLC, or both, had an ownership interest in Defendant DLS during the Tezos

14  ICO, and continues to hold an interest.

15      24.    Defendant Draper Associates V Crypto LLC is a Delaware limited liability company

16  with no parent corporation and with a principal executive office at 55 East Third Avenue, San Mateo,

17  California 94401.

18      25.    At all times mentioned herein, each of the defendants named herein, including DOES

19  1 through 100 were the co-conspirators, agents, representatives, alter egos, employers, and/or joint

20  venturers of the other defendants, and, in doing the acts and things herein alleged, were acting within

21  the course, scope, and authority of said agency, service, or employment with knowledge, permission,

22  and consent of the other defendants and each of them.

23

24

---

25  [12] *Transparency Memo*, previously posted at Tezos.com, https://www.tezos.com/dls (last visited Dec. 1, 2017).

26  [13] *Id.*

27  [14] Around The Coin, *Fintech Podcast, Episode 138: Interview with Kathleen Breitman, CEO of Tezos*, YouTube (Jun. 16, 2017), https://www.youtube.com/watch?v=cDIgGYl5krA.

28

26.     On information and belief, an unknown combination of Defendants controls the Foundation's assets through either a "multisignature procedure" described on the Tezos.ch website that "requires access to a secure location for spending and several security checks"[15] or otherwise controls the assets through other means.

27.     Plaintiffs allege on information and belief that DOES 1-100, inclusive, were individuals, corporations, companies, partnerships, or other business entities.  DOES 1-100 were co-conspirators with, or alter egos of, other Defendants in the violations alleged in this Complaint and performed acts or made statements in furtherance thereof.  Plaintiffs are presently unaware of the true names and identities of DOES 1-100.  Plaintiffs will amend this Complaint to allege the true names of the DOE defendants when they are able to ascertain them.

## V.     SUBSTANTIVE ALLEGATIONS

**A.     Background on Distributed Ledger or Blockchain-Enabled Means For Capital Raising (aka "ICOs")**

28.     In a recent complaint and injunction against the founders of the "REcoin" ICO, as well as in an *Investor Bulletin*, the SEC aptly summarized the blockchain, ICOs, and token distribution process.

29.     Essentially, an ICO is a fundraising event in which an entity offers participants a unique "coin" or "token" in exchange for consideration (often in the form of virtual currency—most commonly Bitcoin and Ethereum—or fiat currency, such as U.S. Dollars).[16]

30.     A "virtual currency," such as Bitcoin and Ethereum, is a digital representation of value that can be digitally traded and functions as a medium of exchange, unit of account, or store of value.  As of December 5, 2017, a Bitcoin could be purchased on an exchange for approximately $11,701 USD.  Fractional Bitcoins can also be purchased.  One unit of Ethereum ("ether") traded at

---

[15] *Diversifying the portfolio of the Tezos Foundation,* Tezos.ch, https://www.tezos.ch/diversifying-the-portfolio-of-the-tezos-foundation.html (last visited Apr. 20, 2018).

[16] *See S.E.C. v. REcoin Group Foundation, et al.*, No. 17 Civ. 5725 (RJD-RER), 2018 WL 1468815 (E.D.N.Y Sept. 29, 2017).

1   $455.81 USD. These virtual currencies have seen tremendous appreciation: Bitcoin has appreciated

2   1446% in one year; ether has appreciated 6,360.62% in one year.

3       31.    Rather than serving as a currency or unit of exchange, virtual "tokens" or "coins" sold

4   in an ICO may represent other rights. In almost every ICO—including the Tezos ICO—investors

5   purchase the tokens with a reasonable expectation of profits to be derived from the entrepreneurial or

6   managerial efforts of others. Accordingly, in most cases—including this one— "tokens" or "coins"

7   sold in an ICO will be securities and may not be lawfully sold without registration with the SEC or

8   pursuant to an exemption from registration.[17]

9       32.    After an ICO, "tokens" or "coins" are issued on a "blockchain," which is an electronic

10   distributed ledger or list of entries – much like a stock ledger – that is maintained by various

11   participants in a network of computers located around the world, including in California and

12   throughout the United States. Blockchains use cryptography to process and verify transactions on

13   the ledger, providing comfort to users of the blockchain that entries are secure.

14       33.    The Bitcoin and Ethereum virtual currencies also use blockchains to create and track

15   transactions in Bitcoin and ether, respectively.[18]

16       34.    Tezos tokens (also called tez, tezzies, or XTZ) were positioned by Tezos and its

17   promoters as being an improvement on Bitcoin or Ethereum. In an FAQ, Tezos stated that "Bitcoin,

18   Ethereum and Tezos are all decentralized ledgers powered by a blockchain. Bitcoin was the first

19   public blockchain and introduced the first truly decentralized form of electronic cash. Ethereum

20   followed suit by including smart-contracts in its platform, allowing a greater range of application to

21   be developed. Tezos takes this concept one step further by letting participants directly control the

22   rules of the network. It is designed to evolve, so that the next generation of ideas doesn't have to

23   start over as a new blockchain."[19]

24

25

26   [17] *Investor Bulletin: Initial Coin Offerings*, U.S. Securities and Exchange Commission (July 25, 2017), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings.

27   [18] *Id.*

28   [19] *FAQ*, previously posted at Tezos.com, https://www.tezos.com/faq (last visited Dec. 11, 2017).

35.     All transactions on a blockchain are recorded in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions.[20]

36.     A "token" sold in an ICO may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. In almost all cases, tokens may also be traded, thereby giving investors a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others (*i.e.*, the people operating the issuer whose efforts will impact the value of those tokens on the secondary market). Tokens are frequently listed on online platforms, often called virtual currency exchanges, where they are tradable for virtual (*e.g.,* Bitcoin or Ethereum) or fiat currencies (e.g., U.S. Dollars). Often, the "tokens" sold in an ICO are immediately tradable.[21]

37.     ICOs are typically announced and promoted through public online channels. Issuers usually release a "whitepaper" describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds (often virtual currency) to the issuer's address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.[22]

**B.     The Tezos ICO**

38.     In August and September 2014, Defendant Arthur Breitman, under the pseudonym "L.M. Goodman," released a Position Paper and White Paper, touting Tezos as a "self-amending crypto-ledger."[23]

---

[20] *S.E.C. v. REcoin, supra* at n. 2.

[21] *Id.* at p. 7.

[22] *Id.* at p. 7-8.

[23] L.M. Goodman, Tezos*: A Self-Amending Crypto-Ledger Position Paper*, previously posted at Tezos.com (August 3, 2014), https://www.tezos.com/static/papers/position_paper.pdf (last visited Dec. 2, 2017); L.M. Goodman, *Tezos — a self-amending crypto-ledger White Paper*, previously

39.     Defendant Arthur Breitman also authored a "Tezos Business Plan" in early 2015, in which he listed himself as chief executive of Tezos. The plan projected that if the company survived 15 years, it would be worth between $2 billion and $20 billion, and the budget called for paying Breitman $212,180 in salary by year three.[24]

40.     In August 2015, Mr. Breitman created and registered Dynamic Ledger Solutions Inc. (DLS) in Delaware to develop Tezos. He listed himself as chief executive.[25] DLS has been principally operated out of the home of Defendants Arthur and Kathleen Breitman (at 111 North Rengstorff Ave #78, Mountain View, CA, 94043), and continues to be owned and controlled by Defendants Arthur Breitman, Kathleen Breitman, Draper, and Draper Associates.

41.     In a pre-sale, ten early backers, including hedge funds and high net-worth individuals, provided the Breitmans with $612,000 in exchange for XTZ tokens equivalent to $893,200.77 in contributions (corresponding to a 31.48% discount).[26]

42.     Around May 2017, the Tezos project started running out of cash, and Defendant Kathleen Breitman reached out to Defendant Tim Draper, who invested $1.5 million into Tezos through his firm, Draper Associates. As a result of the investment, Draper Associates also took a minority stake in DLS, the company that controls the Tezos source code.[27]

43.     On or about April 24, 2017, the Foundation was formed as a Swiss nonprofit (Stiftungen) in Zug, Switzerland, purportedly to promote the development and use of the Tezos blockchain, and to be the recipient of ICO funds. Zug is a notorious haven for white collar

_____

posted at Tezos.com (Sept. 2, 2014), https://www.tezos.com/static/papers/white_paper.pdf (last visited Dec. 1, 2017).

[24] Anna Irrera, Steve Stecklow, Brenna Hughes Neghaiwi, *Special Report: Backroom battle imperils $230 million cryptocurrency venture*, Reuters (Oct. 18, 2017), https://www.reuters.com/article/us-bitcoin-funding-tezos-specialreport/special-report-backroom-battle-imperils-230-million-cryptocurrency-venture-idUSKBN1CN35K.

[25] *Id.*

[26] *Tezos Overview*, previously posted at Tezos.com, https://www.tezos.com/static/papers/Tezos_Overview.pdf (last visited Dec. 2, 2017).

