Neal A. Potischman (SBN 254862)
Serge A. Voronov (SBN 298655)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California  94025
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email: neal.potischman@davispolk.com
       serge.voronov@davispolk.com

Edmund Polubinski III (*pro hac vice*)
Andrew S. Gehring (*pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:   (212) 701-5800
Email: edmund.polubinski@davispolk.com
       andrew.gehring@davispolk.com

*Attorneys for Defendant Tezos Stiftung*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TEZOS SECURITIES LITIGATION<br><br>This document relates to: All Actions | Master File No. 17-cv-06779-RS<br><br><u>CLASS ACTION</u><br><br>**DECLARATION OF ERIC STUPP IN SUPPORT OF DEFENDANT TEZOS STIFTUNG'S MOTION TO DISMISS THE CONSOLIDATED COMPLAINT** |

I, Eric Stupp, hereby declare as follows:

1.      I make this declaration based on my own personal knowledge and would testify competently to the matters stated herein if called upon to do so.

2.      I submit this declaration in support of the Motion to Dismiss the Consolidated Complaint (the "Motion") filed in the above-captioned action by Tezos Stiftung (the "Foundation").

3.      I am a member of the bar of Zurich, Switzerland, and a partner at the law firm Bär & Karrer Ltd., in Zurich, Switzerland.  A copy of my professional resume is attached as Exhibit A. Bär & Karrer performs legal work for multinational corporations across a broad range of industries, and it has frequently been recognized as one of the top law firms in Switzerland.  Bär & Karrer has a significant practice advising banks, securities dealers, and other financial institutions regarding Swiss securities laws.

4.      I studied law at the University of St. Gallen, Switzerland, and graduated in 1989.  I was admitted to the St. Gallen bar in 1994 and completed post-graduate studies (LL.M.) at the University of Chicago in 1996.

5.      I have been a partner at Bär & Karrer Ltd. since 2000, after having worked for Bär & Karrer as an associate since 1994.  I head Bär & Karrer's financial services department and co-head the internal investigation and cross-border proceedings team.  I am a member of the boards of other financial and nonprofit institutions.

6.      I am fluent in the following languages:  German, English, and French.

7.      For the Court's convenience, the original German version and the English translation of the relevant portions of the statutes cited in this declaration are attached as Exhibit B. I have used publicly available translations of the Swiss statutes.

## I.      Background

8.      I have read the Consolidated Complaint filed by Lead Plaintiff Arman Anvari.

9.      I understand that Plaintiff alleges that "Tezos tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1)."  (Compl. ¶ 139.)  I understand that Plaintiff also alleges that the Tezos fundraiser was an unregistered securities offering under U.S. law.  (*Id.* ¶ 142.)

1

10.     Since November 2017, Bär & Karrer has been providing Swiss law advice to the Foundation.  In connection with the Foundation's Motion, I have been asked by Davis Polk & Wardwell LLP to describe the nature and extent of certain kinds of regulatory oversight in Switzerland, as well as the remedies that Swiss courts provide to safeguard investors' interests when purchasing securities.

11.     I express no opinion on whether the Tezos tokens would be deemed securities or whether the fundraiser would be a securities offering under Swiss, U.S., or any other law.  In the analysis below, I do not refer to any confidential information of the Foundation.

## II.     Declaration

### A.     Relevant Authorities

#### 1.     The Swiss Federal Foundation Supervisory Authority

12.     The Foundation is a nonprofit entity organized under the laws of Switzerland of a type known as a "foundation."  A Swiss foundation is an autonomous legal entity consisting of assets irrevocably committed to a defined purpose.  Swiss Civ. Code, art. 80. The Foundation's purpose is defined in its charter as follows: "*The Foundation's mission is promoting and developing new technologies and applications, especially in the fields of new open and decentralized software architectures. A dominating but not exclusive focus is set on the promotion and development of the so-called Tezos protocol and the related technologies, as well as the promotion and support of applications using the Tezos protocol.*"

13.     Pursuant to Swiss law, the governance structure of a foundation is defined in its charter and consists of a board. *Id*., art. 83. Further governing bodies (e.g. management, advisory board) may be created in accordance with the foundation charter, but the board is responsible for the management and must supervise other bodies in case it has delegated some of its management functions to them.  *Id.*  The board members are liable to the foundation if they breach their duties and thereby cause damages.

14.     A foundation and indirectly its governing bodies are subject to oversight by the competent Swiss authorities, including the Swiss Federal Foundation Supervisory Authority (the "Swiss Foundation Authority").  *Id.*, art. 84.

2

15.     The Swiss Foundation Authority ensures that a foundation's funds are used in accordance with its purpose as defined in the foundation charter, including through regular examination of auditors' reports, financial statements and reports about the foundation's operations. *Id.*, arts. 80, 83c, 84.

16.     In the event that the Swiss Foundation Authority determines that a foundation's organization is inadequate, the authority has broad powers to take remedial measures, including issuing directions to the foundation board, revoking existing board members, appointing an administrator or – as a last resort – dissolving the foundation and transferring assets to another entity with a similar purpose.  *Id.*, arts. 83d, 84a.

## 2.     The Swiss Financial Market Supervisory Authority

17.     The Swiss Financial Market Supervisory Authority ("FINMA") is Switzerland's independent regulator of the financial markets and financial institutions.  FINMA's core tasks are issuing authorizations, supervising license holders and, where necessary, enforcing supervisory law, be it in connection with supervised institutions or unauthorized companies and individuals. FINMA shall protect financial market clients – creditors, investors and insurance policy holders – and ensure that Switzerland's financial markets function effectively.  Swiss Financial Market Supervision Act, art. 5.

18.     FINMA also monitors the issuing of crypto tokens by Swiss entities, as they may fall under the scope of its supervisory powers.  In February 2018, FINMA published guidelines for so-called "initial coin offerings" ("ICOs") setting forth its intended treatment of ruling requests from ICO organizers.  *See* FINMA, Guidelines (Feb. 16, 2018), https://www.finma.ch/en/~/media/finma/dokumente/dokumentencenter/myfinma/1bewilligung/fint ech/wegleitung-ico.pdf?la=en.

19.     According to those Guidelines, "[s]ecurities regulation is intended to ensure that market participants can base their decisions regarding investments [...] on a reliable and defined set of information".  FINMA classifies certain tokens issued in an ICO as securities.  *Id.* § 3.2.  If "FINMA comes to the conclusion that the tokens of an ICO constitute securities, they fall under [Swiss] securities regulation."  *Id.* § 3.3.  Further, FINMA states that "[t]he issuing of tokens that

3

1  are analogous to equities or bonds can also result in prospectus requirements under the Swiss Code

2  of Obligations." *Id.* § 3.3. It should be pointed out, however, that unlike derivatives, structured

3  products or collective investment schemes, the issuing of equities or bonds or analogous securities

4  is largely not subject to regulatory oversight of FINMA.

5        **B.**    **Swiss Securities Law**

6       20.    The Swiss Code of Obligations ("CO") provides a mechanism for protecting

7  investors who purchase securities.

8       21.    As relevant here, the CO requires that issuers who conduct offerings of shares or

9  bonds must publish a prospectus. *Id.*, art. 652a CO for the issuance of shares; art. 1156 CO for the

10  issuance of bonds.  Further, the Swiss Collective Investments Schemes Act ("CISA") requires that

11  issuers of structured products or collective investment schemes must also publish a prospectus.

12  CISA art. 5 para. 1 lit. b and para. 2 for the issuance of structured products; CISA art. 75 for the

13  issuance of collective investment schemes.

14       22.    The required contents of the prospectus depend on the type of security at issue.

15  Independent of the type of security at issue, investors must be able to access the prospectus prior to

16  making purchasing decisions.

17       23.    Failure to satisfy the relevant requirements may subject an issuer to private causes of

18  action brought by investors.  According to the CO, an investor may have a cause of action for

19  compensation for damages if the issuer disclosed a prospectus, where (i) the prospectus contains an

20  incorrect or misleading statement, or a statement that does not otherwise comply with legal content

21  requirements; (ii) the issuer or any other person who participated in the preparation or

22  dissemination of the prospectus acted negligently or intentionally; and (iii) the investor proves that

23  he suffered damages due to the incorrect or misleading statement or omission. *Id.*, art. 752.

24  Likewise, an investor may have a cause of action for compensation for damages if an issuer simply

25  fails to draw up or disclose a prospectus, provided that the other requirements of art. 752 CO are

26  met.  *Cf.* WATTER, in: Honsell/Vogt/Watter (eds.), Basler Kommentar, Obligationenrecht II, 5th ed.,

27  Basel 2016, art. 752 paras. 11, 18.

28

C.     **Swiss Tort and Contract Law**

24.     Investors may have causes of action under Swiss tort or contract law that they can also bring in connection with the purchase or sale of a security.

25.     First, investors may seek compensation for damages by claiming that they were injured because an issuer intentionally or negligently violated a provision meant to protect investors from such damages (*Schutznorm*).  CO, art. 41 para. 1.

26.     Second, investors may seek rescission of a securities purchase where (i) they entered into a purchase agreement (*Id.*, arts. 184 *et seq.*) with the securities seller; (ii) the seller made an incorrect or misleading statement that caused the buyer to make the investment; and (iii) the statement is deemed to be a representation (*Zusicherung*) from the seller to the buyer.  *Id.*, art. 205 para. 1.

27.     Third, provided that a purchase agreement has been entered into between the investor and the securities seller, the investor may seek restitution of its investment if the seller exploited the investor's inexperience in concluding the purchase agreement.  *Id.*, art. 21 para. 1.

D.     **Swiss Procedural Law**

28.     Any of the claims described above may be brought by an investor on an individual basis in the Swiss courts to seek damages or rescission, as appropriate. In addition, an investor may under certain conditions base his claims in the Swiss courts on the law applicable where the public offering has been made (art. 156 of the Swiss Federal Statute of private international law).  Swiss courts also have several procedures that would permit investors to proceed collectively.

29.     Plaintiffs may file their claims jointly (*einfache Streitgenossenschaft*) under article 71 of the Swiss Civil Procedure Code ("SCPC"). Two or more plaintiffs may bring proceedings together if their actions are based on the same factual or legal bases, if the court has subject-matter competence for all claims (*sachliche Zuständigkeit*) and if the same type of procedure is applicable to all claims.

30.     A court may also order the joinder of separately filed actions and consolidate claims in order to simplify the proceedings. SCPC, art. 125(c).

31.     Plaintiffs also may assign their claims to any single party, who then files the claims on its own behalf. Such a party can also be a consumer organization or an ad hoc association founded for such purpose.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14 day of May, 2018 at Zurich, Switzerland.

