**LTL ATTORNEYS LLP**
Enoch H. Liang (SBN 212324)
601 Gateway Boulevard, Suite 1010
South San Francisco, California 94080
Tel:  650-422-2130
Fax:  213-612-3773
enoch.liang@ltlattorneys.com

James M. Lee (SBN 192301)
Caleb H. Liang (Bar No. 261920)
300 S. Grand Ave., 14th Floor
Los Angeles, California 90071
Tel:  213-612-8900
Fax:  213-612-3773
james.lee@ltlattorneys.com
caleb.liang@ltlattorneys.com

**HUNG G. TA, ESQ. PLLC**
Hung G. Ta
JooYun Kim
250 Park Avenue, 7th Floor
New York, New York 10177
Tel: 646-453-7288
hta@hgtlaw.com
jooyun@hgtlaw.com

*Lead Counsel for Court-Appointed Lead Plaintiff and the Class*

*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TEZOS SECURITIES LITIGATION | Master File No.  17-cv-06779-RS |
| | **CLASS ACTION** |
| This document relates to: | **LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DLS DEFENDANTS' MOTION TO DISMISS** |
| ALL ACTIONS. | Date:    July 19, 2018 |
| | Time:    1:30 p.m. |
| | Crtrm:    3 |
| | Judge:   Hon. Richard Seeborg |

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES .................................................................................................. ii

TABLE OF ABBREVIATIONS ............................................................................................. v

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 4

ARGUMENT ........................................................................................................................... 6

I.     FORUM NON CONVENIENS ...................................................................................... 6

       A.     Applicable Legal Standards ................................................................................. 6

       B.     This Action Should Not Be Dismissed Under Forum Non Conveniens .............. 7

II.    THE DLS DEFENDANTS ARE SELLERS UNDER SECTION 12(a)(1) ................... 10

       A.     The DLS Defendants Actively Solicited Investors And Were Much More Than
              "Mere Participants" In The Tezos ICO ............................................................... 12

       B.     The DLS Defendants Were Motivated By Their Own Financial Interests To
              Actively Solicit Investors For the Tezos ICO ..................................................... 16

       C.     The DLS Defendants' Arguments Lack Merit ..................................................... 17

III.   THE BREITMANS ARE "CONTROLLING" PERSONS WITH RESPECT TO THE
       TEZOS FOUNDATION .............................................................................................. 19

CONCLUSION ....................................................................................................................... 22

i

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DLS DEFENDANTS' MOTION TO DISMISS
NO. 3:17-CV-06779-RS

1

# TABLE OF AUTHORITIES

2

**Page No(s).**

3

CASES

4

*Bancomer, S.A. v. Sup. Ct.*,
5
 44 Cal. App. 4th 1450 (1996) ............................................................................................ 8

6
*Brody v. Homestore, Inc.*,
 No. CV 02-08068 FMC (JWJx), 2003 U.S. Dist. LEXIS 17267 (C.D. Cal. Aug. 11, 2003) ....... 18
7

8
*Capri v. Murphy*,
 856 F.2d 473 (2d Cir. 1988) ................................................................................... 13, 17

9
*Chan v. Drexel Burnham Lambert, Inc.*,
10
 178 Cal. App. 3d 632 (1986) ............................................................................................. 8

11
*City of Almaty v. Khrapunov*,
 685 F. App'x 634 (9th Cir. 2017) .................................................................................. 6, 7

12

13
*Flynn v. Sientra, Inc.*,
 No. 15-07548, 2016 U.S. Dist. LEXIS 83409 (C.D. Cal. June 9, 2016) .................................. 19

14
*Fouad v. Isilon Sys.*,
15
 No. C07-1764 MJP, 2008 U.S. Dist. LEXIS 105870 (W.D. Wash. Dec. 29, 2008) .................... 18

16
*Howard v. Everex Sys.*,
 228 F.3d 1057 (9th Cir. 2000) ......................................................................................... 19
17

18
*In re Am. Apparel, Inc. Shareholder Litig.*,
 No. CV 10-06352 MMM (RCx), 2013 U.S. Dist. LEXIS 189797 (C.D. Cal. Aug. 8, 2013) ....... 21

19
*In re Am. Bank Note Holographics Secs. Litig.*,
20
 93 F. Supp. 2d 424 (S.D.N.Y. 2000) ........................................................................ 13, 16, 17

21
*In re Charles Schwab Corp. Sec. Litig*,
 257 F.R.D. 534 (N.D. Cal. 2009) ...................................................................................... 11
22

23
*In re Daou Sys.*,
 411 F.3d 1006 (9th Cir. 2005) ......................................................................................... 11

24
*In re Keegan Mgmt. Co.*,
25
 No. 91-20084 SW, 1991 U.S. Dist. LEXIS 17491 (N.D. Cal. Sept. 10, 1991) ..................... 15, 16

26
*In re OSG Sec. Litig.*,
 971 F. Supp. 2d 387 (S.D.N.Y. 2013) ................................................................................ 16

27
*In re Portal Software, Inc. Sec. Litig.*,
28
 No. C-03-5138 (VRW), 2006 U.S. Dist. LEXIS 61589 (N.D. Cal. Aug. 17, 2006) ................... 11

ii

*In re Proxima Corp. Sec. Litig.,*
No. 93-1139-IEG (LSP), 1994 U.S. Dist. LEXIS 21443 (S.D. Cal. May 4, 1994)...................... 17

*In re U.S.A. Classic Sec. Litig.,*
No. 93 Civ. 6667 (JSM), 1995 U.S. Dist. LEXIS 8327 (S.D.N.Y. June 19, 1995)............... 12, 17

*In re Valence Tech. Sec. Litig.,*
No. C 94-1542-SC, 1995 U.S. Dist. LEXIS 10379 (N.D. Cal. May 8, 1995)............................ 15

*In re Vivendi Universal, S.A. Sec. Litig.,*
381 F. Supp. 2d 158 (S.D.N.Y. 2003) ....................................................................... 15

*In re Worlds of Wonder Sec. Litig.,*
721 F. Supp. 1140 (N.D. Cal. 1989)............................................................................. 12

*Kaplan v. Rose,*
49 F.3d 1363 (9th Cir. 1994) ......................................................................................... 20

*Landale-Cameron Court, Inc. v. Ahonen,*
155 Cal. App. 4th 1401 (2007) .......................................................................................... 9

*Lane v. Page,*
649 F. Supp. 2d 1256 (D.N.M. 2009)............................................................................ 19

*Lueck v. Sundstrand Corp.,*
236 F.3d 1137 (9th Cir. 2001) ........................................................................................... 7

*McMahan & Co. v. Wherehouse Enter.,*
859 F. Supp. 743 (S.D.N.Y. 1994), *rev'd on other grounds*, 65 F.3d 1044 (2d Cir. 1995) .......... 17

*Middlesex Ret. Sys. v. Quest Software Inc.,*
527 F. Supp. 2d 1164 (C.D. Cal. Oct. 22, 2007) ...................................................... 21

*Nebenzahl v. Credit Suisse,*
705 F.2d 1139 (9th Cir. 1983) .......................................................................................... 7

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,*
320 F.3d 920 (9th Cir. 2003) ....................................................................................... 20

*Pinter v. Dahl,*
486 U.S. 622 (1988) ................................................................................... 10, 11, 16

*Primo v. Pac. Biosciences of Cal., Inc.,*
940 F. Supp. 2d 1105 (N.D. Cal. 2013)....................................................................... 11

*St. Paul Mercury Ins. Co. v Am. Safety Indem. Co.,*
No. 12-CV-05952-LHK, 2014 U.S. Dist. LEXIS 70785 (N.D. Cal. May 21, 2014) ...................... 8

