1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10   IN RE TEZOS SECURITIES LITIGATION         Case No.   17-cv-06779-RS

11                                             **ORDER ON DEFENDANTS' MOTIONS
                                               TO DISMISS**

12   This Document Relates to:
     ALL ACTIONS
13

14

15                                   **I. INTRODUCTION**

16          This putative class action attempts to hold a cryptocurrency enterprise liable for violations

17   of federal securities law. In July 2017, the Tezos blockchain project ("Tezos") conducted an online

18   fundraising effort. Soon thereafter, certain Tezos contributors brought suit against various project

19   participants for the sale of unregistered securities. These cases were consolidated, and Lead

20   Plaintiff Arman Anvari subsequently filed a complaint on behalf of all contributors against four

21   distinct groups of defendants: Arthur Breitman, Kathleen Breitman, and their company Dynamic

22   Ledger Solutions (collectively, "DLS" or "DLS Defendants"), Timothy Draper and certain of his

23   venture capital vehicles (collectively, "Draper"), the Tezos Foundation ("the Foundation"), and

24   Bitcoin Suisse AG ("Bitcoin Suisse"). In separate motions, comprised of overlapping statutory and

25   jurisdictional arguments, the defendants now seek to dismiss the claims against them under

26   Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). For the reasons set forth below, the

27   motions by DLS and the Tezos Foundation are denied; the motion by Bitcoin Suisse is granted

28   without leave to amend; and the motion by Draper is granted with leave to amend.

United States District Court
Northern District of California

United States District Court
Northern District of California

## II. BACKGROUND[1]

The Breitmans, a husband and wife team based in Northern California, originally conceived of the Tezos project. In 2014, Mr. Breitman released a white paper touting Tezos as "a solution" to the shortcomings of predominant digital currencies such as Bitcoin and Ethereum. *Tezos: A Self-Amending Crypto-Ledger*, (Aug. 3, 2014), https://tezos.com/static/papers/position_ paper.pdf. "Tezos," the white paper declared, "truly aims to be the *last* cryptocurrency." *Id*. The following year, the Breitmans formed DLS to hold all Tezos-related intellectual property. At all relevant times, DLS listed Mrs. Breitman as its Chief Executive Officer, Mr. Breitman as its Chief Technology Officer, and the couple's home as its corporate headquarters.

As early as June 2016, the Breitmans began posting on popular internet forums about their plan for a 2017 "crowdsale" in support of Tezos' ongoing operations. Careful, in most instances[2], to avoid characterizing the plan as an "Initial Coin Offering" ("ICO"), these posts nevertheless described a process by which Tezos "tokens" would be allocated in exchange for "initial investment[s]." In a thread for digital currency traders, Mrs. Breitman disclosed that "a small amount of tokens" had already been sold "at a discount . . . to a small group of high net worth people and hedge funds." Even as the project came to encompass legally distinct development and fundraising arms, the couple continued to refer to it with the first-person "we."

In May 2017, a *Reuters* article revealed that venture capitalist Timothy Draper had taken a minority position[3] in DLS through his firm Draper Associates Crypto. A well-known technology

---

[1] Unless otherwise noted, this synopsis is based on facts drawn from the complaint, which must be taken as true for purposes of a 12(b)(6) motion. For purposes of a 12(b)(2) motion, "uncontroverted allegations must be taken as true, and conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (internal quotation marks and alterations omitted).

[2] Roughly two months prior to the fundraiser, under the handle "arthurb," a user purporting to represent Tezos alluded to "our ICO" on the website bitcointalk.org. Compl. ¶ 40.

[3] While Anvari sets this investment at $1,500,000 in his complaint, Draper disagrees. By his account, Draper Associates Crypto purchased a $500,000, ten percent stake in DLS in May 2017, before separately joining a $1,000,000 capital pool during the July 2017 Tezos fundraiser. In his opposition to this motion, Anvari appears to concede the point.

1    investor, Draper brought publicity along with his cash. Describing him as "the first prominent

2    venture capitalist to openly embrace initial coin offerings," the article quoted Draper as "want[ing]

3    to make sure those tokens get promoted." His goal proved self-fulfilling: by summer's end, the

4    *Wall Street Journal* would observe the mere fact of his involvement had "significantly raised

5    Tezos's profile."

6         Around the same time as Draper's public alignment with Tezos, the project's fundraising

7    efforts started to gather steam.[4] Most notably, the Breitmans and DLS established the Tezos

8    Foundation. Based in Switzerland, the purportedly independent non-profit was intended to oversee

9    the ICO, after which it would acquire DLS and assume full responsibility for the technology's

10   future development. While DLS shareholders, as a part of this handoff, stood to receive 8.5% of

11   all funds raised and 10% of all tokens created, the takeaway for individual contributors was less

12   concrete. Rather than adopting a direct tokens-for-capital system, the Foundation would reward

13   donators by "recommending" (to the decentralized Tezos user network) they be awarded a

14   commensurate token allocation. This flexibility was asymmetric. Contributors, who were to give

15   in either Bitcoin or Ethereum, could not retract donations once recorded on the blockchain ledger.

16        For the next two months, DLS and the Foundation prepared for the ICO. The Breitmans

17   continued to engage with the online cryptocurrency community, with Mrs. Breitman depicting

18   herself as the "one woman band" charged with "promoting the protocol" in a scheduled chatroom

19   appearance. The Breitmans also undertook work presumably falling within the Foundation's

20   mandate, including development of the websites[5] and applications underlying the eventual ICO.