[27] Anna Irrera, Steve Stecklow and Brenna Hughes Neghaiwi, *Special Report: Backroom battle imperils $230 million cryptocurrency venture*, Reuters (Oct. 18, 2017), https://www.reuters.com/article/us-bitcoin-funding-tezos-specialreport/special-report-backroom-battle-imperils-230-million-cryptocurrency-venture-idUSKBN1CN35K.

1  miscreants.  Marc Rich—the billionaire commodities trader who fled the United States in 1983 (and

2  was later featured on the FBI's Ten Most Wanted List) after being indicted on tax evasion and

3  racketeering charges—famously took refuge in Zug.  As Time magazine wrote in a 2010 story:

4  "Rich the outlaw removed himself to Zug to take advantage of the anonymity and light taxes it

5  offered, and he made it the center of no-questions-asked trading.  For anyone wanting to do deals, be

6  they with oil-rich-if-bloodstained despots or run-of-the-mill democracies, this was the place.

7  ....

8  In 2007 the European Commission in Brussels accused Swiss cantons like Zug of giving illegal state

9  aid through giant corporate tax breaks.

10  ....

11  Should taxes increase in Zug, the town has another draw:  secrecy.  Zug is tight-lipped, even for

12  Switzerland.  Tax records are confidential. . . .  At Zug's documentation center, funded by local

13  groups critical of Zug's tax system, archivists track Zug-registered companies by scouring

14  newspapers because many public records are closed.  That privacy can make it difficult to figure out

15  a company's real activities or even who owns it."[28]

16  44.  In a public statement, Defendants admitted that they chose to use a foundation in Zug,

17  Switzerland (the Tezos Foundation) to conduct the ICO and collect investor funds because they

18  perceived Switzerland's regulatory oversight to be weaker than that of the United States.  Defendant

19  Kathleen Breitman stated that they chose Switzerland because Switzerland has "a regulatory

20  authority that had a sufficient amount of oversight but not like anything too crazy."[29]

21  45.  When questioned later about the regulatory framework for the implementation of the

22  ICO and/or Tezos blockchain, Defendant Kathleen Breitman mentioned the countries of Gibraltar,

23  Estonia and Singapore as additional examples of "accommodating usually small nations that are

24

25  [28] Vivienne Walt, *Zug's Secrets: Switzerland's Corporate Hideaway*, Time (Jan. 11, 2010), http://content.time.com/time/magazine/article/0,9171,2040142,00.html.

26  [29] Anna Irrera, Steve Stecklow and Brenna Hughes Neghaiwi, *Special Report: Backroom battle

27  imperils $230 million cryptocurrency venture*, Reuters (Oct. 18, 2017), https://www.reuters.com/article/us-bitcoin-funding-tezos-specialreport/special-report-backroom-battle-imperils-230-million-cryptocurrency-venture-idUSKBN1CN35K.

28

willing to work with you".[30]  In other words, a flexible and less strict regulatory environment was a deciding factor in where and how Defendants chose to operate the Tezos ICO, and where they will choose to operate it in the future.

46.    A contract between DLS and the foundation was signed in June 2017.  The agreement, which is not public, governs the sale of DLS and its intellectual property to the Foundation and states that the Swiss federal supervisory authority for foundations must approve the agreement.  It also indicates the approval was required before the fundraiser took place. This approval has never taken place, and documents provided to participants in the fundraiser did not mention the required approval by the Swiss authority.[31]  The façade of the Tezos Foundation being a completely separate and distinct entity is further weakened by the fact that DLS and the Breitmans have now turned to the Tezos Foundation's funds (i.e., the ICO proceeds) to fund legal costs in connection with the illegal offering.[32]

47.    On May 5, 2017, less than two months before the start of the Tezos ICO, Defendant Timothy Draper promoted the Tezos ICO by announcing his investment in Tezos.  He became, according to Reuters, the "first prominent venture capitalist to openly embrace initial coin offerings."[33]

48.    Draper promoted the ICO, stating that "The best thing I can do is lead by example," implying that he was standing in the same position as any other ICO participant.  "Over time, I actually feel that some of these tokens are going to improve the world, and I want to make sure those

---

[30] Flux Podcast, *14: Kathleen Breitman – Tezos Unleashed*, RRE Ventures Perspectives Blog (Jul. 12, 2017), https://blog.rre.com/14-kathleen-breitman-tezos-unleashed-d0921294ec91.

[31] See e.g., Steve Stecklow, Anna Irrera, Brenna Hughes Neghaiwi, *Exclusive: Tezos founders push for legal bailout from Swiss foundation*, Reuters (Dec. 1, 2017), https://www.reuters.com/article/us-bitcoin-tezos-lawsuits-exclusive/exclusive-tezos-founders-push-for-legal-bailout-from-swiss-foundation-idUSKBN1DV4K0.

[32] *Id.*

[33] GertrudeChavez-Dreyfuss, *Exclusive: Billionaire investor Draper to participate in blockchain token sale for first time*, Reuters (May 5, 2017), http://www.reuters.com/article/us-tezos-blockchain-draper/exclusive-billionaire-investor-draper-to-participate-in-blockchain-token-sale-for-first-time-idUSKBN181250.

tokens get promoted as well. I think Tezos is one of those tokens."[34] A July 7, 2017 story in the Wall Street Journal noted that Tezos was "helped by having one prominent backer: Tim Draper, a founder of the Silicon Valley venture-capital firm Draper Fisher Jurvetson. Mr. Draper's small undisclosed personal investment in the firm, and his public pledge to buy into the initial coin offering, significantly raised Tezos's profile."[35]

49.    As the SEC has explained, "[Individuals] who promote[] a virtual token or coin that is a security . . . may also be liable for potential violations of the anti-fraud provisions of the federal securities laws, for participating in an unregistered offer and sale of securities, and for acting as unregistered brokers."[36]

50.    Investor interest and enthusiasm exploded after Draper's announcement.

51.    Prior to the ICO, the Tezos.com website prominently featured links to https://crowdfund.tezos.com (which has since been taken down), the website through which investors bought Tezos tokens during the ICO. ICO participants posting online on the day the ICO began were commenting that https://crowdfund.tezos.com was redirecting them to tezos.ch – the website for the Swiss-based Tezos Foundation – which they had never seen before.[37]

52.    The website also contained links to the Tezos Position Paper and White Paper, explaining details about the Tezos project, including its purpose, goals, and technology, and the "problems" with Bitcoin and Ethereum that it will solve.

---

[34] *Id.*

[35] Paul Vigna, *Forget an IPO, Coin Offerings Are New Road to Startup Riches*, The Wall Street Journal (July 7, 2017), https://www.wsj.com/articles/forget-an-ipo-coin-offerings-are-new-road-to-startup-riches-1499425200?mg=prod/accounts-wsj.

[36] Public Statement, *SEC Statement Urging Caution Around Celebrity Backed* ICOs, U.S. Securities and Exchange Commission (Nov. 1, 2017), https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos.

[37] See e.g., coinmad123, Comment to *Re: Tezos discussion*, Bitcoin Talk (Jul. 1, 2017, 04:04 AM), https://bitcointalk.org/index.php?topic=1775132.640 (commenter stating, "Is tezos.ch the site? I went to https://crowdfund.tezos.com and it also redirect me to tezos.ch").

53.     The Tezos website encouraged investors to "contribute" to the ICO throughout the website and through links to marketing materials such as the *Tezos Overview* "static paper".[38]

54.     On the "Help" page of Tezos.com, a section entitled, "How exactly do I contribute to the fundraiser?" contained nine steps describing, in plain English, how to submit Bitcoin or Ethereum to purchase Tezos tokens:



## How exactly do I contribute to the fundraiser?

1. Visit https://crowdfund.tezos.com after the fundraiser begins on July 1st, 2017 at 6am UTC. Make sure you type this exact address. Do not follow a link in an email or online; manually type this address into your browser. You will then go through the following steps:

2. First your browser will be checked for compatibility. Once verified, you may either continue the process online or download a static html document which you can use on an air-gapped (not connected to the Internet) computer. If you are considering making a large contribution, we strongly advise you to use the offline option and to use a brand new computer for the occasion which should be securely wiped after use.

3. You will be presented with a prompt asking for an email address and a new password. This isn't a registration. The email and password act as a secondary safety factor to protect the wallet that will be generated on the next screen. Pick a strong but memorable password. Losing your password means you will not be able to access the XTZ which may be allocated to you. There is no way to recover your password if you forget it. Click 'next'.

4. Your browser will generate a set of words (a "mnemonic") representing your private key, as well as the hash of your public key. You must keep these words secure. The hash of your public key a string of numbers and letters starting with "tz1". You can use it to verify your contribution after you have completed the process.

5. Save your wallet, either by manually copying the mnemonic, printing it, or moving the file to a USB drive. Verify that the seed words and public hash on the webpage match your downloaded wallet. Click 'next'.

6. Refer to the wallet number at the top of the document you just saved. Type your wallet number into the appropriate prompt and re-enter your password. Click 'next'. If you used the offline option, you will instead have to follow a link online to continue the contribution process. You can use your regular computer for that step, as it does not leak the private key. If using the online option you will directly go to the contribution screen.