Eric Stupp

DECLARATION IN SUPPORT OF TEZOS STIFTUNG'S MOTION TO DISMISS
MASTER FILE NO. 17-CV-06779-RS

1

2

**INDEX OF EXHIBITS**

3

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Resume of Eric Stupp |
| B | Original German Version and English Translation of the Relevant Portions of the Statutes Cited |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

# Eric Stupp
**lic. iur., Attorney-at-law, LL.M. (University of Chicago)**

*Eric Stupp's main areas of focus are capital markets, bank regulations, and M&A in the finance sector. He heads the financial services team of Bär & Karrer and advises banks, insurances and other financial institutions in Switzerland and abroad on a regular basis.*

**Curriculum**

| | |
|---|---|
| 2003-2011 | Member of the management board of Bär & Karrer Ltd. |
| since 2000 | Partner of Bär & Karrer Ltd. |
| 1996 | LL.M. University of Chicago |
| 1994 | Associate at Bär & Karrer Ltd. |
| 1994 | Admitted to the St. Gallen Bar |
| 1991 | Law Clerk at the Appelate Court of the Canton of St. Gallen |
| 1990 | Trainee at a Swiss law firm |
| 1989 | University of St. Gallen: lic. iur. HSG |

**Memberships and Public Offices**

Swiss Bar Association (SAV/FSA)

Zurich Bar Association (ZAV)

Member of the Specialist Committee Legal & Compliance of the Swiss Funds & Asset Management Association (SFAMA)

Member of the Board of the IBA Banking Law Subcommittee Germany / Switzerland / Austria

Member of the International Bar Association (IBA)

Recognized Representative for the Listing of Securities at the SIX Swiss Exchange

**Practice Areas**

Banking & Insurance

Funds, Financial Products & Asset Management

Mergers & Acquisitions

Internal Investigation

Corporate Governance

**Languages**

German, French, English

# EXHIBIT B

# INDEX OF STATUTES CITED

PAGE

Swiss Civil Code, art. 80 ...................................................................1

Swiss Civil Code, art. 83 ...................................................................1

Swiss Civil Code, art. 84 ...................................................................3

Swiss Financial Market Supervision Act, art. 5 ..........................................4

Swiss Financial Market Supervisory Authority, Guidelines, § 3.2 ................4

Swiss Financial Market Supervisory Authority, Guidelines, § 3.3 ................7

Swiss Code of Obligations, art. 21 ......................................................8

Swiss Code of Obligations, art. 41 ......................................................8

Swiss Code of Obligations, art. 184 .....................................................8

Swiss Code of Obligations, art. 205 ...................................................19

Swiss Code of Obligations, art. 652 ...................................................25

Swiss Code of Obligations, art. 752 ...................................................26

Swiss Code of Obligations, art. 1156...................................................27

Swiss Collective Investments Schemes Act, art. 5...................................27

Swiss Collective Investments Schemes Act, art. 75 ................................28

Swiss Federal Statute of Private International Law, art. 156.....................29

Swiss Civil Procedure Code, art. 71 ...................................................29

Swiss Civil Procedure Code, art. 125...................................................30

# Original German Version and English Translation of the Relevant Portions of the Statutes Cited

## Schweizerisches Zivilgesetzbuch[1]

### Artikel 80 A. Errichtung / I. Im Allgemeinen

A. Errichtung

I. Im Allgemeinen

Zur Errichtung einer Stiftung bedarf es der Widmung eines Vermögens für einen besonderen Zweck.

### Artikel 83 B. Organisation / I. Im Allgemeinen

B. Organisation

I. Im Allgemeinen

Die Organe der Stiftung und die Art der Verwaltung werden durch die Stiftungsurkunde festgestellt.

### Artikel 83c B. Organisation / III. Revisionsstelle / 2. Verhältnis zur Aufsichtsbehörde

2. Verhältnis zur Aufsichtsbehörde

Die Revisionsstelle übermittelt der Aufsichtsbehörde eine Kopie des Revisionsberichts sowie aller wichtigen Mitteilungen an die Stiftung.

## Swiss Civil Code[8]

### Article 80 A. Formation / I. In general

A. Formation

I. In general

A foundation is established by the endowment of assets for a particular purpose.

### Article 83 B. Organisation / I. In general

B. Organisation

I. In general

The foundation charter shall stipulate the foundation's governing bodies and the manner in which it is to be administered.

### Article 83c 1B. Organisation / III. Auditors / 2. Supervisory authority

2. Supervisory authority

The external auditors must provide the supervisory authority with a copy of the audit report and all important communications with the foundation.

---

[1]   https://www.admin.ch/opc/de/classified-compilation/19070042/index.html
[8]   https://www.admin.ch/opc/en/classified-compilation/19070042/index.html

**Artikel 83d B. Organisation / IV. Mängel in der Organisation**

IV. Mängel in der Organisation

1 Ist die vorgesehene Organisation nicht genügend, fehlt der Stiftung eines der vorgeschriebenen Organe oder ist eines dieser Organe nicht rechtmässig zusammengesetzt, so muss die Aufsichtsbehörde die erforderlichen Massnahmen ergreifen. Sie kann insbesondere:

  1. der Stiftung eine Frist ansetzen, binnen derer der rechtmässige Zustand wieder herzustellen ist; oder
  2. das fehlende Organ oder einen Sachwalter ernennen.

2 Kann eine zweckdienliche Organisation nicht gewährleistet werden, so hat die Aufsichtsbehörde das Vermögen einer anderen Stiftung mit möglichst gleichartigem Zweck zuzuwenden.

3 Die Stiftung trägt die Kosten der Massnahmen. Die Aufsichtsbehörde kann die Stiftung verpflichten, den ernannten Personen einen Vorschuss zu leisten.

4 Liegt ein wichtiger Grund vor, so kann die Stiftung von der Aufsichtsbehörde die Abberufung von Personen verlangen, die diese eingesetzt hat.

**Article 83d B. Organisation / IV. Organisational defects**

IV. Organisational defects

1 If the planned system of organisation proves inadequate or if the foundation lacks one of the prescribed governing bodies or one such body is not lawfully constituted, the supervisory authority must take the necessary measures. In particular it may:

  1. set a time limit within which the foundation must restore the legally required situation; or
  2. appoint the body which is lacking or an administrator.

2 In the event that the foundation is unable to organise itself effectively, the supervisory authority shall transfer its assets to another foundation with as similar objects as possible.

3 The foundation bears the cost of such measures. The supervisory authority may require the foundation to make an advance payment to the persons appointed.

4 For good cause, the foundation may request the supervisory authority to remove persons whom it has appointed.

## Artikel 84 C. Aufsicht

C. Aufsicht

1 Die Stiftungen stehen unter der Aufsicht des Gemeinwesens (Bund, Kanton, Gemeinde), dem sie nach ihrer Bestimmung angehören.

1bis Die Kantone können die ihren Gemeinden angehörenden Stiftungen der kantonalen Aufsichtsbehörde unterstellen.

2 Die Aufsichtsbehörde hat dafür zu sorgen, dass das Stiftungsvermögen seinen Zwecken gemäss verwendet wird.

## Artikel 84a Cbis. Massnahmen bei Überschuldung und Zahlungsunfähigkeit

Cbis. Massnahmen bei Überschuldung und Zahlungsunfähigkeit

1 Besteht begründete Besorgnis, dass die Stiftung überschuldet ist oder ihre Verbindlichkeiten längerfristig nicht mehr erfüllen kann, so stellt das oberste Stiftungsorgan auf Grund der Veräusserungswerte eine Zwischenbilanz auf und legt sie der Revisionsstelle zur Prüfung vor. Verfügt die Stiftung über keine Revisionsstelle, so legt das oberste Stiftungsorgan die Zwischenbilanz der Aufsichtsbehörde vor.

2 Stellt die Revisionsstelle fest, dass die Stiftung überschuldet ist oder ihre Verbindlichkeiten längerfristig nicht erfüllen kann, so legt sie die Zwischenbilanz der Aufsichtsbehörde vor.

3 Die Aufsichtsbehörde hält das oberste Stiftungsorgan zur Einleitung der erforderlichen Massnahmen an. Bleibt dieses untätig, so trifft die Aufsichtsbehörde die nötigen Massnahmen.

## Article 84 C. Supervision

C. Supervision

1 Foundations are supervised by the state authority (Confederation, canton, commune) to which they are assigned.

1bis The cantons may subject foundations at communal level to supervision at cantonal level.

2 The supervisory authority must ensure that the foundation's assets are used for their declared purpose.

## Article 84a Cbis. Measures in the event of overindebtedness and insolvency

Cbis. Measures in the event of overindebtedness and insolvency

1 Where there are grounds for concern that the foundation is overindebted or will no longer be able to meet its obligations in the longer term, its board of trustees must draw up an interim balance sheet at liquidation values and submit it to the external auditors. If the foundation has no external auditors, the board of trustees must submit the interim balance sheet to the supervisory authority.

2 If the external auditors establish that the foundation is overindebted or will no longer be able to meet its obligations in the longer term, it must submit the interim balance sheet to the supervisory authority.

3 The supervisory authority shall direct the board of trustees to take the necessary measures. If it fails to do so, the supervisory authority takes such measures itself.

4 Nötigenfalls beantragt die Aufsichtsbehörde vollstreckungsrechtliche Massnahmen; die aktienrechtlichen Bestimmungen über die Eröffnung oder den Aufschub des Konkurses sind sinngemäss anwendbar.

4 If necessary, the supervisory authority shall take legal enforcement measures; the provisions of company law on commencement or deferral of compulsory dissolution apply mutatis mutandis.

## Bundesgesetz über die Eidgenössische Finanzmarktaufsicht

## (Finanzmarktaufsichtsgesetz)[2]

## Swiss Financial Market Supervision Act

## (Financial Market Supervision Act)[9]

### Artikel 5 Ziele der Finanzmarktaufsicht

### Article 5 Objectives of financial market supervision

Die Finanzmarktaufsicht bezweckt nach Massgabe der Finanzmarktgesetze den Schutz der Gläubigerinnen und Gläubiger, der Anlegerinnen und Anleger, der Versicherten sowie den Schutz der Funktionsfähigkeit der Finanzmärkte. Sie trägt damit zur Stärkung des Ansehens und der Wettbewerbsfähigkeit des Finanzplatzes Schweiz bei.

In accordance with the financial market acts, financial market supervision has the objectives of protecting creditors, investors, and insured persons as well as ensuring the proper functioning of the financial market. It thus contributes to sustaining the reputation and competitiveness of Switzerland's financial centre.