*Steed Fin. LDC v. Nomura Secs. Int'l, Inc.,*
No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sept. 20, 2001) .................. 17

iii

*Vanguard Specialized Funds v. VEREIT Inc.*,
   No. CV-15-02157-PHX-ROS, 2016 U.S. Dist. LEXIS 137881 (D. Ariz. Oct. 3, 2016) .............. 18

*Wool v. Tandem Computers, Inc.*,
   818 F.2d 1433 (9th Cir. 1987) ............................................................................................ 20

### STATUTES

15 U.S.C. § 77l(a)(1) ............................................................................................................ 10

15 U.S.C. § 77n ................................................................................................................... 10

15 U.S.C. § 77o ................................................................................................................... 19

### REGULATIONS

17 C.F.R. § 230.405 ............................................................................................................. 19

1

**TABLE OF ABBREVIATIONS**

2

| Abbreviation | Definition |
|---|---|
| "¶ [No.]" | Paragraph references to Lead Plaintiff's Consolidated Complaint, filed April 3, 2018, Dkt. No. 108 |
| "Breitmans" | Defendants Arthur and Kathleen Breitman |
| "Class" | All persons and entities who, directly or indirectly through an intermediary, contributed Bitcoin and/or Ethereum to the Tezos ICO, excluding Defendants and anyone affiliated with any Defendant. |
| "Complaint" | Lead Plaintiff's Consolidated Complaint, filed April 3, 2018, Dkt. No. 108 |
| "DLS" | Defendant Dynamic Ledger Solutions, Inc. |
| "DLS Br." | DLS Defendants' Motion to Dismiss the Consolidated Complaint, Dkt. No. 123 |
| "DLS Defendants" | Defendants DLS and the Breitmans |
| "Draper" | Defendant Timothy C. Draper |
| "Draper Associates Crypto" | Defendant Draper Associates V Crypto LLC |
| "Draper Br." | Draper Defendants' Motion to Dismiss the Consolidated Complaint, Dkt. No. 117 |
| "Draper Defendants" | Defendants Draper and Draper Associates Crypto |
| "Foundation Opposition" | Lead Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant Tezos Foundation's Motion to Dismiss |
| "Gehring Decl." | Declaration of Andrew S. Gehring in Support of Tezos Stiftung's Motion to Dismiss the Consolidated Complaint, Dkt. No. 122 |
| "Securities Act" | Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* |
| "Tezos Br." | Defendant Tezos Stiftung's Motion to Dismiss the Consolidated Complaint, Dkt. No. 119 |
| "Tezos Foundation" or "Foundation" | Defendant Tezos Stiftung |
| "Tezos ICO" | Tezos Initial Coin Offering conducted in July 2017 |
| "XTZ" or "tezzies" | Tezos tokens |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

**PRELIMINARY STATEMENT**

Over a period of two weeks in July 2017, Defendants conducted an initial coin offering (the "Tezos ICO") that raised the equivalent of $232 million in Bitcoin and Ethereum (at July 2017 prices). If an initial coin offering or "ICO" sounds like an "IPO" (*i.e.*, an initial public offering of securities), that is because in all material respects it is an IPO.  As Chairman of the SEC Jay Clayton recently stated, "I have yet to see an ICO that doesn't have a sufficient number of hallmarks of a security."[1] Here, the Tezos ICO had all the hallmarks of an offering of securities.

At its core, the Tezos ICO was an unregistered, initial public offering of securities by a U.S. commercial enterprise directed at citizens of the U.S., one in which the DLS Defendants played a critical role.  The U.S. commercial enterprise was Defendant DLS, of which the Breitmans were the founders and principal shareholders.  The Breitmans established DLS in 2015 to develop the Tezos blockchain protocol, and it was DLS which owned all the intellectual property and other assets constituting the Tezos project, and employed the team developing the Tezos project.  The securities were the Tezos "tokens" being offered for sale.  However, instead of DLS and the Breitmans *directly* offering the Tezos tokens (*i.e.*, the securities) to investors, as in a typical IPO, Defendants structured the Tezos ICO so that an intermediate entity in Switzerland, the Tezos Foundation, sold the tokens to investors and collected the monies.  Simultaneously, as part of the Tezos ICO, DLS agreed to sell all its intellectual property and other assets to the Tezos Foundation.  In this manner, through this two-step structure, the Breitmans *indirectly* sold their business – DLS – to investors.

This indirect structure was arranged by Defendants for no other reason than to disguise the true nature of the Tezos ICO (*i.e.,* an initial public offering of securities by DLS and the Breitmans), to create artificial distance between the offering and the U.S., and thereby to avoid the reach of the U.S. securities laws.  However, despite this nominal structure, the reality was that the Breitmans and the other shareholders of DLS were the sellers of the Tezos tokens, and the reality was that the Tezos ICO was promoted and conducted within and from the U.S.

---

[1] ¶ 5 (quoting *Governance and Transparency at the Commission and in Our Markets*, Institute on Securities Regulation (November 8, 2017)).

First, the DLS Defendants do not dispute (and conspicuously omit to mention) that, prior to the Tezos ICO, between September 2016 and March 2017, *it was DLS who conducted a direct, private pre-sale of the Tezos tokens* to a group of early-round investors, receiving $612,000 in funding.[2]  This sale was not done using the Tezos Foundation, which was formed only in May 2017.  This indisputably shows that, at all relevant times, it was really the DLS Defendants who were selling an interest in their business to investors.

Second, despite the use of the Tezos Foundation in the Tezos ICO to nominally collect monies from investors, the DLS Defendants conducted themselves as the sellers in the Tezos ICO.  In particular, it was the DLS Defendants who promoted and marketed the Tezos project and the Tezos ICO.  In numerous interviews, social media postings and other public statements, the DLS Defendants touted the Tezos ICO and the technology underlying Tezos; discussed the Tezos ICO structure and process; answered questions concerning the Tezos ICO and the technical underpinnings of the ICO system; and even responded to critics who called into doubt Tezos's viability or the structure and process of the Tezos ICO.  In these numerous communications with investors, the DLS Defendants held themselves out as the actual sellers in the Tezos ICO, making statements such as "*we're not planning on having a cap*" for the Tezos ICO; "*We have no intention of running another crowdsale* unless it's too low to fund development over the four years we want to budget the foundation"; "We built a product so we don't need 'fundraising' though *we did sell a small amount of tokens at a discount over the crowdsale price*"; and "We'll have an ANN[OUNCEMENT] on B[itcoin]T[alk] as soon as we're ready to announce *our ICO*."[3]

Third, not only did they promote the Tezos ICO to investors, the DLS Defendants (in particular, Arthur Breitman and DLS) proceeded to oversee and execute the Tezos ICO itself.  Over the two weeks of the Tezos ICO in July 2017, it was Defendant Arthur Breitman who closely monitored the investments coming in from investors, troubleshooting and correcting technical issues, and posting updates to investors about the resolution of these technical issues.

---

[2] ¶ 36.

[3] ¶¶ 40, 51-52 (emphasis added).

Fourth, the center of gravity of the Tezos ICO and of the DLS Defendants' activities was firmly planted in the U.S.  The Breitmans are residents of the Northern District of California.  DLS is a Delaware corporation with its principal place of business in Mountain View, California, also in the Northern District of California.  All or virtually all of the promotion and marketing by the DLS Defendants was performed from the U.S., with Defendant Kathleen Breitman acknowledging that "*We didn't do much marketing outside of the U.S.* Well rather *Arthur and I are based in the U.S.* and *we talk about the technology in mainstream U.S. press outlets*."[4]

In short, the Tezos ICO was an initial public offering of securities conducted in the United States by a U.S. enterprise and its U.S. principals and was directed at U.S. citizens.  Against this background, the DLS Defendants make three arguments for dismissal, all of which are invalid.