21   Indeed, even as the Foundation made outwardly autonomous gestures—creating a board of

22   directors, hiring an American spokesperson (Ross Kenyon), and disseminating that spokesperson's

23   "how-to" video for prospective ICO participants—the Breitmans' close advisory role drew its

24

25   [4] In deference to the language of the complaint, the Tezos fundraiser will hereinafter be referred to as an "ICO."

26   [5] These websites include tezos.ch, crowdfund.tezos.com, and tezos.com, the last of which is

27   hosted on an Arizona server.

28                                              ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                                                CASE NO.  17-cv-06779-RS

United States District Court
Northern District of California

1   independence into question. That fall, one of the Foundation's original directors would indicate

2   that the Breitmans "control the foundation's domains, websites and email servers, so the

3   foundation has no control or confidentiality in its own communications." *See* Compl. ¶ 48.

4       The ICO commenced on July 1, 2017, raising the market equivalent of approximately $232

5   million in Bitcoin and Ethereum[6] by its July 14 close. Nominally overseen by the Foundation, the

6   process bore ample evidence of the Breitmans' handiwork. Three days into the ICO, for instance,

7   Mr. Breitman posted an apology for certain malfunctions, assuring commentators "[w]e're . . .

8   cleaning up the mess." Pursuant to a forum-selection clause within "Contribution Terms" drafted

9   by the Foundation, but neither included in nor linked to any of its English-language sites,

10   contributors agreed to Europe as the legal situs of all ICO-related participation and litigation.[7]

11       Bitcoin Suisse, a foreign firm specializing in the crypto-financial sector, provided

12   intermediary services to certain individual ICO contributors. These services included the

13   conversion of US dollars to Bitcoin and Ethereum, the transfer of that cryptocurrency to the Tezos

14   Foundation, and the creation of digital "wallets" for the later receipt of Tezos tokens. The firm

15   additionally agreed to serve as a co-signatory on all of the Foundation's post-ICO cryptocurrency

16   transactions.

17       Lead Plaintiff Anvari is an Illinois resident who contributed 250 Ethereum coins to the

18   Tezos ICO. Significantly, he does not allege pre-contribution awareness of any of the defendant-

19   specific promotional or procedural activity recounted above. He does not, in other words, claim to

20   have read the Breitmans' posts, watched the Foundation's how-to video, or been aware of

21   Draper's involvement. Nor, for that matter, does he allege to have engaged in any transactions

22   through Bitcoin Suisse, or to have been ignorant of the purportedly governing Contribution Terms.

23

24   [6] By December 2017, a surge in the cryptocurrency market left these funds with a value over $1 billion. At current prices, that figure rests nearer to $700 million.

25   
26   [7] "The Contribution Software and the Client are located in Alderney. Consequently, the contribution procedure . . . is considered to be executed in Alderney." Contribution Terms ¶ 46.
27   "The applicable law is Swiss law. Any dispute . . . shall be exclusively and finally settled in the courts of Zug, Switzerland." *Id.* ¶ 48.

28   ORDER ON DEFENDANTS' MOTIONS TO DISMISS<br>CASE NO. 17-cv-06779-RS

United States District Court<br>Northern District of California

4

1   All the same, he claims he was a victim of an unregistered securities sale, and seeks rescission

2   plus assorted damages for all contributors as against all defendants under Sections 12 and 15 of

3   the Securities Exchange Act of 1934 ("the Exchange Act").

4        The defendants move to dismiss on the basis of arguments that fall into five general

5   categories: (1) Anvari's failure to establish personal jurisdiction; (2) *forum non conveniens*; (3) the

6   impropriety of the Exchange Act's extraterritorial application; (4) the facial inapplicability of

7   Section 12 "statutory seller" liability on the facts alleged; and (5) the facial inapplicability of

8   Section 15 "control person" liability on the facts alleged.

9                          **III. LEGAL STANDARDS**

10       **A.  Personal Jurisdiction**

11       An action is subject to dismissal if the court lacks personal jurisdiction over the

12   defendants. *See* Fed. R. Civ. P. 12(b)(2). Where there is no federal statute applicable to determine

13   personal jurisdiction, a district court should apply the personal jurisdiction law of the state where

14   the federal court sits. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir.

15   2004). California law requires only that the exercise of personal jurisdiction comply with federal

16   due process requirements. *See id.* at 800-01. Personal jurisdiction over a defendant that does not

17   reside in the forum state may be exercised consistent with due process if the defendant has either a

18   continuous and systematic presence in the state (general jurisdiction), or minimum contacts with

19   the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair

20   play and substantial justice" (specific jurisdiction). *See Int'l Shoe Co. v. Washington*, 326 U.S.

21   310, 316 (1946) (citation and internal quotation marks omitted).

22       **B.  *Forum Non Conveniens***

23       District courts have the "inherent power" to decline jurisdiction and to dismiss claims "in

24   exceptional circumstances" under the doctrine of *forum non conveniens*. *Paper Operations*

25   *Consultants Int'l, Ltd. v. S.S. Hong Kong Amber*, 513 F.2d 667, 670 (9th Cir. 1975). Whether to

26   grant a motion to dismiss or to transfer a case based on the doctrine of *forum non conveniens* lies

27   in the sound discretion of district courts. *SanDisk Corp. v. SK Hynix Inc.*, 84 F. Supp. 3d 1021,

28

United States District Court
Northern District of California

ORDER ON DEFENDANTS' MOTIONS TO DISMISS
CASE NO. 17-cv-06779-RS

5

United States District Court
Northern District of California

1    1028 (N.D. Cal. 2015) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981)).