7. You may now enter your desired contribution (if using BTC it is labeled XBT). You can send a test first, and/or send from multiple wallets/exchanges over several transactions. Remember if sending with ETH you must send it with the data as indicated in your paper wallet. Initiate the transfer by clicking your chosen contribution method (if it is fiat currency you will be directed to BitcoinSuisse AG's website and you may skip the rest of step #8). Whether contributing in Bitcoin or Ethereum, double-check that the address is correctly entered by comparing it with your paper wallet, and complete the transfer. If using ShapeShift, click the ShapeShift button and enter the type of alt you'd like to convert into XBT. The destination address automatically populates, though you should check it by clicking on Bitcoin on the conversion page. Enter a return address (an address where your alts can be sent back) in case the transaction does not go through, and enter your email address for a receipt of the transaction. Submit after double-checking everything and you are ready.

8. Once the transaction is confirmed (which will take 6 bitcoin blocks, regardless of your contribution method), you will be able to confirm receipt of your contribution by following the "receipts" link and entering the public hash listed in your wallet.

9. You're done!

55.     Investors were also told they could submit fiat currency via Bitcoin Suisse AG.[39]

---

[38] *Tezos Overview*, previously posted at Tezos.com, https://www.tezos.com/static/papers/Tezos_Overview.pdf (last visited Dec. 2, 2017).

[39] *Help*, previously posted at Tezos.com, https://www.tezos.com/help (last visited Dec. 3, 2017).

56.     On the same page, in another section entitled "Are there bonus periods?" Defendants describe a common ICO bonus scheme, where the sooner ICO investors made their purchases, the greater the bonus of additional tokens they stood to gain. Specifically, this section states that:

> The bonus starts at 20%, meaning that a contribution of 1 BTC will yield a recommended allocation of 6,000 XTZ (a 1000 XTZ bonus). From 20% at the outset the bonuses will decrease progressively to 0% over four additional periods (15%, 10%, 5%, and 0%) lasting 400 Bitcoin blocks each. The average time between Bitcoin blocks is approximately 10 minutes, thus the fundraiser is expected to last about two weeks, and each bonus period of 400 blocks roughly two days and eighteen hours.[40]

57.     The Tezos ICO began on July 1, 2017 and lasted about two weeks.[41] The Tezos ICO was "uncapped" which meant that there was no limit on the amount of contributions that were accepted.[42]

58.     Defendants posted a document called "Contribution Terms" on the tezos.ch website, attempting to disclaim any obligations whatsoever to Plaintiffs and the Class. This document stated that invested Bitcoin and Ethereum constitute "a non-refundable donation" and not an "investment", that Defendants have no obligation to ever provide Plaintiffs and the Class with Tezos tokens, and that the project "could be fully or partially abandoned" without recourse whatsoever. At no time during the signup process were Plaintiffs or other Class members directed to or required to agree to the Contribution Terms. A video depicting the signup process is available at: https://www.youtube.com/watch?v=Uti8-1Y-Wkk.

59.     In a public chat room run by Tezos, an automated bot would send a message each time someone in the chat room referred to an "investment" in the Tezos ICO, stating "Just a reminder, contributions to the Tezos' foundation's fundraiser are not 'investments.' The foundation will recommend allocation of tokens in the genesis block based on contributions."

---

[40] *Id.*

[41] *Help*, previously posted at Tezos.com, https://www.tezos.com/help (last visited Dec. 3, 2017).

[42] *Tezos Overview*, at Section 3.5, "Early Backers", previously posted at Tezos.com, https://www.tezos.com/static/papers/Tezos_Overview.pdf, (last visited Dec. 2, 2017) (referencing Defendants' "uncapped fundraising structure").

60.     Investors recognized this for the transparent fiction it was:



61.     As explained in detail below, Defendants' representations to the market and the Class made clear that contributors to the Tezos ICO were investors, not benefactors of a non-profit enterprise.  Draper himself has admitted as much on multiple occasions.  When, in connection with an October 22, 2017 story, a Reuters reporter asked Draper "how much he donated during the Tezos fundraiser, he replied via email, 'You mean how much I bought? A lot.'"[43]

62.     The idea of idea of labeling payments as "contributions" in an attempt to evade regulatory schemes is not a new one in Silicon Valley.  When the ridesharing company, Lyft, first began offering its service, it attempted to characterize the payments made by riders to drivers as

---

[43] Anna Irrera, Steve Stecklow, and Brenna Hughes Neghaiwi, *Startup Tezos raised $232 million issuing a new digital currency — now key players are fighting*, Business Insider (Oct. 19, 2017), http://www.businessinsider.com/r-special-report-backroom-battle-imperils-230-million-cryptocurrency-venture-2017-10?r=UK&IR=T.

1   voluntary "donations" in an attempt to evade state and federal labor laws and municipal taxi

2   regulations. Regulators and courts saw through the scheme.[44]

3   **C.      The Tezos Tokens Are Securities**

4   63.      The Tezos tokens are securities under federal law.  Under Section 2(a)(1) of the

5   Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment

6   contract." *See* 15 U.S.C. §§ 77b-77c.  California courts have applied the federal test described in

7   *SEC v. W.f. Howey Co.*, 328 U.S. 293 (1946) in determining whether a transaction is an investment

8   contract.

9   64.      An investment contract is an investment of money in a common enterprise with a

10  reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of

11  others.[45]  This definition embodies a "flexible rather than a static principle, one that is capable of

12  adaptation to meet the countless and variable schemes devised by those who seek the use of the

13  money of others on the promise of profits."[46]  The test "permits the fulfillment of the statutory

14  purpose of compelling full and fair disclosure relative to the issuance of 'the many types of

15  instruments that in our commercial world fall within the ordinary concept of a security.'"  *Id.*  In

16  analyzing whether something is a security, "form should be disregarded for substance,"[47] "and the

17  emphasis should be on economic realities underlying a transaction, and not on the name appended

18  thereto."[48]

19

20

---

21  [44] *See, e.g., Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1080 (N.D. Cal. 2015); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, No. 4:14-0941, 2015 WL 1034254, at *17 (S.D. Tex. Mar. 10, 2015).

22

23  [45] See *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-299, 301 (1946); see also *SEC v. EdwardsI*, 540 U.S. 389, 393 (2004); *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.").

24

25

26  [46] *Howey*, 328 U.S. at 299 (emphasis added).

27  [47] *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

    [48] *United Housing Found*, 421 U.S. at 849.

28

65.     The SEC concluded, in a Report of Investigation, that virtual coins similar to those offered in the Tezos ICO—sold by an organization called the "DAO"—were "securities and therefore subject to the federal securities laws." As the SEC made clear, "[I]ssuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[49]

### a.    Investors in the Tezos ICO Invested Money

66.     Investors in the Tezos ICO used Bitcoin, Ethereum, and cash to make their investments, and Tezos Tokens were received in exchange for this consideration.  Such investment is the type of contribution of value that can create an investment contract under section 2(a)(1) of the Securities Act of 1933.

67.     Defendant Kathleen Breitman has represented that Defendants were "selling" the Tezos tokens by stating: "we're *selling*, rather the Foundation is recommending an allocation of tokens to the genesis block based on donations to a Swiss non-profit.  And there's a suggested allocation amount.  So one Bitcoin for 5000 tokens.  And were going to *sell* them over the course of, rather have them up for donation over the course of two weeks."[50]

68.     Defendant Kathleen Breitman recognized that many unaccredited investors don't take the same precautions taken by accredited investors when making investments when she stated:

> **An ICO, which sounds like an IPO,** sort of **leads into this other attitude where people act as though there is some sort of other obligation that doesn't necessarily exist with these structures.**
> And I think that's very poisonous because investors, **accredited**

---

[49] Press Release, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities*, U.S. Securities and Exchange Commission (Jul. 25, 2017) https://www.sec.gov/news/press-release/2017-131.

[50] Around The Coin, *Fintech Podcast, Episode 138: Interview with Kathleen Breitman, CEO of Tezos*, YouTube (Jun. 16, 2017), https://www.youtube.com/watch?v=cDIgGYl5krA.

CLASS ACTION COMPLAINT
010721-11 1028766 V1

19

> investors act a certain way, and they take certain precautions.
> And that's not something everyone has learned.[51]

      **b.    Investors Had a Reasonable Expectation of Profits**

69.    It is widely understood that investors in the Tezos ICO participated with the reasonable expectation that they would make a profit.

70.    Tezos token holders stood to share in potential profits from the successful launch of the Tezos token. Thus, a reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the Tezos project.