## Eidgenössische Finanzmarktaufsicht FINMA Wegleitung für Unterstellungsanfragen betreffend Initial Coin Offerings (ICOs)[3]

## Swiss Financial Market Supervisory Authority FINMA Guidelines for enquiries regarding the regulatory framework for initial coin offerings (ICOs)[10]

**Ausgabe vom 16. Februar 2018**

**Published 16 February 2018**

**3.2 Qualifikation von Token als Effekten**

**3.2 Classification of tokens as securities**

---

2   https://www.admin.ch/opc/de/classified-compilation/20052624/index.html
3   https://www.finma.ch/de/~/media/finma/dokumente/dokumentencenter/myfinma/1bewilligung/fintech/wegleitung-ico.pdf?la=de
9   https://www.admin.ch/opc/en/classified-compilation/20052624/index.html
10  https://www.finma.ch/en/~/media/finma/dokumente/dokumentencenter/myfinma/1bewilligung/fintech/wegleitung-ico.pdf?la=en

Die Regeln zum Effektenhandel sollen sicherstellen, dass Marktteilnehmer ihre Entscheide für Anlagen wie Aktien oder Anleihen auf Grundlage verlässlicher Mindestinformationen treffen können. Darüber hinaus soll erreicht wer-den, dass der Handel fair, zuverlässig und mit effizienter Preisbildung abläuft.

Die FINMA hat im Einzelfall gemäss den folgenden gesetzlichen Definitionen zu prüfen, ob Token als Effekten qualifizieren. Effekten nach Art. 2 Bst. b 4/10 Finanzmarktinfrastrukturgesetz (FinfraG) sind Wertpapiere, Wertrechte, Derivate und Bucheffekten, die vereinheitlicht und zum massenweisen Handel geeignet sind, d.h. in gleicher Struktur und Stückelung öffentlich angeboten oder bei mehr als 20 Kundinnen und Kunden platziert werden, sofern sie nicht für einzelne Gegenparteien besonders geschaffen werden (Art. 2 Abs. 1 Finanzmarktinfrastrukturverordnung, FinfraV).

Wertrechte lassen sich inhaltlich als Rechte definieren, die gestützt auf eine gemeinsame, rechtliche Grundlage (Statuten/Ausgabebedingungen) in einer Vielzahl ausgegeben bzw. begründet werden und untereinander gattungs-mässig identisch sind. Als einzige formelle Voraussetzung für die Entstehung von Wertrechten verlangt das Obligationenrecht einen Eintrag in das vom Schuldner geführten Wertrechtebuch (Art. 973c Abs.3 Obligationen-recht, OR). Dieses kann in digitaler Form auf einer Blockchain geführt werden.

### 3.2.1 Zahlungs-Token / Kryptowährungen

Zur Effektenqualität dieser Token-Kategorie bestehen unterschiedliche Lehr-meinungen. Teilweise wird vertreten, dass alle Token Wertrechte darstellen und Effekten sein können. Die Gegenmeinung lehnt dies ab. Gegeben die Tatsache, dass Zahlungs-Token als Zahlungsmittel konzipiert sind und der wirtschaftlichen Funktion nach keine Analogie zu

Securities regulation is intended to ensure that market participants can base their decisions regarding investments such as equities or bonds on a reliable and defined set of information. Moreover, trading should be fair, reliable and offer efficient price formation.

FINMA will base its determination as to whether tokens qualify as securities on the following legal definitions. Securities in the sense of the Financial Market Infrastructure Act (FMIA) are standardised certificated or uncertificated securities, derivatives and intermediated securities (Art. 2 let. B FMIA), which are suitable for mass standardised trading, i.e. they are publicly offered for sale in the same structure and denomination or are placed with more than 20 clients, insofar as they have not been created especially for individual counterparties (Art. 2 para. 1 FMIA).

Uncertificated securities are defined as rights which, based on a common legal basis (articles of association/issuance conditions), are issued or established in large numbers and are generically identical. Under the Code of Obligations (CO), the only formal requirement is to keep a book in which details of the number and denomination of the uncertificated securities issued and of the creditors are recorded (Art. 973c para.3 CO). This can be accomplished digitally on a blockchain.

### 3.2.1 Payment tokens / cryptocurrencies

There are various legal opinions as to whether tokens of this kind constitute securities. Some assert that all types of tokens should be considered as securities; others disagree. Given that payment tokens are designed to act as a means of payment and are not analogous in their function to traditional securities, FINMA will not treat payment tokens as securities.

traditionellen Effekten aus-weisen, behandelt die FINMA Zahlungs-Token nicht als Effekte. Dies ist kon-sistent mit der bestehenden Praxis der FINMA z.B. betreffend Bitcoin und Ether. Sollte künftig insbesondere die Rechtsprechung oder der Wille des Gesetzgebers eine Qualifikation von Zahlungs-Token als Effekten vorsehen, würde die FINMA ihre Praxis anpassen.

This is consistent with FINMA's current practice (e.g. in relation to Bitcoin and Ether). If payment tokens were to be classified as securities through new case law or legislation, FINMA would accordingly revise its practice.

### 3.2.2 Nutzungs-Token

Nutzungs-Token qualifizieren nicht als Effekten, wenn der Token aus-schliesslich einen Anspruch auf Zugang zu einer digitalen Nutzung oder Dienstleistung vermittelt und der Nutzung-Token im Zeitpunkt der Ausgabe in diesem Sinne einsetzbar ist. In diesen Konstellationen steht die Realerfüllung des Anspruchs auf Zugang zur digitalen Nutzung oder Dienstleistung im Vordergrund und fehlt der für Effekten typische Kapitalmarktbezug.

In allen Fällen, in denen ganz oder teilweise die wirtschaftliche Funktion als Anlage besteht, behandelt die FINMA diese als Effekte (wie Anlage-Token).

### 3.2.2 Utility tokens

Utility tokens will not be treated as securities if their sole purpose is to confer digital access rights to an application or service and if the utility token can actually be used in this way at the point of issue. In these cases, the underlying function is to grant the access rights and the connection with capital markets, which is a typical feature of securities, is missing.

If a utility token additionally or only has an investment purpose at the point of issue, FINMA will treat such tokens as securities (i.e. in the same way as asset tokens).

### 3.2.3 Anlage-Token

Anlage-Token werden von der FINMA als Effekten behandelt. Im Einzelnen qualifizieren Anlage-Token als Effekten im Sinne von Art. 2 Bst. b FinfraG, wenn sie ein Wertrecht repräsentieren und die Token vereinheitlicht und zum massenweisen Handel geeignet sind.

Ein Anlage-Token qualifiziert in gleicher Weise als Effekte, wenn er ein Derivat repräsentiert, d.h. der Wert der vermittelten Forderung von einem unter-liegenden Vermögenswert (Basiswert) abhängig ist, und der Token vereinheitlicht und zum massenweisen Handel geeignet ist.

Im Kontext von ICOs können bei Vorfinanzierungen und Vorverkäufen, die Ansprüche auf

### 3.2.3 Asset tokens

FINMA treats asset tokens as securities. Asset tokens constitute securities within the meaning of Article 2 let. b FMIA if they represent an uncertificated security and the tokens are standardised and suitable for mass standardised trading.

An asset token also qualifies as a security if it represents a derivative (i.e. the value of the conferred claim depends on an underlying asset) and the token is standardised and suitable for mass standardised trading.

In the case of the pre-financing and pre-sale phases of an ICO which confer claims to acquire tokens in the future, these claims will

Bezug von Token vermitteln, Wertrechte entstehen, die als Effekten zu behandeln sind (wie Anlage-Token), sofern die Wertrechte vereinheitlicht und zum massenweisen Handel geeignet sind.

## 3.3 Rechtsfolgen bei Qualifikation als Effekten

Kommt die FINMA entlang den ausgeführten Leitlinien zur Beurteilung, dass Token eines ICO als Effekten qualifizieren, ergeben sich die Rechtsfolgen aus den Finanzmarktgesetzen. Die Schaffung von Wertrechten im Sinne einer Eigenemission hat nach Börsengesetz (BEHG) grundsätzlich keine Unterstellungspflicht zur Folge, auch wenn diese Wertrechte Effektenqualität im Sinne des FinfraG aufweisen (d.h. standardisiert und zum massenweisen Handel geeignet sind). Dasselbe gilt für das öffentliche Angebot von Effekten. Eine unterstellungspflichtige Tätigkeit als Derivathaus liegt vor, wenn Derivate selber geschaffen und für eigene oder fremde Rechnung öffentlich auf dem Primärmarkt angeboten werden (Art. 3 Abs. 3 Börsenverordnung, BEHV). Dies ist nur relevant für Token, die als Derivate im Sinne des FinfraG qualifizieren. Werden Token im Sinne von Effekten von Dritten fest oder in Kommission übernommen und öffentlich erstmalig auf dem Primärmarkt angeboten, kann bei Gewerbsmässigkeit eine bewilligungspflichtige Emissionshaustätigkeit vorliegen (Art. 3 Abs. 2 BEHV).

Die Ausgabe von Aktien oder Anleihensobligationen, auch in Form von Token, kann aber eine Prospektpflicht nach Obligationenrecht auslösen. Die FINMA hat diesbezüglich keine Zuständigkeit. ICO-Organisatoren sind verantwortlich, diese Pflicht angemessen abzuklären und einzuhalten. Gemäss dem Entwurf zum Finanzdienstleistungsgesetz (FIDLEG) soll zukünftig eine aufsichtsrechtliche Prospektpflicht bei öffentlichen Angeboten zum Erwerb von Effekten in der Schweiz gelten (Art. 37 E-FIDLEG). Obligationenrecht und FIDLEG sehen verschiedene Ausnahmetatbestände vor.

## 3.3 Legal implications of treatment as a security

If, based on the guidelines set out above, FINMA comes to the conclusion that the tokens of an ICO constitute securities, they fall under securities regulation. Under the Stock Exchange Act (SESTA), book-entry of self-issued uncertificated securities is essentially unregulated, even if the uncertificated securities in question qualify as securities within the meaning of FMIA. The same applies to the public offering of securities to third parties. The creation and issuance of derivative products as defined by FMIA to the public on the primary market is however regulated (Art. 3 para. 3 Stock Exchange Ordinance, SESTO). Underwriting and offering tokens constituting securities of third parties publicly on the primary market, is, if conducted in a professional capacity, a licensed activity (Art. 3 para. 2 SESTO).