Like Defendant Tezos Foundation, the DLS Defendants argue that this action should be dismissed under the doctrine of forum non conveniens, relying principally on the purported "Contribution Terms."  However, for the same reasons articulated in Lead Plaintiff's opposition to the Tezos Foundation's motion to dismiss, this argument should be rejected.  The purported Contribution Terms were never incorporated by reference or made a part of the investment process, and are therefore not contractually enforceable.  Moreover, the Northern District of California is clearly the correct forum, given the undeniable nexus between the Tezos ICO and this forum, the location of critical witnesses, the fact that the U.S. securities laws govern the Tezos ICO, and the Court's undeniable familiarity with and expertise in these laws.

As a further argument, the DLS Defendants contend that they were not "sellers" of the Tezos tokens under Section 12(a)(1) of the Securities Act and therefore are not liable to Lead Plaintiff and the Class.  However, as set forth in more detail below, based on the fact that it was the DLS Defendants who were really selling an interest in their business to investors, and based on their activity in promoting and overseeing and executing the Tezos ICO, there is no doubt that the DLS Defendants solicited investments from investors and were thus "sellers" under Section 12(a)(1).

---

[4] ¶ 110 (emphasis added).

1    Finally, the Breitmans argue that they were not "controlling" persons under Section 15 of the

2   Securities Act with respect to the Tezos Foundation.  This argument should similarly be rejected,

3   because it is clear from their personal involvement in all aspects of the promotion, marketing,

4   management and execution of the Tezos ICO that the DLS Defendants controlled the Tezos

5   Foundation for purposes of the Tezos ICO.

6    For all of these reasons, the DLS Defendants' motion to dismiss should be denied.

7                        **STATEMENT OF FACTS**

8    Defendants Arthur and Kathleen Breitman conceived the Tezos project as a new blockchain

9   protocol to compete with and supplant the Ethereum blockchain.  ¶ 32.

10    In August 2015, the Breitmans formed Defendant DLS.  ¶ 35.  DLS is the developer of the

11   Tezos project, and holds all the intellectual property, including the source code of the Tezos

12   cryptographic ledger, logos and Tezos-related trademarks.  ¶¶ 15, 46.  As DLS had no traditional

13   office, the Breitmans listed their home in Mountain View, California as DLS's formal headquarters.

14   ¶ 35.  Arthur Breitman is the primary developer behind the Tezos cryptographic ledger.   ¶ 20.

15   Kathleen Breitman is the Chief Executive Officer of DLS and has stated she "take[s] care of all the

16   operational aspects of the Tezos blockchain," including dealing with business partners, attorneys and

17   their marketing group.  ¶ 21.

18    Prior to the Tezos ICO, between September 2016 and March 2017, the DLS Defendants

19   conducted a private pre-sale of the yet-to-be-issued Tezos tokens.  ¶ 36.  The Breitmans received

20   $612,000 in funding from these early investors.  ¶ 36.

21    In or around May 2017, the Tezos Foundation was established as a Swiss non-profit

22   (Stiftungen) in Zug, Switzerland to oversee the Tezos ICO and to receive and manage all contributions

23   from investors.  ¶ 47.  The Tezos Foundation was conferred the right to determine the allocation of

24   Tezos tokens in the Tezos ICO. *Id*.  Under a separate contract, the Tezos Foundation will acquire

25   DLS, its intellectual property, its trademark applications and domain names, as well as DLS's existing

26   business relationships with contractors and potential customers.  *Id.*

27

28

1    DLS and the Tezos Foundation are closely affiliated, and jointly conducted the Tezos ICO.

2    ¶ 48.  According to the Tezos Overview, it was DLS and the Breitmans who established the Tezos

3    Foundation.  *Id.*  According to the Tezos Transparency Memo, "DLS advises the Foundation closely

4    on technology."  Further, DLS controls the Tezos Foundation website (www.tezos.ch).  *Id.*  According

5    to Johann Gevers, one of the original directors on the Board of the Tezos Foundation, "[t]hey [the

6    Breitmans] control the foundation's domains, websites and email servers, so the foundation has no

7    control or confidentiality in its own communications."  *Id.*

8        The Breitmans were actively involved in promoting and marketing the Tezos ICO.  ¶¶ 49-50.

9    On Reddit, a popular discussion forum for a variety of topics, including cryptocurrencies, Kathleen

10   Breitman confirmed that she had been the "one woman band" responsible for "promoting the

11   protocol."  ¶ 54.  Throughout the months leading up to the Tezos ICO, Defendants Arthur Breitman

12   (under the usernames "murbard" and "abtezos") and Kathleen Breitman (as "breitwoman") posted

13   numerous times on Reddit.  ¶ 50.  In their posts, the Breitmans: (i) touted the technology underlying

14   Tezos; (ii) discussed the Tezos ICO's structure and process; (iii) answered numerous questions

15   concerning the Tezos ICO and the technical underpinnings of the ICO system; (iv) touted the Tezos

16   ICO and the Tezos project; and (v) responded to critics who called into doubt Tezos's viability or the

17   structure and process of the Tezos ICO.  *Id.*  In this manner, the Breitmans were directly involved in

18   the marketing and promotion of the Tezos ICO.  *Id.*

19       In the course of their promotional and marketing activities, the Breitmans frequently held

20   themselves out as the actual sellers of the Tezos tokens in the Tezos ICO.  For example, on June 27,

21   2016, in answer to a Reddit user's question "when is the crowdfunding?", Arthur Breitman responded:

22   "Looking at a crowdsale circa Q1 2017, but *we have to iron out the details*."  ¶ 51 (emphasis added).

23   In April 2017, Arthur Breitman stated: "Indeed *we're not planning on having a cap*. The structure

24   will be highly similar to the Ethereum crowdsale." (emphasis added).  *Id.*  On the same Reddit thread,

25   Defendant Kathleen Breitman stated: "*We have no intention of running another crowdsale* unless

26   it's too low to fund development over the four years we want to budget the foundation. Even then,

27   this choice would be left up to our network to decide. We built a product so we don't need

28

'fundraising' though *we did sell a small amount of tokens at a discount over the crowdsale price* (read: not a fixed % of a cap), to a small group of high net worth people and hedge funds with a focus on tokens." ¶ 52 (emphasis added).  On May 3, 2017, Defendant Arthur Breitman posted an update about the Tezos ICO, stating "We're keeping our nose to the grindstone.  We'll have an ANN[OUNCEMENT] on B[itcoin]T[alk] as soon as we're ready to announce *our ICO*." ¶ 40.

All of these promotional and marketing activities were conducted by the Breitmans and DLS within the U.S.  When touting the fact that she was the "one woman band" responsible for "promoting the protocol," Kathleen Breitman also stated that she was US-based and "I don't have any plans to leave the US." ¶ 54.  In July 2017, Kathleen Breitman further confirmed the center of gravity of their marketing activities was in the U.S., stating: "*We didn't do much marketing outside of the U.S.* Well rather *Arthur and I are based in the U.S.* and *we talk about the technology in mainstream U.S. press outlets* and sometimes it's picked up in Asian outlets." ¶ 110.

Defendants Arthur Breitman and DLS were also heavily involved in planning, managing and executing the Tezos ICO itself.  ¶ 55.  During the Tezos ICO, Defendant Arthur Breitman was monitoring the ICO's progress, maintaining the Tezos computers tracking the progress of the ICO and the contribution amounts and addresses of ICO investors, and was on hand to deal with any problems that arose, including answering troubleshooting questions and giving investors updates on technological glitches.  ¶¶ 57-58.

As a result of the Tezos ICO, which was conducted over a two-week period in July 2017, Defendants raised the equivalent of $232 million in Bitcoin and Ethereum (at July 2017 prices) from 30,317 investors.  ¶¶ 2, 41, 78.