2        A defendant invoking *forum non conveniens* assumes "the burden of demonstrating an

3    adequate alternative forum, and that the balance of private and public interest factors favors

4    dismissal." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011). The

5    Supreme Court has identified the following private factors: (1) the "relative ease of access to

6    sources of proof"; (2) the "availability of compulsory process for attendance of unwilling"

7    witnesses; (3) "the cost of obtaining attendance of willing[] witnesses"; (4) the ability to view the

8    premises if doing so would be appropriate; (5) "all other practical problems that make trial of a

9    case easy, expeditious and inexpensive"; and (6) the "enforceability of a judgment if one is

10   obtained." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). Public factors include: (1)

11   "administrative difficulties flowing from court congestion"; (2) the "local interest in having

12   localized controversies decided at home"; (3) the desirability of "trial of a diversity case in a

13   forum that is at home with the law that must govern the action"; (4) "the avoidance of unnecessary

14   problems in conflicts of law, or in the application of foreign law"'; and (5) the "unfairness" of jury

15   service on a community unrelated to the litigation. *Piper Aircraft*, 454 U.S. at 241 n.6 (internal

16   quotation marks omitted) (citing *Gilbert*, 330 U.S. at 509).

17       In undertaking its analysis, the court bears in mind that "[a] plaintiff's choice of forum is

18   generally entitled to deference, especially where the plaintiff is a United States citizen or resident,

19   because it is presumed a plaintiff will choose [their] home forum." *Ranza v. Nike,* 793 F.3d 1059,

20   1076 (9th Cir. 2015) (citation and internal quotation marks omitted). This presumptive deference

21   is "far from absolute." *Id.* at 1076. The more the court's attention is drawn to a plaintiff's

22   "eleventh-hour efforts to strengthen connection with the chosen forum," or other evidence "that

23   the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less

24   deference the plaintiff's choice of forum commands." *Ayco Farms, Inc. v. Ochoa*, 862 F.3d 945,

25   951 (9th Cir. 2017) (citations and internal quotation marks omitted).

26       **C.  Failure to State a Claim**

27       "A pleading that states a claim for relief must contain . . . a short and plain statement of the

28

1    claim showing that the pleader is entitled to relief . . ." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual

2    allegations" are not required, but a complaint must provide sufficient factual allegations to "state a

3    claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting

4    *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotations marks omitted).

5            Federal Rule of Civil Procedure 12(b)(6) provides a mechanism to test the legal sufficiency

6    of the averments in a complaint. Dismissal is appropriate when the complaint "fail[s] to state a

7    claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint in whole or in part

8    is subject to dismissal if it lacks a cognizable legal theory or the complaint does not include

9    sufficient facts to support a plausible claim under a cognizable legal theory. *Navarro v. Block*, 250

10   F.3d 729, 732 (9th Cir. 2001). When evaluating a complaint, the court must accept all its material

11   allegations as true and construe them in the light most favorable to the non-moving party. *Iqbal*,

12   556 U.S. at 678. Legal conclusions, however, need not be accepted as true and "[t]hreadbare

13   recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice."

14   *Id*. When a plaintiff has failed to state a claim upon which relief can be granted, leave to amend

15   should be granted unless "the complaint could not be saved by any amendment." *Gompper v.*

16   *VISX, Inc.*, 289 F.3d 893, 898 (9th Cir. 2002) (citation and internal quotation marks omitted).

**IV. DISCUSSION**

**A. Jurisdictional Motions**

**1. <u>Specific Personal Jurisdiction</u>**

20          As Anvari does not suggest general jurisdiction could attach to either Bitcoin Suisse or the

21   Tezos Foundation, the operative jurisdictional question concerns specific jurisdiction. Such

22   personal jurisdiction can be exercised over a non-resident defendant when three requirements are

23   satisfied: "(1) The nonresident defendant must purposefully direct his activities or consummate

24   some transaction with the forum or resident thereof; or perform some act by which he purposefully

25   avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits

26   and protections of its law; (2) the claim must be one which arises out of or relates to the

27   defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair

28

ORDER ON DEFENDANTS' MOTIONS TO DISMISS
CASE NO. 17-cv-06779-RS

United States District Court
Northern District of California

1    play and substantial justice, i.e. it must be reasonable." *Schwarzenegger*, 374 F.3d at 802 (citation

2    omitted). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id*. (citation

3    omitted). "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts

4    to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be

5    reasonable." *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

6        The plaintiff need only make a prima facie showing of jurisdiction to defeat a motion to

7    dismiss, but "may not simply rest on the bare allegations of the complaint." *Ranza*, 793 F.3d at

8    1068 (internal quotation marks and alterations omitted). "[U]ncontroverted allegations must be

9    taken as true, and conflicts between parties over statements contained in affidavits must be

10   resolved in the plaintiff's favor." *Id*. (internal quotation marks and alterations omitted).