71.    Defendant Draper told Reuters that cryptocurrencies are commodities like pork bellies, and characterized acquiring Tezzies as a purchase rather than a donation.[52]

72.    In addition, on July 26, 2017, Draper published an open letter to the SEC on Facebook,[53] in which he acknowledged the SEC's statutory authority to regulate ICOs (i.e., implicitly acknowledging that tokens are securities). Draper wrote "I agree that some (light) regulation might be in order with regard to ICOs. But in the spirit of clarity, and encouraging innovation with this new vehicle that has so much potential, I recommend the following: 1. If the purpose of a token is for investment, it must register with the SEC. . . . 3. If the purpose of a token is to raise money for a company, and the money is used to support the company, it must register with the SEC." Draper went on to suggest that "Any tokens issued before October 30, 2017 should be grandfathered in," betraying a recognition that, even under the test he proposed, the Tezos tokens should have been registered.

---

[51] This Week In Startups, *E759: Tezos Kathleen Breitman raises $232m top ICO for new self-governing smart contract blockchain*, YouTube (Sept 1, 2017), https://www.youtube.com/watch?v=rdRSUJkvmxM (at 37:40) (emphasis added).

[52] Anna Irrera, Steve Stecklow and Brenna Hughes Neghaiwi, *Backroom battle imperils $230 million cryptocurrency venture*, Reuters (Oct. 18, 2017), https://www.reuters.com/investigates/special-report/bitcoin-funding-tezos/.

[53] Tim Draper, *Open Letter to the SEC*, Facebook (Jul. 26, 2017), https://www.facebook.com/tim.draper/posts/10155685679894235?pnref=story.

73.     In reference to investors who are seeking profit, Defendant Kathleen Breitman has stated: "ultimately we're appealing to people's rational self-interest."[54]

74.     Additionally, Section 3.1.2 of the Tezos White Paper, entitled "Mining and signing rewards", describes the financial incentive (described as a "pecuniary reward") provided to miners to validate blocks and maintain and operate the Tezos network, and states that "[m]ining and signing both offer a small reward."[55]

75.     In Section 3.2 of the Tezos White Paper, Defendants go on to describe Tezo's "proof-of-stake" concept, which gives token-holders a dividend-like reward for mining tokens and maintaining the Tezos blockchain:

> We conjecture that the security of any decentralised currency requires to **incentivize** the participants with a **pecuniary** reward (we are in the process of finalizing the rewards schedule at the moment). As explained in the position paper, relying on transaction costs alone suffers from a tragedy of the commons. In Tezos, we rely on the combination of a bond and a reward.
>
> Bonds are one year (bonds will now only last a single cycle, given the high opportunity cost and little benefit to security of extending the bonding period past one cycle) security deposits purchased by miners (endorsers will also be required to purchase bonds). In the event of a double signing, these bonds are forfeited.
>
> After a year (cycle), the miners (and endorsers) receive a reward along with their bond to compensate for their opportunity cost. The security is primarily being provided by the value of the bond and the reward need only be a small percentage of that value.[56]

---

[54] Flux Podcast, *14: Kathleen Breitman – Tezos Unleashed*, RRE Ventures Perspectives Blog (Jul. 12, 2017), https://blog.rre.com/14-kathleen-breitman-tezos-unleashed-d0921294ec91.

[55] L.M. Goodman, *Tezos — a self-amending crypto-ledger White Paper*, previously posted at Tezos.com (Sept. 2, 2014), https://www.tezos.com/static/papers/white_paper.pdf (last visited Dec. 1, 2017).

[56] *Id.*

76.     The Tezos Foundation's website acknowledges that the depression of prices "is *obviously not in the best interest of contributors* or the foundation".[57]  This is because investors are clearly interested in seeing a return on their investment.

77.     Other factors that support the conclusion that Tezos investors invested their money for Tezos tokens with the reasonable expectation of profits include, *inter alia*, the following:

      a.  The statement on February 17, 2017 by Defendant Kathleen Breitman in reference to the Polychain VC investment and the ICO process that "[w]e created a product that was purchased by VC **investors** without the traditional equity investment model because of **the anticipated appreciation of our token**." (emphasis added);[58]

      b.  Defendant Draper, a billionaire venture capitalist, has stated: "We invested for ownership in [DLS]" and "participated in the Pre-sale," going on to say "All tokens we hope to receive that we didn't buy in the Pre-sale (alongside with all the other **investors** who participated) will vest over time with the founders' tokens." (emphasis added).  In the same statement, Draper said: "If [Defendants Arthur Breitman and Kathleen Breitman] are successful [in developing the Tezos tokens], they might just transform society, and we will all be better off as a result, **and then, maybe 5 or ten years down the road, my investors and I might get rich**." (emphasis added);[59]

---

[57] *Diversifying the portfolio of the Tezos Foundation*, previously posted at Tezos.com, https://www.tezos.ch/diversifying-the-portfolio-of-the-tezos-foundation.html (last visited Dec. 1, 2017).

[58] Rebecca Campbell, *Tezos Receives Funding for Smart Contact System from Polychain Capital's Digital Currency Fund*, Nasdaq (Feb. 17, 2017), http://www.nasdaq.com/article/tezos-receives-investment-in-smart-contact-system-from-polychain-capitals-digital-currency-fund-cm749875 (last visited Apr. 23, 2018).

[59] Cinerama, *Tim Draper: There Was Nothing Secretive About Our Purchase of Tezos*, Bitcoin Isle (Oct. 23, 2017), https://www.bitcoinisle.com/2017/10/23/tim-draper-there-was-nothing-secretive-about-our-purchase-of-tezos/.

c.   The statement on the Tezos.com *Frequently Asked Questions* ("FAQ") webpage that **"token holders can receive rewards** for participating in the proof-of-stake consensus mechanism" (emphasis added);[60]

d.   The statement on the *Tezos Overview* document that developers will be **"compensate[d]" with Tezos tokens** that "have immediate value rather than forcing them to seek corporate sponsorships, foundation salaries, or work for Internet fame alone" (emphasis added);[61]

e.   The statement on the *Tezos Overview* document that long-term governance goals include "favoring decisions that tend toward **increasing the value of the tokens** (emphasis added);[62]

f.   The language used by Defendants to describe the Tezos tokens:  According to Defendants, tokens are "minted", experience "inflation", and the receipt of more tokens are described as "profits".[63]  The Tezos position paper even describes Tezos miners and/or token holders as "stakeholders";[64]

g.   The question posed in the Tezos position paper, while analogizing Bitcoin mining with Tezos mining:  "why would a dominant miner **destroy the value of their investments by compromising the currency**?"[65] and

h.   Statements in the Tezos position paper suggesting that stakeholders (i.e., Tezos miners and/or token holders) will be incentivized to, and may actually

---

[60] *FAQ*, previously posted at Tezos.com, https://www.tezos.com/faq (last visited Dec. 2, 2017).

[61] *Tezos Overview*, at 2.1, "The Principles of the Tezos Blockchain": *Governance*, previously posted at Tezos.com, https://www.tezos.com/static/papers/Tezos_Overview.pdf (last visited Dec. 2, 2017).

[62] *Id.* at 6.1, "Long-Term Goals": *Community Goals*.

[63] See *Id.* at 2.3, "The Principles Of The Tezos Blockchain": *Proof of Stake*.

[64] See e.g., L.M. Goodman, *Tezos: A Self-Amending Crypto-Ledger Position Paper*, at p. 13, previously posted at Tezos.com (August 3, 2014), https://www.tezos.com/static/papers/position_paper.pdf (last visited Dec. 2, 2017) (describing a former stakeholder as one who has "since cashed out").

[65] *Id.* at p. 6.

1          take actions to raise the value of Tezos tokens, and prevent the dilution of the

2          token's value.[66]

3      78.     Public statements by investors themselves also suggest that many investors in Tezos

4  consider themselves investors, and not simply "contributors" or "donors", and that they expect a

5  return on their investments.

6      79.     For instance, one investor, Kevin Zhou, co-founder of the cryptocurrency trading fund

7  Galois Capital, invested about five Bitcoins in Tezos, and said: "For me and for a lot of people this

8  is an investment.  We are looking for a return."[67]

9      80.     Similarly, Plaintiffs and the Class view their financial contributions as investments

10 that were made dependent upon Defendants' representations and efforts.

11     81.     Moreover, members of the online crypto-investment sphere regularly keep track of the

12 return on investment (ROI) they could potentially gain from investing in an ICO through websites

13 such as icostats.com.

---

25 [66] *Id.* at p. 16.

26 [67] Anna Irrera, Steve Stecklow, Brenna Hughes Neghaiwi, *Special Report: Backroom battle

27 imperils $230 million cryptocurrency venture*, Reuters (Oct. 18, 2017),
   https://www.reuters.com/article/us-bitcoin-funding-tezos-specialreport/special-report-backroom-
   battle-imperils-230-million-cryptocurrency-venture-idUSKBN1CN35K.