The issuing of tokens that are analogous to equities or bonds can also result in prospectus requirements under the Swiss Code of Obligations. FINMA has no direct responsibility in this area but expects ICO organisers to themselves clarify these requirements. According to the draft Financial Services Act (FinSA) prospectus requirements will become part of supervisory law (Art. 37 Draft FinSA). The Swiss Code of Obligations and FinSA provide for a number of different exceptions and exemptions.

| | |
|---|---|
| **Schweizerisches Obligationenrecht / Bundesgesetz betreffend die Ergänzung des Schweizerischen Zivilgesetzbuches** | **Swiss Code of Obligations ("CO") / Federal Act on the Amendment of the Swiss Civil Code** |
| **(Fünfter Teil: Obligationenrecht) (OR)[4]** | **(Part Five: The Code of Obligations)[11]** |
| **Artikel 21 Abs. 1 OR E. Inhalt des Vertrages / III. Übervorteilung** | **Article 21 para. 1 CO E. Terms of the contract / III. Unfair advantage** |
| III. Übervorteilung | III. Unfair advantage |
| 1 Wird ein offenbares Missverhältnis zwischen der Leistung und der Gegenleistung durch einen Vertrag begründet, dessen Abschluss von dem einen Teil durch Ausbeutung der Notlage, der Unerfahrenheit oder des Leichtsinns des andern herbeigeführt worden ist, so kann der Verletzte innerhalb Jahresfrist erklären, dass er den Vertrag nicht halte, und das schon Geleistete zurückverlangen. | 1 Where there is a clear discrepancy between performance and consideration under a contract concluded as a result of one party's exploitation of the other's straitened circumstances, inexperience or thoughtlessness, the injured party may declare within one year that he will not honour the contract and demand restitution of any performance already made. |
| **Artikel 41 Abs. 1 OR A. Haftung im Allgemeinen / I. Voraussetzungen der Haftung** | **Article 41 para. 1 CO A. General principles / I. Conditions of liability** |
| A. Haftung im Allgemeinen | A. General principles |
| I. Voraussetzungen der Haftung | I. Conditions of liability |
| 1 Wer einem andern widerrechtlich Schaden zufügt, sei es mit Absicht, sei es aus Fahrlässigkeit, wird ihm zum Ersatze verpflichtet. | 1 Any person who unlawfully causes loss or damage to another, whether wilfully or negligently, is obliged to provide compensation. |
| **Artikel 184 *ff.*, inkl. Artikel 205 Abs. 1 OR** | **Article 184 *et seq.*, incl. Article 205 para. 1 CO** |
| **Zweite Abteilung: Die einzelnen Vertragsverhältnisse** | **Division Two: Types of Contractual Relationship** |
| **Sechster Titel: Kauf und Tausch** | **Title Six: Sale and Exchange** |

---

[4] https://www.admin.ch/opc/de/classified-compilation/19110009/index.html
[11] https://www.admin.ch/opc/en/classified-compilation/19110009/index.html

**Erster Abschnitt: Allgemeine Bestimmungen**

**Art. 184 A. Rechte und Pflichten im Allgemeinen**

A. Rechte und Pflichten im Allgemeinen

1 Durch den Kaufvertrag verpflichten sich der Verkäufer, dem Käufer den Kaufgegenstand zu übergeben und ihm das Eigentum daran zu verschaffen, und der Käufer, dem Verkäufer den Kaufpreis zu bezahlen.

2 Sofern nicht Vereinbarung oder Übung entgegenstehen, sind Verkäufer und Käufer verpflichtet, ihre Leistungen gleichzeitig - Zug um Zug - zu erfüllen.

3 Der Preis ist genügend bestimmt, wenn er nach den Umständen bestimmbar ist.

**Art. 185 B. Nutzen und Gefahr**

B. Nutzen und Gefahr

1 Sofern nicht besondere Verhältnisse oder Verabredungen eine Ausnahme begründen, gehen Nutzen und Gefahr der Sache mit dem Abschlusse des Vertrages auf den Erwerber über.

2 Ist die veräusserte Sache nur der Gattung nach bestimmt, so muss sie überdies ausgeschieden und, wenn sie versendet werden soll, zur Versendung abgegeben sein.

3 Bei Verträgen, die unter einer aufschiebenden Bedingung abgeschlossen sind, gehen Nutzen und Gefahr der veräusserten Sache erst mit dem Eintritte der Bedingung auf den Erwerber über.

**Section One: General Provisions**

**Art. 184 A. Rights and obligations of the parties in general**

A. Rights and obligations of the parties in general

1 A contract of sale is a contract whereby the seller undertakes to deliver the item sold and transfer ownership of it to the buyer in return for the sale price, which the buyer undertakes to pay to the seller.

2 Unless otherwise provided by agreement or custom, the seller and the buyer are obliged to discharge their obligations simultaneously quid pro quo.

3 The price is deemed sufficiently determined where it can be determined from the circumstances.

**Art. 185 B. Benefits and risks**

B. Benefits and risks

1 The benefit and risk of the object pass to the buyer on conclusion of the contract, except where otherwise agreed or dictated by special circumstance.

2 Where the object sold is defined only in generic terms, the seller must select the particular item to be delivered and, if it is to be shipped, must hand it over for dispatch.

3 In a contract subject to a condition precedent, benefit and risk of the object do not pass to the buyer until the condition has been fulfilled.

## Art. 186 C. Vorbehalt der kantonalen Gesetzgebung

C. Vorbehalt der kantonalen Gesetzgebung

Der kantonalen Gesetzgebung bleibt es vorbehalten, die Klagbarkeit von Forderungen aus dem Kleinvertriebe geistiger Getränke, einschliesslich der Forderung für Wirtszeche, zu beschränken oder auszuschliessen.

## Art. 186 C. Reservation of cantonal law

C. Reservation of cantonal law

Cantonal law may limit or exclude the right to bring claims in connection with retail sales of alcoholic beverages, including hotel bills.

## Zweiter Abschnitt: Der Fahrniskauf

### Art. 187 A. Gegenstand

A. Gegenstand

1 Als Fahrniskauf ist jeder Kauf anzusehen, der nicht eine Liegenschaft oder ein in das Grundbuch als Grundstück aufgenommenes Recht zum Gegenstande hat.

2 Bestandteile eines Grundstückes, wie Früchte oder Material auf Abbruch oder aus Steinbrüchen, bilden den Gegenstand eines Fahrniskaufes, wenn sie nach ihrer Lostrennung auf den Erwerber als bewegliche Sachen übergehen sollen.

## Section Two: The Chattel Sale

### Art. 187 A. Object

A. Object

1 Any sale in which the object is not land, property or a right in rem entered in the land register is a chattel sale.

2 Where constituent parts of land, such as crops, architectural salvage materials or quarry products, are separated therefrom for transfer to the acquirer, their sale constitutes a chattel sale.

## Art. 188 B. Verpflichtungen des Verkäufers / I. Übergabe / 1. Kosten der Übergabe

B. Verpflichtungen des Verkäufers

I. Übergabe

1. Kosten der Übergabe

Sofern nicht etwas anderes vereinbart worden oder üblich ist, trägt der Verkäufer die Kosten der Übergabe, insbesondere des Messens und Wägens, der Käufer dagegen die der Beurkundung und der Abnahme.

## Art. 188 B. Seller's obligations / I. Transfer / 1. Transfer costs

B. Seller's obligations

I. Transfer

1. Transfer costs

Unless otherwise provided by agreement or custom, the seller bears the costs of transfer and in particular those of measuring and weighing, while the buyer bears those of documentation and receipt.

10

**Art. 189 B. Verpflichtungen des Verkäufers / I. Übergabe / 2. Transportkosten**

2. Transportkosten

1 Muss die verkaufte Sache an einen anderen als den Erfüllungsort versendet werden, so trägt der Käufer die Transportkosten, sofern nicht etwas anderes vereinbart oder üblich ist.

2 Ist Frankolieferung verabredet, so wird vermutet, der Verkäufer habe die Transportkosten übernommen.

3 Ist Franko- und zollfreie Lieferung verabredet, so gelten die Ausgangs-, Durchgangsund Eingangszölle, die während des Transportes, nicht aber die Verbrauchssteuern, die bei Empfang der Sache erhoben werden, als mitübernommen.

**Art. 190 B. Verpflichtungen des Verkäufers / I. Übergabe / 3. Verzug in der Übergabe / a. Rücktritt im kaufmännischen Verkehr**

3. Verzug in der Übergabe

a. Rücktritt im kaufmännischen Verkehr

1 Ist im kaufmännischen Verkehr ein bestimmter Lieferungstermin verabredet und kommt der Verkäufer in Verzug, so wird vermutet, dass der Käufer auf die Lieferung verzichte und Schadenersatz wegen Nichterfüllung beanspruche.

2 Zieht der Käufer vor, die Lieferung zu verlangen, so hat er es dem Verkäufer nach Ablauf des Termines unverzüglich anzuzeigen.

**Art. 189 B. Seller's obligations / I. Transfer / 2. Transport costs**

2. Transport costs

1 Unless otherwise provided by agreement or custom, if the object sold must be transported to a place other than the place of performance, the buyer bears the costs of such transport.

2 The seller is presumed to have borne the transport costs where free delivery has been agreed.

3 Where delivery free of shipping costs and duties has been agreed, the seller is deemed to have assumed the export, transit and import duties payable during transport but not the consumer tax levied on receipt of the object.

**Art. 190 B. Seller's obligations / I. Transfer / 3. Delivery default / a. Withdrawal from commercial transactions**

3. Delivery default

a. Withdrawal from commercial transactions

1 Where in commercial transactions the contract specifies a time limit for delivery and the seller is in default, the presumption is that the buyer will forego delivery and claim damages for non-performance.

2 However, if the buyer prefers to demand delivery, he must inform the seller without delay on expiry of the time limit.

**Art. 191 B. Verpflichtungen des Verkäufers / I. Übergabe / 3. Verzug in der Übergabe / b. Schadenersatzpflicht und Schadenberechnung**

b. Schadenersatzpflicht und Schadenberechnung

1 Kommt der Verkäufer seiner Vertragspflicht nicht nach, so hat er den Schaden, der dem Käufer hieraus entsteht, zu ersetzen.

2 Der Käufer kann als seinen Schaden im kaufmännischen Verkehr die Differenz zwischen dem Kaufpreis und dem Preise, um den er sich einen Ersatz für die nicht gelieferte Sache in guten Treuen erworben hat, geltend machen.

3 Bei Waren, die einen Markt- oder Börsenpreis haben, kann er, ohne sich den Ersatz anzuschaffen, die Differenz zwischen dem Vertragspreise und dem Preise zur Erfüllungszeit als Schadenersatz verlangen.

**Art. 192 B. Verpflichtungen des Verkäufers / II. Gewährleistung des veräusserten Rechtes / 1. Verpflichtung zur Gewährleistung**

II. Gewährleistung des veräusserten Rechtes

1. Verpflichtung zur Gewährleistung

1 Der Verkäufer hat dafür Gewähr zu leisten, dass nicht ein Dritter aus Rechtsgründen, die schon zur Zeit des Vertragsabschlusses bestanden haben, den Kaufgegenstand dem Käufer ganz oder teilweise entziehe.

2 Kannte der Käufer zur Zeit des Vertragsabschlusses die Gefahr der Entwehrung, so hat der Verkäufer nur insofern Gewähr zu leisten, als er sich ausdrücklich dazu verpflichtet hat.

**Art. 191 B. Seller's obligations / I. Transfer / 3. Delivery default / b. Liability for and computation of damages**

b. Liability for and computation of damages

1 A seller who fails to discharge his contractual obligation is liable for the resultant loss or damage to the buyer.

2 The buyer in a commercial transaction is entitled to compensation of the difference between the sale price and the price he has paid in good faith to replace the object that was not delivered to him.