## ARGUMENT

## I.    FORUM NON CONVENIENS

### A.    Applicable Legal Standards

The doctrine of forum non conveniens is an "exceptional tool to be employed sparingly." *City of Almaty v. Khrapunov*, 685 F. App'x 634, 636-37 (9th Cir. 2017).  Great deference is afforded to the plaintiff's choice of forum, such that "a defendant seeking forum non conveniens dismissal must

1   carry an *almost impossible burden* in order to deny a citizen access to the courts of this country."

2   *Nebenzahl v. Credit Suisse*, 705 F.2d 1139, 1140 (9th Cir. 1983) (quotation marks omitted, emphasis

3   added).  To evaluate a motion to dismiss based on forum non conveniens grounds, a court examines

4   whether an adequate alternative forum exists and whether the balance of private and public interest

5   factors favors dismissal.  *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001).  A

6   defendant must establish that the public and private interest factors "*strongly outweigh*" the plaintiff's

7   convenience.  *City of Almaty*, 685 F. App'x at 636 (emphasis added).

8               **B.       This Action Should Not Be Dismissed Under Forum Non Conveniens**

9           Like the Tezos Foundation, the DLS Defendants have moved to dismiss under the doctrine of

10  forum non conveniens.  The DLS Defendants' arguments are without merit for all the reasons set

11  forth in Lead Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant Tezos

12  Foundation's Motion to Dismiss ("Foundation Opposition"), which is hereby incorporated by

13  reference.

14          Like the Tezos Foundation, the DLS Defendants' argument is based primarily on the forum

15  selection clause contained in the purported "Contribution Terms" document.  DLS Br. at 9-14.

16  However, as discussed in detail in the Foundation Opposition, this argument is without merit because

17  the "Contribution Terms" were never incorporated by the crowdfund.tezos.com investment website.

18  The Contribution terms were located on an entirely separate website than the crowdfund.tezos.com

19  website, and were not referenced by the crowdfund.tezos.com website.  Investors did not even need

20  to access the Contribution Terms in order to invest in Tezos.  Accordingly, as a matter of law, the

21  Contribution Terms are not enforceable against Tezos investors.

22          The DLS Defendants argue that investors had either actual notice or inquiry notice of the

23  Contribution Terms, going so far as to submit the affidavit of one investor, Woodrow Levin, to show

24  that this particular investor had actual notice of the Contribution Terms. DLS Br. at 10-11.  However,

25  as set forth in the Foundation Opposition, awareness of the Contribution Terms is simply irrelevant

26  where the terms were not incorporated and therefore were unenforceable as a matter of law.  In

27  addition, extrinsic evidence, such as a declaration, "may not overcome a failure to provide a clear and

28

7

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DLS DEFENDANTS' MOTION TO DISMISS
NO. 3:17-CV-06779-RS

1  unequivocal incorporation by reference." *St. Paul Mercury Ins. Co. v Am. Safety Indem. Co.*, No. 12-

2  CV-05952-LHK, 2014 U.S. Dist. LEXIS 70785, at *34 (N.D. Cal. May 21, 2014); *Chan v. Drexel*

3  *Burnham Lambert, Inc.*, 178 Cal. App. 3d 632, 642 (1986) ("Because extrinsic evidence would be

4  unavailing as to whether the reference in the alleged agreement to the crucial NYSE rules is on its

5  face clear and unequivocal, we make an independent determination.").[5]  In any event, for the reasons

6  stated in the Foundation Opposition, there was no actual notice or inquiry notice.

7       Finally, as discussed in the Foundation Opposition, the relevant private and public interest

8  factors also strongly militate against dismissal given the significant deference accorded to Plaintiff's

9  choice of a domestic forum and given that the bulk of the evidence and the majority of the Defendants

10  are located in the Northern District of California

11       In addition to the reasons set forth above, dismissal of this action under forum non conveniens

12  as to *the DLS Defendants* would be particularly inappropriate for the following reasons:

13       *First*, as discussed above and for the reasons stated in the Foundation Opposition, the

14  purported "Contribution Terms" do not constitute any sort of enforceable agreement between the

15  Tezos investors and the Tezos Foundation.  Here, the DLS Defendants attempt to go even one step

16  further by seeking to enforce the purported "Contribution Terms" despite *not even being a party to*

17  *those terms on its face.  See* Contribution Terms, ¶ 1 ("The following Terms … govern the

18  contribution procedure … to **the Tezos Foundation** ('TEZOS') by contributors ….") (emphasis

19  added).  The DLS Defendants have offered no evidence that would establish any sort of special

20  relationship with the Tezos Foundation that would give them any right to enforce the purported

21  "Contribution Terms."  Thus, even assuming that the purported "Contribution Terms" constitute some

22  sort of enforceable agreement between Tezos investors and the Tezos Foundation (which they do

23  not), the *DLS Defendants* still have no standing to claim the benefit of their provisions.  *See*

24  *Bancomer, S.A. v. Sup. Ct.*, 44 Cal. App. 4th 1450, 1461 (1996) (a third party may enforce a

25  contractual provision only if it shows "by specific conduct or express agreement that (1) it agreed to

26

---

27  [5] Because the Contribution Terms are not enforceable, there is no need to address the DLS
Defendants' further arguments as to whether there are grounds for repudiating the forum selection
28  clause.  DLS Br. at 11-14.

1    be bound by the terms of the [] agreement, (2) the contracting parties intended [it] to benefit from the

2    [] agreement, or (3) there was sufficient evidence of a defined and intertwining business relationship

3    with a contracting party"); *Landale-Cameron Court, Inc. v. Ahonen*, 155 Cal. App. 4th 1401, 1410

4    (2007) ("A third party should not be permitted to enforce covenants made not for his benefit, but

5    rather for others.  He is not a contracting party; his right to performance is predicated on the

6    contracting parties' intent to benefit him…. The fact that … the contract, if carried out to its terms,

7    would inure to the third party's benefit is insufficient to entitle him or her to demand enforcement.")

8    (quotation marks omitted).

9         *Second*, enforcement of the forum selection clause as to the DLS Defendants would be

10   unreasonable because it would effectively deprive Lead Plaintiff and the putative Class of their day

11   in court.  The DLS Defendants assert that the Tezos Foundation is a Swiss entity and amenable to

12   service of process in Switzerland, but they are conspicuously silent as to whether *they* would likewise

13   be amenable to service of process in Switzerland.  It is thus clear that the DLS Defendants are trying

14   to have their cake and eat it too – by seeking to enforce a forum selection clause in a contract to which

15   they are not a party, with the intent of later arguing to a Swiss court that there is no jurisdiction over

16   them in Switzerland.  In short, the DLS Defendants have offered no evidence that, *as to each of them*,

17   Switzerland would be an adequate alternative forum.

18        *Third*, the DLS Defendants claim that "California has no special public interest in resolution

19   of this dispute" (DLS Br. at 14), but their argument appears to rest solely on the Tezos Foundation's

20   ties to Switzerland, while conveniently ignoring the numerous acts of the DLS Defendants themselves

21   and the other California-based Defendants.  Specifically, the DLS Defendants fail to mention the

22   salient facts that: (1) Arthur Breitman, a California resident, is the primary developer behind the Tezos

23   ledger; (2) DLS, which has its primary place of business in California, owns all the intellectual

24   property of the Tezos project and employs the core development team; (3) the Tezos ICO was in

25   substance an offering of investment interests in the assets and intellectual property of DLS, with the

26   Tezos Foundation created as an intermediate entity to shield the Tezos ICO from the U.S. securities

27   laws; (4) Kathleen Breitman, a California resident, was actively involved in promoting and marketing

28

1   the Tezos ICO; and (5) as Defendant Kathleen Breitman has admitted, virtually all the marketing and

2   promotion of the Tezos ICO was performed here in the United States by the DLS Defendants while

3   located in the United States and was directed at U.S. citizens.  ¶¶ 49-58, 110.  It is thus clear that,

4   contrary to the DLS Defendants' arguments, California and the U.S. have a significant public interest

5   in the resolution of this dispute, while Switzerland's interest is a mere byproduct of Defendants'

6   attempt to avoid the U.S. securities laws.