11                    **i.      *Bitcoin Suisse***

12       The first requirement of the specific jurisdiction analysis, purposeful direction, is tested

13   under the three-part *Calder* standard. *Schwarzenegger*, 374 F.3d at 803 (citing *Calder v. Jones*,

14   465 U.S. 783 (1984)). This standard "requires that the defendant allegedly have (1) committed an

15   intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows

16   is likely to be suffered in the forum state." *Id*. (citations and internal quotation marks omitted).

17   Anvari alleges, in relevant part, that Bitcoin Suisse deliberately contracted with the Foundation in

18   order to facilitate the sale of unregistered securities to United States residents. *See* Compl. ¶ 25

19   (quoting stated Bitcoin Suisse policy for "US-clients" in the Tezos ICO) (emphasis omitted).  A

20   declaration submitted by Bitcoin Suisse's CEO, however, directly contradicts that assertion in

21   insisting the company did *not* provide services for the Tezos ICO to any U.S. investors. Anvari has

22   offered no adequate response to this declaration.

23       Anvari has further problems with the second prong of the specific jurisdiction test which

24   requires a showing that he would not have been injured "but for" the defendant's forum-related

25   contacts. *See Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 561 (9th Cir. 1995). Setting aside

26   Anvari's attempts to cloud this prong's causal focus, his complaint, which does not allege his

27   having in any way known of or utilized Bitcoin Suisse's services, plainly fails to meet this

28
                                                     ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                                                          CASE NO. 17-cv-06779-RS

United States District Court
Northern District of California

1    standard. In light of these shortcomings, the exercise of personal jurisdiction over Bitcoin Suisse is

2    improper.

3         Seeming to anticipate this result, Anvari requests in the alternative to retain Bitcoin Suisse

4    as a "nominal defendant."[8] At oral argument, Anvari's counsel conceded that a plaintiff must show

5    a basis for personal jurisdiction over a nominal defendant just as any other defendant and, as noted

6    above, Anvari has not made such showing.[9] In any event, Bitcoin Suisse does not appear to be a

7    key player in this action. To the extent a future judgment implicates Bitcoin Suisse's role as a co-

8    signatory for the ICO funds, its counsel represented at oral argument that it would comply with all

9    of its obligations under Swiss law. While this promise is not binding, Anvari offers no reason to

10   suspect Bitcoin Suisse will fail to honor it.

11        For all of the above reasons, the exercise of personal jurisdiction over Bitcoin Suisse is

12   unsupported and amendment appears futile. Anvari's claims against Bitcoin Suisse must therefore

13   be dismissed without leave to amend.

### ii.    *The Tezos Foundation*

15        By contrast, the Foundation's relationship to Anvari's alleged harm provides an adequate

16   basis for allowing further factual development of his claims against it. The Foundation is correct

17   that the tezos.com website being (1) hosted on an Arizona server, (2) freely accessible by U.S.

18   citizens, and (3) highly interactive, is not, without more, enough to make it subject to the Court's

19   personal jurisdiction. *See, e.g., Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir.

20   1998) (collecting Ninth Circuit cases and "agree[ing] . . . that posting a website on the Internet is

21   not sufficient to subject a party to" personal jurisdiction because "there must be 'something more'

22   to demonstrate that the defendant directed his activity towards the forum"); *see also Boschetto v.*

23

24   [8] "A nominal defendant is a person who holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute. The paradigmatic nominal defendant is a
25   trustee, agent, or depository who is joined purely as a means of facilitating collection." *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998) (citations and internal quotation marks omitted).

26   [9] Because Anvari has failed to make a colorable showing, his additional request for jurisdictional
27   discovery is denied.

28                                                    ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                                                            CASE NO.  17-cv-06779-RS

United States District Court
Northern District of California

1    *Hansing*, 539 F.3d 1011, 1017-19 (9th Cir. 2011) (finding a "lone transaction for the sale of one

2    item" legally insufficient under a "sliding scale" approach to online purposeful direction analysis).

3    The Foundation errs, however, in clinging to this assertion where, as here, "something more" is in

4    fact alleged.

5       Bearing in mind the relatively modest jurisdictional showing asked of a plaintiff facing

6    dismissal under 12(b)(2), Anvari's averment that the Foundation kept at least one employee or

7    agent in the United States is responsive to the personal jurisdiction test's first "purposeful

8    direction prong." So too, for that matter, are the following inferences arising from Anvari's

9    allegations: (a) the California-based Breitmans were the de facto U.S. marketing arm of the

10   Foundation; (b) the Foundation engaged in little to no marketing of the ICO anywhere other than

11   in the U.S.; and (c) an accordingly significant portion of the some 30,000 contributors to the ICO

12   were in fact U.S. citizens. A different conclusion might be warranted if Anvari were one of a small

13   number of well-informed Americans who managed to learn about and participate in an ICO

14   exclusively marketed in some foreign country. Here, however, the averments suggest the opposite:

15   the Foundation encouraged U.S. citizens to participate in the ICO, it made it easy for them to do

16   so, and the results reflected those efforts.