28

82. For instance, according to the site, Ethereum's ICO price was $0.311, and it now trades at $559.56 as of April 19, 2018. Defendants have consistently represented Tezos as being a technologically improved version of the Bitcoin and Ethereum blockchains.[68] Defendants' statements fueled speculation that Tezos was the "next Ethereum",[69] driving investors to seek similar (or greater returns).

    c.    **Investors Expect Those Profits to Be Derived from the Managerial Efforts of Others**

83.     Investors' profits were to be derived from the managerial efforts of others— specifically, Tezos and its co-founders, and the Tezos development team. The Tezos investors relied

---

[68] See e.g., *Tezos Overview*, "Executive Summary", previously posted at Tezos.com, https://www.tezos.com/static/papers/Tezos_Overview.pdf (last visited Dec. 3, 2017) (stating, "The Tezos blockchain will underpin secure, decentralized applications and smart contracts while avoiding some of the political and technological problems which earlier efforts such as Bitcoin and Ethereum have faced.");

[69] See e.g., Matt Dibb, *Tezos ICO: Is this really the next Ethereum?*, Medium (July 4, 2017), https://medium.com/@picolo/tezos-ico-is-this-really-the-next-ethereum-cea99fcc3a1c.

on the managerial and entrepreneurial efforts of Tezos and its co-founders, and the Tezos

development team, to manage and develop the Tezos project.

84.    Defendants, especially the Breitmans, held themselves out to investors as experts in

Ethereum, the blockchain protocol on which Tezos operated (or will operate), and told investors on

multiple occasions that they were in the process of hiring additional developers.

85.    Investors in Tezos reasonably expected the Tezos co-founders and the Tezos

development team to provide significant managerial efforts after Tezos's launch.

86.    The expertise of Defendants was critical in monitoring the operation of Tezos,

promoting Tezos, and safeguarding investor funds, etc.  Investors had little choice but to rely on their

expertise.  The Tezos blockchain protocol and governing structure were predetermined long before

the ICO was launched.

87.    Defendant Arthur Breitman has even recently mocked investors for not being as

knowledgeable as he is regarding the development of Tezos.  After a developer challenged him

because of the lack of news and delay in the development of Tezos, stating "Maybe the issue is you

first of all?  Maybe the issue is your absolute incompetence in terms of writing a code?  Either you

lied [to] us about three years of development prior to [the] ICO . . . [or] you are [an] incompetent

developer and your entire team [is] too."  Breitman responded by stating:

> "Maybe the issue is your trolling.  **Writing "a" code?  You have zero
> understanding of what such a project entails.**"[70]

88.    Defendant Arthur Breitman has also put forth public statements admitting that the

progress of the Tezos project is dependant on his own personal efforts by stating, for instance:

> Some development has continued and we have **personally been
> working** to create strong relationships with successful entrepreneurs
> looking to build with Tezos.[71]

---

[70] *2017-12-01 dev update*, Reddit (Dec. 2, 2017),
https://www.reddit.com/r/tezos/comments/7gzmll/20171201_dev_update/?st=jashudk1&sh=1524a8e
5.

[71] Arthur Breitman, *The Path Forward: A letter from Arthur & Kathleen Breitman to the Tezos
community*, Medium (Oct. 18, 2017), https://medium.com/@arthurb/the-path-forward-eb2e6f63be67.

89.     And Defendants have represented that they did in fact, and continue to, actively oversee the Tezos project.

**D.     Tezos Defendants Were Required to Register Offers and Sales of Securities Unless a Valid Exemption Applies**

90.     Defendants were issuers of securities under the meaning of the Securities Act. The definition of "issuer" is broadly defined to include "every person who issues or proposes to issue any security" and "person" includes "an individual, a corporation, a partnership, an association, a joint-stock company, a trust, any unincorporated organization, or a government or political subdivision thereof." *See* 15 U.S.C. § 77b(a)(4) and 15 U.S.C. § 77b(a)(2).

91.     During the Offering Period, Defendants offered and sold Tezos Tokens in exchange for Ethereum, Bitcoin, and fiat currency through the Tezos Website, which was publicly-accessible, to individuals in the United States.  Because Tezos Tokens were securities, Defendants were required to register the offer and sale of Tezos Tokens, unless a valid exemption from such registration applied.

92.     Those who participate in an unregistered offer and sale of securities not subject to a valid exemption are liable for violating Section 5 of the Securities Act.

**E.     Infighting, Governance Problems, and Delays Emerge**

93.     The Breitmans were engaged in a very public ongoing power struggle with Gevers regarding control over Defendant Tezos Foundation, and the proceeds from the ICO.

94.     Between August and October 2017, Defendants provided investors with few updates on the Tezos project.

95.     On or around October 18, 2017, Defendant Arthur Breitman published a blog post on medium.com stating:  "In early September we became aware that the president of the Tezos Foundation, Johann Gevers, engaged in an attempt at self-dealing, misrepresenting to the council the value of a bonus he attempted to grant himself."[72]

---

[72] *Id.*

96.     The same day, an attorney for the Breitmans sent a 46-page letter to the two other members of the foundation's three-person board (currently, and likely also at the time, Diego Ponz and Guido Schmitz-Krummacher), calling for Gevers' prompt removal and seeking to give the couple a "substantial role" in a new structure that would limit the foundation's responsibilities. The document accuses Gevers of "self-dealing, self-promotion and conflicts of interest." According to Gevers, the Breitmans later suggested via email that he step aside for a month while they investigate.[73]

97. Gevers responded that he is not stepping down and that the Breitmans have been trying to control the foundation as if it were their own private entity by bypassing the foundation's legal structure and interfering with management and operations.  Their interference has resulted in costly delays in developing and launching the Tezos network and new currency (which Tezos promised to have launched by now), according to Gevers.[74]  Gevers accused the Breitmans of "character assassination," and of making "misleading statements and outright lies," and accused Defendants Ponz and Schmitz-Krummacher of an "illegal coup."

F.     **Defendants Are Selling, Converting and Dissipating the Consideration Collected From the Class**

98.     The Tezos Foundation has been liquidating the Bitcoin and Ethereum invested by investors since July 17, 2017, shortly after the ICO ended.[75]  On July 18, 2017, Defendants posted the following on the Tezos.ch website:

> The Tezos Foundation currently holds over $220M worth of bitcoins and ethers. To best serve the interests of the Tezos community, we intend to gradually diversify our position by slowly selling some (but not all) of these holdings over the coming months and purchasing a conservative portfolio of cash, stocks, bonds,

---

[73] Anna Irrera, Steve Stecklow, Brenna Hughes Neghaiwi, *Special Report: Backroom battle imperils $230 million cryptocurrency venture*, Reuters (Oct. 18, 2017), https://www.reuters.com/article/us-bitcoin-funding-tezos-specialreport/special-report-backroom-battle-imperils-230-million-cryptocurrency-venture-idUSKBN1CN35K.

[74] *Id.*

[75] *Diversifying the portfolio of the Tezos Foundation*, Tezos.ch (Jul. 18, 2017), https://www.tezos.ch/diversifying-the-portfolio-of-the-tezos-foundation.html.

and precious metals.  This will ensure that our organization is resilient in good times, and bad times.[76]

99.    Defendants' first conversion of the ICO proceeds was completed on July 17, 2017 when they "sold 1,587 ether at a price of $163.82, netting about 250,000 CHF for the Tezos Foundation."[77]

100.    Moreover, in an August 2017 update, Defendants confirmed that they were still converting these assets by stating that they "have been slowly converting these assets into cash at a pace of roughly CHF 500,000 per day."[78]

101.    Defendants also admitted that they were holding Bitcoin at the time of a so-called "fork," which created a new form of cryptocurrency called Bitcoin Cash for every holder of Bitcoin. As a result of the fork, Defendants admitted that "for every Bitcoin held by the Tezos Foundation, the Foundation now additionally holds a new 'BCH' token" and plans to gradually convert and sell these assets as well.[79]

102.    On August 10, 2017, the Tezos Foundation also announced its commitment to use $50 million in ICO proceeds "through venture capital partners to be announced" and "a direct venture arm" for "companies looking to build on the Tezos platform."[80]

103.    Moreover, Defendant Arthur Breitman has stated via a post on reddit.com that the Foundation has given funds to DLS, including a $60,000 payment "a few months ago."[81]

104.    In addition, there are reports that the Foundation fired its auditors.  A document filed with the Swiss Commercial Register indicated that the auditing firm Lufida Revision AG had been

[76] *Id.*

[77] *Id.*

[78] *August Update*, Tezos.ch (Aug. 10, 2017), https://www.tezos.ch/august-update.html#august-update (last visited Apr. 23, 2018)

[79] *Id.*

[80] *What is the Tezos Foundation doing with their Funds?*, previously posted at tezos.community (Aug. 14, 2017), https://forums.tezos.community/t/what-is-the-tezos-foundation-doing-with-their-funds/359.

[81] Murbard founder, Comment to *Reasons why Gevers should resign*, Reddit (Dec. 2, 2017), https://www.reddit.com/r/tezos/comments/7h13bk/reasons_why_gevers_should_resign/?st=jars8mcu&sh=11f66b73.

1   terminated.[82] Moreover, as mentioned, the Breitmans are also seeking to spend the Foundation's

2   assets on their legal bills.[83]

## VI. CLASS ALLEGATIONS

105. Plaintiffs bring this action as a class action pursuant to California Code of Civil Procedure § 382 and seek certification of the following Class: all persons who purchased Tezos tokens, XTZ, and/or Tezzies during the ICO conducted by Defendants in July 2017.

106. Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

107. Plaintiffs reserve the right to amend the Class definition if further investigation and/or discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified.

108. The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time but it is believed to be in the tens of thousands. Members of the Class may be identified by publicly-accessible blockchain ledger information and records maintained by Defendants or its agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

109. Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by the Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiffs additionally do not have any interests that are in conflict with the interests of the members of the Class.

[82] *Handelsregister - Registre du commerce - Registro di commercio*, shab.ch (Aug. 7, 2017), https://www.shab.ch/shabforms/servlet/Search?EID=7&DOCID=3904447 (last visited Apr. 24, 2018).

[83] Steve Stecklow, Anna Irrera, Brenna Hughes Neghaiwi, *Exclusive: Tezos founders push for legal bailout from Swiss foundation*, Reuters (Dec. 1, 2017), https://www.reuters.com/article/us-bitcoin-tezos-lawsuits-exclusive/exclusive-tezos-founders-push-for-legal-bailout-from-swiss-foundation-idUSKBN1DV4K0.

110.    Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

111.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a)  Whether the Tezos tokens are "securities" within the meaning of the Securities Act of 1933;

    b)  Whether Defendants offered or sold Tezos securities through the ICO;

    c)  Whether Defendants were required to register Tezos tokens and file a registration statement for the Tezos ICO pursuant to the Securities Act of 1933;

    d)  Whether the Tezos ICO violated the registration provisions of the Securities Act of 1933;

    e)  Whether Defendants are "issuers", "underwriters" and/or "necessary participants" in the Tezos securities offering;

    f)  The type and measure of damages suffered by Plaintiffs and the Class; and

    g)  Whether Plaintiffs and the Class are entitled to rescission, damages, or restitution and the proper calculation and amount of those damages.

112.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST COUNT

## VIOLATION OF SECTIONS 5(A), 5(C), AND 12(A) OF THE SECURITIES ACT OF 1933

### (Against All Defendants)

113.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, except any allegation of fraud, recklessness or intentional misconduct.

1      114.    This Count is brought pursuant to Sections 5(a) and 5(c) and 12(a)(1) of the Securities

2    Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a)(1), on behalf of the Class, against each of the

3    Defendants.

4      115.    The Tezos tokens Plaintiffs purchased from Defendants were securities within the

5    meaning of 15 U.S.C. § 77b(a)(1) because they are "investment contract[s]".

6      116.    Defendants, and each of them, by engaging in the conduct described above (including

7    the promotion, offering and/or selling of securities through the Tezos ICO), directly or indirectly,

8    made use of means or instruments of transportation or communication in interstate commerce or of

9    the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through

10    the mails or in interstate commerce for the purpose of sale or for delivery after sale.

11      117.    No Defendant or other person registered the Tezos securities, or the Tezos ICO, with

12    the SEC.

13      118.    No registration statements have been filed with the SEC or have been in effect with

14    respect to any of the offerings alleged herein.

15      119.    By reason of the foregoing, each of the Defendants have violated Sections 5(a) and

16    5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c). Section 12(a)(1) of the Securities Act

17    grants Plaintiff a private right of action against any person who offers or sells a security in violation

18    of Section 5.

19      120.    Defendants, and each of them, are issuers, underwriters, and/or necessary participants

20    in the Tezos ICO.

21      121.    Due to Defendants' violations of Sections 5(a) and 5(c) of the Securities Act of 1933,

22    15 U.S.C. §§ 77e(a) and 77e(c), Defendants are liable to Plaintiffs and each Class member pursuant

23    to Sections 12(a)(1) of the 1933 Act, 15 U.S.C. § 77l(a)(1).

24      122.    As a direct and proximate result of the Defendants' unregistered sale of securities,

25    Plaintiffs and members of the Class have suffered damages in connection with their respective

26    purchases of Tezzies securities at the Tezos ICO.

27

28

1

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for relief and judgment as follows:

2

3
(a) Declaring that this action is properly maintained as a class action pursuant to California

4
Code of Civil Procedure section 382 and California Rule of Court 3.760 *et seq.*;

5
(b) Certifying the proposed Class, including appointment of Plaintiffs' counsel as Class

6
Counsel and Plaintiffs as class representatives;

7
(c) Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs

8
and the Class;

9
(d) Awarding Plaintiffs and the members of the Class the remedy of rescission of their

10
investment to the Tezos ICO, including any appreciation of the contributed bitcoin and

11
ethereum, and/or awarding compensatory damages in favor of Plaintiffs and the Class

12
against all Defendants, jointly and severally, for all damages sustained as a result of

13
Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

14
(e) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

15
action, including counsel fees, expert fees, witness fees and electronic discovery fees as

16
permitted by law; and

17
(f) Granting such other and further relief as this Court may deem just and proper.

18

19
## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury for all of the claims asserted in this Complaint so triable.

20

21
DATED: April 24, 2018            HAGENS BERMAN SOBOL SHAPIRO LLP

22
                                 By: _____
23
                                 Reed R. Kathrein (139304)
                                 Peter E. Borkon (212596)
24
                                 Danielle Smith (291237)
                                 715 Hearst Ave., Suite 202
25
                                 Berkeley, CA 94710
                                 Telephone: (510) 725-3000
26
                                 Facsimile: (510) 725-3001
                                 Email: reed@hbsslaw.com
27
                                        peterb@hbsslaw.com
                                        danielles@hbsslaw.com
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Joel A. Fleming (281264)
Jacob A. Walker (271217)
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Email: jason@blockesq.com
        joel@blockesq.com
        jake@blockesq.com

*Attorneys for Plaintiff*

# EXHIBIT B

# CLASS ACTIONS: INTERJURISDICTIONAL WARFARE; Corporate Update; Corporate Securities

New York Law Journal

September 25, 1997 Thursday

Copyright 1997 ALM Media Properties, LLC All Rights Reserved Further duplication without permission is prohibited

### New York Law Journal

**Section:** Pg. 33, (col. 6); Vol. 218

**Length:** 4081 words

**Byline:** John C. Coffee Jr.

## Body

**Corporate Update**

**Corporate Securities**

D EFENSE strategy in class actions has changed materially in the last several years, and a distinctive, but dubious, new pattern has emerged that challenges the ability of courts to maintain their jurisdiction over cases before them. Although defendants continue to resist class action certification with considerable (and increasing) success, an alternative option has become popular when it appears likely that the class will in fact be certified: encourage a second and overlapping class action to be filed in another jurisdiction and certified by agreement as a settlement class.[1]

Sometimes, this second settlement class will be filed and certified virtually on the eve of trial, and after the first court has expended considerable time, supervising years of discovery and deciding numerous contested motions. The proposed settlement's terms will likely be well below the terms that had been discussed in settlement negotiations (or recommended by a mediator) in the first jurisdiction, and the plaintiffs' attorneys in the second action will have conducted little or no discovery.

**Home Court Advantage**

Why would any court approve such a seemingly collusive settlement? Sometimes, the answer may be that the second court is never apprised by the parties of the existence of the first proceeding.[2] More typically, however, the common denominator is that the second proceeding is brought in one of three states: Alabama, Louisiana or Texas (generally, South Texas). In these states, the home court advantage seems particularly strong, and at least in Alabama the second action will predictably be preliminarily certified the day it is filed.

Not all overlapping cases resemble this first pattern of outright collusion. Another variation is for defendants to seek to exploit a long-shot action premised on a doubtful legal theory and filed in jurisdiction A by obtaining a global release covering the stronger legal claims at issue in jurisdiction B.

To use an example to which this column will return, suppose a class action has proceeded for several years in Texas (either in state court or federal) involving oil and gas rights in Texas and alleging that defendants have underpaid their royalty owners in violation of common law duties and Texas statutory law. One defendant agrees to settle, and the rest of the defendants, sensing the trend is against them, begin to search for other alternatives.

One of these defendants decides to utilize a pending antitrust class action recently filed against it in an Alabama state court as a vehicle for a global settlement. Although it could easily defend this action, the defendant instead proposes to settle the alleged price-fixing class action, provided that the plaintiffs grant a release expressly covering all oil and gas royalty claims and the pending Texas action. The nationwide settlement will, however, be at a substantial discount off what the first defendant already has settled for in Texas (in a class action limited to Texas royalty owners).

- - - -

**T** O STUDENTS of the art form of collusion, there is a certain intellectual elegance to this approach. Had instead a nationwide class action covering all oil and gas properties been filed in Alabama (which would be the traditional way of pleading an overlapping class action), considerable doubt would arise as to whether such a class could meet the new, higher standards for a settlement class action under the Supreme Court's decision this year in **Amchem Products Inc. v. Windsor.**[3]

Oil and gas law differs significantly among state jurisdictions, and thus class members in different states with different legal rights may require separate representation. Because the Alabama Supreme Court considers federal decisions on Rule 23 to be at least persuasive and, more importantly, has begun to show some early doubts about the class action practices that have made Alabama nationally notorious,[4] certification of such a nationwide class might be overturned on appeal.