3 In the case of goods with a market or stock exchange price, the buyer need not buy the replacement object but is entitled to claim as damages the difference between the contractual sale price and the market price at the time of performance.

**Art. 192 B. Seller's obligations / II. Warranty of title / 1. Warranty obligation**

II. Warranty of title

1. Warranty obligation

1 The seller is obliged to transfer the purchased goods to the buyer free from any rights enforceable by third parties against the buyer that already exist at the time the contract is concluded.

2 Where on conclusion of the contract the buyer was aware of the existence of such rights, the seller is not bound unless by any express warranty given.

3 Eine Vereinbarung über Aufhebung oder Beschränkung der Gewährspflicht ist ungültig, wenn der Verkäufer das Recht des Dritten absichtlich verschwiegen hat.

3 Any agreement to exclude or limit the warranty obligation is void if the seller has intentionally omitted to mention the right of a third party.

**Art. 193 B. Verpflichtungen des Verkäufers / II. Gewährleistung des veräusserten Rechtes / 2. Verfahren / a. Streitverkündung**

**Art. 193 B. Seller's obligations / II. Warranty of title / 2. Procedure / a. Third-party notice**

2. Verfahren

2. Procedure

a. Streitverkündung

a. Third-party notice

1 Die Voraussetzungen und Wirkungen der Streitverkündung richten sich nach der ZPO.

1 The requirements for and effects of the third-party notice are governed by the CPC.

2 Ist die Streitverkündung ohne Veranlassung des Verkäufers unterblieben, so wird dieser von der Verpflichtung zur Gewährleistung insoweit befreit, als er zu beweisen vermag, dass bei rechtzeitig erfolgter Streitverkündung ein günstigeres Ergebnis des Prozesses zu erlangen gewesen wäre.

2 In the event of failure to serve the third-party notice for reasons not attributable to the seller, he is released from his warranty obligation to the extent that he can prove that the outcome would have been more favourable had the third-party notice been served promptly.

**Art. 194 B. Verpflichtungen des Verkäufers / II. Gewährleistung des veräusserten Rechtes / 2. Verfahren / b. Herausgabe ohne richterliche Entscheidung**

**Art. 194 B. Seller's obligations / II. Warranty of title / 2. Procedure / b. Surrender of object without court decision**

b. Herausgabe ohne richterliche Entscheidung

b. Surrender of object without court decision

1 Die Pflicht zur Gewährleistung besteht auch dann, wenn der Käufer, ohne es zur richterlichen Entscheidung kommen zu lassen, das Recht des Dritten in guten Treuen anerkannt oder sich einem Schiedsgericht unterworfen hat, sofern dieses dem Verkäufer rechtzeitig angedroht und ihm die Führung des Prozesses erfolglos angeboten worden war.

1 The seller remains subject to the warranty obligation even if the buyer has in good faith acknowledged the right of a third party without waiting for a court decision or if he has agreed to submit to arbitration, provided that the seller was warned of the arbitration proceedings in good time but declined an invitation to engage therein.

2 Ebenso besteht sie, wenn der Käufer beweist, dass er zur Herausgabe der Sache verpflichtet war.

2 The same applies if the buyer proves that he was compelled to surrender the object.

13

**Art. 195 B. Verpflichtungen des Verkäufers / II. Gewährleistung des veräusserten Rechtes / 3. Ansprüche des Käufers / a. Bei vollständiger Entwehrung**

3. Ansprüche des Käufers

a. Bei vollständiger Entwehrung

1 Ist die Entwehrung eine vollständige, so ist der Kaufvertrag als aufgehoben zu betrachten und der Käufer zu fordern berechtigt:

1. Rückerstattung des bezahlten Preises samt Zinsen unter Abrechnung der von ihm gewonnenen oder versäumten Früchte und sonstigen Nutzungen;
2. Ersatz der für die Sache gemachten Verwendungen, soweit er nicht von dem berechtigten Dritten erhältlich ist;
3. Ersatz aller durch den Prozess veranlassten gerichtlichen und aussergerichtlichen Kosten, mit Ausnahme derjenigen, die durch Streitverkündung vermieden worden wären;
4. Ersatz des sonstigen durch die Entwehrung unmittelbar verursachten Schadens.

2 Der Verkäufer ist verpflichtet, auch den weitern Schaden zu ersetzen, sofern er nicht beweist, dass ihm keinerlei Verschulden zur Last falle.

**Art. 196 B. Verpflichtungen des Verkäufers / II. Gewährleistung des veräusserten Rechtes / 3. Ansprüche des Käufers / b. Bei teilweiser Entwehrung**

b. Bei teilweiser Entwehrung

1 Wenn dem Käufer nur ein Teil des Kaufgegenstandes entzogen wird, oder wenn die verkaufte Sache mit einer dinglichen Last beschwert ist, für die der Verkäufer einzustehen hat, so kann der Käufer nicht die

**Art. 195 B. Seller's obligations / II. Warranty of title / 3. Rights of the buyer / a. Full dispossession**

3. Rights of the buyer

a. Full dispossession

1 In the case of full dispossession, the contract of sale is deemed terminated and the buyer has the right to claim:

1. restitution of the price paid, with interest, less the value of any fruits the buyer has obtained or neglected to obtain from the object and other benefits derived therefrom;
2. reimbursement of his expenditures on the object, to the extent this cannot be obtained from the third party with the superior right;
3. reimbursement of all judicial and extrajudicial costs arising from the proceedings, apart from those he would have avoided by serving third-party notice on the seller;
4. compensation for all other damage directly caused by the dispossession.

2 The seller is also obliged to make good any further loss suffered by the buyer unless the seller can prove that he is not at fault.

**Art. 196 B. Seller's obligations / II. Warranty of title / 3. Rights of the buyer / b. Partial dispossession**

b. Partial dispossession

1 Where the buyer is dispossessed of only part of the purchased object or it is encumbered with a charge in rem for which the seller is guarantor, the buyer may not seek termination of the contract of sale but may only

Aufhebung des Vertrages, sondern nur Ersatz des Schadens verlangen, der ihm durch die Entwehrung verursacht wird.

2 Ist jedoch nach Massgabe der Umstände anzunehmen, dass der Käufer den Vertrag nicht geschlossen haben würde, wenn er die teilweise Entwehrung vorausgesehen hätte, so ist er befugt, die Aufhebung des Vertrages zu verlangen.

3 In diesem Falle muss er den Kaufgegenstand, soweit er nicht entwehrt worden ist, nebst dem inzwischen bezogenen Nutzen dem Verkäufer zurückgeben.

**Art. 196a B. Verpflichtungen des Verkäufers / II. Gewährleistung des veräusserten Rechtes / 3. Ansprüche des Käufers / c. Bei Kulturgütern**

c. Bei Kulturgütern

Für Kulturgüter im Sinne von Artikel 2 Absatz 1 des Kulturgütertransfergesetzes vom 20. Juni 2003 verjährt die Klage auf Gewährleistung des veräusserten Rechts ein Jahr, nachdem der Käufer den Mangel entdeckt hat, in jedem Fall jedoch 30 Jahre nach dem Vertragsabschluss.

**Art. 197 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 1. Gegenstand der Gewährleistung / a. Im Allgemeinen**

III. Gewährleistung wegen Mängel der Kaufsache

1. Gegenstand der Gewährleistung

a. Im Allgemeinen

claim damages for being thus dispossessed.

2 However, where in the circumstances there is cause to presume that he would not have entered into the contract if he had foreseen such a partial dispossession, he has the right to request its termination.

3 In this case, he must return to the seller that part of the item of which he has not been dispossessed together with the benefits he obtained from it in the interim.

**Art. 196a B. Seller's obligations / II. Warranty of title / 3. Rights of the buyer / c. Objects of cultural heritage**

c. Objects of cultural heritage

In the case of objects of cultural heritage within the meaning of Article 2 paragraph 1 of the Cultural Property Transfer Act of 20 June 2003, actions for breach of warranty of title become time-barred one year after the buyer discovered the defect of title but in any event 30 years after the contract was concluded.

**Art. 197 B. Seller's obligations / III. Warranty of quality and fitness / 1. Object of the warranty / a. In general**

III. Warranty of quality and fitness

1. Object of the warranty

a. In general

15

1 Der Verkäufer haftet dem Käufer sowohl für die zugesicherten Eigenschaften als auch dafür, dass die Sache nicht körperliche oder rechtliche Mängel habe, die ihren Wert oder ihre Tauglichkeit zu dem vorausgesetzten Gebrauche aufheben oder erheblich mindern.

2 Er haftet auch dann, wenn er die Mängel nicht gekannt hat.

1 The seller is liable to the buyer for any breach of warranty of quality and for any defects that would materially or legally negate or substantially reduce the value of the object or its fitness for the designated purpose.

2 He is liable even if he was not aware of the defects.

### Art. 198 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 1. Gegenstand der Gewährleistung / b. Beim Viehhandel

b. Beim Viehhandel

Beim Handel mit Vieh (Pferden, Eseln, Maultieren, Rindvieh, Schafen, Ziegen und Schweinen) besteht eine Pflicht zur Gewährleistung nur insoweit, als der Verkäufer sie dem Käufer schriftlich zugesichert oder den Käufer absichtlich getäuscht hat.

### Art. 198 B. Seller's obligations / III. Warranty of quality and fitness / 1. Object of the warranty / b. In livestock trading

b. In livestock trading

There is no warranty obligation in sales of livestock (horses, donkeys, mules, cattle, sheep, goats or pigs) unless the seller has given express warranty in writing to the buyer or has intentionally misled the buyer.

### Art. 199 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 2. Wegbedingung

2. Wegbedingung

Eine Vereinbarung über Aufhebung oder Beschränkung der Gewährspflicht ist ungültig, wenn der Verkäufer dem Käufer die Gewährsmängel arglistig verschwiegen hat.

### Art. 199 B. Seller's obligations / III. Warranty of quality and fitness / 2. Exclusion of warranty

2. Exclusion of warranty

Any agreement to exclude or limit the warranty obligation is void if the seller has fraudulently concealed the failure to comply with warranty from the buyer.

### Art. 200 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 3. Vom Käufer gekannte Mängel

3. Vom Käufer gekannte Mängel

1 Der Verkäufer haftet nicht für Mängel, die der Käufer zur Zeit des Kaufes gekannt hat.

### Art. 200 B. Seller's obligations / III. Warranty of quality and fitness / 3. Defects known to the buyer

3. Defects known to the buyer

1 The seller is not liable for defects known to the buyer at the time of purchase.

16

2 Für Mängel, die der Käufer bei Anwendung gewöhnlicher Aufmerksamkeit hätte kennen sollen, haftet der Verkäufer nur dann, wenn er deren Nichtvorhandensein zugesichert hat.