7          *Finally*, the DLS Defendants suggest that, even were the forum selection clause in the

8   purported "Contribution Terms" inapplicable, the Court should nevertheless apply the *choice of law*

9   provision in the "Contribution Terms."  DLS Br. at 15.  This argument is illogical and internally

10  inconsistent.  Because the Contribution Terms as a whole are contractually unenforceable (including

11  the forum selection clause), the choice of law provision would also likewise be inapplicable.  In

12  addition, as discussed in the Foundation Opposition, Section III, the U.S. securities laws apply to the

13  claims of Lead Plaintiff and the Class.  Under these circumstances, enforcing the choice of law

14  provision designating Swiss law would result in a violation of the anti-waiver prohibition contained

15  in Section 14 of the Securities Act, which states that "[a]ny condition, stipulation, or provision binding

16  any person acquiring any security to waive compliance with any provision of [the Securities Act] or

17  of the rules and regulations of the Commission shall be void."  15 U.S.C. § 77n.

18  **II.      THE DLS DEFENDANTS ARE SELLERS UNDER SECTION 12(a)(1)**

19         Section 12(a)(1) of the Securities Act provides that "[a]ny person who offers or sells

20  a security in violation of section 5" "shall be liable … to the person purchasing such security from

21  him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the

22  consideration paid for such security with interest thereon, less the amount of any income received

23  thereon, upon the tender of such security, or for damages if he no longer owns the security."  15

24  U.S.C. § 77l(a)(1).

25         Under *Pinter v. Dahl*, 486 U.S. 622, 642 (1988), a defendant is liable under Section 12 of the

26  Securities Act if the defendant "passed title, or other interest in the security, to the buyer for value."

27  However, given the definition of "sale" or "sell" under the Securities Act, "the range of persons

28

10

1  potentially liable under § 12(1) is not limited to persons who pass title.  The inclusion of the phrase

2  'solicitation of an offer to buy' within the definition of 'offer' brings an individual who engages in

3  solicitation, an activity not inherently confined to the actual owner, within the scope of § 12." *Pinter*,

4  486 U.S. at 643.  Indeed, the "applicability of § 12 liability to [those] who solicit securities purchases

5  has been recognized frequently since the passage of the Securities Act." *Id.* at 646.

6       With respect to solicitation, "liability extends [ ] to the person who successfully solicits the

7  purchase, motivated at least in part by a desire to serve his own financial interests or those of the

8  securities owner.  If he had such a motivation, it is fair to say that the buyer 'purchased' the security

9  from him and to align him with the owner in a rescission action."  *Id.* at 647; *see also In re Daou Sys.*,

10  411 F.3d 1006, 1029 (9th Cir. 2005) (requiring a plaintiff to "allege that the defendants did more than

11  simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited

12  purchase of the securities for their own financial gain….") (citing *Pinter*, 486 U.S. at 647).

13       "Whether or not defendants actually solicited plaintiffs' sales is a factual question which

14  should generally be left to the jury; at this stage plaintiffs' need only satisfy Rule 8(a)'s lenient

15  pleading standards." *In re Charles Schwab Corp. Sec. Litig*, 257 F.R.D. 534, 550 (N.D. Cal. 2009);

16  *see also Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1126 (N.D. Cal. 2013) ("The

17  Court also agrees with other courts that have held that whether an individual is a seller under Section

18  12 is a question of fact, not properly decided on a motion to dismiss.") (*citing In re Portal Software,

19  Inc. Sec. Litig.*, No. C-03-5138 (VRW), 2006 U.S. Dist. LEXIS 61589, at *11-12 (N.D. Cal. Aug. 17,

20  2006)) (internal quotations omitted).

21       Here, in opposing the DLS Defendants' motion to dismiss, Lead Plaintiff does not presently

22  contend that DLS/the Breitmans directly passed title in the Tezos tokens to investors under the Tezos

23  ICO, because it is clear that the DLS Defendants are liable in any event for solicitation.[6]

24  _____

25  [6] However, despite the nominal structure in the Tezos ICO of DLS → Tezos Foundation → investors,
Lead Plaintiff notes that (as discussed in the Statement of Facts, *supra*) DLS conducted a *direct*,

26  private pre-sale of tokens to an initial group of investors, raising $612,000, *before the Tezos ICO and
before the Tezos Foundation was created*.  ¶ 36; *see also* Gehring Declaration, Ex. A, Tezos

27  Overview, Section 3.5 ("Early Backers") (Dkt. No. 122-1).  This indisputably shows that the real
seller of the tokens was, at all relevant times, DLS.  The Tezos Foundation was merely an intermediate

28

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DLS DEFENDANTS' MOTION TO DISMISS
NO. 3:17-CV-06779-RS

1

**A.** **The DLS Defendants Actively Solicited Investors And Were Much More Than "Mere Participants" In The Tezos ICO**

2

As required under *Pinter* and *Daou*, the Complaint alleges that the DLS Defendants engaged

3

in active solicitation in the Tezos ICO, as opposed to "mere participation," thereby subjecting them

4

to liability as sellers under Section 12.

5

*First*, the DLS Defendants are the architects of the Tezos ICO and the Tezos project. The

6

Breitmans conceived the Tezos project as a new blockchain protocol to compete with and supplant

7

the Ethereum blockchain. ¶ 32. Arthur Breitman is the primary developer behind the Tezos

8

cryptographic ledger. ¶ 20. Kathleen Breitman is the Chief Executive Officer of DLS and has stated

9

she "take[s] care of all the operational aspects of the Tezos blockchain," including dealing with

10

business partners, attorneys and their marketing group. ¶ 21.

11

In or around May 2017, it was the DLS Defendants who established the Tezos Foundation for

12

purposes of the Tezos ICO to hold the consideration raised from investors in the Tezos ICO. ¶¶ 16,

13

47-48. The Tezos Foundation did little, if anything, without the direction and participation of the

14

DLS Defendants. As alleged in the Complaint, "[d]espite the purportedly separate legal status of the

15

Tezos Foundation and DLS, the two entities are in fact closely affiliated, and jointly conducted the

16

Tezos ICO." ¶ 48. "DLS advises the Foundation closely on technology." Further, DLS controls the

17

Tezos Foundation website (www.tezos.ch). *Id.* According to a former board member of the Tezos

18

Foundation, Johann Gevers, "[t]hey [the Breitmans] control the foundation's domains, websites and

19

email servers, so the foundation has no control or confidentiality in its own communications." *Id.*

20

Thus, the DLS Defendants carefully planned, organized and orchestrated the Tezos ICO, and based

21

on this role alone, the DLS Defendants are unquestionably sellers under Section 12. *See In re Worlds*

22

*of Wonder Sec. Litig.*, 721 F. Supp. 1140, 1148 (N.D. Cal. 1989) (allegations that defendants

23

"orchestrated and controlled the sales and distribution process" of the securities were sufficient to

24

state these defendants were "sellers" under Section 12"); *In re U.S.A. Classic Sec. Litig.*, No. 93 Civ.

25

6667 (JSM), 1995 U.S. Dist. LEXIS 8327, at *10 (S.D.N.Y. June 19, 1995) (holding that it is

26

27

shell entity created to pass title and shield the DLS Defendants from the reach of the U.S. securities laws.