17      Nor is much weight owed to the Foundation's arguments on prong two. Even affording no

18   analytical value to Anvari's allegations concerning its relationship with a U.S. agent or the

19   Breitmans, two of the Foundation's actions nevertheless loom large: the decision to build an

20   English-language, U.S.-hosted website, and the decision to structure an ICO accommodating U.S.-

21   based participation. Irrefutably, these decisions served as "but for" causes of Anvari's alleged

22   unregistered securities purchase. Because the foregoing considerations overwhelm, at this early

23   point in the proceedings, the Foundation's various riffs on the third "reasonableness" prong,

24   Anvari has made a sufficient prima facie personal jurisdictional showing to survive dismissal.

25      **2. *Forum Non Conveniens***

26      No party meaningfully disputes Switzerland's adequacy in theory as an alternative forum

27   for the adjudication of this matter. Thus, under a traditional *forum non conveniens* inquiry, the

28                   ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                       CASE NO. 17-cv-06779-RS

United States District Court
Northern District of California

1    only operative issue would be whether Anvari's choice of forum, generally entitled to great

2    deference, should be "disturbed" by a balance of private and public factors weighing "strongly in

3    favor" of the defendants. *Cheng v. Boeing Co.*, 708 F.2d 1406, 1410 (9th Cir. 1983) (citation and

4    internal quotation marks omitted)

5          Here, the traditional analysis is impacted by the presence of a forum-selection clause. In

6    *Atlantic Marine Construction Co. v. U.S. District Court*, the Supreme Court "redefined the *forum*

7    *non conveniens* analysis when a valid forum selection clause is present." *In re Orange, S.A.*, 818

8    F.3d 956, 962 (9th Cir. 2016) (summarizing *Atlantic Marine Const. Co. v. U.S. Dist. Ct.*, 134 S.Ct.

9    568 (2013)) (italics added). "Because a valid forum selection clause is bargained for by the parties

10   and embodies their expectations as to where disputes will be resolved, it should be given

11   controlling weight in all but the most exceptional cases." *Id.* (citation and internal quotation marks

12   omitted). Among other effects, such a clause precludes a court from "consider[ing] arguments

13   about the parties' private interests." *Id.* (citation and internal quotation marks omitted).

                                   **i.      *The Tezos Foundation***

15         Relying principally on *Atlantic Marine*, the Foundation insists the facts of this dispute do

16   not situate it among "the most exceptional cases," thus lending "controlling weight" to the ICO

17   Contribution Terms' selection of Switzerland for all Tezos-related litigation. *Id.* This argument is

18   a strong one, and may well threaten Anvari's access to this forum pending discovery. It is not

19   enough, however, to require dismissal or transfer at this juncture.

20         "Browsewrap" agreements refer to terms and conditions by which a website attempts to

21   bind its users by inferring affirmative assent. Such agreements are most readily distinguished by

22   comparison to their "clickwrap" counterparts, which ask users specifically to engage with the

23   website—generally by checking a box—in a show of contractual consent. "Where . . . there is no

24   evidence that [a] website user had actual knowledge of the agreement, the validity of the

25   browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry

26   notice of the terms of the contract." *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1177 (9th Cir.

27   2014).

28                                                                    ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                                                                            CASE NO. 17-cv-06779-RS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Here, Anvari outlines a contribution process whereby "a reasonably prudent user" would

2    not have suspected the Contribution Terms' governing force. Cabining his ICO experience to the

3    actual moments of the transaction, he alleges a sequence with only glancing connection to legalese

4    of any sort: on the tenth of a twenty-page document posted to www.tezos.com, the site from which

5    he claims to have been quickly redirected, a single sentence directed users to "refer to the legal

6    document that will be issued by the Foundation for more details." Bereft of hyperlinks to the

7    contract itself, language indicating the user's purported agreement, or other indicia tending to

8    validate a "browsewrap" agreement[10], Anvari's account does not facially indicate his having been

9    put on inquiry notice.

10    Of course, as the Ninth Circuit has made emphatically clear, evidence of Anvari's "actual

11    knowledge" of the agreement may provide the Foundation with an alternate method of breathing

12    life into the Contribution Terms. *See Nguyen*, 763 F.3d at 1176 (opining that "[w]ere there any

13    evidence in the record that [plaintiff] had actual notice of the Terms of Use . . . the outcome of this

14    case might be different"); s*ee also Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 569 (9th Cir.

15    2014) (citing *Nguyen*'s inquiry-or-actual notice standard with approval). On this score, Anvari—

16    whose complaint and opposition papers, even where called directly to the question, are

17    conspicuously silent regarding whether he had actual notice[11]—is granted what may ultimately

18    prove to be fleeting procedural mercy. For now, however, the averments in the complaint support

19    an inference that Anvari is not bound by the forum-selection clause.

20

21    ───────────────

[10] It bears noting that even faced with ample evidence of such hallmarks, browsewrap agreements
22    may still be held unenforceable. *See Nguyen*, 763 F.3d at 1178-79 (noting "courts' traditional
reluctance to enforce browsewrap agreements against individual consumers," and declining to
23    enforce one "where a website makes its terms of use available via a conspicuous hyperlink on
every page . . . even in close proximity . . . to relevant buttons users must click on").

24
[11] *Compare* Tezos Foundation's Mot. Dismiss at 18 (highlighting that Anvari "has nowhere
25    alleged that he was unaware of the Contribution Terms when he made his contribution"), *with*
Pl.'s Opp'n Tezos Foundation's Mot. Dismiss at 16 (declining to so allege, and arguing "it is
26    irrelevant whether Lead Plaintiff or the Class was aware of the Contribution Terms"). Indeed, at
oral argument, Anvari's counsel represented that they did not know whether Anvari had actual
27    notice of the terms.