Nor would it be possible to file a federal antitrust class action in an Alabama state court, because federal courts have exclusive subject matter jurisdiction over the federal antitrust laws. But by pleading a nationwide class action based on the antitrust laws of the 50 states, it becomes possible to sidestep the obstacles posed by **Amchem Products** on the grounds that the class is homogenous (and not the sprawling class that **Amchem** says is uncertifiable).

**Court Action**

After all, it can be argued, virtually every state criminalizes price fixing, and thus there is no significant legal variations among the states or within the class. Although these claims would be hard to prove, they need not be, because the real goal is to plead a vehicle by which the different common law claims can be released. The road map for such a strategy was supplied by the Supreme Court's decision in **Matsushita Elec. Industrial Co. v. Epstein,**[5] which permitted a state court to release legal claims over which federal courts have exclusive subject matter jurisdiction.

At this point, one of the most important contemporary legal questions in class actions comes into view: is there anything that the court in the first jurisdiction can do about all this? Or must it sit, passive and powerless, and watch the ritual of Alabama collusion unfold, protected from its intervention by the Full Faith and Credit Clause?

Commentators have offered different proposals, but none strike me as fully adequate. Professor Geoffrey Miller has focused on the All Writs Act, which authorizes federal courts to issue all writs necessary or appropriate in aid of their jurisdiction and agreeable to the usages and principles of law.[6]

But federal courts have used this power sparingly, principally because of the counterbalancing instruction of the Anti-Injunction Act that federal courts may not (except in extraordinary cases) enjoin state court proceedings.[7]

To date, some federal courts have been willing to enjoin state class actions, but only when they were doing so to protect their own judgment or had an imminent settlement before them.[8] The theory of these cases is that they are protecting the implementation of their own judgment or preventing the relitigation of matters already decided before them.

Thus in a leading case, **Carlough v. Amchem Products Inc.,**[9] which was a precursor of the Supreme Court's **Amchem Products** decision, the Third Circuit upheld a district court's injunction against a rival class action being maintained in state court where it found that the prospect for settlement was indeed imminent.[10]

CLASS ACTIONS: INTERJURISDICTIONAL WARFARE; Corporate Update; Corporate Securities

On analogous facts, where judgment had been entered and a trust fund established to benefit class members, the Second Circuit has also permitted a district court to remove state court proceedings under the All Writs Act.[11] Other circuits have, however, expressed doubt about whether the scope of the authority conferred by the All Writs Act goes even this far.[12]

Thus, whatever the outer limits on a federal court's power under the All Writs Act, these limits fall well short of authorizing the court to enter a broad channeling injunction prohibiting suit by absent class members (or their attorneys) in other forums simply based on the pendency of an action before it.  Put simply, short of the judgment stage, the federal court simply lacks personal jurisdiction over the absent class members (or their attorneys).

But if a federal court can protect an imminent settlement, but not an imminent trial, the result is a strange disparity that increases the pressure on plaintiffs to settle in the first jurisdiction, lest some action be brought at the last minute in another jurisdiction.  Moreover, a court that has heard and decided dozens of pretrial motions may find its time and efforts wasted if on the eve of trial a defendant can elope to another jurisdiction with a friendly plaintiffs' attorney.

Other commentators (including my Columbia colleague, Professor Henry Monaghan, the Harlan Fiske Stone Professor of Constitutional Law) have emphasized an alternative avenue that is available today to the court in the first jurisdiction.[13]

In principle, the first court may refuse to honor the judgment in the second jurisdiction if it finds that the class lacked adequate representation.  In **Hansberry v. Lee**[14] and in later decisions,[15] the Supreme Court has said that if adequate representation is lacking, due process is violated and other state and federal courts are not required to accord full faith and credit to such judgment.[16]

The Restatement (Second) of Judgments states this rule unequivocally:  Final judgments remain vulnerable to collateral attack for failure to satisfy the adequate representation requirements.[17]

Recent case law at the federal appellate level has repeatedly reaffirmed this rule that a collateral attack is possible on the judgment entered by the court that approved the settlement.[18]  The standards applicable to such a collateral attack appear to vary marginally.

The Ninth Circuit requires the party making the collateral attack to show both inadequate representation and that the defendant was on notice of sufficient facts to apprise it clearly of this failure.[19]  The Third Circuit, however, has emphasized the checking value inherent in permitting collateral attacks and announced broadly that such attacks are a necessary part of the class action rule.[20]

At least on a policy level, however, there are several problems with reliance on this approach.  First, it puts the plaintiffs' lawyer in the initial forum to a terrible choice:  the lawyer can enter the first forum to object, but if so, the lawyer waives any right to make a collateral attack.  If instead the lawyer stays out of the forum, she may have to assume the additional burden of proving not only that the representation was inadequate, but that the defendant knew it.[21]

Second, collateral attacks create years of uncertainty and may produce undesirable constitutional confrontations (particularly between state courts).

Finally, the Supreme Court's 1996 decision in **Matsushita Elec. Industrial Co. v. Epstein**[22] casts an uncertain shadow over the case law on collateral attack by holding that a federal statute (28 U.S.C. 1738) requires the federal court to give the same issue preclusive effect to the state court judgment as the law of that state would give it.

Thus, for example, a federal court must treat an Alabama judgment (or global release) as precluding federal antitrust law claims, even though an Alabama court would lack jurisdiction to hear such claims, if Alabama law authorizes the court to release the federal claims.

CLASS ACTIONS: INTERJURISDICTIONAL WARFARE; Corporate Update; Corporate Securities

But must the federal court similarly respect the Alabama state's court's finding that there was adequate representation in the Alabama proceeding, even if the action was filed and settled in a matter of hours and without discovery and involved a suspiciously disproportionate fee award paid by the defendants.  This issue remains open in the **Matsushita** litigation itself, which was reargued before a Ninth Circuit panel on remand from the Supreme Court over a year ago.

Whatever the eventual outcome in **Matsushita,** it is clear that some federal courts are today becoming disenchanted with last minute settlement class actions that attempt to divest them of jurisdiction.

Last year, in **Romstadt v. Apple Computer Inc.,**[23] an Ohio federal district court expressly denied full faith and credit to a Texas state court judgment that Apple Computer secured through a settlement class filed long after the federal action had been commenced.

The facts in **Romstadt** were egregious:   the federal plaintiffs were not even notified of the Texas certification hearing.  **Romstadt** thus signals that if the race to the courthouse to reach a preclusive settlement is begun too late or run too unfairly, the victory may be disqualified.

Similarly, an Alabama federal court expressed its dismay late last year at an Alabama state court settlement, where the state court plaintiffs filed a mirror-image class action in state court two and one half years after the filing of the federal action before it.[24]   Only after the Alabama state court settlement class was certified was either court informed of the pendency of the other action.

Angry at the obvious settlement shopping, the federal district court framed the problem succinctly:

In dealing with multiple representatives for what is putatively the same class, the defendants can engage in competitive bargaining.  Representatives and their counsel are under pressure to give the defendant the settlement offer most favorable to the defendant.  Otherwise, the defendant may take a more favorable settlement offer from a different class representative and leave the other class representatives and their counsel with nothing.[25]

If this states the problem, what is the practical answer?

New York University Professors Marcel Kahn and Linda Silberman have proposed some criteria that the court in the second jurisdiction should evaluate before releasing federal claims in a state action.[26]

While this may be a step in the right direction, I am afraid that it is only a baby step - at least given the substantial home court advantages that the second team of plaintiff's attorneys have in states like Alabama.

Moreover, they imply that collateral attacks should not be possible once the court makes their requisite findings.  This would eliminate an important checking value from the process.

Instead, a prospective answer is needed that allows the initial plaintiff's team to return to the first court.  Although courts - state and federal - normally lack the power to enjoin absent class members (or their attorneys) from bringing suit in another forum, they do have power over the parties before them.

This includes the power to enjoin the defendant from entering into a settlement class action with another plaintiff in another forum, at least without notice to the court and its approval.  Exactly this distinction between the federal district court's limited power over absent class members and its fuller power over the parties before it has been made this year in dicta by a Tenth Circuit panel.[27]

Such a prospective remedy fits the problem without creating the constitutional confrontation that results when one court refuses to give full faith and credit to the judgment of another court in another jurisdiction.

After all, it takes two to tango, and collusion cannot occur without the active participation of the defendant.  The federal court (or indeed a state court to the extent that it is not enjoining federal court litigation) could enter a standing order that the defendants in any pending class action before it could neither settle the claims in a class

action in another forum nor receive any release of those claims that would be binding on the class as a whole - without its prior approval.

Is this unfair to defendants?  If defendants were on the eve of trial elsewhere, it might be, because it would force them to litigate claims that they would rather settle.

But the most egregious recent examples of settlement shopping (including **Matsushita** itself) have involved attempts by defendants to exploit actions that simply could not be litigated successfully against them.