2 He is not liable for defects that any normally attentive buyer should have discovered unless he assured the buyer that they do not exist.

## Art. 201 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 4. Mängelrüge / a. Im Allgemeinen

## Art. 201 B. Seller's obligations / III. Warranty of quality and fitness / 4. Notice of defects / a. In general

4. Mängelrüge

4. Notice of defects

a. Im Allgemeinen

a. In general

1 Der Käufer soll, sobald es nach dem üblichen Geschäftsgange tunlich ist, die Beschaffenheit der empfangenen Sache prüfen und, falls sich Mängel ergeben, für die der Verkäufer Gewähr zu leisten hat, diesem sofort Anzeige machen.

1 The buyer must inspect the condition of the purchased object as soon as feasible in the normal course of business and, if he discovers defects for which the seller is liable under warranty, must notify him without delay.

2 Versäumt dieses der Käufer, so gilt die gekaufte Sache als genehmigt, soweit es sich nicht um Mängel handelt, die bei der übungsgemässen Untersuchung nicht erkennbar waren.

2 Should he fail to do so, the purchased object is deemed accepted except in the case of defects that would not be revealed by the customary inspection.

3 Ergeben sich später solche Mängel, so muss die Anzeige sofort nach der Entdeckung erfolgen, widrigenfalls die Sache auch rücksichtlich dieser Mängel als genehmigt gilt.

3 Where such defects come to light subsequently, the seller must be notified immediately, failing which the object will be deemed accepted even in respect of such defects.

## Art. 202 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 4. Mängelrüge / b. Beim Viehhandel

## Art. 202 B. Seller's obligations / III. Warranty of quality and fitness / 4. Notice of defects / b. In livestock trading

b. Beim Viehhandel

b. In livestock trading

1 Enthält beim Handel mit Vieh die schriftliche Zusicherung keine Fristbestimmung und handelt es sich nicht um Gewährleistung für Trächtigkeit, so haftet der Verkäufer dem Käufer nur, wenn der Mangel binnen neun

1 Where in a sale of livestock a written assurance includes no time limit and does not warrant that an animal is pregnant, the seller is not liable to the buyer unless a defect is dis-

17

Tagen, von der Übergabe oder vom Annahmeverzug an gerechnet, entdeckt und angezeigt wird, und wenn binnen der gleichen Frist bei der zuständigen Behörde die Untersuchung des Tieres durch Sachverständige verlangt wird.

2 Das Gutachten der Sachverständigen wird vom Richter nach seinem Ermessen gewürdigt.

3 Im Übrigen wird das Verfahren durch eine Verordnung des Bundesrates geregelt.

covered and notified within nine days of delivery or of the notice of default in taking delivery and an application is made to the competent authority within the same time limit to have the animal examined by experts.

2 The court evaluates the experts' report at its discretion.

3 In other respects the procedure is governed by regulations enacted by the Federal Council.

**Art. 203 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 5. Absichtliche Täuschung**

5. Absichtliche Täuschung

Bei absichtlicher Täuschung des Käufers durch den Verkäufer findet eine Beschränkung der Gewährleistung wegen versäumter Anzeige nicht statt.

**Art. 203 B. Seller's obligations / III. Warranty of quality and fitness / 5. Intentional deceit**

5. Intentional deceit

Where the seller has wilfully misled the buyer, liability for breach of warranty is not limited by any failure on the buyer's part to give prompt notice of defects.

**Art. 204 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 6. Verfahren bei Übersendung von anderem Ort**

6. Verfahren bei Übersendung von anderem Ort

1 Wenn die von einem anderen Orte übersandte Sache beanstandet wird und der Verkäufer an dem Empfangsorte keinen Stellvertreter hat, so ist der Käufer verpflichtet, für deren einstweilige Aufbewahrung zu sorgen, und darf sie dem Verkäufer nicht ohne weiteres zurückschicken.

2 Er soll den Tatbestand ohne Verzug gehörig feststellen lassen, widrigenfalls ihm der Beweis obliegt, dass die behaupteten Mängel

**Art. 204 B. Seller's obligations / III. Warranty of quality and fitness / 6. Remote sale and purchase**

6.      Remote      sale      and      purchase

1 A buyer who complains that an object sent from another place is defective is obliged to place it in temporary storage, provided the seller has no representative in the place in which it was received, and cannot simply return it to the seller.

2 The buyer is obliged to have the condition of the object duly and promptly witnessed,

schon zur Zeit der Empfangnahme vorhanden gewesen seien.

3 Zeigt sich Gefahr, dass die übersandte Sache schnell in Verderbnis gerate, so ist der Käufer berechtigt und, soweit die Interessen des Verkäufers es erfordern, verpflichtet, sie unter Mitwirkung der zuständigen Amtsstelle des Ortes, wo sich die Sache befindet, verkaufen zu lassen, hat aber bei Vermeidung von Schadenersatz den Verkäufer so zeitig als tunlich hievon zu benachrichtigen.

failing which he will bear the burden of proving that the alleged defects already existed when he took receipt of the object.

3 Where there is a risk that the object will rapidly deteriorate, the buyer has the right and, should the interests of the seller so require, the obligation to arrange its sale with the assistance of the competent authority of the place where the object is located, but must notify the seller of such sale as soon as possible to avoid rendering himself liable in damages.

### Art. 205 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 7. Inhalt der Klage des Käufers / a. Wandelung oder Minderung

### Art. 205 B. Seller's obligations / III. Warranty of quality and fitness / 7. Types of action / a. Rescission or reduction

7. Inhalt der Klage des Käufers

7. Types of action

a. Wandelung oder Minderung

a. Rescission or reduction

1 Liegt ein Fall der Gewährleistung wegen Mängel der Sache vor, so hat der Käufer die Wahl, mit der Wandelungsklage den Kauf rückgängig zu machen oder mit der Minderungsklage Ersatz des Minderwertes der Sache zu fordern.

1 In claims for breach of warranty of quality and fitness, the buyer may sue either to rescind the contract of sale for breach of warranty or to have the sale price reduced by way of compensation for the decrease in the object's value.

2 Auch wenn die Wandelungsklage angestellt worden ist, steht es dem Richter frei, bloss Ersatz des Minderwertes zuzusprechen, sofern die Umstände es nicht rechtfertigen, den Kauf rückgängig zu machen.

2 Even where the buyer has brought action for rescission the court is free to order a reduction in the price of the object if it does not consider rescission justified by the circumstances.

3 Erreicht der geforderte Minderwert den Betrag des Kaufpreises, so kann der Käufer nur die Wandelung verlangen.

3 If the decrease in the object's value is equal to the sale price, the buyer may only sue for rescission.

### Art. 206 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 7. Inhalt der Klage des Käufers / b. Ersatzleistung

### Art. 206 B. Seller's obligations / III. Warranty of quality and fitness / 7. Types of action / b. Substitute performance

b. Ersatzleistung

b. Substitute performance

19

1 Geht der Kauf auf die Lieferung einer bestimmten Menge vertretbarer Sachen, so hat der Käufer die Wahl, entweder die Wandelungs- oder die Minderungsklage anzustellen oder andere währhafte Ware derselben Gattung zu fordern.

2 Wenn die Sachen dem Käufer nicht von einem andern Orte her zugesandt worden sind, ist auch der Verkäufer berechtigt, sich durch sofortige Lieferung währhafter Ware derselben Gattung und Ersatz allen Schadens von jedem weiteren Anspruche des Käufers zu befreien.

**Art. 207 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 7. Inhalt der Klage des Käufers / c. Wandelung bei Untergang der Sache**

c. Wandelung bei Untergang der Sache

1 Die Wandelung kann auch dann begehrt werden, wenn die Sache infolge ihrer Mängel oder durch Zufall untergegangen ist.

2 Der Käufer hat in diesem Falle nur das zurückzugeben, was ihm von der Sache verblieben ist.

3 Ist die Sache durch Verschulden des Käufers untergegangen, oder von diesem weiter veräussert oder umgestaltet worden, so kann er nur Ersatz des Minderwertes verlangen.

**Art. 208 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 8. Durchführung der Wandelung / a. Im Allgemeinen**

8. Durchführung der Wandelung

a. Im Allgemeinen

1 Where the contract of sale is for delivery of a specified quantity of fungibles, the buyer may choose to bring action either for rescission or for a reduction in the sale price or to request other acceptable goods of the same kind.

2 Where the purchased objects have not been sent from another place, the seller may discharge his obligation to the buyer by immediately delivering acceptable items of the same kind and making good any loss or damage the buyer has suffered.

**Art. 207 B. Seller's obligations / III. Warranty of quality and fitness / 7. Types of action / c. Rescission when the object is destroyed**

c. Rescission when the object is destroyed

1 Action for rescission of the contract of sale may be brought if the object has been destroyed as a result of its defects or by accident.

2 In such cases the buyer must return only that which remains of the object.

3 If the object is destroyed through the fault of the buyer or has been sold on or transformed by him, his only claim is for compensation for the decrease in value.

**Art. 208 B. Seller's obligations / III. Warranty of quality and fitness / 8. Rescission of the contract of sale / a. In general**

8. Rescission of the contract of sale

a. In general

20

1 Wird der Kauf rückgängig gemacht, so muss der Käufer die Sache nebst dem inzwischen bezogenen Nutzen dem Verkäufer zurückgeben.

2 Der Verkäufer hat den gezahlten Verkaufspreis samt Zinsen zurückzuerstatten und überdies, entsprechend den Vorschriften über die vollständige Entwehrung, die Prozesskosten, die Verwendungen und den Schaden zu ersetzen, der dem Käufer durch die Lieferung fehlerhafter Ware unmittelbar verursacht worden ist.

3 Der Verkäufer ist verpflichtet, den weitern Schaden zu ersetzen, sofern er nicht beweist, dass ihm keinerlei Verschulden zur Last falle.

**Art. 209 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 8. Durchführung der Wandelung / b. Bei einer Mehrheit von Kaufsachen**

b. Bei einer Mehrheit von Kaufsachen

1 Sind von mehreren zusammen verkauften Sachen oder von einer verkauften Gesamtsache bloss einzelne Stücke fehlerhaft, so kann nur rücksichtlich dieser die Wandelung verlangt werden.

2 Lassen sich jedoch die fehlerhaften Stücke von den fehlerfreien ohne erheblichen Nachteil für den Käufer oder den Verkäufer nicht trennen, so muss die Wandelung sich auf den gesamten Kaufgegenstand erstrecken.

3 Die Wandelung der Hauptsache zieht, selbst wenn für die Nebensache ein besonderer Preis festgesetzt war, die Wandelung auch dieser, die Wandelung der Nebensache dagegen nicht auch die Wandelung der Hauptsache nach sich.