28

1   reasonable to infer that a defendant was a seller who "conducted and controlled the solicitation" where

2   the defendant is alleged to have controlled the company issuing the securities and caused the offering

3   of the company's common stock in order to secure repayment of a debt from the company); *Capri v.*

4   *Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (holding that general partners were sellers under Section

5   12 where agent's promotional efforts were done at their "behest," the agent provided to investors only

6   the information supplied by the general partners, and agent did not take any action in relation to

7   investors other than what was contemplated and authorized by defendants).

8       *Second*, DLS is the owner of all the intellectual property in the Tezos project, including the

9   source code of the Tezos cryptographic ledger, logos, and trademark applications associated with the

10  names Tezos.  ¶ 15.  The DLS Defendants specifically formed Defendant DLS to hold the intellectual

11  property for the Tezos project.  ¶¶ 35, 48.  Thus, it is was an investment interest in the underlying

12  business and assets of DLS which was being sold to Lead Plaintiff and the Class through the Tezos

13  ICO.  The relationship between the Tezos Foundation and DLS in connection with the Tezos ICO is

14  therefore similar to the relationship between the parent and subsidiary defendants in *In re Am. Bank*

15  *Note Holographics Secs. Litig.*, 93 F. Supp. 2d 424 (S.D.N.Y. 2000).

16      In *Am. Bank Note*, the wholly owned subsidiary (Holographics) of the parent holding company

17  (ABN) commenced an IPO.  *Id.* at 430.  Holographics argued that, because ABN was the parent and

18  owner of Holographics prior to the IPO, Holographics itself never "owned" the shares sold in the IPO

19  and only ABN could transfer title.[7]  *Id.* at 439.  The court held that, "[w]hile it may be true that

20  Holographics was not the owner, and therefore could not transfer title to the shares, Holographics

21  nonetheless actively solicited the sale of shares through participation in preparation of the registration

22  statement and prospectus and in road shows, with a motivation to serve its own financial interests or

23  those of the securities' owner here, ABN."  *Id.*.  Here, the Tezos Foundation is like the parent ABN,

24  and DLS is like the subsidiary Holographics.   While the Tezos Foundation (like ABN) may

25  technically be the entity that issues the Tezos tokens, it is DLS (like Holographics) which is the

26

27  ───────────────
    [7] The underwriters were held to be "sellers" for purposes of Section 12 because the IPO was a "firm
28  commitment" offering in which the underwriters directly passed title to public investors.  *Id.* at 438.

underlying business being sold in the offering to investors.   Like Holographics, the DLS Defendants actively solicited sales in the Tezos ICO and had a financial motivation to do so (*see infra* Section II.B).

*Third*, the DLS Defendants actively promoted, and solicited investors for, the Tezos ICO. ¶ 49.  In 2014, Arthur Breitman released the Tezos White Paper describing the Tezos blockchain, the mechanics of the Tezos ICO, the parties involved, and the intended uses for the Bitcoin and Ethereum to be contributed by investors.   ¶ 33-34.   From mid-2016 up to the Tezos ICO in July 2017, the Breitmans actively promoted the Tezos ICO and solicited investors online, including on Reddit.   In their communications, the Breitmans discussed a wide-range of subject matters relating to the Tezos project and the Tezos ICO, including: (i) the technology underlying Tezos; (ii) the Tezos ICO's structure and process; (iii) answering numerous questions concerning the Tezos ICO and the technical underpinnings of the ICO system; (iv) touting the Tezos ICO and the Tezos project; and (v) systematically responding to critics who called into doubt Tezos's viability or the structure and process of the Tezos ICO.   These posts show that the Breitmans were intimately involved in the promotion and marketing of the Tezos ICO.   ¶ 50.

In the course of promoting and marketing the Tezos ICO, the Breitmans frequently held themselves out as the actual sellers of the Tezos tokens in the Tezos ICO.   Specifically:

- On June 27, 2016, in answer to a Reddit user's question "when is the crowdfunding?" Arthur Breitman responded: "Looking at a crowdsale circa Q1 2017, but *we have to iron out the details*."  ¶ 51 (emphasis added).

- In April 2017, Arthur Breitman stated: "Indeed *we're not planning on having a cap*. The structure will be highly similar to the Ethereum crowdsale."  ¶ 51 (emphasis added).

- On the same April 2017 Reddit thread, Defendant Kathleen Breitman stated: "***We have no intention of running another crowdsale*** unless it's too low to fund development over the four years we want to budget the foundation. Even then, this choice would be left up to our network to decide. We built a product so we don't need 'fundraising'

14

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DLS DEFENDANTS' MOTION TO DISMISS
NO. 3:17-CV-06779-RS

though *we did sell a small amount of tokens at a discount over the crowdsale price* (read: not a fixed % of a cap), to a small group of high net worth people and hedge funds with a focus on tokens." ¶ 52 (emphasis added).

- On May 3, 2017, Defendant Arthur Breitman posted an update about the Tezos ICO, stating "We're keeping our nose to the grindstone. We'll have an ANN[OUNCEMENT] on B[itcoin]T[alk] as soon as we're ready to announce *our ICO*." ¶ 40 (emphasis added).

Having held themselves out as sellers, the DLS Defendants cannot now disclaim liability under Section 12. *See, e.g.*, *In re Keegan Mgmt. Co.*, No. 91-20084 SW, 1991 U.S. Dist. LEXIS 17491, at *22 (N.D. Cal. Sept. 10, 1991) (holding that defendants were properly alleged as sellers even though they did not own legal title to the stock and explaining that "[t]o one who studies corporate filings and news releases before purchasing via a dealer on an impersonal and anonymous market, the corporation, its officers and directors, and other promoters of the stock appear to be the true 'sellers'").

<u>*Fourth*</u>, the Breitmans were responsible for executing the actual Tezos ICO. For example, Arthur Breitman oversaw the ICO's progress, maintained the Tezos computers tracking the progress of the ICO, the contribution amounts and addresses of ICO investors, and dealt with any problems that arose. ¶ 57. When there was a database crash during the Tezos ICO, Arthur Breitman was the person who addressed investors to explain how the problem was being resolved. ¶¶ 57-58.

All these allegations more than sufficiently allege that the DLS Defendants were statutory sellers under Section 12. Indeed, allegations of lesser involvement and participation in securities transactions have been held to be sufficient to allege seller liability under Section 12. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (defendant properly pleaded as a seller where complaint alleged that defendant actively participated in the preparation of the registration statement, and regularly appeared before investors and financial news agencies to tout the financial vitality of the company issuing the securities); *In re Valence Tech. Sec. Litig.*, No. C 94-1542-SC, 1995 U.S. Dist. LEXIS 10379, at *50 (N.D. Cal. May 8, 1995) (holding that underwriters were properly pleaded as sellers under Section 12 where the complaint alleged that the underwriters

15

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DLS DEFENDANTS' MOTION TO DISMISS
NO. 3:17-CV-06779-RS

1   agreed to a multi-city roadshow before the offerings, had a financial interest in the sales, and solicited

2   sales through reports and roadshows).

3   **B.   The DLS Defendants Were Motivated By Their Own Financial Interests To Actively Solicit Investors For the Tezos ICO**

4

5       As required under *Pinter*, the Complaint also alleges that the DLS Defendants were

6   "motivated at least in part by a desire to serve [their] own financial interests or those of the securities

7   owners." *Pinter*, 486 U.S. at 647.  Apart from owning the intellectual property underlying the Tezos

8   project, DLS and its shareholders will be paid 8.5% of the investments raised and 10% of the initial

9   issuance of Tezos tokens (representing 76,330,692.97 tokens).  ¶ 8.  The DLS Defendants clearly had

10  a significant financial stake in the Tezos ICO and were motivated by this financial stake to solicit

11  investors.  Indeed, as alleged in the Complaint, the "Tezos ICO was a financial boon for Defendants."