28    ORDER ON DEFENDANTS' MOTIONS TO DISMISS
CASE NO. 17-cv-06779-RS

1        Consequently, a traditional *forum non conveniens* analysis is in order. Under that

2   framework, the private interest factors set forth in *Gilbert* counsel strongly against dismissal, as

3   the vast majority of evidence, litigants, and assorted practical efficiencies rendering "trial of [this]

4   case easy, expeditious and inexpensive" are most easily accessible in the United States. *Gilbert*,

5   330 U.S. at 508. There likewise is no denying the "local interest" in having federal securities law

6   enforced at home, this District's crowded dockets and busy jurors notwithstanding. *Piper Aircraft*,

7   454 U.S. at 241 n.6 (citation omitted). In short, the doctrine of *forum non conveniens* does not

8   presently warrant this action's dismissal or transfer to the courts of Switzerland. Accordingly, the

9   Foundation's *forum non conveniens* motion is denied without prejudice to the Foundation

10  renewing the motion at a later date should doing so be warranted by facts unearthed in discovery.

11              **ii.      *DLS***

12       The Breitmans and DLS both emphasize the Foundation's autonomy and join fully in its

13  *forum non conveniens* argument. Crediting, arguendo, the propriety of extending the benefits of a

14  forum-selection clause to parties seeking explicitly to distance themselves from the underlying

15  contract, this effort suffers from the same defects as the Foundation's. Indeed, without delving into

16  all the relevant private and public factors, it is apparent DLS' status as an American company, run

17  by Americans, in the United States, at the time of this suit's filing, leaves it with an even weaker

18  claim to the operation of the *forum non conveniens* doctrine than its Swiss counterpart. The

19  company's invocation of that doctrine must therefore be rejected.

20          **B. Extraterritorial Application of the Exchange Act**

21       The Foundation, the only defendant alleged to have "sold" a security within the

22  conventional, title-passing sense, predicates its final argument on where such a sale would have

23  necessarily occurred. Citing the "bedrock principle" against extraterritorial application of U.S. law

24  without express Congressional provision, particularly as articulated in *Morrison v. National*

25  *Australia Bank Ltd.*, 561 U.S. 247 (2010), the Foundation contends the Exchange Act only

26  regulates domestic transactions. It further reasons any transaction taking place with Anvari could

27  only have occurred in Alderney—a remote outpost of the British Crown specified as the legal site

28

United States District Court
Northern District of California

1    of all ICO transactions by the Contribution Terms. In the event the Contribution Terms' do not

2    govern, the Foundation maintains any ICO-related transfer of title or instance of "irrevocable

3    liability"—both touchstones of the domestic transaction inquiry outlined by the Second Circuit

4    and recently adopted by the Ninth Circuit[12]—is also prospectively confined to Alderney, where the

5    Foundation's "contribution software" resides.

6         The Foundation, while generally correct as to the scope of federal securities law, misplaces

7    its reliance on the validity of the Contribution Terms. Though likely of consequence at later stages

8    of this action, the Contribution Terms are, to reiterate, of little significance at this juncture.

9    Focusing instead on the actual (rather than contractual) situs of ICO transactions, the operative

10   question quickly surfaces: where does an unregistered security, purchased on the internet, and

11   recorded "on the blockchain," actually take place?

12        Try as the Foundation might to argue that all critical aspects of the sale occurred outside of

13   the United States, the realities of the transaction (at least as alleged by Anvari) belie this

14   conclusion. Anvari participated in the transaction from this country. He did so by using an

15   interactive website that was: (a) hosted on a server in Arizona and; (b) run primarily by Arthur

16   Breitman in California. He presumably learned about the ICO and participated in response to

17   marketing that almost exclusively targeted United States residents. Finally, his contribution of

18   Ethereum to the ICO became irrevocable only after it was validated by a network of global

19   "nodes" clustered more densely in the United States than in any other country. While no single

20   one of these factors is dispositive to the analysis, together they support an inference that Anvari's

21   alleged securities purchase occurred inside the United States.[13] Viewed in the light most favorable

22

23   [12] *See Stoyas v. Toshiba Corp.*, 2018 WL 3431764, at *11 (9th Cir. July 17, 2018) ("a plaintiff
     must plausibly allege "that the purchaser incurred irrevocable liability within the United States to
24   take and pay for a security, or that the seller incurred irrevocable liability within the United States
     to deliver a security.") (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60,
25   at 68 (2d Cir. 2012)).

26   [13] *Cf. Securities and Exchange Commission v. Traffic Monsoon, LLC*, 245 F.Supp.3d 1275, 1296
     (D. Utah 2017) (holding that where non-exchange listed securities are offered and sold over the
27   internet, the sale takes place in both the location of the seller and the location of the buyer.)

28                                                         ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                                                                       CASE NO. 17-cv-06779-RS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    to Anvari, and proceeding with all due consideration of the limited reach of this nation's laws,

2    application of the Exchange Act does not offend the mandate of *Morrison*.

3        **C. 12(b)(6) Motions**

4            **1. <u>Section 12 "Statutory Seller" Liability</u>**

5        Section 12(a)(1) of the Exchange Act prohibits the offer or sale of any unregistered

6    security in interstate commerce. 15 U.S.C. § 77l(a)(1). Under the Supreme Court's decision in

7    *Pinter v. Dahl*, Section 12(a)(1) liability "is not limited to persons who pass title" in an

8    unregistered security, but also extends to "the person who successfully solicits the purchase" of

9    such security, "motivated at least in part by a desire to serve his own financial interests or those of

10   the security owner." *Pinter v. Dahl*, 486 U.S. 622, 643-647 (1988). While broad, this latter

11   "statutory seller" theory does not contemplate mere "collateral participants in the . . . transaction."