This may be so either because (1) as in **Matsushita,** the court in the settlement forum had already found the action to be frivolous, or (2) the later action is filed sufficiently far behind the first action that the former will clearly come to trial first (thereby precluding the later action either by its success or failure).

In truth, defendants are not unfairly prejudiced to the extent that they only cannot settle actions filed at the last minute to block an action that is approaching trial.

**Gray Areas**

Admittedly, gray cases can arise.  Actions in different jurisdictions may initially seem unrelated, but after a series of amended complaints and other developments, the two cases can come to overlap.  In such a case, it is a closer question whether a federal court should bar defendants from settling a state court action that is also approaching trial.

But to the extent that a standing order entered at the outset of the case barred the defendant from settling or receiving a release of the class's claims without notice to, and prior approval by, the federal court, this order does not imply that the federal court could not decide to defer to the state forum.

Essentially, the federal court is only protecting its jurisdiction and slowing the race to the courthouse for the speediest settlement.  Plaintiffs in the federal court action could then negotiate with defendants knowing that at least they will not awake one morning to learn that their case was settled the night before in Alabama.

Where two class actions do overlap and neither appears to have been filed at the behest of the defendants, how should a court proceed that has entered such a restraining order against the defendant?

One possibility is that it should allow both actions to proceed, provided that neither grants a release that will preclude the other.  Thus, for example, in **Matsushita,** the Delaware state court could settle fiduciary claims, but not release Rule 10b-5 claims, and the federal court would be correspondingly limited.  This will work, however, only when the overlap between the two actions is merely tangential.  When the overlap is more substantial, the settlement value of each action depends on the same damages; the two actions may plead different legal theories, but the damages to the class are roughly the same.  Thus, neither action can successfully settle without precluding the other.

An example that illustrates this problem is the case posed at this column's outset.  Assume a Texas state court class action, pleading Texas common law claims and covering only royalty owners with properties in Texas, overlaps with a later filed nationwide class action that was filed in Alabama state court, which pleads price-fixing violations in violation of the state antitrust laws of all 50 states.[28]  Both actions allege the same underlying damages: the amount by which royalty owners were underpaid.  Correspondingly, both actions inevitably seek to release the other action's claims.

How should the court resolve this situation?  The timing of the two actions should not alone be dispositive (although the last minute filing of a settlement class is certainly suspicious).

Rather, the focus should again be on adequacy of representation, as that standard has been redefined by **Amchem Products.**

CLASS ACTIONS: INTERJURISDICTIONAL WARFARE; Corporate Update; Corporate Securities

In that case, the Supreme Court said, citing this author, that if class counsel could settle claims that it could not litigate it would be disarmed because it could not use the threat of litigation to press for a better offer.[29]

It is but a small step from this position to say that such a disarmed counsel is an inadequate representative.  Hence, when a class counsel seeks to release claims far broader than it has pled, it is also disarmed, because it also cannot use the threat of litigation to secure a better offer for claims that it has not even pled.

In effect, although the state antitrust class action may avoid the predominance issue under Rule 23(b)(3) by pleading a legal theory on which state law is arguably uniform, it trips over the adequacy of representation standard of Rule 23(a)(4) by doing so because by failing to plead the more meritorious claims the class counsel disarms itself.

In truth, this approach frames an empirical inquiry:  which claims are the more valuable?  The Texas class action did not plead any antitrust conspiracy (because its attorneys considered such a theory weak), while the Alabama class action did not plead any common law claims (because a nationwide class action alleging violations of the common law of all 50 jurisdictions is probably uncertifiable).

Which claims are more valuable?  The antitrust claims were like the proverbial tip of the iceberg, with the unpled common law claims representing the submerged bulk of the iceberg.  My assessment rests on the great difficulty of proving a price-fixing conspiracy by all the major oil companies where each at all times charged different prices.

Of course, others may disagree with this evaluation, but the key point is that a class counsel who pleads only legal theories constituting the tip of the iceberg should not be able to release the underlying bulk of the actual claims. Such a counsel lacks sufficient leverage to be an adequate representative.

If, however, a court were to believe that the antitrust claims had the greater value, then the reverse conclusion follows:  the Alabama action should be permitted to settle, and the Texas action should be stayed from releasing antitrust claims.  Thus, the proposed mode of analysis is neutral.

Ultimately, a principal attraction of this approach is that it frames a manageable inquiry.  It neither relies on a laundry list of questions that state court should ask before approving a settlement releasing federal law claims, nor depends on the uncertainty of collateral attack.

Federal courts also have little incentive to hold onto a class action that could settle elsewhere.  They can conduct a prospective valuation of the competing claims based on the premise that the more adequate representative is the legal team with the stronger case.

1. There has been relatively little writing on this topic, but for stimulating assessments of this area, see:  Geoffrey Miller, Class Actions and Jurisdiction Boundaries:  Overlapping Class Actions, **71 N.Y.U. L. Rev. 514** (1996); Marcel Kahan and Linda Silberman, Matsushita and Beyond:  The Role of State Courts in Class Actions Involving Exclusive Federal Claims, **1996 Supreme Court Rev.** 219.

2. See cases cited infra at notes 23 and 24.

3. **Amchem Products, Inc. v. Windsor,** 117 S. Ct. 2231 (1997).

4. For a possible first sign of a new appellate resistance to class certification in Alabama, see **Ex Parte Holland,** 692 So. 2d 811 (Ala. 1997).

5. 116 S. Ct. 873 (1996).

6. 28 U.S.C. 1651(a).

7. 28 U.S.C. 2283.  For an overview of its reach, see Fallon, Metzger & Shapiro, Hart & Wechsler's **The Federal Courts and the Federal System** (4th ed. 1996) at 1189-1210.

CLASS ACTIONS: INTERJURISDICTIONAL WARFARE; Corporate Update; Corporate Securities

8. See, e.g., **White v. National Football League,** 41 F.3d 402, 409 (8th Cir. 1994); **In re Baldwin-United Corp.,** 770 F.2d 328, 335 (2d Cir. 1985).

9. 10 F.3d 193 (3d Cir. 1990).

10. Id. at 203-204.

11. See **In re Agent Orange Product Liability Litig,** 996 F.2d 1425 (2d Cir. 1993), **cert. denied,** 114 U.S. 1126 (1994).

12. In **Hillman v. Webley,** 115 F.3d 1461, (10th Cir. 1997), the Tenth Circuit this year has criticized and refused to follow the Second Circuit's **Agent Orange** decision.

13. See Monaghan, **Channeling Injunctions and Related Problems in Class Actions** (forthcoming).

14. 311 U.S. 32, 41-42 (1940).

15. See also **Martin v. Wilks,** 490 U.S, 755, 762 n.2 (1989); **Richards v. Jefferson County,** 116 S. Ct. 1761, 1766 (1996).

16. See Kremer v. Chem. Constr. Co., 456 U.S. 461, 482 (1982); see also **Shutts v. Phillips Petroleum Co.,** 472 U.S. 797, 805 (1985).

17. Restatement (Second) of Judgments, 42(1)(d) & (e) and Comments (e) and (f) to 42(1)(e)(1982).

18. See **Barney v. Holtzer Clinic, Ltd.,** 110 F.3d 1207, 1214 n.11 (6th Cir. 1997) ( the absent class member may later collaterally attack a faulty judgment by challenging adequacy of representation); **Brown v. Ticor Title Ins. Co.,** 982 F.2d 386, (9th Cir. 1992), cert. dismissed, 114 S. Ct. 1359.

19. See **Brown v. Ticor Title Ins. Co.,** supra, at 390-91.

20. See **In re Real Estate Antitrust Litigation,** 869 F.2d 760, 769 (3d Cir.), cert. denied sub. nom. **Chicago Title Ins. Co. v. Tucson United School Dist.,** 493 U.S. 821 (1989).

21. See **Brown v. Ticor Title Ins. Co.,** supra note 18.

22. See supra note 3; see also **Marrese v. American Academy of Orthopaedic Surgeons,** 470 U.S. 373 (1985).

23. 948 F. Supp. 701 (N.D. Ohio 1996).

24. See **Walter Johnson v. Norwest Financial Alabama Inc.,** No. CV-93-PT-0962-S (N.D. Ala. Dec. 9, 1996).

25. Id.  Memorandum Opinion at pp. 5-6.

26. See Kahan and Silberman, supra note 1.

27. See **Hillman v. Webley,** supra note 12, at 1469.

28. Obviously, this case is not a hypothetical, but is pending, and the author testified for the Texas lawyers opposing the Alabama class certification.  Nonetheless, the test proposed in this column does not inherently favor either side.

29. 117 S. Ct. at  (citing Coffee, **Class Wars:  The Dilemma of the Mass Tort Class Action,** 95 Colum. L. Rev. 1343, 1379-80 (1995); 1997 U.S. LEXIS 4032 *53.

**Load-Date:** August 5, 2011

CLASS ACTIONS: INTERJURISDICTIONAL WARFARE; Corporate Update; Corporate Securities

**End of Document**