1 In the event of rescission of the contract of sale the buyer must return the object to the seller together with any benefits derived from it in the interim.

2 The seller must reimburse to the buyer the sale price paid together with interest and, in accordance with the provisions governing full dispossession, compensation for litigation costs, expenses and the loss or damage incurred by the buyer as a result of the delivery of defective goods.

3 The seller is obliged to compensate the buyer for any further loss or damage unless he can prove that no fault is attributable to him.

**Art. 209 B. Seller's obligations / III. Warranty of quality and fitness / 8. Rescission of the contract of sale / b. For sales of batches or sets of objects**

b. For sales of batches or sets of objects

1 Where the sale involves a batch or set of objects of which only some are defective, action for rescission may be brought only in respect of the defective items.

2 However, where the defective items cannot be separated from the unflawed items without substantial prejudice to the buyer or the seller, rescission of the contract of sale must extend to the entire batch or set.

3 Rescission in respect of the main sale object necessarily involves rescission in respect of all accessory objects even if they are priced separately, whereas rescission in respect of accessory objects does not extend to the main object.

**Art. 210 B. Verpflichtungen des Verkäufers / III. Gewährleistung wegen Mängel der Kaufsache / 9. Verjährung**

9. Verjährung

1 Die Klagen auf Gewährleistung wegen Mängel der Sache verjähren mit Ablauf von zwei Jahren nach deren Ablieferung an den Käufer, selbst wenn dieser die Mängel erst später entdeckt, es sei denn, dass der Verkäufer eine Haftung auf längere Zeit übernommen hat.

2 Die Frist beträgt fünf Jahre, soweit Mängel einer Sache, die bestimmungsgemäss in ein unbewegliches Werk integriert worden ist, die Mangelhaftigkeit des Werkes verursacht haben.

3 Für Kulturgüter im Sinne von Artikel 2 Absatz 1 des Kulturgütertransfergesetzes vom 20. Juni 2003 verjährt die Klage ein Jahr, nachdem der Käufer den Mangel entdeckt hat, in jedem Fall jedoch 30 Jahre nach dem Vertragsabschluss.

4 Eine Vereinbarung über die Verkürzung der Verjährungsfrist ist ungültig, wenn:

    a. sie die Verjährungsfrist auf weniger als zwei Jahre, bei gebrauchten Sachen auf weniger als ein Jahr verkürzt;

    b. die Sache für den persönlichen oder familiären Gebrauch des Käufers bestimmt ist; und

    c. der Verkäufer im Rahmen seiner beruflichen oder gewerblichen Tätigkeit handelt.

5 Die Einreden des Käufers wegen vorhandener Mängel bleiben bestehen, wenn innerhalb

**Art. 210 B. Seller's obligations / III. Warranty of quality and fitness / 9. Time limits**

9. Time limits

1 An action for breach of warranty of quality and fitness becomes time-barred two years after delivery of the object to the buyer, even if he does not discover the defects until later, unless the seller has assumed liability under warranty for a longer period.

2 The period amounts to five years where defects in an object that has been incorporated in an immovable work in a manner consistent with its nature and purpose have caused the work to be defective.

3 In the case of cultural property within the meaning of Article 2 paragraph 1 of the Cultural Property Transfer Act of 20 June 2003, actions for breach of warranty of quality and fitness become time-barred one year after the buyer discovered the defect but in any event 30 years after the contract was concluded.

4 An agreement to reduce the limitation period is null and void if:

    a. the limitation period is reduced to less than two years, or less than one year in the case of second-hand goods;

    b. the object is intended to be used by the buyer or his or her family; and

    c. the seller is acting in the course of his or her professional or commercial activities.

5 The defence of defective goods remains available to the buyer provided he has notified the seller within the limitation period.

der Verjährungsfrist die vorgeschriebene Anzeige an den Verkäufer gemacht worden ist.

6 Der Verkäufer kann die Verjährung nicht geltend machen, wenn ihm eine absichtliche Täuschung des Käufers nachgewiesen wird. Dies gilt nicht für die 30-jährige Frist gemäss Absatz 3.

6 The seller may not invoke the limitation period if it is proved that he wilfully misled the buyer. The foregoing does not apply to the 30-year period under paragraph 3.

**Art. 211 C. Verpflichtungen des Käufers / I. Zahlung des Preises und Annahme der Kaufsache**

C. Verpflichtungen des Käufers

I. Zahlung des Preises und Annahme der Kaufsache

1 Der Käufer ist verpflichtet, den Preis nach den Bestimmungen des Vertrages zu bezahlen und die gekaufte Sache, sofern sie ihm von dem Verkäufer vertragsgemäss angeboten wird, anzunehmen.

2 Die Empfangnahme muss sofort geschehen, wenn nicht etwas anderes vereinbart oder üblich ist.

**Art. 211 C. Obligations of the buyer / I. Payment of the sale price and acceptance of the object**

C. Obligations of the buyer

I. Payment of the sale price and acceptance of the object

1 The buyer has an obligation to pay the price in accordance with the terms of the contract and to accept the sale object provided it is offered to him by the seller as contractually agreed.

2 Unless otherwise provided by agreement or custom, such acceptance must take place immediately.

**Art. 212 C. Verpflichtungen des Käufers / II. Bestimmung des Kaufpreises**

II. Bestimmung des Kaufpreises

1 Hat der Käufer fest bestellt, ohne den Preis zu nennen, so wird vermutet, es sei der mittlere Marktpreis gemeint, der zurzeit und an dem Ort der Erfüllung gilt.

2 Ist der Kaufpreis nach dem Gewichte der Ware zu berechnen, so wird die Verpackung (Taragewicht) in Abzug gebracht.

3 Vorbehalten bleiben die besonderen kaufmännischen Übungen, nach denen bei einzelnen Handelsartikeln ein festbestimmter oder nach Prozenten berechneter Abzug vom

**Art. 212 C. Obligations of the buyer / II. Fixing the price**

II. Fixing the price

1 Where the buyer places a firm order without indicating the sale price, the price is presumed to be the average current market price at the place of performance.

2 Where the price is based on the weight of the goods, the weight of the packaging (tare) is deducted.

3 The foregoing does not apply to special commercial customs whereby the gross weight of certain resale merchandise is reduced by a set amount or percentage or the

23

Bruttogewicht erfolgt oder das ganze Bruttogewicht bei der Preisbestimmung angerechnet wird.

price is based on the gross weight including packaging.

## Art. 213 C. Verpflichtungen des Käufers / III. Fälligkeit und Verzinsung des Kaufpreises

III. Fälligkeit und Verzinsung des Kaufpreises

1 Ist kein anderer Zeitpunkt bestimmt, so wird der Kaufpreis mit dem Übergange des Kaufgegenstandes in den Besitz des Käufers fällig.

2 Abgesehen von der Vorschrift über den Verzug infolge Ablaufs eines bestimmten Verfalltages wird der Kaufpreis ohne Mahnung verzinslich, wenn die Übung es mit sich bringt, oder wenn der Käufer Früchte oder sonstige Erträgnisse des Kaufgegenstandes beziehen kann.

## Art. 213 C. Obligations of the buyer / III. Time when price falls due, interest

III. Time when price falls due, interest

1 The price falls due as soon as the property passes into the buyer's possession, unless some other juncture is agreed.

2 Regardless of the provision governing default on expiry of a specified time limit, interest accrues on the sale price even if no reminder is issued where such practice is customary or the buyer may derive fruits or other benefits from the purchased object.

## Art. 214 C. Verpflichtungen des Käufers / IV. Verzug des Käufers / 1. Rücktrittsrecht des Verkäufers

IV. Verzug des Käufers

1. Rücktrittsrecht des Verkäufers

1 Ist die verkaufte Sache gegen Vorausbezahlung des Preises oder Zug um Zug zu übergeben und befindet sich der Käufer mit der Zahlung des Kaufpreises im Verzuge, so hat der Verkäufer das Recht, ohne weiteres vom Vertrage zurückzutreten.

2 Er hat jedoch dem Käufer, wenn er von seinem Rücktrittsrecht Gebrauch machen will, sofort Anzeige zu machen.

3 Ist der Kaufgegenstand vor der Zahlung in den Besitz des Käufers übergegangen, so kann der Verkäufer nur dann wegen Verzu-

## Art. 214 C. Obligations of the buyer / IV. Buyer in default / 1. Seller's right of withdrawal

IV. Buyer in default

1. Seller's right of withdrawal

1 Where the property is to be delivered against advance payment of the price in full or in instalments and the buyer is in default on such payment, the seller is entitled to withdraw from the contract without further formality.

2 However, if he intends to exercise this right he must notify the buyer immediately.

3 Where the purchased object has passed into the buyer's possession prior to payment, the seller may withdraw from the contract on the

ges des Käufers von dem Vertrage zurücktreten und die übergebene Sache zurückfordern, wenn er sich dieses Recht ausdrücklich vorbehalten hat.

grounds that the buyer is in default and demand the return of the object only if he has expressly reserved the right to do so.

**Art. 215 C. Verpflichtungen des Käufers / IV. Verzug des Käufers / 2. Schadenersatz und Schadenberechnung**

**Art. 215 C. Obligations of the buyer / IV. Buyer in default / 2. Liability for and computation of damages**

2. Schadenersatz und Schadenberechnung

2. Liability for and computation of damages

1 Kommt der Käufer im kaufmännischen Verkehr seiner Zahlungspflicht nicht nach, so hat der Verkäufer das Recht, seinen Schaden nach der Differenz zwischen dem Kaufpreis und dem Preise zu berechnen, um den er die Sache in guten Treuen weiter verkauft hat.

1 Where the buyer in a commercial transaction fails to discharge his payment obligation, the seller is entitled to compensation for the difference between the sale price and the price at which he has subsequently sold the object in good faith.

2 Bei Waren, die einen Markt- oder Börsenpreis haben, kann er ohne einen solchen Verkauf die Differenz zwischen dem Vertragspreis und dem Markt- und Börsenpreis zur Erfüllungszeit als Schadenersatz verlangen.

2 In the case of goods with a market or stock exchange price, the seller is entitled to claim as damages the difference between the contractual sale price and the market price at the time of performance without needing to sell the object on.