12  ¶ 8.

13      The allegations concerning the DLS Defendants' financial motivation, together with the above

14  allegations of the DLS Defendants' active solicitation, are more than sufficient, at the motion to

15  dismiss stage, to establish that the DLS Defendants were "sellers" under Section 12.  *See In re OSG*

16  *Sec. Litig.*, 971 F. Supp. 2d 387, 403 (S.D.N.Y. 2013) (finding defendants were sellers because in

17  addition to pleading active solicitation, complaint alleged that defendants solicited securities

18  purchases for their personal financial gain, as the company defendant received over $289 million in

19  proceeds and individual defendants stood to gain personally from the offering); *Am. Bank Note*, 93 F.

20  Supp. 2d at 439 (holding that defendant Holographics was a seller under Section 12, even though it

21  never owned the shares sold, because defendant "actively solicited the sale of shares through

22  participation of the registration statement and prospectus and in road shows with a motivation to serve

23  its own financial interests or those of the securities' owner"); *Keegan Mgmt.*, 1991 U.S. Dist. LEXIS

24  17491, at *21 (seller liability sufficiently alleged under Section 12 where complaint listed several

25  ways that defendants' actions served their financial interests, including to protect their executive

26  positions and substantial compensation, enhance the value of the individual defendants' holdings to

27  obtain significant profits from advantageous sales, and enable the public offering to go forward).

28

16

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DLS DEFENDANTS' MOTION TO DISMISS
NO. 3:17-CV-06779-RS

### C.   The DLS Defendants' Arguments Lack Merit

Despite the foregoing, the DLS Defendants make two principal arguments to avoid liability.

First, the DLS Defendants argue that they cannot be liable as sellers under Section 12 because there are no allegations that they caused Lead Plaintiff or the Class to make a purchase in the Tezos ICO.  DLS Br. at 19.  However, as recognized in the case relied on by DLS Defendants for this argument, *personal* solicitation is not required for liability under Section 12.  *Steed Fin. LDC v. Nomura Secs. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761, at *24 (S.D.N.Y. Sept. 20, 2001) (citing cases).  Where, as here, "significant involvement in the solicitation is found, a defendant may be liable under Section 12[ ]" even if the defendant is not alleged to have personally solicited the sale from the plaintiff.  *Am. Bank Note*, 93 F. Supp. 2d at 439 n.5 (rejecting the argument that in order to be a solicitor of sales under Section 12, defendant must be alleged to have personally solicited the sale from plaintiff and noting that "[t]his requirement… is not absolute"); *see also Capri*, 856 F.2d at 478 (holding that under *Pinter*, defendants were "sellers" even though they did not have any direct contact with plaintiffs); *In re Proxima Corp. Sec. Litig*, No. 93-1139-IEG (LSP), 1994 U.S. Dist. LEXIS 21443, at *15 (S.D. Cal. May 4, 1994) (explaining that *Pinter* "nowhere stated that contacts between the buyer and the statutory seller must be face-to-face"); *U.S.A. Classic*, 1995 U.S. Dist. LEXIS 8327 ("No direct contact between the purchaser and the purported 'solicitor' is necessary for Section 12[ ] liability."); *McMahan & Co. v. Wherehouse Enter.*, 859 F. Supp. 743, 755 (S.D.N.Y. 1994) ("There need be no direct contact between a plaintiff and defendant, provided that the defendant, with scienter, participated in the sale of securities."), *rev'd on other grounds*, 65 F.3d 1044 (2d Cir. 1995).  As explained above, the DLS Defendants were significantly involved in the solicitation of investors for the Tezos ICO.

Second, the DLS Defendants argue that they did not engage in any acts of solicitation.  Specifically, the DLS Defendants argue that all they did was provide investors with information, that they did not seek any contributions and that such "educational" efforts render them "mere participants" who are not liable under Section 12.  DLS Br. at 20-21.  This is a gross and sweeping mischaracterization of the allegations in the Complaint.  As discussed above, the DLS Defendants did

1  not just provide information to potential investors in a vacuum.  They were doing so in the context of

2  a pitch for the Tezos ICO.  The DLS Defendants *owned* the Tezos technology, *created* the Tezos

3  Foundation as a special purpose vehicle for selling tokens in the Tezos ICO, and had a contractual

4  arrangement under which *they agreed to sell all of the Tezos technology to the Tezos Foundation* as

5  part of the Tezos ICO.  Thus, when providing information to investors, they clearly were promoting

6  the Tezos ICO itself, because the DLS Defendants' financial interests were inextricably connected to

7  the success of the Tezos ICO.  This conduct clearly constituted solicitation.

8      The cases relied on by the DLS Defendants are not to the contrary, because the plaintiffs in

9  those cases failed to allege more than "mere participation" and did not allege that the defendants were

10  motivated by their own financial interests.  *See Vanguard Specialized Funds v. VEREIT Inc.*, No. CV-

11  15-02157-PHX-ROS, 2016 U.S. Dist. LEXIS 137881, at *50-51 (D. Ariz. Oct. 3, 2016) (allegations

12  that the defendant signed and participated in the preparation and dissemination of the registration

13  statement and prospectus, promoted the transaction to investors via press releases and conference call,

14  without more, were insufficient to plead that defendants were statutory sellers); *Fouad v. Isilon Sys.*,

15  No. C07-1764 MJP, 2008 U.S. Dist. LEXIS 105870 (W.D. Wash. Dec. 29, 2008) (allegations that

16  defendants issued and participated in preparation of prospectus, and paid for and participated in road

17  shows only establish common issuer activity or "mere participation"); *Brody v. Homestore, Inc*., No.

18  CV 02-08068 FMC (JWJx), 2003 U.S. Dist. LEXIS 17267, at *17 (C.D. Cal. Aug. 11, 2003)

19  (allegations that defendants arranged a road show, met with potential investors and money managers,

20  and presented highly favorable information about the company, and where there was no alleged

21  financial motivation, insufficient to establish defendants as sellers).[8]  As explained above, the DLS

22  Defendants here did much more than merely educate investors.

23      The DLS Defendants also argue that the Breitmans' statements specifically about the

24  underlying Tezos technology are different from statements about the Tezos ICO itself and, thus,

25  cannot qualify as solicitation.  DLS Br. at 21.  The DLS Defendants argue that there are "no

26  _____

27  [8]    The DLS Defendants also argue that the allegations establishing them as sellers are conclusory
and must be rejected.  DLS Br. at 20 n.8.  However, as shown in Section II.A, *supra*, the allegations

28  in the Complaint are hardly conclusory.

allegations connecting [the Breitmans'] statements explaining the Tezos technology to participation in the fundraiser." DLS Br. at 21 (again citing *Vanguard, Fouad* and *Brody*). This argument is silly. The only reason the DLS Defendants were touting the Tezos technology was in order to generate investor interest in the "uncapped" Tezos ICO. The Tezos Foundation and the DLS Defendants were not giving away the technology for free. The more Bitcoin and Ethereum that was raised in the ICO, the more the DLS Defendants stood to gain. ¶¶ 8, 42, 79. As already explained, the Breitmans were not mere software designers hired by the Tezos Foundation to provide "professional services" in the manner that accountants and lawyers might provide. DLS Br. at 18. Here, the DLS Defendants owned the underlying technology that was being sold.