12   *Id*. at 650 n.26. In the Ninth Circuit, *Pinter* liability has been read to require that a defendant be

13   "directly involved in the actual solicitation of a securities purchase." *In re Dauo Systems, Inc.* 411

14   F.3d 1006, 1029 (9th Cir. 2005) (internal quotation marks omitted); *see also Maine State Ret. Sys.*

15   *v. Countrywide Fin. Corp.,* 2011 WL 4389689 at *9 (C.D. Cal. May 5, 2011) (permitting Section

16   12 claims to go forward only where "a direct relationship between the purchaser and the

17   defendant" was sufficiently pled).

18            **i.        *Draper***

19       Draper's argument that he lacked involvement in Anvari's purchasing decision—direct or

20   otherwise—is compelling. As Draper notes, *Pinter*'s "successfully solicits" standard was an

21   express rejection of older, less exacting "substantial factor" tests for § 12(a)(1) statutory seller

22   liability. *See Pinter,* 486 U.S. at 654. Here, Anvari has failed even to allege knowledge of Draper's

23   name, let alone his venture capital activities, prior to participating in the ICO. How, Draper argues,

24   could Anvari have been solicited by a man of whom he was utterly unaware?

25       His attempts to reframe the issue notwithstanding, Anvari ultimately fails to answer the

26   question. While it may be true the Ninth Circuit stops short of demanding "face-to-face" buyer-

27   seller contact for Section 12 liability to attach, Anvari does not identify any authority, here or

28                                                      ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                                                                CASE NO. 17-cv-06779-RS

1    elsewhere, holding *Pinter* applicable in the absence of any buyer-seller contact whatsoever. *See,*

2    *e.g. In re Proxima Corp. Sec. Litig.,* 1994 WL 374306 at *5 (S.D. Cal. 1994). Without averments

3    that he was cognizant of, or influenced by, Draper's involvement in the Tezos project, Anvari's

4    statutory seller claim against Draper is not plausible.

5                                              **ii.    *DLS***

6         The DLS defendants are less successful in undercutting Anvari's allegations that they

7    successfully solicited his ICO contribution. Conceding a "financial interest" in the ICO generally,

8    DLS nonetheless likens itself to a "collateral participant" in the vein of accountants, lawyers, and

9    other service providers normally situated beyond the scope of statutory seller liability. *Pinter*, 486

10   U.S. at 647, 650 n.26. By this logic, DLS portrays the Foundation as the only meaningful "seller"

11   in the Tezos universe, reducing its own role to that of a common service provider.

12        Here, Anvari's rebuttal hits decidedly nearer the mark. Reiterating his factual allegations

13   surrounding DLS' comprehensive involvement with the ICO's planning and execution, he

14   effectively discredits any notion of DLS as a bit player. More to the point, he frames that

15   involvement—including creation of the Tezos technology, establishment of a legal entity to

16   monetize DLS' interest in that technology, development of a platform to facilitate said

17   monetization, and minute-to-minute oversight of the monetization process itself—as rising well

18   above the level of "collateral participa[tion]" in his and all other ICO transactions. *Pinter*, 486

19   U.S. at 647. Under *Pinter*'s "statutory seller" standard, Anvari's Section 12 claim therefore

20   withstands DLS' 12(b)(6) motion.

21                                        **iii.    *Bitcoin Suisse***

22        As noted previously, Anvari has failed to make a colorable showing that the Court has

23   personal jurisdiction over Bitcoin Suisse. Even if he could correct that defect—and this order finds

24   that he cannot—he would remain unable plausibly to state a claim against Bitcoin Suisse under

25   Section 12.  The complaint presents the firm's role as that of a "service provider and intermediary

26   . . . providing investors with virtual currency conversion services, and then contributing these

27   virtual currencies to the Tezos ICO on behalf of investors." Compl. ¶ 25. Though such averments

28                                                            ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                                                                      CASE NO. 17-cv-06779-RS

United States District Court
Northern District of California

16

1    sufficiently plead Bitcoin Suisse's connection to the ICO, they are not supportive of more than

2    "collateral" involvement. *Pinter*, 486 U.S. at 650 n.26. To the contrary, Anvari's depiction of a

3    "service provider" situates the company squarely within the class of actors "who merely assist in

4    another's solicitation efforts." *Id.* at 651 n.27.

5           Under *Pinter* and its progeny, such ancillary efforts do not support a defendant's having

6    "successfully solicit[ed]" a securities purchase. *Pinter,* 486 U.S. at 646; *Moore v. Kayport*

7    *Package Exp.*, 885 F.2d 531, 537 (9th Cir. 1989) (assigning no "role at all in soliciting the

8    purchases" to "defendants [who] performed professional services in their respective capacities");

9    *Me. State Ret. Sys.*, 2011 WL at *10 (holding "[p]laintiffs must include very specific allegations of

10   solicitation," going beyond a defendant's "being merely a substantial factor in causing the sale of

11   unregistered securities" for Section 12 liability to attach) (internal citations and alterations

12   omitted) (citing *Pinter*, 486 U.S. at 654). Moreover, and placing this considerable shortcoming to

13   the side, Anvari's claim nowhere demonstrates the requisite nexus between his particular

14   transaction and Bitcoin Suisse's "desire to serve [its] own financial interests or those of the

15   security owner." *Pinter*, 486 U.S. at 647. In sum, Anvari's complaint does not support a

16   characterization of Bitcoin Suisse as a "statutory seller" and therefore fails to state a claim under

17   Section 12.

18                       **2. <u>Section 15 "Control Person" Liability</u>**

19          Section 15 of the Exchange Act confers secondary liability upon "[e]very person who, by

20   or through stock ownership, agency, or otherwise . . . controls any person liable" under Section 12.