**Artikel 652a OR K. Erhöhung des Aktienkapitals / I. Ordentliche und genehmigte Kapitalerhöhung / 3. Gemeinsame Vorschriften / b. Emissionsprospekt**

**Article 652a CO K. Increase in the share capital / I. Ordinary and authorised capital increase / 3. Common provisions / b. Issue prospectus**

b. Emissionsprospekt

b. Issue prospectus

1 Werden neue Aktien öffentlich zur Zeichnung angeboten, so gibt die Gesellschaft in einem Emissionsprospekt Aufschluss über:

1 Where new shares are publicly offered for subscription, the company publishes an issue prospectus containing information on:

1. den Inhalt der bestehenden Eintragung im Handelsregister, mit Ausnahme der Angaben über die zur Vertretung befugten Personen;
2. die bisherige Höhe und Zusammensetzung des Aktienkapitals unter Angabe von Anzahl, Nennwert und Art

1. the content of the existing entry in the commercial register, with the exception of details relating to the persons authorised to represent the company;
2. the existing amount and composition of the share capital, including the number, nominal value and type of

der Aktien sowie der Vorrechte einzel-
ner Kategorien von Aktien;

3. Bestimmungen der Statuten über eine
   genehmigte oder eine bedingte Kapi-
   talerhöhung;

4. die Anzahl der Genussscheine und
   den Inhalt der damit verbundenen
   Rechte;

5. die letzte Jahresrechnung und Kon-
   zernrechnung mit dem Revisionsbe-
   richt und, wenn der Bilanzstichtag
   mehr als sechs Monate zurückliegt,
   über die Zwischenabschlüsse;

6. die in den letzten fünf Jahren oder seit
   der Gründung ausgerichteten Divi-
   denden;

7. den Beschluss über die Ausgabe
   neuer Aktien.

2 Öffentlich ist jede Einladung zur Zeichnung,
die sich nicht an einen begrenzten Kreis von
Personen richtet.

3 Bei Gesellschaften, die über keine Revisi-
onsstelle verfügen, muss der Verwaltungsrat
durch einen zugelassenen Revisor einen Re-
visionsbericht erstellen lassen und über das
Ergebnis der Revision im Emissionsprospekt
Aufschluss geben.

**Artikel 752 OR A. Haftung / I. Für den
Emissionsprospekt**

A. Haftung

I. Für den Emissionsprospekt

Sind bei der Gründung einer Gesellschaft o-
der bei der Ausgabe von Aktien, Obligationen
oder anderen Titeln in Emissionsprospekten
oder ähnlichen Mitteilungen unrichtige, irre-
führende oder den gesetzlichen Anforderun-
gen nicht entsprechende Angaben gemacht
oder verbreitet worden, so haftet jeder, der
absichtlich oder fahrlässig dabei mitgewirkt
hat, den Erwerbern der Titel für den dadurch
verursachten Schaden.

shares and the preferential rights at-
taching to specific share classes;

3. the provisions of the articles of associ-
   ation relating to any authorised or
   contingent capital increase;

4. the number of dividend rights certifi-
   cates and the nature of the associated
   rights;

5. the most recent annual accounts and
   consolidated accounts with audit re-
   port and, if more than six months have
   elapsed since the accounting cut-off
   date, the interim accounts;

6. the dividends distributed in the last
   five years or since the company was
   established;

7. the resolution concerning the issue of
   new shares.

2 A public offer is any invitation to subscribe
that is not addressed solely to a limited num-
ber of persons.

3 In the case of companies that do not have
an auditor, the board of directors must ar-
range for an audit report to be prepared by a
licensed auditor and provide information on
the result of the audit in the issue prospectus.

**Article 752 CO A. Liability / I. For the is-
sue prospectus**

A. Liability

I. For the issue prospectus

Where information that is inaccurate, mis-
leading or in breach of statutory requirements
is given in issue prospectuses or similar state-
ments disseminated when the company is es-
tablished or on the issue of shares, bonds or
other securities, any person involved whether
wilfully or through negligence is liable to the
acquirers of such securities for the resultant
losses.

26

**Erster Abschnitt: Prospektzwang bei Ausgabe von Anleihensobligationen**

**Artikel 1156 OR**

1  Anleihensobligationen dürfen nur auf Grund eines Prospektes öffentlich zur Zeichnung aufgelegt oder an der Börse eingeführt werden.

2 Die Bestimmungen über den Prospekt bei Ausgabe neuer Aktien finden entsprechende Anwendung; überdies soll der Prospekt die nähern Angaben enthalten über das Anleihen, insbesondere die Verzinsungs- und Rückzahlungsbedingungen, die für die Obligationen bestellten besondern Sicherheiten und gegebenenfalls die Vertretung der Anleihensgläubiger.

3 Sind Obligationen ohne Zugrundelegung eines diesen Vorschriften entsprechenden Prospektes ausgegeben worden, oder enthält dieser unrichtige oder den gesetzlichen Erfordernissen nicht entsprechende Angaben, so sind die Personen, die absichtlich oder fahrlässig mitgewirkt haben, solidarisch für den Schaden haftbar.

**Bundesgesetz über die kollektiven Kapitalanlagen (Kollektivanlagengesetz, KAG)[5]**

**Artikel 5 Abs. 1 lit. b und Abs. 2 KAG**

**Strukturierte Produkte**

1  Strukturierte Produkte wie kapitalgeschützte Produkte, Produkte mit Maximalrendite und Zertifikate dürfen in der Schweiz oder von der Schweiz aus an nicht qualifizierte

**Section One: Obligation to publish a Prospectus when issuing Bonds**

**Article 1156 CO**

1 Bonds may be offered for public subscription or sale on the stock exchange only on the basis of a prospectus.

2 The provisions governing prospectuses for issues of new shares apply mutatis mutandis; in addition, the prospectus must provide more detailed information on the bonds and in particular on the interest and redemption conditions, the special collateral posted for the bonds and, where applicable, representation of the bond creditors.

3 In the event that bonds are issued without a prospectus that complies with these provisions or that the prospectus contains inaccurate information or information that fails to satisfy the statutory requirements, all persons involved in such non-compliance, whether intentionally or negligently, are jointly and severally liable for the damage arising.

**Swiss Collective Investments Schemes Act ("CISA")[12]**

**Article 5 para. 1 lit. b and para. 2 CISA**

**Structured products**

1 Structured products, such as capital-protected products, capped return products and certificates, may only be distributed in or from Switzerland to non-qualified investors if:

---

[5]   https://www.admin.ch/opc/de/classified-compilation/20052154/index.html
[12]   https://www.admin.ch/opc/en/classified-compilation/20052154/index.html

Anlegerinnen und Anleger nur vertrieben werden, wenn:

    b.  für sie ein vereinfachter Prospekt vorliegt.

2 Der vereinfachte Prospekt muss folgende Anforderungen erfüllen:

    a.  Er beschreibt gemäss einem genormten Schema die wesentlichen Merkmale des strukturierten Produkts (Eckdaten), dessen Gewinn- und Verlustaussichten, sowie die bedeutenden Risiken für die Anlegerinnen und Anleger.

    b.  Er ist für die Durchschnittsanlegerin und den Durchschnittsanleger leicht verständlich.

    c.  Er weist darauf hin, dass das strukturierte Produkt weder eine kollektive Kapitalanlage ist noch der Bewilligung der FINMA untersteht.

    b.  a simplified prospectus is available for them.

2 The simplified prospectus must comply with the following requirements:

    a.  It must describe, in accordance with a standard format, the key characteristics of the structured product (key data), its profit and loss prospects, together with the significant risks for investors.

    b.  It must be easily understood by the average investor.

    c.  It must make reference to the fact that the structured product is neither a collective investment scheme, nor does it require the authorisation of FINMA.

## Artikel 75 KAG Prospekt

1 Die Fondsleitung und die SICAV veröffentlichen für jede offene kollektive Kapitalanlage einen Prospekt.

2 Der Prospekt enthält das Fondsreglement, sofern den interessierten Personen nicht mitgeteilt wird, wo dieses vor Vertragsabschluss beziehungsweise vor der Zeichnung separat bezogen werden kann. Der Bundesrat legt fest, welche weiteren Angaben im Prospekt aufgeführt werden müssen.

3 Der Prospekt muss interessierten Personen auf Verlangen vor Vertragsabschluss beziehungsweise vor der Zeichnung kostenlos zur Verfügung gestellt werden.

## Article 75 CISA Prospectus

1 The fund management company and the SICAV shall publish a prospectus for each open-ended collective investment scheme.

2 The prospectus shall include the fund regulations in cases where interested persons are not notified as to where such regulations may be separately obtained prior to an agreement being concluded or prior to subscription. The Federal Council determines which other information must be contained in the prospectus.

3 If requested, the prospectus must be provided free of charge to interested persons prior to an agreement being concluded or prior to subscription.

## Bundesgesetz über das Internationale Privatrecht (IPRG)[6]

**Artikel 156 IV. Sonderanknüpfungen / 1. Ansprüche aus öffentlicher Ausgabe von Beteiligungspapieren und Anleihen**

IV. Sonderanknüpfungen

1. Ansprüche aus öffentlicher Ausgabe von Beteiligungspapieren und Anleihen

Ansprüche aus öffentlicher Ausgabe von Beteiligungspapieren und Anleihen aufgrund von Prospekten, Zirkularen und ähnlichen Bekanntmachungen können nach dem auf die Gesellschaft anwendbaren Recht oder nach dem Recht des Staates geltend gemacht werden, in dem die Ausgabe erfolgt ist.

## Swiss Federal Statute of Private International Law[13]

**Article 156 IV. Special connecting factors / 1. Claims arising out of public issues of equity or debt securities**

IV. Special connecting factors

1. Claims arising out of public issues of equity or debt securities

Claims regarding public issues of equity or other debt securities based on prospectuses, circulars or similar publications are governed either by the law applicable to the company or the law of the state where the instruments were issued.

## Schweizerische Zivilprozessordnung (ZPO)[7]

**Artikel 71 ZPO Einfache Streitgenossenschaft**

1 Sollen Rechte und Pflichten beurteilt werden, die auf gleichartigen Tatsachen oder Rechtsgründen beruhen, so können mehrere Personen gemeinsam klagen oder beklagt werden.

2 Die einfache Streitgenossenschaft ist ausgeschlossen, wenn für die einzelnen Klagen nicht die gleiche Verfahrensart anwendbar ist.

3 Jeder Streitgenosse kann den Prozess unabhängig von den andern Streitgenossen führen.

## Swiss Civil Procedure Code ("SCPC")[14]

**Article 71 SCPC Voluntary joinder**

1 Two or more persons whose rights and duties result from similar circumstances or legal grounds may jointly appear as plaintiffs or be sued as joint defendants.

2 Voluntary joinder is excluded if the individual cases are subject to different types of procedure.

3 Each of the joint parties may proceed independently from the others.

---

[6]   https://www.admin.ch/opc/de/classified-compilation/19870312/index.html
[7]   https://www.admin.ch/opc/de/classified-compilation/20061121/index.html
[13]  www.andreasbucher-law.ch
[14]  https://www.admin.ch/opc/en/classified-compilation/20061121/index.html

**Artikel 125(c) ZPO Vereinfachung des Prozesses**

Zur Vereinfachung des Prozesses kann das Gericht insbesondere:

    c. selbstständig eingereichte Klagen vereinigen;

**Article 125(c) SCPC Simplification of proceedings**

In order to simplify the proceedings, the court may, in particular:

    c. order the joinder of separately filed actions;