## III.   THE BREITMANS ARE "CONTROLLING" PERSONS WITH RESPECT TO THE TEZOS FOUNDATION

To allege controlling person liability under Section 15 of the Securities Act, 15 U.S.C. § 77o, a plaintiff is required to plead only that: (i) there was a primary violation of federal securities laws; and (ii) the defendant possessed actual power or control over the primary violator. *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Control may be direct or indirect. *See* 17 C.F.R. § 230.405 (SEC defining control as the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."). However, "it is not necessary to show actual participation or the exercise of actual power." *Howard*, 228 F.3d at 1065. Accordingly, day-to-day involvement in the operations of a primary violator is not necessary for control person liability. *Lane v. Page*, 649 F. Supp. 2d 1256, 1308 (D.N.M. 2009) ("The regulation thus focuses on the power to direct, not on the exercise of that power. Requiring that a defendant have actually exercised power over the primary violator's general operations would involve divining an exercise of power requirement from a regulation that mentions only the possession of power."). Moreover, a "Plaintiff need not show that the defendant was a culpable participant in the violation [to prove the defendant is a 'controlling person' under section 15(a) or section 20], but defendant may assert a good faith defense." *Flynn v. Sientra, Inc.*, No. 15-07548, 2016 U.S. Dist. LEXIS 83409, at *53 (C.D. Cal. June 9, 2016) (citing *Howard*, 228 F.3d 1057) (text in brackets in original, internal quotation marks omitted).

19

1    Whether such power to control exists presents "a complex question of fact requiring a close

2    examination of the particular situation and organization" and "how to characterize the relationship

3    between the various alleged controlling persons and the alleged violator of the securities laws." *Wool*

4    *v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987); *No. 84 Employer-Teamster Joint*

5    *Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (same); *see*

6    *also Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) ("Whether [the defendant] is a controlling

7    person 'is an intensely factual question….'"). "Because the concept of control… is an elusive notion

8    for which no clear-cut rule or standard can be devised," it "should be construed liberally and flexibly."

9    *Wool*, 818 F.2d at 1441.

10    Here, the DLS Defendants do not argue in their motion to dismiss that there was not a primary

11    violation.[9]  Instead, the DLS Defendants argue the Breitmans did not control the Tezos Foundation.

12    DLS Br. at 21-22.  The DLS Defendants argue that the only allegations of the Breitmans' control are

13    that the Breitmans closely advised the Tezos Foundation and that the Breitmans, through DLS,

14    controlled the Tezos Foundation website.  DLS Br. at 22.  This mischaracterizes the Complaint.

15    As alleged in the Complaint, the DLS Defendants *established* the Tezos Foundation to execute

16    the Tezos ICO.  Specifically, in or around May 2018, just *two months* prior to the Tezos ICO, the

17    DLS Defendants created the Tezos Foundation to oversee the ICO, to receive and manage all

18    contributions, and to recommend a token allocation in the Tezos genesis block based on the

19    contributions received.  ¶¶ 16-17, 47-48.  Despite the purported separate legal status of the Tezos

20    Foundation and DLS, the Complaint alleges the "two entities are in fact closely affiliated, and jointly

21    conducted the Tezos ICO."  ¶ 48.  Indeed, Johann Gevers, one of the original directors on the Board

22    of the Tezos Foundation, publicly acknowledged that "[t]hey [the Breitmans] control the foundation's

23    domains, website and email servers, so the foundation has no control or confidentiality in its own

24

25    _____

26    [9] The DLS Defendants argue that the Section 15 claim against the Breitmans with respect to DLS
     must be dismissed because Lead Plaintiff has not alleged a primary violation on the part of DLS.
27    DLS Br. at 9 n.21.  However, as explained above, a primary violation of Section 12 against DLS has
     been properly alleged.  *See supra* Section II (DLS is a "seller" under Section 12).  Thus, the Section
28    15 claim against the Breitmans as to DLS should not be dismissed.

communications." ¶ 48.  Further, although the Tezos Foundation nominally received and managed contributions, and made token allocation determinations, the Breitmans (individually and through DLS) *planned*, *promoted* and *executed* the Tezos ICO.  For example, on Reddit, Kathleen Breitman confirmed that she had been the "one woman band" responsible for "promoting the protocol." ¶ 54. Defendant Arthur Breitman was responsible for the execution of the Tezos ICO, and maintained the Tezos computers tracking the progress of the ICO and the contribution amounts and addresses of ICO investors, as well as dealing with any technical problems that arose.  ¶¶ 57-58.  At this motion to dismiss stage, these allegations, which are much more than merely giving advice or controlling a website, suffice to establish the Breitmans' control over the Tezos Foundation.

The cases relied on by the DLS Defendants support Lead Plaintiff's position.  In *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. Oct. 22, 2007), the court in fact found that control person liability was properly alleged as to certain individual defendants, because they were alleged to have caused the company to file several misstated financial results. *Id.* at 1193-94.  As to the claim for control person liability that was dismissed, the *Middlesex* court held that it was "difficult… to determine how, as a Vice President, [the defendant] was able to exercise control over the other [ ] Defendants when [they] held positions of Vice President or higher…." *Id.* at 1194. Here, in contrast, the Breitmans, individually and through DLS, were the masterminds behind the Tezos ICO, without whom the Tezos Foundation would not have existed and the ICO would not have occurred.  Further, the Breitmans created the Tezos Foundation to facilitate the Tezos ICO. *In re Am. Apparel, Inc. Shareholder Litig.*, No. CV 10-06352 MMM (RCx), 2013 U.S. Dist. LEXIS 189797 (C.D. Cal. Aug. 8, 2013) is also distinguishable.  In *Am. Apparel*, a defendant minority shareholder and lender which had access to the company's internal financial information and operations was not liable as a control person over the company's actions regarding immigration compliance because the shareholder/lender's relationship with the company was long after, or only briefly overlapped, with the misrepresentations at issue. *Id.* at 130.

1

## <u>CONCLUSION</u>

2

For the reasons set forth above and in Lead Plaintiff's opposition to the other Defendants'

3

motions to dismiss, the Court should deny the DLS Defendants' motion in its entirety.

4

5
                                  Respectfully Submitted,

6
Date: June 8, 2018                        LTL ATTORNEYS LLP

7
                                By: *s/ Enoch H. Liang*

8
                                  Enoch H. Liang
                                  LTL ATTORNEYS LLP

9
                                  601 Gateway Boulevard, Suite 1010
                                  South San Francisco, California 94080

10
                                  Tel:  650-422-2130

11
                                  Fax:  213-612-3773
                                  enoch.liang@ltlattorneys.com

12

13
                                  James M. Lee
                                  Caleb H. Liang

14
                                  LTL ATTORNEYS LLP
                                  300 S. Grand Ave., 14th Floor

15
                                  Los Angeles, California 90071

16
                                  Tel:  213-612-8900
                                  Fax:  213-612-3773

17
                                  james.lee@ltlattorneys.com
                                  caleb.liang@ltlattorneys.com

18

19
                                  Hung G. Ta
                                  JooYun Kim

20
                                  Natalia D. Williams
                                  HUNG G. TA, ESQ., PLLC

21
                                  250 Park Avenue, 7th Floor
                                  New York, New York 10177

22
                                  Tel: 646-453-7288
                                  Fax: 646-453-7289

23
                                  hta@hgtlaw.com
                                  jooyun@hgtlaw.com

24
                                  natalia@hgtlaw.com

25
                                *Lead Counsel for Court-Appointed Lead*

26
                                *Plaintiff and the Class*

27

28

22

1
2
3
4

William R. Restis
THE RESTIS LAW FIRM, P.C.
550 West C Street, Suite 1760
San Diego, California 92101
Tel: 619.270.8383
william@restislaw.com

5
6
7
8
9
10

Joe J. DePalma
Bruce D. Greenberg
LITE DEPALMA GREENBERG,
LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
Jdepalma@litedepalma.com
bgreenberg@litedepalma.com

11
12

*Additional Counsel for the Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DLS DEFENDANTS' MOTION TO DISMISS
NO. 3:17-CV-06779-RS