21   15 U.S.C. § 77o(a). The Securities and Exchange Commission defines "control" as "the

22   possession, direct or indirect, of the power to direct or cause the direction of . . . management and

23   policies." 17 C.F.R. § 230.405. A defendant's "controlling person" status turns chiefly upon

24   "scrutiny of the defendant's participation in the day-to-day affairs of the corporation," as opposed

25   to the "defendant's involvement in an isolated corporate action."[14] *Paracor Finance, Inc.*, 96 F.3d

26

27   [14] There is some dispute amongst the parties as to whether the Ninth Circuit additionally demands
     a prospective control person's "culpable participation" in the underlying violation. *Compare*

28                                                         ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                                                           CASE NO. 17-cv-06779-RS

United States District Court
Northern District of California

1   1151, 1162 (9th Cir. 1996) (citations and internal quotation marks omitted).

2             **i.**     ***Draper***

3        Draper properly characterizes Anvari's factual allegations as legally insufficient to

4   establish his "control person" status. Muddled though the case-law may be, it is clear the Ninth

5   Circuit requires some assertion of a defendant's "day-to-day" interaction with a company for a

6   Section 15 claim to stand. *See, e.g. Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir. 1994) (noting

7   that even "[a] director is not automatically liable as a controlling person" absent evidence of

8   "participation in the [company's] daily affairs"); *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir.

9   2011) (finding "indicia of control [to] include whether the person managed the company on a day-

10  to-day basis") (citations and internal quotations marks omitted). "To ignore the overall situation

11  but to separate out specific actions undertaken by [a defendant] . . . would be an unwarranted

12  expansion of secondary liability under the securities law." *Paracor Finance,* 96 F.3d at 1162.

13       Here, Anvari alleges nothing in the way of Draper's daily or overall participation in the

14  Tezos project or corporate entities. Instead, he asks that his claim move forward on the strength of

15  two facts alone: Draper's minority stake in DLS, and the temporal proximity of Draper's

16  investment to the Tezos ICO. Admitting the well-settled legal inadequacy of the former to sustain

17  a "control person" claim, Anvari leans heavily on the latter to suggest Draper is a fast-moving

18  puppet master. Fatal to Anvari's suggestion, however, is a fact he pleads elsewhere: that "since at

19  least mid-2016"—a year prior to news of Draper's investment—the Breitmans had been targeting

20  an early 2017 fundraiser. Compl. ¶ 49-51. In other words, even supposing Draper's controlling

21  hand in the "isolated corporate action" of the ICO could support Section 15 liability, that inference

22  is unsupportable on the face of the complaint. Extending Anvari every benefit of the doubt, his

23

24  _____

25  Draper's Mot. Dismiss, Dkt. 117 at 9, *with* Pl.'s Opp'n to Draper's Mot. Dismiss, Dkt. 134 at 10. As has been aptly observed in the Second Circuit, "for section 15 claims, *some* California federal courts have held that culpable participation is required." *In re WorldCom, Inc.*, 377 B.R. 77, 104

26  (Bankr. S.D.N.Y 2007) (emphasis added). Because this issue only stands to impact the Section 15 claim against Draper, which falls for failure to support the more fundamental fact of his "control"

27  over the Tezos project, it need not be resolved here.

United States District Court
Northern District of California

1   argument is simply too threadbare to maintain his claim. Absent further averments regarding

2   Draper's "power to direct or cause the direction of [Tezos'] . . . management and policies," as

3   evidenced by his routine interactions with either DLS or the Foundation, Anvari cannot plausibly

4   allege that Draper is liable as a control person. 17 C.F.R. § 230.405.

5                          **ii.**   ***DLS***

6          As noted in the above discussion of Section 12 liability, DLS' role in establishing and

7   aiding the Tezos Foundation rendered the two entities deeply intertwined, if not functionally

8   interchangeable, throughout the ICO process. Further averments, including a former Foundation

9   director's detailed description of the Breitmans' "control" over the Foundation and the Breitmans'

10  regular, expansive use of the word "we," urge a reading of interchangeability on a more general

11  level. While the Breitmans and DLS are free to renew their arguments regarding the detached

12  operation and structure of the Foundation at later stages in this litigation, at this point, Anvari's

13  allegations are sufficient to enable his Section 15 "control person" claim against them to survive

14  dismissal.

15                          **V. CONCLUSION**

16         The motions to dismiss filed by the DLS Defendants and the Foundation are denied. The

17  motion filed by Bitcoin Suisse is granted without leave to amend. The motion filed by Draper is

18  granted with leave to amend. Any amended complaint must be filed within 20 days of the issuance

19  of this order.

20

21  **IT IS SO ORDERED**.

22

23  Dated: August 7, 2018

24

25                          RICHARD SEEBORG
                            United States District Judge

26

27

28                          ORDER ON DEFENDANTS' MOTIONS TO DISMISS
                            CASE NO. 17-cv-06779-RS

United States District Court
Northern District of California