Pages 1 - 101

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, JUDGE

IN RE TEZOS SECURITIES        )
LITIGATION,                   )   Master File No. 17-cv-06779-RS
_____)
                                  San Francisco, California
                                  Wednesday, August 1, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    HGT LAW
                    250 Park Avenue, 7th Floor
                    New York, New York 10177
              BY:   **HUNG G. TA, ESQ.**
                    **ANGUS NI, ESQ.**

                    LTL ATTORNEYS LLP
                    601 Gateway Boulevard, Suite 1010
                    South San Francisco, California 94080
              BY:   **ENOCH H. LIANG, ESQ.**

For Defendants TIMOTHY C. DRAPER and DRAPER ASSOCIATES V
CRYPTO LLC:
                    MANATT, PHELPS & PHILLIPS, LLP
                    One Embarcadero Center, 30th Floor
                    San Francisco, California 94111
              BY:   **CHRISTOPHER L. WANGER, ESQUIRE**

For Defendant Bitcoin SUISSE:
                    AGBROWN RUDNICK LLP
                    7 Times Square
                    New York, New York 10036
              BY:   **SIGMUND S WISSNER-GROSS, ESQ.**
                    **JESSICA N. MEYERS, ESQ.**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Official Reporter - U.S. District Court

**<u>APPEARANCES (CONTINUED):</u>**

For Defendant DYNAMIC LEDGER SOLUTIONS, INC. and ARTHUR AND
KATHLEEN BREITMAN:

> BAKER MARQUART LLP
> 2029 Century Park East, Suite 1600
> Los Angeles, CA 90067
> BY:  **BRIAN E. KLEIN, ESQ.**
> **DONALD R. PEPPERMAN, ESQ.**

> COOLEY LLP
> 3175 Hanover Street
> Palo Alto, California 94304-1130
> BY:  **JEFFREY M. KABAN, ESQ.**

For Defendant TEZOS STIFTUNG:

> DAVIS POLK & WARDWELL LLP
> 1600 El Camino Real
> Menlo Park, California 94025
> BY:  **NEAL A. POTISCHMAN, ESQ.**
> **SERGE VERONOV, ESQ.**

| | |
|---|---|
| 1 | **Wednesday - August 1, 2018**                    **10:03 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | **THE CLERK:**  Calling Civil Case Number 17-6779, In re |
| 5 | Tezos Securities Litigation. |
| 6 | Will counsel please step forward and state your |
| 7 | appearances for the record. |
| 8 | **MR. TA:**  Good morning, Your Honor.  Hung Ta, from HGT, |
| 9 | on behalf of the plaintiffs. |
| 10 | **THE COURT:**  Good morning. |
| 11 | **MR. TA:**  And with me -- I'll let him introduce |
| 12 | himself. |
| 13 | **MR. LIANG:**  Good morning, Your Honor.  Caleb Liang, |
| 14 | also on behalf of the plaintiffs. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MR. NI:**  Angus Ni on behalf of the plaintiffs. |
| 17 | **THE COURT:**  Good morning. |
| 18 | **MR. POTISCHMAN:**  Good morning, Your Honor.  Neal |
| 19 | Potischman, from Davis Polk, on behalf of the Tezos Foundation. |
| 20 | And with me for today is Serge Veronov. |
| 21 | **THE COURT:**  Good morning. |
| 22 | **MR. WANGER:**  Good morning, Your Honor.  Chris Wanger, |
| 23 | of Manatt Phelps & Phillips, for the Draper defendants. |
| 24 | **THE COURT:**  Good morning. |
| 25 | **MR. KLEIN:**  Good morning, Your Honor.  Brian Klein on |

behalf of Arthur and Kathleen Breitman and DLS.  And with me is
Jeff Kaban and Don Pepperman.

      **THE COURT:**  Good morning.

      **MR. WISSNER-GROSS:**  Good morning, Your Honor.  Sigmund
Wissner-Gross, from Brown Rudnick, on behalf of Bitcoin Suisse.
With me in the courtroom is my colleague, Jessica Meyers.

      **THE COURT:**  Good morning.

    Okay.  Well, I have before me various motions to dismiss
on various issues.  And I was giving some thought how best to
proceed.  I'm not going to give you a tentative.  I sometimes
do that.  Most of the time I do that.  But in this instance I
would rather just hear argument.

    So I was thinking of what the best way to proceed is.  One
option is to go by issue because there are a great deal of
overlapping issues with respect to the various defendants.  The
other way to go is defendant by defendant.  Both carry with it
the prospect of some repetition.

    I think going defendant by defendant is the easiest way
for me to manage this.  So that's how I'm planning to proceed.

    Because there's a great deal of overlap in the issues, I
really do encourage the parties on both sides not to just
repeat, every time we have the next defendant who may have
overlapping issues, the same things I've heard before.

    The briefing was very good.  I've spent time with the
briefing.  So I do encourage you to operate by reference.  And

1    if you want to remind me that there are issues that pertain to

2    particular defendants that I've already heard, that's fine.

3    But you can do it in shorthand, and that will, I think, benefit

4    all of us.

5         So in no particular order, why don't we start with the

6    motions that have been brought by DLS and the Breitmans.  And I

7    know on the plaintiffs' side it means you're going to be

8    getting up and sitting down, getting up and sitting down, but

9    it's good exercise.

10        Okay.  So why don't I begin, as I say, with the Breitmans

11   and DLS, unless someone has some particular reason why they

12   don't want to proceed that way.

13        **MR. KLEIN:**  Your Honor, on the issue of *forum non*

14   *conveniens* we had talked before and wanted the Foundation to

15   take the lead on that issue.

16        **THE COURT:**  That's fine.  That's fine.  I mean, that's

17   also fine.  If you want to begin the discussion and say this

18   particular issue is primarily so-and-so is going to carry the

19   water for us, and we're with them on that, I encourage that.

20   So that's fine.

21        Okay.  So just to remind me, so you're Mr. Klein?

22        **MR. KLEIN:**  Yes.

23        **THE COURT:**  Okay.  And you're representing DLS and the

24   Breitmans.  So you may proceed.  And I'll reserve the right, as

25   will come as no surprise to you, to interrupt you in mid

1  sentence and ask questions.  So go ahead.

2      **MR. KLEIN:**  I intend to be brief, in part because I

3  will let the Foundation take the lead on the *forum non*

4  *conveniens*.  I would ask if they miss something I want to step

5  up and come back.  But, in general, we're in agreement on that

6  issue.  You know we don't think --

7      **THE COURT:**  Now you're talking about *forum non*

8  *conveniens*?

9      **MR. KLEIN:**  Yes.  This should be heard in Switzerland.

10  My clients, I just wanted to point out in case you missed it in

11  our reply brief, they would submit to jurisdiction in

12  Switzerland.

13     It was an issue that was raised by plaintiffs' counsel.  I

14  think that's an important factor for Your Honor to consider.

15  From that I'll just move on, frankly.

16      **THE COURT:**  So just so that you can give me a preview,

17  you're going to be talking primarily about the Section 12

18  issues.  What do you think you would like to highlight for me

19  before you launch into it?

20      **MR. KLEIN:**  Highlight with regard to Section 12?

21      **THE COURT:**  No, no, which issues are you going to be

22  focusing on?

23      **MR. KLEIN:**  Yeah, I think both the section -- both the

24  other issues.

25      **THE COURT:**  Okay.  And we also have the

1    extraterritoriality issue.  Is that one you're going to be

2    addressing?

3             **MR. KLEIN:**  The Foundation briefed the *Morrison*

4    arguments, Your Honor.

5             **THE COURT:**  Yes.

6             **MR. KLEIN:**  We would join in that.  I would also let

7    them take the lead in that.

8             **THE COURT:**  Okay.  Good.

9             **MR. KLEIN:**  So I'll just address the Section 12

10   issues, Your Honor.  You know, the plaintiffs' counsel has not

11   submitted any evidence that the lead plaintiff relied on

12   anything that my clients allegedly said.  That's very telling.

13   I think Your Honor should consider that.

14        There's no declaration.  There's no even argument about

15   that.  And the test, as Your Honor knows, is whether they --

16   they didn't sell it.  That's clear.  They concede that.  So the

17   question is whether it was a successful solicitation.  That

18   means not just a solicitation but also that Mr. Anvari relied

19   on their solicitation.

20        There was no solicitation.  There were a series of

21   comments included in the complaint that, at most, add up to

22   them discussing the technology, discussing the protocol, and

23   answering --

24             **THE COURT:**  Isn't it fair, though, to say that the DLS

25   and the Breitmans are who launched this entire thing?  And so I

1    understand that there is going to be some discussion about --

2    you will remind me, no doubt, that tezos Foundation is a

3    separate entity in Switzerland from the Breitmans and DLS.  But

4    is that really a fair way to look at this?  I mean, didn't

5    they -- they are the masters of the Tezos technology, if I can

6    use it that way.  Isn't that fair?

7          MR. KLEIN:  This -- this idea germinated with them.

8    There's no dispute about that.

9          THE COURT:  And aren't they, kind of, the moving force

10   behind getting people to sign on?

11         MR. KLEIN:  No, Your Honor.  That's where I think we

12   would draw the distinction.  And it is actually a very

13   important distinction that they had a role, some roles -- they

14   don't equal solicitation -- and then the Foundation is the one

15   who actually conducted the fundraiser, holds all the funds.

16         THE COURT:  Can they also cleanly say, We launched it,

17   and after that we were just -- we were interested observers

18   watching it all play itself out?

19         MR. KLEIN:  Well, Your Honor, their statements

20   indicated they did some things.  They provided operational

21   support.  There were some IT issues.  But, again, those do not

22   rise to the level of solicitation.

23      So I think Your Honor is focused --

24         THE COURT:  Doesn't Mrs. Breitman very much, like an

25   operational point of view, make statements and things about

1 "We're looking forward to this being successful" and the like?

2   **MR. KLEIN:**  So they did make certain statements like

3 that.

4   One, I would say, to the extent we are using that "we,"

5 that's informal language.  These are things on Reddit.  They're

6 at conferences.  We all use the word "we" when we're often

7 referring to ourselves or to a different subset if they're not

8 lawyers trying to cabin language in a courtroom or on a legal

9 pleading.  So I think that's important to consider.

10   In addition, the fact that they would talk about this is

11 normal.  Like Your Honor said, this is their idea.  The White

12 paper was written by Arthur.  Of course they're going to talk

13 about it.  People are going to want to hear from them.  And

14 they've been invited to speak at places.  People look to them

15 for information.  But providing --

16   **THE COURT:**  Doesn't that get rather close to really

17 encouraging people to contribute to the Tezos plan, if you

18 will?

19   And how different is that in the *Pinter* case giving us the

20 guidance about, you know, direct involvement in solicitation?

21 Isn't that getting pretty close?

22   **MR. KLEIN:**  Your Honor, I think if you look back at

23 the case law it's urging people to buy into this specific

24 product.  They did not do that.  That's very clear.

25   Plaintiffs' counsel spent a long time scouring, scorched

1    earth basically, to find the best statements they could find.

2         There are no statements like that.  There are no

3    statements:  "We urge you to contribute."  "You should be

4    contributing."  Those types of statements are not there in the

5    record, and they don't exist.  And so that's not solicitation.

6         There is a spectrum, right?  Of course, we're fully

7    soliciting.  I'm coming out.  Buy this tomorrow.  And then

8    there's we do nothing.  They don't fall at the nothing end, but

9    they definitely don't fall at the solicitation end.

10        The fact that they were participating, speaking, and

11   talking about their baby, so to speak, is not surprising.  And

12   I think it's important to step back and understand how

13   blockchains work a little bit, which is you need to build a

14   community for a blockchain to successfully work.  And it's not

15   a community made up of many different people and parts and

16   pieces.

17        So the fact that they would write their White paper and

18   they would have some operational involvement and be invited to

19   speak and answer technical questions or that the community

20   would look to them is not surprising.

21        **THE COURT:**  I recognize we're in kind of the brave new

22   world here, but at the end of the day I don't think that they

23   can use it as a -- you know, it's the sword and the shield

24   problem.

25        Can they say, Well, we're the generators of this whole

1   concept, and then we step back and we make positive statements

2   to encourage people to -- using the language as I understand

3   it -- contribute.  Because you don't like "invest," and

4   plaintiffs will say "invest."

5        But it can't be as disengaged as you suggest.  I have to

6   say that I think that at the motion to dismiss stage it's a

7   tough argument for you to say that they can really divorce

8   themselves from -- from the actual investment part into the

9   Tezos Foundation.  I think that's a tall order.

10       It may be that down the line, you know, you're not -- it

11  doesn't mean -- motion to dismiss doesn't mean if you don't

12  succeed that you're done for in terms of making those arguments

13  at summary judgment and the like.  But it's a tall order for

14  you guys.

15       **MR. KLEIN:**  Well, I'm a tall guy, so I like to take on

16  tall orders, Your Honor.

17       **THE COURT:**  All right.

18       **MR. KLEIN:**  What I would say is, if we move past that

19  point, which I think they didn't solicit, I think that's clear

20  if you look at the case law, urging people directly to buy

21  something.

22       So I would ask you to look at, like, the roadshow cases,

23  Your Honor.  Where do people who go on roadshows, even officers

24  and directors who join them were involved in companies where

25  they've done and S1 and they're going to launch and it's an

IPO, they have been found not to be solicitors.

Because there is an important distinction in the law, and that's where I would ask Your Honor to look, is did they actually urge people --

THE COURT:  Aren't we getting into some factual issues though?  Again, you may be right that at the end of the day I'll go back and the roadshow cases are certainly instructive. But those will rise or fall, often, on specific facts.  They've made averments -- "they" being the plaintiffs -- that there is a whole lot of involvement by the Breitmans and DLS.  And I have to accept those, as you would agree with me, in terms of where we are now on a motion to dismiss.

So that's why I say it's kind of a tough -- it's asking a lot to say the case should be -- that your client should be out on Section 12 issues where they made averments about their involvement.

MR. KLEIN:  I want you to accept, I mean --

THE COURT:  I have to.

MR. KLEIN:  But if you look at those closely -- and we have broken them down, there's a number of them -- none of them add up to the definition of solicitation.

They had a chance to plead this how they wanted and to well plead it.  The fact that they failed to should not be held against my clients.  They did not plead solicitation.  More importantly --

1          **THE COURT:**  Well, they don't have to use the magic

2    word.

3          **MR. KLEIN:**  They don't have to, but they tried to find

4    the best statements.  None of them add up, even together, to

5    solicitation, if you look at them closely, and I would urge you

6    to, and to look at the roadshow cases.

7         But to move on to the next point is, there is no pleading

8    that Mr. Anvari relied on anything they said.  That's another

9    key component.

10        So even if Your Honor is saying, well, their involvement

11   was enough, so to speak, at this early stage, okay, even

12   accepting that, they still have to show that Mr. Anvari relied

13   on something, that they were successful in what they did.

14         **THE COURT:**  That would be, at most, with leave to

15   amend, because they might be able to come back theoretically --

16         **MR. KLEIN:**  I don't think they would be able to.  They

17   would have put it in their opposition, Your Honor.

18         **THE COURT:**  Then I would never grant a motion with

19   leave to amend because you could always say, "You should have

20   put it in the first time."

21         **MR. KLEIN:**  Well, I think it's very telling silence,

22   Your Honor.

23         **THE COURT:**  Yeah.

24         **MR. KLEIN:**  So Mr. Anvari, they were able to find all

25   these quotes.  They were able to put them in their complaint.

1    But there's not one allegation in there that says he relied on

2    anything they said.  They don't include that in their

3    opposition.  That silence is deafening.

4         **THE COURT:**  I know, as you noted for me before, you're

5    certainly also moving on *forum non conveniens*.  And we'll look

6    to Tezos Foundation to develop those arguments for me.  There's

7    no jurisdictional -- I mean, plainly, DLS and the Breitmans are

8    subject to personal jurisdiction.

9         **MR. KLEIN:**  We did not challenge jurisdiction, Your

10   Honor.

11        **THE COURT:**  Okay.  And we talked about Section 12.

12   Then Section 15, are those control-person liability?  Are you

13   making some arguments there?  Or is that not --

14        **MR. KLEIN:**  We are definitely making some arguments

15   there.

16        **THE COURT:**  Okay.  Let's go to that then.

17        **MR. KLEIN:**  You know, even if Your Honor finds that

18   they solicited -- not that you should -- you still don't have

19   to find that they were controlling people.  And I think it's

20   clear that they weren't.

21       Again, I think Your Honor asked --

22        **THE COURT:**  Because Tezos Foundation gets launched and

23   then they're not directly involved?

24        **MR. KLEIN:**  They have no formal or informal role at

25   the Tezos Foundation.  It's a separate independent Swiss entity

1    with its own board governed by Swiss law.  They don't have any

2    equity interest.  Not that they could as a nonprofit.  They

3    don't have any seat on it.  They don't have a formal role.

4    There are no allegations like that.

5         This seems, frankly, fairly clear-cut to us, Your Honor.

6    I don't want to overdo it here.

7              **THE COURT:**  Okay.

8         They've averred that you do.

9         **MR. KLEIN:**  They haven't really, Your Honor.  They

10   haven't really put in any specific allegations that they

11   controlled the Foundation.

12             **THE COURT:**  Well, okay.  I'll let them address that

13   and give you a chance to respond.

14        On the extraterritoriality issue under the Exchange Act --

15   which is a big issue and, to be candid with you, a tough one.

16   I mean, I'm ruminating on all the things the parties have

17   presented to me on that.  And it's the one issue that I think

18   most implicates the particular aspect of this world of crypto

19   currency.

20        Anything you want to say on that?  Or is somebody else

21   going to --

22             **MR. KLEIN:**  I'm going to let Foundation counsel deal

23   with that, Your Honor.

24             **THE COURT:**  All right. So let me let plaintiffs' side

25   discuss your particular situation, and then we will get the

1    next one.  You can come back after they talk to us.

2              **MR. KLEIN:**  Yes, your Honor.

3              **THE COURT:**  Go ahead, Mr. Ta.

4              **MR. TA:**  Thank you, Your Honor.

5        Your Honor, you're absolutely right.  This was, for all

6    intents and purposes, a sale by DLS and the Breitmans despite

7    the fact that they created a nominal two-step structure where

8    DLS transferred all it's intellectual property to the

9    Foundation, and then the Foundation was the actual entity that

10   issued the tokens.  For all intents and purposes, DLS and the

11   Breitmans were selling their product.

12             **THE COURT:**  Okay. So how do I get there?  Because

13   there is no dispute, I think -- you're not disputing, as I read

14   the averments in your complaint, there is a Swiss entity.  And

15   the entity is the Tezos Foundation.

16             **MR. TA:**  Correct.

17             **THE COURT:**  And it is entitled to the corporate forum

18   that it has.  And you're not really alleging, as I look at your

19   complaint, an alter ego piercing the veil concept.  So because

20   these are the Breitmans, DLS and Tezos Foundation, why should I

21   just jump over that distinction?

22             **MR. TA:**  Let me address the critical facts here, the

23   relationship between DLS and the Breitmans and the Tezos

24   Foundation.

25        There are several critical facts that show that the DLS

1    defendants were solicitors for purposes of Section 12 of the

2    Securities Act.

3              **THE COURT:**  So I don't need alter ego or --

4          **MR. TA:**  Not at this stage, Your Honor.

5              **THE COURT:**  -- piercing veil?  Okay.

6          **MR. TA:**  Not at this stage.  We're not alleging,

7    presently, that DLS and the Breitmans conveyed title.  We're

8    alleging that they're liable as solicitors.

9          The first critical fact:  Between September 2016 and March

10   of 2017, DLS conducted a direct private presale of Tezos tokens

11   to a group of early-round investors, and obtained proceeds of

12   $612,000.

13         Now, we point this out --

14             **THE COURT:**  This is preTezos Foundation?

15         **MR. TA:**  Correct, Your Honor.

16         And we point this out simply to put everything in

17   perspective because right now, without the benefit of

18   discovery, we're not alleging that DLS and the Breitmans were

19   the direct sellers, that they passed title.

20         But the fact that, like, a year prior to the Tezos ICO,

21   the fact that they conducted a direct private presale of the

22   same tokens to a group of early-round investors, I think that

23   puts everything into perspective as to who the sellers were.

24   So we just point that fact out.

25         Second, it was DLS and the Breitmans who orchestrated and

1   marketed the ICO.  The Breitmans created the Tezos Foundation.

2   After the Tezos Foundation was created, it was the Breitmans

3   who marketed the Tezos ICO also exclusively in the

4   United States.  Kathleen Breitman is on record as saying she

5   was a one woman band promoting the protocol.  And she said she

6   did almost all the marketing -- almost exclusively in the U.S.

7   And she hoped that the Tezos Foundation would take over

8   marketing after the ICO.  Right?  She's on public record as

9   saying that.

10          **THE COURT:**  I mean, I think this is kind of what I'm

11  going to hear from DLS/Breitman.  They're contending that they

12  deeply believe in this concept, and it gets formed in the form

13  of the Tezos Foundation.  And then they're out there as

14  proselytizers saying, This is wonderful and people should

15  participate in it.

16      But they're not actually doing the solicitation.  They're

17  just -- if you believe their view of the world, they are true

18  believers since they are promoting it.

19      Why, then, should they be saddled with the designation of

20  or the identity of being a solicitor of the investment?  I

21  mean, it's like somebody -- you use a consumer product.  You

22  think it's wonderful.  And you say, "I think everybody should

23  buy this," you know, "this particular product, because it's

24  just terrific."  But you're not -- you know, you have no

25  particular involvement in the actual sale.

1          **MR. TA:**  Because they weren't just proselytizing about

2     the technology, Your Honor.

3          When they were talking about the -- when they were doing

4     all their marketing, and issuing all the statements on Reddit

5     and other social media platforms and talking to news outlets,

6     they were talking about the ICO.  And they were talking as if

7     they were the sellers.

8          And that's the critical point about the marketing

9     allegations in our complaint.  These people weren't just

10    talking about, ah, this technology is great, this project is

11    going to be the next best thing since sliced bread.

12         They were talking about the ICO.  They were promoting the

13    ICO.  Statements like, "We're not planning on having a cap."

14    That's Arthur Breitman, paragraph 51 of our complaint.

15    Kathleen Breitman saying, "We have no intention of running

16    another crowdsale.  We want to budget the Foundation.  We did

17    sell a small amount of tokens at a discount over the crowdsale

18    price."  It's all "we" "we" "we."  They're referring to

19    themselves as the sellers, and they're talking about the ICO.

20    They're not just talking about the technology.

21         So that's the second critical fact, the fact that they

22    orchestrated and marketed the ICO.

23         **THE COURT:**  Again, because you're not making piercing

24    the veil or an alter ego allegation, and they're -- there's no

25    reason to believe that Tezos Foundation is not a properly

```
 1   formed Swiss entity to which the Breitmans are not involved, in
 2   the sense of being board members or in some way managing the
 3   operation of the Foundation, "we" gets you over the hurdle?  I
 4   mean, they say "we" and, therefore, I assume they're the moving
 5   force behind the solicitation?
 6        MR. TA:  No, it's not just the fact they use the word
 7   "we," Your Honor.  What we are alleging is that the Breitmans
 8   were the agents of the Tezos Foundation for purposes of the
 9   ICO.  Orchestrating and marketing the ICO and then, more
10   importantly, executing the ICO.
11        THE COURT:  What's the indicator that they are
12   actually acting as agents?  Are they getting paid to do so?
13   What makes this agency relationship, and make it somehow
14   different than, as we talked about before, true believers in
15   it?  Where is it that I can see, oh, they're agents, they're
16   acting as agents?
17        MR. TA:  Well, they're acting as agents in terms of
18   the marketing.  And in the course of acting as the agents, they
19   get to the level of being solicitors because they're now
20   financially motivated.  They're the ones who are selling the
21   business.  And they are the ones going out there and telling
22   people this ICO is great.
23      Now, Your Honor, defense counsel said they never urged
24   anyone to buy.  And I think that may be where Your Honor is
25   going with your questions.
```

1      There is no case law saying that someone has to use those

2  words "I urge you to buy" in order to sustain solicitation

3  liability.  Right?

4      If you look at all the cases, first of all, the courts

5  have said, including the Northern District of California, that

6  this is an intensely factual question not properly decided on a

7  motion to dismiss.

8          **THE COURT:**  To use the colloquial phrase, you have to

9  have skin in the game at that point?

10         **MR. TA:**  Correct, Your Honor.  You have to --

11         **THE COURT:**  You do?

12         **MR. TA:**  You have to have financial motivation.

13         **THE COURT:**  Okay.  And where in the averments are

14  their financial motivation other than they -- well, go ahead.

15         **MR. TA:**  They're the owners, Your Honor, of DLS.  And

16  DLS is the actual company.  It's an interest in DLS that's

17  actually being sold off in the ICO.

18         **THE COURT:**  Okay.

19         **MR. TA:**  The third factor I wanted to point Your Honor

20  to, in terms of solicitation, I think is highly relevant is the

21  fact that it was the Breitmans, specifically Arthur Breitman,

22  who was executing the ICO.  The ICO happened over two weeks,

23  the first two weeks in July.

24      And you'll see from Mr. Breitman's Reddit postings that he

25  was the one manning computers, watching the contributions come

1  in, addressing troubleshooting issues, and then addressing

2  questions posed by investors.

3      For example, on the very -- on the very first night, there

4  was a data base crash.  And Mr. Breitman, who was then, at the

5  time, located in California, he was running the ICO, and he

6  said this, he said, "For the curious, one of our machine's

7  roles is to go through the Ethereum and Bitcoin blockchains and

8  look for Tezos contributions.  That machine threw a tantrum and

9  chose to do it at the time where I finally got some sleep.  I

10  woke up in the middle of the night, after sleeping through one

11  or two phone calls, and addressed the issue with the team."

12      So you've got that fact, the fact it was the Breitmans who

13  conducted the Tezos ICO.  It wasn't the Foundation.  The

14  Foundation was basically a passive entity receiving the

15  contributions.

16      Fourth, Your Honor -- this is an important factor -- in

17  September of 2014, Arthur Breitman, under the pseudonym LM

18  Goodman, authored and published a White paper.

19      Now, why is that significant?  A White paper, in the

20  context of an ICO, is essentially the prospectus.  It doesn't

21  just proselytize about the technology; it actually is the

22  precursor to an initial coin offering.

23      All of these ICOs had white papers.  And defense counsel

24  said, well, you know, this white paper was just a discussion of

25  technology; didn't mention the ICO.

1          Well, it does.  Page 8 specifically refers to the upcoming

2    Tezos ICO.  It says, and I quote, The initial extent of the

3    token supply will be the number of tokens issued during the

4    crowdsale and not specifically 10 billion, which was merely a

5    placeholder.

6          So they were discussing in the White paper an upcoming

7    ICO.  And it's important to bear in mind that the White paper

8    serves, essentially, as a prospectus.

9          So I think, based on all these facts, Your Honor, these

10   are the facts that we rely on to establish solicitation

11   liability:  The fact that they created the Tezos Foundation,

12   the Breitmans then went out and marketed the Tezos ICO.  The

13   fact that they executed the Tezos ICO.  The fact that they had

14   a prospectus that they issued which evangelized not just the

15   project but the ICO itself.  Based on those facts, numerous

16   courts have held there to be solicitation liability.

17         And I think we have to remember that, as Judge Alsup, in

18   *Charles Schwab* said, and Judge Wilken in *Primo*, at a motion to

19   dismiss level at the pleading stage these are intensely factual

20   questions.  Who is the seller, who is not a seller, that's not

21   properly inside the motion to dismiss.

22         Let me quickly address the two main arguments made by

23   defense counsel.

24         He said that -- first of all, that there has to be

25   reliance.  And you'll see that in the opening briefs.  They

1   dance around the issue.  And it's only in the reply --

2       **THE COURT:**  Mr. Anvari, right, whether or not he

3   relied on the --

4       **MR. TA:**  Correct.  They dance around the issue.

5       And it's only in the reply brief, and it was the reply

6   brief of the Draper defense, where for the first time they used

7   the word "induced," where Mr. Anvari was induced to rely.

8       The reason they dance around the issue, Your Honor, is

9   because they're really making a causation argument, a

10  causation, slash, reliance argument.

11      And why do they dance around the issue?  Because *Pinter*

12  *versus Dahl* has already decided against that.  In *Pinter versus*

13  *Dahl* the Supreme Court expressly rejected a causation and

14  reliance requirement.

15      In discussing its reasons for rejecting the substantial

16  factor test, this is what the Supreme Court says:

17          "No Congressional intent to incorporate tort law

18          doctrines of reliance and causation into Section 12.1

19          emerges from the language or the legislative history of

20          the statute.  Indeed, the strict liability nature of the

21          statutory cause of action suggests the opposite."

22      I think that disposes that issue.  There is no causation

23  reliance requirement in Section 12.

24          **THE COURT:**  How about the Section 15 issues?

25          **MR. TA:**  In Section 15, Your Honor, I think the same

1   factors that we point to, to suggest that there was a seller

2   liability, also suggests that there was control person

3   liability.  Why?  Because, essentially, the Tezos Foundation

4   ceded all control of the Tezos ICO to DLS and the Breitmans.

5        As we said, the Foundation was created simply to hold the

6   monies.  The Tezos ICO was exclusively marketed on behalf of

7   the Tezos Foundation by DLS and the Breitmans.  The Breitmans

8   referred to it as their sale.  It was executed by the

9   Breitmans.  And even the former Tezos board director, Johann

10  Gevers, he publicly acknowledged that the Breitmans controlled

11  the critical functionalities of the Foundation.

12       I think all of those facts would satisfy -- would show,

13  under the SEC definition of control, not just the possession of

14  the power to direct management and policies but the actual

15  exercise of it in this situation.

16       They -- the Tezos Foundation ceded all control of the ICO

17  to DLS and the Breitmans.

18       I think the only argument they make, the principal

19  argument they make on control person liability is to suggest

20  that well, you know, we have this conflict that emerged between

21  Johann Gevers on the Foundation, of the board Foundation, and

22  DLS and the Breitmans, and that suggestion of a conflict

23  contradicts the ideal that DLS and the Breitmans were

24  controlling the Foundation.

25       Well, several problems with that.  This conflict they

1   point to happened in October of 2017.  That's three months

2   after the Tezos ICO.  So it's irrelevant.  The fact that then

3   they have a conflict three months after ICO doesn't preclude a

4   finding that they controlled the Tezos ICO in July of 2017.

5         But, more importantly, the dispute doesn't contradict the

6   fact that the Breitmans controlled the Foundation because the

7   Breitmans ended up getting rid of Johann Gevers.  That, to me,

8   suggests that they were in control and they managed to force

9   Mr. Gevers out.

10        In any event, we rely on the fact that this is, again, an

11  intensely factual question.  Courts have said that controlling

12  person liability should be looked at flexibly and liberally.

13        And at the motion to dismiss stage, Your Honor, I think

14  we've adequately alleged controlling person liability and

15  seller liability for purposes of Section 12.

16            **THE COURT:**  Okay.

17        Very briefly, Mr. Klein, if you wanted to.

18            **MR. KLEIN:**  Your Honor, a couple of quick responses.

19        I would note that the roadshow cases we cited to and they

20  cited to our motion are motion to dismiss cases.  This is

21  definitely something that can be decided now.

22        In all the examples he pointed out there is no discussion.

23  I would direct Your Honor again to look at all the statements

24  put in their allegations about them saying, go buy -- sorry,

25  excuse me, go contribute, go participate in this fundraiser.

1    Even a quote that they rely on the most here, which is
2    allegation 110, paragraph 110, what they stated there was:
3         "It's tough.  We didn't do much marketing outside of
4    the U.S.  While, rather, Arthur and I are based in the
5    U.S. and we talk about the technology in mainstream U.S.
6    press outlets."
7    That's what they're talking about.  "We talked about the
8    technology."
9    To find liability here because you talk about technology
10   or you provide operational support of IT would put --
11        THE COURT:  Of course, I'm not finding liability at
12   this stage.
13        MR. KLEIN:  But to find that they are -- so I think
14   they are really stretching here, Your Honor.  I would urge you
15   to look back at the complaint and look at the allegations
16   closely and to look at those roadshow cases.
17        THE COURT:  Okay.  The point that Mr. Ta made with
18   respect to the Section 12 factors/elements and his point that
19   reliance is not essential to an adequate claim of Section 12
20   liability --
21        MR. KLEIN:  It's just not accurate, Your Honor.  I'll
22   direct Your Honor to the cite.  *Pinter*, 486 U.S. 622, at 647,
23   successfully solicits a purchase.
24   And the cases all flowing from that, which are discussed
25   on page 6 of our reply, which is docket number 139, talk about

```
1   how courts look to whether someone did -- if it was a
2   successful solicitation.  And that's very clear from reading
3   the cases, Your Honor.
4        THE COURT:  Successful solicitation in the sense that
5   the plaintiff must have been solicited him- or herself.
6        MR. KLEIN:  Yes.  The people who are alleged to have
7   solicited, caused that person to purchase whatever it was or to
8   contribute or to participate in the fundraiser.  However you
9   want to look at it.
10       THE COURT:  If it's a representative plaintiff, and
11  the allegation is that others purchased, does the
12  representative plaintiff have to be the one that's -- under
13  your theory under Section 12, has to be the one that actually
14  was successfully solicited?
15       MR. KLEIN:  There are no allegations with the
16  Breitmans successfully soliciting anybody in their complaint,
17  period.
18       THE COURT:  Okay.  Let's go next to the Draper
19  defendant, Mr. Wanger.
20       MR. WANGER:  Good morning, Your Honor.
21       THE COURT:  Good morning.
22       MR. WANGER:  And I just want to follow up on the last
23  point that you were making about the representative plaintiff,
24  because obviously this is not yet a certified class.
25       THE COURT:  Right.
```

1          **MR. WANGER:**  And so it's important that the --

2          **THE COURT:**  Putative class.

3          **MR. WANGER:**  It is a putative class.  But the

4   plaintiff has got to be able to state a Section 12 claim

5   against my clients now.  And my clients are different.  They

6   are not officers or directors of DLS or the Foundation.

7       And what is striking is --

8          **THE COURT:**  Actually, before you launch into what you

9   want to tell me, again, I just want to have an idea of what

10  issues are being covered by which parties.

11      Remind me which of the various bases for dismissal you're

12  advancing and which ones do you want to talk about, and which

13  ones are you going to say, Pay attention to this, one of my

14  colleagues who is going to cover.

15         **MR. WANGER:**  I have two defendants.

16         **THE COURT:**  Right.

17         **MR. WANGER:**  Timothy Draper, an individual, and his

18  venture capital firm Draper Associates.  They've been named as

19  defendants in both of the claims, the Section 12 claim and the

20  Section 15 claim.

21         **THE COURT:**  Right.

22         **MR. WANGER:**  I'm going to address both of those

23  claims.  I'm not relying on anyone else.

24         **THE COURT:**  And there's no jurisdiction argument

25  you're making.

1          **MR. WANGER:**  (Nods head.)

2          **THE COURT:**  And the sort of extraterritoriality of the

3     securities laws argument you're not focused on that?

4          **MR. WANGER:**  I'm not focused on these.  My motions are

5     pure 12(b)(6) motions.

6          **THE COURT:**  Very good.

7          **MR. WANGER:**  So *Pinter* says, in order to state a claim

8     where you're not alleging that you bought the security from the

9     defendant, then you have to allege that the defendant

10    successfully solicited your investment, the plaintiffs'

11    investment.  That's what *Pinter* says.

12       Now, they admit that their client had never heard of Tim

13    Draper or Draper Associates.  They were not aware of any

14    statement that he made.  And so there can't possibly be a

15    successful solicitation by the Draper defendants of this

16    plaintiff.

17         **THE COURT:**  Remind me on the facts, the acquisition by

18    the plaintiff, Mr. Anvari, how that relates vis-a-vis to the

19    Draper statements about the Tezos.

20         **MR. WANGER:**  Well, as far as we know, they are totally

21    unrelated.  There's no allegation, again, that Mr. Anvari was

22    aware that --

23         **THE COURT:**  But chronologically had Draper already

24    been making the statements he's alleged to have made?

25         **MR. WANGER:**  Yes.  So they -- they allege that

1    Mr. Draper made statements to online publications prior to the

2    contribution.  There's no allegation that they were aware of

3    those statements.  And these are, frankly, somewhat obscure

4    publications in Internet publications.

5         And so they don't -- they don't allege that they were

6    aware of that or that that had any impact at all on their

7    decision to invest.

8         And I will be interested to hear them tell you what their

9    best case is for the claim that the Draper defendants

10   successfully solicited their investment.

11        Every case that they cite is a 12(a)(2) case in which some

12   defendant, either an officer, a director or an issuer, was

13   responsible for a prospectus, signed the prospectus, and the

14   investor specifically alleges "I was induced to purchase this

15   security as a result of this false and misleading statement in

16   the prospectus."

17        There's no claim that Mr. Draper made any false statement.

18   He's clearly a fan of blockchain technology.  And he said, "I'm

19   going to invest in it."  And he did, through his firm, invest

20   in it.  But --

21             **THE COURT:**  He's a bystander.

22             **MR. WANGER:**  I'm sorry?

23             **THE COURT:**  He's a bystander.

24             **MR. WANGER:**  He is.  He's the classic collateral

25   participant that *Pinter* says are not a proper defendant to a

1    solicitation claim under Section 12.

2         **THE COURT:**  And under 15 you say he doesn't control

3    anything.

4         **MR. WANGER:**  Yeah.

5         And let me just make one point.  Counsel was mentioning

6    how *Pinter* has rejected the causation or substantial factor

7    test, but in doing so it narrowed the class of defendants.  So

8    nothing in that line of discussion in *Pinter* helps his client.

9         Going to the Section 15 claim, again, Mr. Draper and his

10   firm have no position at either DLS or the Foundation.  They

11   are -- the firm is a 10 percent shareholder in DLS.  That's

12   undisputed.  And they have no involvement at all in the

13   day-to-day affairs of DLS, let alone the Foundation.  And you

14   can't possibly state a control claim under those facts.

15        **THE COURT:**  Okay.

16        Mr. Ta.

17        **MR. TA:**  Your Honor, the Draper defendants were as

18   much sellers as DLS defendants.

19        And they were financially motivated.  As defense counsel

20   has just said, they owned a 10 percent interest in DLS.  Just

21   like the Breitmans.  The Breitmans owned --

22        **THE COURT:**  Well, any investor, if you want the

23   investment to be a success, every time you buy a share of

24   stock, you're -- in the same sense you want it to be

25   successful.  You want other people to, you know, buy up the

1    market.  How's that any different?

2        They're saying the Drapers had a 10 percent interest.

3    Well, they do have an interest in the success of the venture.

4    That doesn't mean they're soliciting the sale.

5            **MR. TA:**  Right.  That goes towards the financial

6    motivation aspect of Section 12 liability, that you have to be

7    financially motivated and that you solicit.  So I'm pointing

8    that out to establish the financial motivation.

9            **THE COURT:**  So financial motivation, I got you.  But

10   were is the solicitation?

11           **MR. TA:**  The solicitation is you've got the Draper

12   defendants, specifically Timothy Draper, announcing his

13   investment in the Tezos project on May 5, 2017.  And from then

14   on it's just a publicity tour.

15       He goes out and he says, "I want to lead by example."

16   That's a quote, "lead by example."  He says he wants to make

17   sure the Tezos tokens "get promoted."  That's his word.

18       Numerous media sources pick up on these statements, and

19   they start saying Timothy Draper's statements, these

20   promotional statements, are going to create the ingredients for

21   success for this Tezos ICO.

22       Arthur Breitman publicly acknowledges that, "We got a bump

23   up in publicity."  Why?  Because Timothy Draper was, quote,

24   behind a lot of this --

25           **THE COURT:**  Again, what I'm concerned about is the

1   ramification of your argument, which is anytime someone in the

2   public eye, a celebrity or somebody else, number one, invests

3   in something and then talks it up, that doesn't make them

4   liable under Section 12.  But your argument seems to be that it

5   does.

6       And, you know, apparently Mr. Draper in this world is

7   well-known.  So, you know, he -- if he says positive things

8   combined with the fact that he personally invests, you've now

9   bootstrapped him up to a Section 12 defendant and a Section 15

10  control person.  And that's a big leap.

11      And I'm concerned by the ramifications of that argument,

12  because anytime anybody makes a public statement about some --

13  something that's being sold they would be -- if it's a security

14  they would be subject to Section 12 violation.

15          MR. TA:  Your Honor, we agree that there should be

16  limits on --

17          THE COURT:  Where are the limits under your theory

18  then?

19          MR. TA:  And let me point this out.

20      First of all, again, defense counsel talked about

21  successful solicitation.  If you read *Pinter versus Dahl*, what

22  the Supreme Court says there is all that means is that there

23  must have been a purchase.

24      So it's to distinguish between people who purchased and

25  what the Supreme Court said are prospective purchases who have

1  no claim.  Okay.  So that's that.

2      But, importantly, solicitation occurs -- has been found to

3  occur in many situations and can take many forms.

4      So, for example, courts have found the controlling

5  shareholders of an issuer to be -- to be engaged in

6  solicitation.  They've found general partners of an issuer to

7  be solicitors.  They found the subsidiaries of an issuer to be

8  solicitors.  They've even found the creditors, the creditors of

9  an issuer to be a solicitor.

10      **THE COURT:**  Which of those buckets does Mr. Draper

11  fall into?

12      **MR. TA:**  Well, he's probably closer to the general

13  partners of an issuer because, as we've said --

14      **THE COURT:**  But he's not.

15      **MR. TA:**  Well, by analogy, Your Honor, because they

16  own an interest in DLS.  And we've said that DLS controls the

17  Foundation.  And so based on that, he comes close enough.

18      I'm not going to put it any higher than that, Your Honor.

19  I know Your Honor has difficulty with the concept.  But I think

20  it comes closest to that.

21      And just -- if I can just give you the citations for some

22  of the cases for those situations that I've cited.  For

23  example, the creditor and issuer, that was a case that was

24  cited, actually, by the defendants.  A Sixth Circuit decision,

25  *Smith versus American National Bank*.  And in that decision the

1   Sixth circuit actually cited a situation where solicitation

2   liability would arise in the case of a creditor.  They cited

3   *Davis versus Avco Financial Services*.  And the Sixth Circuit

4   says this in a parenthetical:

5        "Section 12.2 liability imposed on a finance company

6        whose manager attended and made speeches at promotional

7        meetings represented that scheme was a good-quality

8        investment, furnished loan applications, and generally

9        contributed to the selling momentum."

10   So I would put it to you that what they did here was

11   similar.  The Draper defendants contributed to the selling

12   momentum.

13       But let me turn to Section 15.  I think we're stronger on

14   Section 15, controlling person liability.

15       What we've alleged is that the Draper defendants were

16   controlling persons vis-a-vis DLS.  They acquired a 10 percent

17   interest.

18       For three years prior to the acquisition of interest, the

19   Tezos ICO was bumbling around, didn't progress very far.  But

20   after they announced the investment in May 2017, that same

21   month the Tezos Foundation was created.  Two months later,

22   July 2017, the Tezos ICO was officially launched.

23       So what we've alleged, Your Honor, is essentially that the

24   Draper defendants acquired an interest and gained some sort of

25   say, whether it was through a seat on the board of DLS or some

other contractual arrangement, but they acquired some say.

And it's -- the Court can infer from the allegations that we've asserted in the complaint that the Draper defendants made it a condition of their investment in DLS that there be a Tezos ICO.  And for that reason we say that they were the controlling persons of DLS.

**THE COURT:**  Okay.  Mr. Wanger.

Did you have something further?

**MR. TA:**  Sorry, I do have some more.

**THE COURT:**  Section 15.

**MR. TA:**  Section 15, Your Honor.  I wanted to point out, also, that they mentioned in their arguments on controlling person liability that culpable participation is an element.

And you'll notice that DLS doesn't argue that.  And it's for good reason.  Because the better view and, I think, the majority view in the Ninth Circuit is that controlling person liability doesn't require culpable participation.

And I would refer Your Honor to the decision of Judge White in this district, in *Shepherd versus S3 Partners LLC*.  It's a Northern District of California decision, October 1, 2011.  Footnote 5.  He goes through the decisions that were cited by the Draper defendants for culpable participation and he says -- he explains why those decisions don't apply.

1    The Draper defense counsel has said all the decisions

2  we've cited for no culpable participation refer to Section

3  20(a) of the Exchange Act.

4    And they point out that there's a difference between 20,

5  Section 20, and Section 15.  But if you look at the decisions

6  that they cite and you read them carefully, what they say is

7  that that distinction favors us.  Because if there is going to

8  be culpable participation, it should be in Section 20(a).

9    Why?  Because that's based on a Section 10(b) claim for

10  which scienter is an element.  Section 15 is based on Section

11  11.  Section 12 there is no scienter requirement.  So they

12  cited a case incorrectly.

13    And I would point out that there's no requirement, in

14  terms of controlling person liability, that it's the actual

15  exercise of the power; it is just the possession of power.  The

16  SEC has made that clear.  All the cases make that clear, that

17  controlling person liability just simply requires the ability,

18  the possession of the ability to exercise power.

19    I would wrap up, Your Honor, by saying, look, this is an

20  intensely factual question.  Again, courts are reluctant to

21  make determinations about who is a controlling person, who's

22  not.

23    And if Your Honor has doubts about the controlling person

24  liability, I would ask this, that they put into factual dispute

25  the contractual arrangement by which the -- by which the Draper

1   defendants acquired an interest in DLS.  They cited it in their

2   brief.  They said it was a 10 percent interest.  They tried to

3   correct the fact.

4        The fact that they put that document into factual dispute,

5   I think, converts this in some way to a motion for summary

6   judgment.

7            THE COURT:  That assumes that I ultimately conclude

8   there is some significance to the investment in DLS.  And if I

9   don't think it's a particularly relevant factor for my analysis

10  of Section 12 and Section 15, it doesn't matter.

11           MR. TA:  Well, we would say it's highly relevant, Your

12  Honor, because knowing what the contract says, if the contract

13  says we're investing 10 percent, we get a board seat, you're

14  going to do --

15           THE COURT:  A board seat in DLS.

16           MR. TA:  DLS.

17           THE COURT:  Not a board seat in the Tezos Foundation.

18           MR. TA:  Right.  But we're only asserting, Your Honor,

19  that the Draper defendants were controlling persons vis-a-vis

20  DLS.  We're not saying that they were controlling persons

21  vis-a-vis the Tezos Foundation.

22       So, I think, in fairness, for them to put that document

23  into factual dispute on this motion to dismiss requires us to

24  be given access to that document and leave to amend.

25       Thank you, Your Honor.

1          **THE COURT:**  Okay.  Go ahead Mr. Wanger.

2          **MR. WANGER:**  Thank you.

3      There is no allegation in the complaint that the Draper

4  defendants own anything more than a 10 percent stake.  They

5  don't allege that they're controlling shareholders.  So you can

6  ignore that issue.

7      Going back to the Section 12 claim, I didn't hear a cite

8  to any case that saves their claim.  Again, *Pinter* instructs

9  that the focus has got to be the relationship between the

10 plaintiff and the defendant who is alleged to have solicited

11 the investment.

12     There's no relationship at all between Draper and the

13 plaintiff in this case before -- before the investment.  He

14 didn't know of Draper.  He didn't know of any statement that

15 Draper made.  So there cannot possibly be solicitation.

16     On the Section 15 claim, Counsel mentioned that you can

17 infer from the timeline of events that Draper was in control of

18 DLS.  There's no allegation like that in the complaint.

19     I think our reply points out that the complaint alleges

20 exactly the opposite, that DLS was proceeding towards --

21 towards the fundraiser before Draper got involved, and it took

22 place exactly when DLS and the Breitmans said the fundraiser

23 would take place.  It just so happened that was not long after

24 Draper invested, but there's no allegations in here that you

25 can infer control from.

1          Finally, again, there's -- there are no allegations that

2     they were at all involved in the day-to-day affairs of the

3     company.  You cannot have control without that.

4          And so, you know, we can say that these all are intensely

5     factual issues, but they haven't given you any facts on which

6     to hang your hat.

7               THE COURT:  Okay.

8               MR. WANGER:  Thank you.

9               THE COURT:  Thank you.

10         Let's go to Bitcoin Suisse.  So that's Mr. Wissner-Gross.

11              MR. WISSNER-GROSS:  Yes, Your Honor.

12         With respect to the issues that I'll cover, I'm going

13    to -- we finally get to the person jurisdiction issue.  We have

14    a motion to dismiss on that ground.  We have an argument,

15    alternatively, under Section 12.  We're not named on the

16    control person claim.

17         I'm going to defer to counsel for the Foundation for his

18    argument on forum non and the forum selection cause.

19         If Your Honor grants a motion to dismiss on either of

20    those grounds and the case goes to Switzerland, obviously we

21    don't have a jurisdictional argument there.

22         And I'm going to rely on the arguments you've heard

23    before, and perhaps what the Foundation may say further on the

24    pleading standard under Section 12.  I'll talk briefly on how

25    that applies to my client.

 1          With respect to Bitcoin Suisse, the complaint has very few
 2    allegations with respect to Bitcoin Suisse.   Those are
 3    contained in paragraphs 24 to 26 in paragraph 59 of the
 4    complaint.
 5          Bitcoin Suisse, its role was limited to serving as a
 6    currency converter.  What that means, Your Honor, is if -- and
 7    we're talking, really, essentially about foreign investors.
 8    Because, as I will get to in a moment, Bitcoin Suisse in June,
 9    before the offering in July, announced on its website that it
10    would not be able to take any investments or serve on behalf of
11    U.S. -- U.S. clients, U.S. citizens.
12          But its role with respect to the foreign investors who
13    invest was simply to convert.  If someone had dollars or Euros,
14    for example, and wanted to have that converted to Bitcoins,
15    they would provide that service.
16          The service was solely done in Switzerland.  They're based
17    in Switzerland.  They don't have any employees in the
18    United States.  They don't have any operations in the
19    United States.  It's a classic situation, Your Honor, where all
20    their conduct, all their operations, occurred solely in
21    Switzerland.
22          Now, on the motion to dismiss, we supplied the declaration
23    of the CEO of Bitcoin Suisse.  And he confirmed all that.  And
24    on a motion to dismiss the declaration is considered evidence.
25    Perfectly standard.  It's how these -- typically how motions to

1  dismiss are handled.

2      And in his declaration he identified what I've just

3  summarized in terms of where its business is located, how it

4  operates subject to Swiss law.  And he went on further to

5  state --

6          THE COURT:  I can consider this because it's the

7  jurisdictional question as --

8          MR. KLEIN:  Yes.

9          THE COURT:  -- opposed to a 12(b)(6) question?

10     (Unreportable simultaneous colloquy.)

11         MR. WISSNER-GROSS:  Purely with respect to a motion to

12  dismiss, at least on jurisdictional grounds.

13         THE COURT:  Okay.

14         MR. WISSNER-GROSS:  But he goes on to state that while

15  some very small percentage of foreign investors utilize Bitcoin

16  Suisse for its currency conversion role, there were no U.S.

17  citizens who participated and -- because before the offering,

18  Bitcoin Suisse announced that it would not be able to accept

19  any such role on behalf of U.S. citizens.

20     And the CEO also stated -- hasn't been rebutted -- that

21  the plaintiff does not show up anywhere on its records as a

22  client or any respect.

23     The burden on a motion to dismiss for lack of jurisdiction

24  now shifts to the plaintiff.  Under well-established case law

25  in this circuit they have to make some colorable showing.

 1          They have not made a colorable showing.  They've actually

 2     made no showing.  There is -- they had an opportunity of

 3     submitting a declaration or affidavit.  They've submitted

 4     nothing.

 5          So the statements by Bitcoin Suisse's CEO is completely

 6     unrebutted.  We think, Your Honor, that with respect to our

 7     jurisdictional motion that's dispositive.

 8          If Your Honor has to reach the jurisdictional motion after

 9     having assessed the forum non and forum selection issues, we

10     think that that's a dispositive ground to grant --

11          **THE COURT:**  Couldn't I reach the jurisdictional

12     question first?  Or --

13          **MR. WISSNER-GROSS:**  I think --

14          **THE COURT:**  -- your point being if it's going to

15     Switzerland then I don't even have to worry about it.

16          **MR. WISSNER-GROSS:**  I recognize, Your Honor, in the

17     transfer law context that sometimes courts say, I'm going

18     transfer it, and I don't have to reach the jurisdictional

19     issue.

20          If Your Honor finds, as an alternative ground, as to my

21     client would find that there's a lack of personal jurisdiction,

22     I think that Your Honor could reach that on an alternative

23     basis.

24          But, in any event, on the issue of personal jurisdiction,

25     we think that there's no evidence, let alone any colorable

1    evidence that they've submitted.  We think that Bitcoin Suisse

2    should be dismissed on that ground alone.

3         And we'd also note that in paragraph 25 of their

4    consolidated complaint they mostly allege -- and I'm quoting

5    from the language of the complaint -- that Bitcoin Suisse was

6    going to provide a currency conversion facility through which

7    U.S. investors could invest in the Tezos ICO.  Note the

8    language "could."

9         Your Honor, let me -- unless you have any questions,

10   because I think the jurisdictional argument is clear-cut, we've

11   briefed the cases, we don't think that there's any basis to

12   keep my client on personal jurisdiction.

13        Let me turn, briefly, to what I think is their only

14   rebuttal that they're suggesting, well, we should be allowed to

15   take some jurisdictional discovery.

16        The case law, we think, is fairly clear that in order to

17   satisfy the colorable showing to be entitled to take some

18   jurisdictional discovery you have to do something.  You can't

19   just rely on your pleadings.

20        And whereas here Bitcoin's CEO has presented a very

21   specific declaration that's unrebutted, the case law, we would

22   submit, suggests that there is absolutely no basis for any

23   jurisdictional discovery --

24            THE COURT:  So you think under the case law -- and I

25   deal with this from time to time.  This will come as no

1    surprise to you that a party will say, well, the jurisdictional

2    discovery I want to take is the following:   I want to take the

3    deposition of this particular person.   And the era of inquiry

4    is going to be about this, because if it comes out in a

5    particular way it would give us a basis to say that there is

6    jurisdiction.

7        And I assume what they're going to say is, Well, you've

8    submitted this declaration, so at the very least we should be

9    able to test the statements in the declaration.

10        **MR. WISSNER-GROSS:**  Well, the standard, Your Honor, is

11   that -- and I'm quoting from some of the case law in this

12   area -- that the plaintiff has to come forward with, quote,

13   some evidence, some evidence tending to establish jurisdiction.

14        The plaintiff can't simply say, in an *ad hominem* attack on

15   an affidavit declaration, well, I need to test that.   The

16   burden under the case law is they have to -- they don't have to

17   make a *prima facie* showing, but they have to come forward with

18   some evidence.

19        And here I'll take their silence about our statement that

20   their client -- their lead plaintiff was not a client of ours

21   as consent or they're not disputing that.

22        So under the case law, in the absence of providing some

23   evidence, there is no entitlement to jurisdictional discovery.

24   We would submit that it's not warranted here, Your Honor.

25        **THE COURT:**  What's this concept that's kind of bandied

1  about in the footnotes of the briefs about, well, Bitcoin

2  Suisse should stay in, at the very least, as a nominal

3  defendant?

4         **MR. WISSNER-GROSS:**  We saw that, Your Honor.

5         **THE COURT:**  Yes.  So give me your position on that.

6         **MR. WISSNER-GROSS:**  Well, it's a little bit of

7  tautology here.  If there isn't jurisdiction over Bitcoin

8  Suisse, they can't be kept in as a nominal defendant.

9         **THE COURT:**  And what would you cite me to for that

10  proposition?

11         **MR. WISSNER-GROSS:**  Well, in our brief, Your Honor, I

12  believe that we've discussed the issue.  We've addressed it.

13  And I believe there's authority --

14         **THE COURT:**  Well, it's kind of addressed as a -- well,

15  frankly, by everybody as kind of an aside: oh, well, you know.

16  So I'm not sure it's fully developed in the briefs.

17         **MR. WISSNER-GROSS:**  Well, let me make a few

18  observations, Your Honor.

19         **THE COURT:**  Okay.

20         **MR. WISSNER-GROSS:**  First, I believe the predicate

21  that they used to argue that we should be made a nominal

22  defendant, in their opposition papers they argue that we have

23  title along with the Foundation.

24      Now, I would note that that's not in their complaint.  I

25  would note further that in paragraph 80 of their complaint they

1    actually say the opposite.  They contend, in paragraph 80 of

2    their complaint, that the funds that were raised are the,

3    quote, property of the Foundation.

4        There's nothing in the complaint anywhere that suggests

5    that any of the funds that were raised are the property of or

6    in any respect on a co-titled basis with Bitcoin Suisse.

7        So the argument that they make in their opposition, I

8    believe, as a predicate to argue to keep us in as a nominal

9    defendant is predicated on allegations that aren't in the

10   complaint, we think, respectfully, are false.

11       Let me try to explain.  And I think this dovetails to

12   another point I wanted to make.

13       Bitcoin Suisse's role preICO was entirely in Switzerland.

14   And, as I noted and the Bitcoin Suisse's CEO has stated in his

15   declaration, we did not take any U.S. citizens' money in the

16   ICO.  That's all that's relevant for the jurisdictional

17   analysis.

18       Post ICO, Bitcoin Suisse -- and I think this is what gets

19   to his argument on the other side as to why we should remain in

20   as a nominal defendant.  Post ICO, Bitcoin Suisse served and

21   has served as a cosignatory on the account that the Foundation

22   has.

23       And the best way to analogize that is that it's as if the

24   Foundation had a security box at a bank, or some kind of

25   security box, and there were two keys necessary to get in to

1    get to its funds.  The Foundation has one key.  Bitcoin Suisse

2    has a second key.  The assets in the account are entirely the

3    Foundation's.

4         **THE COURT:**  Is your argument there that -- I think I

5    read this in your brief, that at most those would be general

6    jurisdiction arguments and there isn't enough there?

7         I mean, because the fact that this activity took place

8    afterwards, if I'm talking about a jurisdictional analysis, I'm

9    not sure in the appropriate case it would make any difference

10   because the question is can the Court assert jurisdiction over

11   you and -- but that's then where we get into the distinction

12   between specific jurisdiction --

13        **MR. WISSNER-GROSS:**  Right.

14        **THE COURT:**  -- and general jurisdiction.

15        So your point, if I understand it correctly, is it can't

16   be a basis for a specific jurisdiction invocation.  It's really

17   going to general jurisdiction, and there isn't enough --

18        **MR. WISSNER-GROSS:**  We don't think there is

19   specific --

20        **THE COURT:**  -- is that correct?

21        **MR. WISSNER-GROSS:**  I would adopt that.  I would agree

22   with that, Your Honor.  I think there's a lack of specific

23   jurisdiction post ICO, because our conduct was 100 percent in

24   Switzerland.  And if there isn't specific jurisdiction for that

25   post ICO conduct, *a fortiari* there can't be general

1   jurisdiction.

2       In any event, for us to remain -- we're still wondering

3   why we're in the case.  For us to remain, even on a nominal

4   basis, a defendant, assuming Your Honor keeps the case here,

5   would impose huge costs, unnecessary burden.

6       My client is going to honor whatever its obligation under

7   Swiss law.  The dispute that arose post ICO did not involve us.

8   That was a dispute between others.  And my client will abide by

9   whatever ultimate determination is made, whether it be a Swiss

10  court or otherwise, as to what should happen with respect to

11  the funds.

12      But, in the meantime, we're -- we really don't belong in

13  this case.  If Your Honor ultimately keeps the case, we should

14  be dismissed on any one of these various grounds.

15      Now, if I could briefly touch on the Section 12 argument.

16  I'm not going to repeat any of the arguments that have been

17  made before.  But if anybody is not a seller, subject to *Pinter*

18  *versus Dahl*, my client is not.

19      Number one, the plaintiff does not contend that he was a

20  customer.  If he was a customer, I might have more of a

21  challenge on that.  But he doesn't claim he was a customer.  He

22  doesn't dispute what my client has contended in its

23  declaration.

24          **THE COURT:**  Again, being a customer for your purposes

25  would be to effectively be converting dollars into Bitcoin.

1      **MR. WISSNER-GROSS:**  Correct.  The currency conversion

2 role that Bitcoin Suisse played with respect to the plaintiff

3 didn't occur.

4      **THE COURT:**  Right.  If it did occur --

5      (Unreportable simultaneous colloquy.)

6      **MR. WISSNER-GROSS:**  If it did occur, we would say that

7 our role was a currency converter.  The kind of collateral

8 participant that *Pinter v. Dahl* says is the classic collateral

9 participant that should not be subject to liability under

10 Section 12.

11      So even if the plaintiff were a customer, and even if we

12 provided currency conversion services for the plaintiff,

13 there's no allegation in the complaint with respect to any

14 solicitation, let alone the demonstration of proof that the

15 other defendants have argued that under *Pinter v. Dahl* and

16 progeny you have to show a nexus between the solicitation and

17 the procurement of the sale.

18      Your Honor, unless you have any further questions, that's

19 the gist of our argument.

20      **THE COURT:**  All right.  Mr. Ta.

21      **MR. TA:**  Thank you, Your Honor.

22      Your Honor, we've alleged, at the very least, a

23 colorable -- we've made, at the very least, a colorable showing

24 that there's personal jurisdiction over Bitcoin Suisse.

25 Bitcoin Suisse provided two key financial services in

1    connection with Tezos' ICO.

2        First, it provided a currency conversion service for U.S.

3    investors who wished to invest in U.S. dollars, by converting

4    the U.S. dollars into Bitcoin and then contributing those U.S.

5    dollars on behalf of the investors -- of the Bitcoin on behalf

6    of the U.S. investors into the Tezos ICO.

7        And, secondly, it received the funds advanced by

8    investors, including U.S. investors, and is holding -- even

9    today, is holding those funds as a mandatory cosignatory.

10       Now, contrary to Counsel's suggestion that this was a post

11   ICO event, I would say that's an integral part of the ICO

12   process.

13       If you look at those financial services that it

14   provided --

15           THE COURT:  That's dependent entirely on -- and they

16   said that primarily they're dealing with non-U.S. participants,

17   but to the extent that they took some funds from U.S.

18   participants, that's all they did; right?  Did they do anything

19   else?  And then provide the conversion service.

20           MR. TA:  Those are the two bases upon which we rely.

21           THE COURT:  Right.

22           MR. TA:  And these aren't just speculative

23   allegations, Your Honor.  The framework agreement, that's a

24   document published by Bitcoin Suisse, it's on Bitcoin Suisse's

25   website.  It expressly states that, quote, for U.S. clients

1  BTC, in other words the Bitcoin rate, will be locked

2  immediately upon reception of deposit.

3        THE COURT:  Let's assume that you could get over the

4  jurisdictional issue.

5      How are they Section 12 defendants?  I mean, aren't they,

6  as counsel pointed out, aren't they kind of the classic

7  collateral participant?

8      I mean, they're providing a service.  They're not -- to

9  facilitate the transaction.  They're not involved at all in

10  selling anything.

11        MR. TA:  Well, we would say this, Your Honor.  And

12  I'll concede that the allegations against Bitcoin Suisse, in

13  terms of seller liability, are not as strong as the allegations

14  against the DLS defendants and Draper defendants.

15      One, they were financially motivated because they were

16  promoting their financial intermediary services.  And, very

17  importantly, as I said earlier, they received the funds of

18  U.S. -- of investors in the Tezos ICO, including U.S.

19  investors.

20      So it's not like they were just sitting, like a bank,

21  holding the funds.  They were a mandatory co-signatory.

22  They're as involved in the Tezos' ICO as the Foundation.

23        THE COURT:  It sounds equivalent to a bank's role to

24  me.

25      I mean, an escrow agent has to sign at various points

1    along the transaction path, but that doesn't mean they're

2    involved in the solicitation of the sale.

3         I mean, they really are functionaries, as far as I can

4    tell, in this particular proceeding.

5             MR. TA:  Again, Your Honor, we concede that the

6    allegations are not strong.  And I don't want to put it any

7    higher than what I've already said.

8         Going back to what we -- what Your Honor was asking

9    counsel, which is essentially, even if they're not sellers, at

10   the very least they should be kept in this case as nominal

11   defendants because we've established that, at the very least --

12   we made, at the very least, a colorable showing of personal

13   jurisdiction.

14            THE COURT:  You do agree that you can't keep a nominal

15   defendant in the case absent a jurisdictional basis?  Do you

16   agree with that?

17            MR. TA:  We would agree with that, Your Honor.

18            THE COURT:  All right.

19            MR. TA:  And the only evidence that they submitted was

20   a statement on their website saying that Bitcoin Suisse can no

21   longer accept U.S. clients.  That just raises a question of

22   fact.

23            THE COURT:  So the nominal defendant concept, from

24   your perspective, would come into play if I conclude that there

25   really is no basis on which to keep them in the case under your

1   theories on Section 12 and the like.  But your point being:

2   We've shown we have jurisdiction -- you, you have jurisdiction

3   over this defendant.  And this defendant needs to be there to

4   afford complete relief?

5            **MR. TA:**  Correct, Your Honor.  That's correct.

6            **THE COURT:**  All right.  Okay.

7            **MR. TA:**  Thank you, Your Honor.

8            **THE COURT:**  Anything further?

9            **MR. WISSNER-GROSS:**  Fifteen seconds, Your Honor.

10           **THE COURT:**  Go ahead.

11           **MR. WISSNER-GROSS:**  I would just note, with respect to

12   the framework agreement that counsel referenced, that in the

13   declaration of Bitcoin's CEO he specifically stated that after

14   that framework agreement was issued on their website they

15   specifically stated that they would not be able to take any

16   role on behalf of U.S. clients.  So that -- and that's

17   unrebutted.

18           **THE COURT:**  Well, but, as you acknowledge, there was a

19   point in time where U.S. clients were utilizing the service?

20           **MR. WISSNER-GROSS:**  No.  But the issue is with respect

21   to the ICO.  The ICO occurred from July 1st to the middle of

22   July.

23        With respect to the ICO itself, no U.S. citizens were

24   involved, and there was no activity on behalf of U.S. citizens

25   by Bitcoin Suisse.

1    The offering itself, to the extent it was considered an

2    offering, occurred in July.  The announcement by Bitcoin

3    Suisse, on its website, was on, I believe, June 15th, that it

4    put everyone on notice that it couldn't be involved on behalf

5    of U.S. citizens.

6        **THE COURT:**  Okay.  PreJune activities involving

7    Bitcoin Suisse, can't I look at that for purposes of

8    determining if there's specific jurisdiction?

9        **MR. WISSNER-GROSS:**  I don't think so, Your Honor,

10   because I think the issue in the case is the alleged offering

11   itself.  And that would not be relevant for purposes --

12   frankly, I'm not sure to what extent there was any dealings

13   with people in the U.S. prior to June 15th.

14       **THE COURT:**  They say there were.  They aver that.

15       **MR. WISSNER-GROSS:**  Even if they were, Your Honor,

16   what's relevant is the role in connection with the ICO itself.

17       **THE COURT:**  Well, what's relevant -- I'm not sure that

18   you can cut it that cleanly when the question is whether or not

19   I can assert jurisdiction over them.

20       I mean, I understand why it may be of particular relevance

21   on the substantive claims, but if we're going back to this idea

22   that they want you to stay in -- let's assume that I come to

23   the conclusion that you really don't have any Section 12

24   liability here, even theoretical.  So then they're saying,

25   well, keep them in as nominal a defendant.  Then my focus

1    really is on whether or not there's jurisdiction over you.

2        And the other question -- this is why I didn't think the

3    nominal defendant issue was fleshed out.  And I alluded to it

4    at the end.  They're effectively saying the only reason to keep

5    you in, it's the only way they can get complete relief in the

6    end.

7        Well, is that true?  You may have the position that that

8    wouldn't be necessary.  You kind of addressed it when you said,

9    well, we'll abide by any order of the Court.  But that's just a

10   statement of counsel, which I'm not sure I can -- so is

11   there -- are you unnecessary even if -- let's assume I could

12   assert jurisdiction over Bitcoin Suisse.  Are they right that

13   we would need you?

14       **MR. WISSNER-GROSS:**  No, no, we're not a necessary

15   party, Your Honor.

16       **THE COURT:**  Okay.

17       **MR. WISSNER-GROSS:**  Again, I would refer --

18       **THE COURT:**  That you might need to flesh out more if I

19   get there in the briefing.

20       **MR. WISSNER-GROSS:**  If we have to provide supplemental

21   briefing on this, we would be delighted to.  This issue was

22   raised in a footnote --

23       **THE COURT:**  I understand --

24       **MR. WISSNER-GROSS:**  -- in their opposition.  We

25   addressed it, I believe, briefly in our reply.

1          **THE COURT:**  Right.

2          **MR. WISSNER-GROSS:**  But in their Complaint they allege

3   that the property at issue, the funds -- and I cited to

4   paragraph 80 of the consolidated complaint -- states that the

5   funds that were raised are the funds or property of the

6   Foundation.  So there's no issue.  These are not our funds.

7          And I believe the other defendants, including the

8   Foundation, their papers have said, look, we, the Foundation,

9   are really the only necessary party.

10          To the extent that this case does stay in the

11   United States, if you're talking about an enforcement, we're

12   sitting only in the position of, essentially -- talk about like

13   a custodian, but not even really a custodian.  We're just the

14   second key holder.

15          So I don't think Your Honor needs to keep us in as a

16   nominal defendant for purposes of hypothetical enforcement

17   within Switzerland in the event the case stays here and there's

18   an issue with respect to trying to secure access to the funds.

19          But, Your Honor, if it's helpful to you on this issue, if

20   you need to reach this issue, we're happy to provide a short

21   supplemental submission fleshing out this point.

22          **THE COURT:**  Okay.  Let me ask you, before we go to the

23   Foundation, Counsel had mentioned -- and you didn't get to the

24   point of addressing it -- your alternative argument that you

25   should, in the event that I am inclined to go with Bitcoin

1    Suisse, that you say, well, at least we should do -- if reason

2    for it is jurisdiction issues, that, well, we need to take

3    jurisdictional discovery.

4        And counsel pointed out, and I agree with him, that

5    jurisdictional discovery isn't just, well, we'd like to take

6    some discovery.  It's got to be very specific.  And there's got

7    to be a showing by the party that wants to take the discovery

8    exactly what they think they can get that would -- through the

9    discovery process, that would actually be of consequence to the

10   jurisdictional analysis.

11       So what is it you think you would -- what would you

12   propose you want to do, and why would that be potentially

13   significant for a jurisdiction?

14           **MR. TA:**  So, Your Honor, we've alleged two bases for

15   personal jurisdiction.  We say that they provided currency

16   conversion services, one.  And, two, that --

17           **THE COURT:**  That's undisputed.

18           **MR. TA:**  Right.

19       And that they received the funds advanced by investors,

20   including U.S. investors, and are holding those funds right now

21   as a mandatory cosignatory.

22           **THE COURT:**  According to counsel, do you dispute that

23   that's preJune of -- ICO is July.  It's in June where they make

24   the statement, we don't want any -- we can't do anything with

25   U.S. investors?

1          **MR. TA:**  So we don't know, Your Honor, without the

2   benefit of discovery.  They've asserted that these statements

3   were done preICO.  But I would point this out, that the holding

4   of the funds, that is part of the ICO.  So we've got those two

5   alternative bases for personal jurisdiction.

6          So in response to Your Honor's question, that's where we

7   would want discovery, to show that they either did or did not

8   accept U.S. dollar investments from U.S. investors.  And,

9   secondly, to show the basis, the contractual basis and

10  contractual arrangements between them and the Tezos Foundation

11  for actually holding the funds right now, which funds, everyone

12  agrees, includes the funds of U.S. investors.

13         **THE COURT:**  Okay.

14  Let's go to the Foundation.

15         **MR. POTISCHMAN:**  Good morning, Your Honor.  Neal

16  Potischman on behalf of the Foundation.

17         **THE COURT:**  Good morning.

18         **MR. POTISCHMAN:**  Your Honor, we, in our papers, raise

19  three primary arguments: personal jurisdiction, *forum non*

20  *conveniens*, and then the extraterritorial application.

21         Would Your Honor like me to address all three?

22         **THE COURT:**  Yes.

23         **MR. POTISCHMAN:**  Thank you, Your Honor.

24         With respect to personal jurisdiction, I think the parties

25  agree on the standard.  I will not try to repeat it.

1          I confess to Your Honor that, listening to oral argument

2     today, it is confusing to understand, based on the complaint,

3     based on the briefing, and based on plaintiff counsel's

4     comments, what their theory actually is.  It sounds like alter

5     ego light.  You know, they don't plead alter ego.  They don't

6     plead agency.

7          So far at the hearing I've heard comments by plaintiffs'

8     counsel saying -- he once said that the Breitmans are agents of

9     the Foundation.  But another time he said the Foundation is

10    basically a passive entity accepting contributions.  Another

11    time he said the Foundation ceded all control.  And then in

12    response to arguments from Mr. Draper, plaintiffs' counsel

13    said, according to my notes, DLS controls the Foundation.

14         Your Honor, it's difficult to know what we're arguing

15    against here, and I don't think the complaint articulates a

16    plausible theory at least in its current incarnation.

17         The Foundation is in Switzerland.  If their theory was

18    that the Foundation was the principal and DLS was the agent, we

19    could argue about that, I suppose.

20         I think maybe that's what they think they've done by

21    saying Kathleen Breitman has said some things in the

22    United States.  But that doesn't seem to be what they're

23    arguing.  They're arguing, in essence, the opposite, which is

24    that -- at least in their briefing they repeatedly argue that

25    DLS dominates and controls the Foundation.

1          Well, the agent is not responsible for the acts of a

2     principal, Your Honor.   I think that's black letter agency law.

3     And, again, it's complicated because this isn't pleaded.

4          But, Your Honor, turning to the law a little bit, the case

5     they have, that seems to be their strongest case, they think,

6     is LDK, where you have overseas individual file a registration

7     statement with the SEC, and then there's an IPO on the New York

8     Stock Exchange.   And they say, aha, you know, this is our case.

9          And respectfully, Your Honor, it's hard to imagine a more

10    textbook case of purposeful availment than submitting a

11    registration statement to the SEC and doing a New York Stock

12    Exchange listing.

13         That is, I think, the classic specific jurisdiction sort

14    of car accident case we all studied in law school, where the

15    foreigner comes to the U.S. and hits somebody and, well, they

16    have to answer to it.

17         But that's not this case.   The Foundation didn't do that.

18    In fact, to some extent that's what the case is about.   But the

19    Foundation is very clearly in Switzerland.

20         It's clear in the terms and conditions, but let's put

21    those aside.   It's clear in the overview document, which is

22    Exhibit A to our declaration, where they repeatedly say, This

23    is a Swiss entity.   This is a Swiss entity.

24         There doesn't seem to be any ambiguity that they're

25    dealing with a Swiss entity.

1          **THE COURT:**  Yes.  Although, I'm not going to -- I

2     think it's not subject to any argument that this was carefully

3     constructed, perhaps for this precise reason, that we have this

4     Swiss entity functioning as you suggest.

5          But is it really fair, stepping back, to say -- to

6     compartmentalize this in the fashion that you're hoping I will

7     compartmentalize it, which is, you know, the Breitmans and DLS

8     launch this.  They're the brains behind this whole concept.

9          And we then find a Swiss Foundation doing the actual

10     activity, and I am to just put blinders on and look at these

11     two entities as completely separate, and there we are.  And

12     even though the Foundation is no doubt hoping to get donations

13     from United States participants, that's not enough to hold --

14     assert jurisdiction over them.

15          Now, I appreciate your argument because I was asking

16     questions along these lines.  It is important to know, what is

17     the theory?  How are they connected?  Is that adequately

18     fleshed out in the complaint?  And those are all legitimate

19     points for you to make.

20          But my question is a little different.  And perhaps your

21     answer is it doesn't matter because they've got to fall into

22     these particular component parts to be able to connect the two.

23          But stepping back, the two are connected, aren't they?  I

24     mean, it would be a little strange to say, oh, they launched

25     the Tezos Foundation, and now they're not involved directly.

1   The Tezos Foundation is doing the soliciting for the donations,

2   and you don't have any jurisdiction over it.

3           **MR. POTISCHMAN:**  Your Honor, I'm with you up until the

4   last point.

5       Let's assume that there was close coordination between the

6   Breitmans and DLS and the Foundation in the lead-up.

7       I think -- I would start from the premise, Your Honor, how

8   different is that from creators of an idea deciding to

9   incorporate in Delaware and say, you know, we believe that the

10  best place for us to be is Delaware.  We want Delaware rules

11  and law to apply to us.  And potentially even have a foreign

12  selection clause in the governing documents so that if there's

13  a dispute it will be resolved in Delaware.  I don't think

14  anybody thinks that that is suspicious or sketchy in the least.

15      But I do think there's a sense, and they would like there

16  to be a sense from their papers, that suggesting that somebody

17  might have to go to Switzerland to deal with these people,

18  there's something nefarious or tricky about that.

19      And I don't think that is.  I don't think it's any

20  different from choosing Delaware as your forum.  They made an

21  affirmative decision to set up a Swiss Foundation.  They were

22  absolutely transparent about that.

23           **THE COURT:**  Let me ask you --

24           **MR. POTISCHMAN:**  Yes.

25           **THE COURT:**  -- let's just put aside DLS and the

1    Breitmans for a moment.

2        The Tezos Foundation, is it fair to say they do seek

3    participants in the United States?  We have this Mr. Kenyon,

4    and I know your argument as to why he's not an agent to the

5    Foundation and all that.  But even put him aside.

6        Just as a general proposition, isn't the Tezos Foundation

7    actively seeking, in whatever form it may be seeking, U.S.

8    participation in the program?

9            **MR. POTISCHMAN:**  I don't mean to quibble.  What I

10   would say is the Foundation is seeking contributions from

11   anyone worldwide who is interested.  And that includes the

12   United States.  But it is not targeting the United States.

13           **THE COURT:**  Well, how can they simply sit there --

14   that's an important point you make.  Well, they -- it's a wing

15   and a prayer.  They hope U.S. investors/donators will come

16   forward, but they're not really asking them to do it.  That's

17   an awfully fine point at a motion to dismiss stage.

18       I can understand, maybe, an ultimate argument that, We're

19   making ourselves available in Zug, Switzerland, and we build it

20   and they will come.  Okay.  But, in reality, a good chunk of

21   investors are going to come from the United States if things

22   work out as they want it to work out.  And isn't it a pretty

23   fine point to say, But they're not actively seeking that?

24           **MR. POTISCHMAN:**  Your Honor, I think it's distinction,

25   though, that has -- that is grounded in the case law.  It's not

1   grounded in counsel's sophistry or an attempt to be

2   argumentative.

3        I mean, the cases draw a distinction between an

4   interactive website where, let's say, somebody placing an order

5   says, "I'm located in Los Angeles, California," where maybe the

6   website has put up a California privacy policy to comply with

7   California law.

8        Those things suggest something more, that there is, in

9   fact, intentional targeting.  And those are -- I mean, that's

10  the *Calder* case at the Supreme Court level.  I think, also, the

11  *DFSB Collective* case.

12       But you do -- our contention is, Your Honor, that as a

13  legal matter you actually do need something more than just

14  knowledge that people in the U.S. may choose to contribute.

15  You need to have targeted them.  And that is what they do not

16  have from the Foundation.  They may think they have it against

17  other defendants, but they don't have it for us.

18       I would also refer to the *Azzarello* case cited in our

19  papers.

20            **THE COURT:**  Why don't we move to *forum non conveniens*.

21            **MR. POTISCHMAN:**  Yes, Your Honor.

22       Your Honor, paragraph 48 of the Terms and Conditions is

23  abundantly clear.  And it doesn't seem like there's any dispute

24  that if paragraph 48 controls, this case should be in

25  Switzerland.  It says the applicable law is Swiss.  And it says

1    any dispute that's arising out of, sort of, anything is going

2    to be settled in the courts of Zug.

3         **THE COURT:**  So the big dispute seems to be, if we ever

4    get to it, is Mr. Anvari expected to somehow -- is it

5    reasonable to conclude that he would focus on that aspect of

6    the contribution agreement?

7         **MR. POTISCHMAN:**  I think there's -- I think there's

8    three issues at least.

9         One is, did he -- did he see the terms?  And he doesn't

10   allege that he didn't see the terms.  And he didn't put in a

11   declaration saying he didn't see the terms.

12        **THE COURT:**  And what is the basis for concluding that

13   I should give the presumption in the absence of that why --

14   your argument seems to be I should assume that he is

15   effectively saying he did see the terms by not affirmatively

16   saying he didn't.

17        Where is the proposition that I make that assumption in

18   your favor when, on a motion to dismiss just as a general

19   matter, most of the presumptions go to the plaintiff?

20        **MR. POTISCHMAN:**  Your Honor, I think it's because if

21   you look at, let's say, the *Nguyen* case, N-g-u-y-e-n, it's very

22   clear that the first thing -- to us it was the first thing that

23   the courts look to is, did the person have actual notice?

24   Okay.  Because if they had actual notice everything else falls

25   away.  It's not a question of the shading of a hyperlink or

1    whatever appeared on the page.  They knew.

2        And in that regard, we have a lawyer as the lead plaintiff

3    investing in a new crypto currency, in his words, contributing

4    to a Swiss Foundation, in our words, with the hope of possibly

5    getting tokens one day down the road.  And we think it's

6    utterly implausible that he didn't read them.

7        It's in that backdrop that I think --

8        **THE COURT:**  Well, except they've given me all the

9    reasons why -- and I know you profoundly disagree with this --

10   that effectively it's hidden in reality, because there's the

11   absence of hyperlink, and the like, and those sort of

12   arguments.  They wouldn't be making those arguments, in some

13   ways, if at the end of the day Mr. Anvari saw it anyway.

14       Now, at the very least, where your argument leads is they

15   would have, if they wanted it, an opportunity to amend.

16   Because if, in fact, they could aver that he didn't see it,

17   then that kind of ends that argument.

18       **MR. POTISCHMAN:**  It may, Your Honor.

19       I mean, Judge Alsup, in the *Doe versus Xytex*, X-y-t-e-x,

20   case in 2016, he granted discovery to the defendants on this

21   issue because it was -- in his view, it was unclear and felt

22   the plaintiff had to sort of own it.  Did the plaintiff read

23   the terms or not read the terms?  And so he allowed a

24   deposition and, I believe, limited document discovery.

25       That's certainly one way this could go, and we be allowed

 1    to take Mr. Anvari's deposition limited to this issue.

 2        But I think the actuality is the first question.  Did he

 3    review it?  We don't know, from the record, whether he did or

 4    he didn't.  We think it's implausible that he didn't, but we

 5    don't know.

 6        The next is, was it conspicuous?  Was it out there?  And

 7    we concede, Your Honor, this is a different case from a lot of

 8    the cases that are there, where you have an incorporation by

 9    reference issue.  But this isn't an incorporation by reference

10    case. Certainly not in our view.

11        There are two websites.  There's tezos.com and tezos.ch.

12    The terms are prominently displayed on tezos.ch.  There doesn't

13    seem to be a dispute about that.  So if he's on notice of

14    those, they are prominently there.

15        I don't want to repeat what's in our briefing, Your Honor,

16    but direct you to the fact that the Foundation, in addition to

17    putting these on that website, in addition to referring in the

18    overview document that he said he saw, to the fact that around

19    the contribution there's going to be a legal document coming

20    out, in addition to that they posted them on Twitter, which I

21    think in this day and age it's inconceivable to us that a

22    contributor, and again a sophisticated contributor, would not

23    be monitoring the Twitter feed before he sent in $50,000 of

24    ether.

25        Mr. Anvari refers in his complaint to discussion forums

1  that he says are popular.  The Gehring declaration, Exhibit H,

2  in Bitcoin Talk, one of the forums that he says is popular,

3  they're talking about the terms.  And there's multiple

4  references to Tezos.ch.  He refers to Reddit as being a popular

5  forum --

6          THE COURT:  I take it there's no discussion about the

7  forum selection clause, presumably.

8          MR. POTISCHMAN:  There isn't, Your Honor.  But I have

9  to say, I don't think plaintiff has alleged that this term was

10  buried.

11      This is not a -- I'm not suggesting it would be relevant

12  if it was, but this is not a 200-page document with six-point

13  font.  There's a relatively limited number of terms.  It's a

14  readable document, and it's clearly displayed.

15      So Gehring declaration, Exhibit G, the terms are posted

16  there and discussed as well.

17      So, Your Honor, if the test, as referred to in *Nguyen*, is

18  what a reasonably prudent user would do, what does a reasonably

19  prudent person do the first time they invest $50,000 in a new

20  crypto currency offering being run by a Swiss entity -- and

21  I'll also say again, the lawyer, we'll put it aside -- you

22  would think you would want to know the rules.

23      He doesn't say what rules he thought were operative.

24  Where are the rules that he thought was going to govern this?

25  Those are the rules.

1    **THE COURT:**  Again, though, this is a very, as you

2    know, very actively litigated area.  I have a case now where

3    there was a question about a pop-up that obscured an agreement,

4    the arbitration issue which comes up constantly.  And I'm going

5    to have to have an evidentiary hearing on that question, what

6    could be seen and what couldn't be seen and the like.

7        On a motion to dismiss, to determine this question about

8    how conspicuous the term was, and that kind of thing, is kind

9    of a tall order.

10       Now, I understand if it's a *forum non conveniens* argument

11   it needs to be resolved early because you don't want to

12   litigate a case for a long time and then send it off.

13       But it troubles me that it's, you know, a pretty

14   fact-specific question as to the conspicuous nature of this

15   provision.

16       **MR. POTISCHMAN:**  Your Honor, I don't disagree that

17   there appear to be facts there.  But I also fully agree with

18   Your Honor that it does need to be addressed as a threshold

19   matter.

20       And, again, without retreading the personal jurisdiction

21   ground, Mr. Anvari quite intentionally and knowingly decided to

22   deal with a Swiss entity.  It's clear throughout everything

23   that that's the way that this has been structured, is with a

24   Swiss entity.

25       The terms, which again are the only terms that anybody

1   seems to think govern this, make clear it's a Swiss entity.

2   And they make clear that there's a forum selection clause in

3   Switzerland.  We think, Your Honor, even if you don't have the

4   terms there is a basis under the *forum non conveniens* case law

5   to transfer this.

6          **THE COURT:**  At that point, though -- I mean, I

7   understand that you have the alternative argument that even if

8   the browsewrap isn't applicable here, that is sort of a -- it's

9   akin to a 1404 type of transfer set of factors.

10      And that's, again using the expression I used before, a

11  tall order.  If you don't have the benefit of the browsewrap

12  argument, just a straight *forum non conveniens*, send this to

13  Switzerland, you know, I think there are reasons why it could

14  be litigated in Switzerland.  But I don't think it's very

15  strong to send it off absent that argument.

16         **MR. POTISCHMAN:**  Then heeding Your Honor's advice,

17  we'll submit on that portion of it and not argue it.

18         **THE COURT:**  So now we go to extraterritoriality.

19         **MR. POTISCHMAN:**  Yes.

20      So, Your Honor, again, the parties don't seem to disagree

21  on the legal standard.  And since the briefing was completed on

22  July 17th, the Ninth Circuit issued a decision in *Auto*

23  *Industries Pensions versus Toshiba*, that makes clear that

24  courts in this circuit follow *Absolute Activist*.  So at least I

25  think everybody is clear that we're in the land of *Absolute*

1     *Activist.*

2       So the cases indicate that the question is not where the

3     plaintiff is domiciled, no matter how many times it gets

4     repeated.  It doesn't matter where he lives.  It has to do with

5     where irrevocable liability attaches.

6       The case that they rely on most strongly, I think, *Myun-Uk*

7     *Choi versus Tower* is distinguishable.  There you had traders

8     placing trades overnight in the U.S., and they got matched in

9     the U.S.  And the exchange rules which the Court considered in

10     trying to figure out the reality of the situation concluded

11     once the traders were matched they had a contract and they had

12     to live with it.  It wasn't filled until the next day in Korea,

13     but the Court said, once it's matched, you've got irrevocable

14     liability to each other.

15       That's not this case.  And there's a few different

16     reasons.  And I think our arguments -- there's a few different

17     ways to get there.  One, again, the terms themselves make clear

18     how this is going to work.  And they make clear that the

19     transaction is being completed overseas.

20       Okay.  But let's put aside that specific portion of the

21     terms for right now.

22       **THE COURT:**  Is it the same -- is the transaction being

23     completed and the irrevocable liability the same in this case?

24     That's where this particular world seems to make it more

25     complicated.

1          I mean, ministerially, there may be completion of the

2     activity elsewhere, but their point seems to be the moment of

3     truth is because of the computing power in the United States,

4     that's where it's going to happen.

5               MR. POTISCHMAN:  Yeah.

6               THE COURT:  And it's an elusive concept to somebody at

7     my stage of the game, so I'm trying to wrestle with that.

8               MR. POTISCHMAN:  Understood, Your Honor.

9          Your Honor, I think -- their position seems to be that at

10    tezos.com, when you click "OK" right then and there, there is

11    irrevocable liability in both directions.

12         I think that is clearly wrong, according to what's in the

13    record already.  And there's a couple of different reasons for

14    that.

15         One, it's very clear that the Foundation only agreed to

16    make a recommendation to the community, okay.  They didn't

17    say -- they want to call it an ICO.  We don't agree with the

18    term, but they're saying you contribute a dollar, you get ten

19    tokens.

20         This was not a case where in July you contributed a dollar

21    and then you got ten tokens bounced into your box.  In fact, to

22    the extent it happened at all, it didn't happen for months.

23    The beta net of this platform just actually launched at the end

24    of June, okay.

25         So to the extent that people were going to be getting

1    tokens, the argument that there was irrevocable liability when

2    you clicked "OK" to give you a token, I don't think is borne

3    out by the facts at all.

4        Moreover, as I said, the Foundation never said, If you

5    give me a dollar, I'll give you ten tokens.  They said, We'll

6    make a recommendation to the community.

7        And, again, put aside the terms.  That's in the overview

8    document --

9            THE COURT:  Your money, though, is not coming back to

10   you.

11           MR. POTISCHMAN:  That's correct.

12           THE COURT:  Your Bitcoin, under your theory or

13   whatever.

14           MR. POTISCHMAN:  That's correct, Your Honor.  It was a

15   one-way street in terms of the contribution.  But a couple of

16   points on that.

17       First of all, the cases *MVP Asset Management* and *Cascade*

18   both deal, I would say, with noncrypto but closely analogous

19   idea where once you send your check, you don't have a right to

20   get your check back, but the recipient has to decide what to do

21   with it.

22       And we think this case falls squarely within that type of

23   authority.  But the Foundation still had to do something once

24   you clicked "okay."

25       But beyond the terms, which we think are controlling and

 1    dispositive, Your Honor, I really don't mean to minimize them,

 2    the complaint itself, in paragraph 58 -- and Mr. Ta referred to

 3    this paragraph in earlier argument -- it's a discussion of what

 4    Arthur Breitman supposedly said on July 4th, during this what

 5    they want to call an ICO.  And I don't want to read it back

 6    into the record, but it refers to exactly what the terms say is

 7    supposed to happen, which is you click "OK" and then something

 8    else has to happen.

 9        What has to happen is the Foundation computer systems have

10    to figure out what you have contributed or what you tried to

11    contribute.  So they have to go look at the blockchains.  They

12    have to look at Bitcoin.  They have to look at ether and make

13    sense of it.

14        **THE COURT:**  I guess the challenge for me is, is all of

15    that, that you've just described, sort of a ministerial act?

16    Because the die is cast one way or another, and then you are

17    cleaning it up, if you will.  Or is it indicative of a

18    transaction that still has elements that need to be ironed out?

19        **MR. POTISCHMAN:**  Well, Your Honor, I think very

20    clearly, again for numerous reasons, including what I said

21    before, that there, in fact, was no response with coins at that

22    time.  I don't think it is a -- I don't think there was

23    irrevocable liability the moment you click "okay."

24        And I do think the only time you could have irrevocable

25    liability is once the Foundation's computer systems effectively

1  decide, here's what we're going to do with this, here's what

2  we're going to do with this attempt.

3       And, again, now going back to the terms briefly, it's very

4  clear that that computer system is located in Europe, which is

5  not surprising for a Swiss Foundation.  And so we don't think

6  irrevocable liability could attach.

7            THE COURT:  This is where we get to throw in the

8  Channel Islands -- right? -- because Alderney is where this is.

9            MR. POTISCHMAN:  That is one of the places.

10           THE COURT:  Yeah.

11           MR. POTISCHMAN:  The developers are in France.  But

12 Alderney does come up a few times, Your Honor.

13           THE COURT:  I would be happy to visit all these

14 places, by the way, if you would like me to go on the field

15 trip.

16      (Laughter)

17           THE COURT:  Go ahead.

18           MR. POTISCHMAN:  Yeah.  Maybe we should see if we can

19 get an expert there.

20      So, Your Honor, we think that to the extent that you've

21 ever had acceptance by the Foundation and creation of

22 irrevocable liability it happened over in Europe.  We think,

23 again, paragraph 58 of the complaint supports that view.

24           THE COURT:  Okay.  I think we're getting close to the

25 end, but I'll check with the court reporter.

1      (Discussion held off the record.)

2          **MR. TA:**  Thank you, Your Honor.  What I propose to do

3   is address personal jurisdiction, *Morrison*.  And then my

4   co-counsel, Mr. Liang, will address *forum non conveniens*.

5          **THE COURT:**  Okay.

6          **MR. TA:**  Your Honor, the Tezos ICO had numerous -- the

7   Tezos Foundation had numerous points of contact with the

8   United States.

9          And Your Honor asked the correct question, which is,

10  putting aside whatever the DLS and the Breitmans did, what did

11  the Tezos Foundation do in this case?

12         Here they projected themselves into the United States with

13  an interactive website, and they received investments from

14  thousands of U.S. investors.

15         And to adopt what the court said in *Zippo*, which has been

16  endorsed by the Ninth Circuit, you can't project yourself into

17  a forum and repeatedly and consciously choose to take

18  applications from the residents of a forum state.

19         If you chose to conduct business with those residents,

20  you're on clear notice that you are subject to jurisdiction in

21  that state.  So -- in that forum.

22         So I think that pretty much answers the question in terms

23  of personal jurisdiction.

24         We have cited cases where foreign defendants who took

25  sales as little 0.02 percent of their sales from a forum were

1    held to be subject to personal jurisdiction.

2         In *Zippo*, it was 2 percent of their sales, and they were

3    held to be subject to personal jurisdiction in the Western

4    District of Pennsylvania.

5         So I think that the interactive website compels the

6    conclusion that there was a purposeful availment of the laws

7    and benefits of the United States.

8         But apart from that, we have all these other factors.  We

9    have the factor that DLS, which was the actual business being

10   ICO'd, is a Delaware corporation headquartered here in Mountain

11   View.  We've said that the Breitmans and DLS --

12        **THE COURT:**  I think your stronger argument is the one

13   you just covered.  Because to the extent you are trying to use

14   DLS as your basis for jurisdiction over Tezos I do have a

15   problem with the fact that you haven't articulated a -- haven't

16   identified what the theory is.  Is it alter ego?  Is it agent?

17   What is it?  And that's a problem if DLS is critical to your

18   jurisdiction point.

19        Your point a moment ago is you don't think it is critical.

20   And I understand that argument.  But I have some trouble with

21   the idea that DLS's activities can simply somehow be ascribed

22   to Tezos Foundation for purposes of the jurisdictional

23   analysis.

24        **MR. TA:**  Well, it's DLS and the Breitmans, Your Honor.

25        **THE COURT:**  Right.

1          **MR. TA:**  And what we're saying that for purposes of

2     the ICO -- I want this to be absolutely clear.  For purposes of

3     the ICO, they were acting as the agents.  We've alleged that

4     they were closely affiliated, that they jointly conducted the

5     Tezos ICO.

6          **THE COURT:**  Do you think that the complaint, in

7     fairness right now, makes a specific agency allegation?

8          **MR. TA:**  I think so, Your Honor.

9          **THE COURT:**  Where is it in the complaint?

10         **MR. TA:**  I think so, Your Honor, for these reasons.

11    What we've alleged is that the -- the DLS and the Breitmans

12    created Tezos Foundation for purposes of conducting the ICO,

13    that they went out and marketed the ICO.

14        We've quoted Kathleen Breitman saying that, "I'm the

15    one-woman band conducting this ICO, and I hope that the Tezos

16    Foundation takes over the responsibilities after the ICO."

17    Right?

18        And the Breitmans, when they're on Reddit, when they're on

19    all these other social media, they're talking about themselves

20    as the sellers.

21         **THE COURT:**  So the Tezos Foundation makes the point in

22    their reply brief -- which I think is a good point, so I want

23    to give you an opportunity to respond to it -- to the extent

24    you're analyzing this as a sort of parent, if it's a parent

25    subtype situation, i.e., the DLS-Breitman folks are the parent,

1  jurisdiction over the subsidiary can't be based on the parent's

2  activities.

3      The reverse may be true, but it's not true -- if Tezos

4  Foundation is, indeed, simply the operation subsidiary in

5  Switzerland, you wouldn't necessarily, in fact, you wouldn't

6  ascribe the activities of the parent in the United States to

7  get jurisdiction over an international subsidiary.

8          **MR. TA:**  Well, we actually argued it the reverse, Your

9  Honor, in our brief.  We said that the Tezos Foundation, as the

10  issuer, is in a sense like the parent in --

11          **THE COURT:**  How so?  At the same time you say this is

12  all a creation of DLS and the Breitmans.

13      So, I mean, you can't have it both ways.  Are you

14  effectively saying now, they may have launched it, but now the

15  Tezos Foundation is in the position of the parent, and DLS and

16  the Breitmans are in the position of a subsidiary?

17      I mean, if you're even arguing that.  That's where it gets

18  very murky, because I'm not clear what -- this DLS-Breitman

19  slash Tezos Foundation relationship seems to be quite murky in

20  your complaint.

21          **MR. TA:**  Well, we're saying that they were the agents,

22  Your Honor.  And at the same time -- for purposes of personal

23  jurisdiction.  At the same time we're saying that the Breitmans

24  controlled the Foundation for purposes of Section 15 liability.

25  Maybe that's where the confusion arises.

1      **THE COURT:**  Well, if that's true, isn't that usually

2  indicative of parent sub?  That's why they made that argument.

3      **MR. TA:**  Well, I don't think the two are mutually --

4  are mutually exclusive, Your Honor, because here you have the

5  Breitmans controlling the Foundation.

6      But that's not -- but that doesn't preclude the -- a

7  situation where the Breitmans are going out and marketing the

8  ICO on behalf of the Tezos Foundation.

9      In fact, that would -- you would think that that's what

10  they're doing.  They set up the foundation to issue the tokens,

11  and at the same time they're going to go out there and market

12  the ICO on behalf of the Tezos Foundation and, really, on

13  behalf of themselves.

14      So even if the -- I think it's plausibly alleged in our

15  complaint that there was some sort of agency relationship.

16  Because if you look at the facts, they marketed the ICO and

17  then they executed the ICO, Your Honor.

18      It wasn't the Tezos Foundation manning the computers and

19  answering questions from people when there were database

20  questions.  It was Arthur Breitman, located in California,

21  doing that.

22      So for all those reasons, we have a lot of contacts

23  between the Tezos Foundation directly and through their agents,

24  DLS and the Breitmans, with the United States.

25      **THE COURT:**  Before you go to *forum non conveniens* and

extraterritoriality, let me ask kind of a basic question.  And

it's the last one on jurisdiction because I do want to move to

those other issues with you.

    You know, let's assume for a moment that when this was all

constructed at the beginning it was constructed with, in part,

the intent that the Swiss entity was going to be able to

operate and not be subject to U.S. jurisdiction.  Is there

anything wrong with that?

        **MR. TA:**  There's --

        **THE COURT:**  I mean, in and of itself, if right from

the get-go the grand design was that there would be a -- the

operation of the functioning entity that was going to do all

this is going to be a Swiss entity, and we're doing it

precisely -- let's say there's evidence that those involved in

it said, We want to set it up in Switzerland so the U.S. courts

have nothing to do with this activity.  That, in and of itself,

is there anything wrong with that?

        **MR. TA:**  There's nothing wrong in and of itself with

that.

        **THE COURT:**  Okay.

        **MR. TA:**  The problem is though, Your Honor, is if you

start taking investments from U.S. investors.  That's the

problem here.  And that's what the court in *Zippo* said.  This

is not a situation where you can say, Oh, it was really the

fault of the U.S. investors for seeking us out.

1      **THE COURT:**  You're saying the intent doesn't matter;

2    it's just whether or not they did it in a way that works.  And

3    you said it doesn't work because the Tezos Foundation is

4    placing itself back into the United States by virtue of it's --

5          **MR. TA:**  Correct.  That's correct.

6          **THE COURT:**  Okay.  Let's go to *forum non conveniens*

7    and the browsewrap issue.

8          **MR. TA:**  Do you want me to address *Morrison* first?

9          **THE COURT:**  You're doing extraterritoriality?

10         **MR. TA:**  Yes.

11         **THE COURT:**  Why don't you go ahead, while you're

12   standing there, and do extraterritoriality.

13         **MR. TA:**  So, Your Honor, in terms of *Morrison*, I think

14   the parties have all agreed the test in *Absolute Activist*

15   applies.

16       So the question there, as expressed by the Second Circuit,

17   is whether irrevocable liability was incurred by the purchaser

18   to take or pay for the security.  And Your Honor touched on

19   this issue earlier.

20       Is there an extra step that has to be taken once an

21   investor pressed the "Send" button, typed in the amount of

22   tokens that -- typed in the amount of the Ethereum and Bitcoin

23   it wanted to invest, received a promised amount of Tezos's

24   tokens, and pressed the "send" button?

25       We say that at that point they incurred irrevocable

1   liability to pay, because they could not unilaterally revoke

2   that transaction.  Once they pressed the "send" button the --

3          THE COURT:  Even though you acknowledge that the

4   transaction, if you will, writ large, has a ways to go?

5          MR. TA:  I wouldn't even say that, Your Honor.

6          THE COURT:  Okay.

7          MR. TA:  I don't think there is any ways to go.  And

8   that is the point: there is no further step.

9          If you look at the *Choi* case that we cited, which is the

10   overnight market, the Second Circuit there distinguished

11   between what is the point where the purchaser is unable to

12   unilaterally revoke the transaction -- in other words, get a

13   refund -- and what is the point where the transaction gets

14   settled?

15          THE COURT:  Right.

16          MR. TA:  We don't care about the settlement.  The

17   question is, when is the purchaser precluded from obtaining the

18   refund?  And by their own documents --

19          THE COURT:  And that occurs in the United States

20   because why?

21          MR. TA:  Numerous reasons, Your Honor.  The first

22   reason is, as we said, we have to remember that these

23   transactions, these are a new type -- it's a new type of

24   paradigm where it's not going to be the same as the traditional

25   certificate of securities, handing it over.

1      These are transactions that are entirely digital.  They're

2  being recorded on the blockchains.  The Tezos Foundation, their

3  own statements say that these transactions are being recorded

4  on the blockchains.  So what does that mean when these

5  transactions are being recorded on the blockchains?

6      **THE COURT:**  What that means from the Tezos Foundation

7  argument is that, effectively, to go your way means that I'm

8  concluding that every transaction that is involving this brave

9  new world is going to be subject to the U.S. securities laws.

10  No matter what the circumstances are, almost invariably,

11  without exception, U.S. securities laws will be deemed to be

12  applicable.

13      And that, they tell me, is one reason why this is

14  problematic.  So why isn't that something I should be concerned

15  about?

16      **MR. TA:**  Well, that may be a consequence, Your Honor,

17  but there are additional factors here apart from the recording

18  of the blockchain.

19      We've got here the fact that the interactive website that

20  was used by investors to make the contribution was hosted on a

21  server in Phoenix, Arizona, in the United States.

22      We have here the fact that we had thousands of U.S.

23  investors making the investments.

24      We have the fact here that the ICO was executed -- and

25  that's important, the fact that of the two weeks it was Arthur

```
 1    Breitman in California executing this ICO.

 2         THE COURT:  So it's your position, if we didn't have

 3    those factors, and all we had was the moment of clicking on,

 4    and your position that that transaction, where, under your

 5    theory you're becoming irrevocably liable, that the

 6    United States happens to be where this digital activity is

 7    happening, if that was all we had, we didn't have these

 8    other -- you know, the server in Arizona and all the other

 9    things you just recited, would that be enough?

10         MR. TA:  I think so, Your Honor.  I think the fact

11    that you've got these transactions being recorded on the

12    blockchains -- as I said, this is a new paradigm.

13         And the consequence may be that it brings in a lot of

14    transactions that a layperson would look at and say this is

15    kind of international.  But the fact that these are being

16    recorded in the blockchains, the United States has the largest

17    number of nodes or computers that underline the Ethereum and

18    Bitcoin blockchains.

19         And, frankly, defense counsel hasn't offered an

20    alternative.  If these transactions aren't U.S. transactions,

21    where are they?  Where are they located?  Is this going to be

22    in the ether somewhere, where no court has any jurisdiction?

23         THE COURT:  In part, they say this one could be

24    litigated in Switzerland.

25         MR. TA:  Well, that's based on their construction of
```

1    the contribution terms which, as my co-counsel would say, are

2    not legally enforceable --

3            THE COURT:   Well, they could be litigated in the

4    Channel Islands.

5            MR. TA:   Again, that's based on their assertion that

6    this is -- all their contributions software is located in

7    Alderney.   And, as we pointed out, that doesn't mean anything.

8        The contribution software, you look at the statements that

9    they -- you look at their own statements about what the

10   function of this contribution software is, it's a mysterial

11   post liability, post irrevocable liability transaction.

12       Let me find you the quote, Your Honor.

13           THE COURT:   No, I understand that point.

14       But going back for a moment to whether or not this is

15   all-encompassing, in this case the U.S. securities laws

16   applies, then it would apply anytime you're involved with this

17   kind of activity your argument, I thought, was, well, you still

18   need jurisdiction over the defendants.

19       The problem with that is, it's entirely circular because

20   under your theory you get jurisdiction because this is where

21   all the activity is going on and, therefore, it's purposeful

22   direction and, therefore, you've got jurisdiction.

23       So that doesn't provide any sort of basis, from what I can

24   tell, to limit the scope of the application of the securities

25   laws.

1          **MR. TA:**  I'm not sure I follow Your Honor on the

2    circular --

3          **THE COURT:**  Well, maybe I'm suggesting an argument you

4    didn't make.

5      I thought you said in part response to this concern of, oh

6    my god, you're going to be saying that U.S. securities laws

7    apply to every transaction.  And I thought one of your

8    arguments pushing back on that was, well, one of the reasons

9    that's not a concern is you still need to be in position to

10   assert jurisdiction over a defendant.  You have to have

11   personal jurisdiction over a defendant.

12     I thought you had made that argument.  And my concern

13   about that is, I'm not sure there would ever be a circumstance,

14   if I accept the basic application of the securities laws, that

15   there wouldn't be, in your theory, personal jurisdiction.

16         **MR. TA:**  I should clarify.

17         **THE COURT:**  Do you understand what I'm asking?

18         **MR. TA:**  Yes, I understand your questions, Your Honor.

19     And I'm not suggesting that personal jurisdiction supplies

20   the criteria for the *Morrison* analysis.

21     What I'm saying is that you have here -- the reason these

22   are U.S. domestic transactions is -- apart from the fact that

23   they've been recorded on the blockchains, you have all these

24   other factors.

25     Remember what the court says, the Second Circuit says in

1    *Absolute Activist*.  You look at wherever the contract is

2    exchanged, what steps were taken, and the rest of it.

3         And here all the steps, nearly all the steps were taken in

4    the United States.  So apart from the recording of the

5    transactions on the blockchains, you have the ICO being

6    executed in the United States.  You have the interactive

7    website, the portal, the digital interface between investors

8    and purchasers.  That's located in the United States.

9         You have the marketing.  They've admitted in their own

10   public statements, all the marketing, almost all the marketing

11   was done in the United States.

12        You combine all those factors, it suggests irrevocable

13   liability was incurred in the United States.  And I really

14   can't find an alternative for -- for -- an alternative

15   jurisdiction.

16        **THE COURT:**  Well, I'm not sure if, you know, that idea

17   that there must be an alternative venue is a little different

18   than the question of whether or not U.S. securities laws should

19   apply.

20        I mean, you know, it isn't, well, they apply if you can't

21   find any other place, any other set of securities laws to

22   apply.  That is not necessarily so.

23        We have to focus just on whether or not it is appropriate

24   for U.S. securities laws to be in play for these transactions

25   or not.

1          MR. TA:  I agree with that statement, Your Honor.

2          THE COURT:  Okay.

3          MR. TA:  The only point I was making was that, really,

4   if you boil all this down, the U.S. is going to be the closest

5   jurisdiction in terms of the steps that were taken, all the

6   different things that went towards the incurrence of

7   irrevocable liability.

8          THE COURT:  Your colleague is going to talk about

9   *forum non conveniens*?

10         MR. TA:  Yes, Your Honor.  Thank you.

11         THE COURT:  Then I'll give the defendants one last go

12  at it, and then we'll call it a day.

13      Go ahead.

14         MR. LIANG:  Thank you, Your Honor.  And I'll just

15  address the contribution terms that the forum selection --

16         THE COURT:  The browsewrap issue.

17         MR. LIANG:  Right.

18         THE COURT:  Go ahead.

19         MR. LIANG:  It would be our position that those terms,

20  as a matter of law, are not enforceable.

21      So you don't have to ask Mr. Anvari what he knew or what

22  he thought with respect to those terms.  And the reason why is

23  because it's undisputed that those terms are entirely separate

24  from and divorced and not referenced at all by the contribution

25  website and the process in which contributions are made.

1          **THE COURT:**  So if Mr. Anvari did, in fact, see it,

2     wouldn't that defeat his claim?

3          I mean, whether or not -- you're saying as a matter of law

4     the term is invalid and, therefore, even if he saw it, and even

5     if he read the provision that says the forum for disputes is

6     Switzerland, it wouldn't matter.  Is that true?

7          **MR. LIANG:**  That is true, Your Honor.

8          And I think what we have to recognize is that that

9     website, the terms exist on an entirely external source, untied

10    and unlinked and untethered in any way to the contribution

11    process.

12         **THE COURT:**  Wouldn't it be the plaintiff -- it

13    wouldn't mean that there would be no claim.  It would mean that

14    you have the wrong plaintiff effectively.

15         That if a plaintiff did actually see it, despite all of

16    its problems, despite the fact, accepting your view, that it's

17    obscured from view effectively, but if he does see it, then

18    he's just -- there may be a claim of another plaintiff but not

19    this plaintiff, isn't that a problem?

20         **MR. LIANG:**  Well, Your Honor, what I would say to that

21    is, as soon as you recognize that it's an external source then

22    a whole body of law kicks in.  And that is incorporation by

23    reference.

24         Essentially, what defendants are trying to do is they're

25    trying to take an external document, another set of terms, and

1   apply it to the contribution website.  Doesn't reference it at

2   all.  And the contribution process doesn't reference those

3   terms at all.

4       And as soon as you do that, that body of law kicks in and

5   says there has to be a clear reference on the website, in the

6   contract, that refers the parties to that set of terms.  Even

7   when the other party is aware of that external document and

8   aware of those external terms, that's not enough.  An express

9   incorporation is still required.

10      And I think the principle that this goes to is an

11  objective manifestation of assent.  Courts look at --

12          THE COURT:  Your argument is that it's effectively an

13  unconscionable provision and, therefore, it can't apply to

14  anybody.

15          MR. LIANG:  Well, I guess my argument is that you

16  can't look to the subjective actions of parties or the

17  subjective beliefs or thoughts or knowledge that they gain from

18  external sources.  Courts have to look at the contract itself

19  and the objective manifestations of assent that contract

20  evidences.

21      So the classic example is, I sign a contract.  And the

22  courts say, that signature is a clear objective manifestation

23  of assent to the terms of that contract.

24      I can't later on say, well, I didn't read the terms

25  clearly; I didn't know about those terms; I didn't understand

1    them.  The courts are going to disregard what I said I

2    believed.  The courts are also going to disregard what I said I

3    learned or knew from another external website that's not

4    referenced in that contract, because there's no objective

5    manifestation of assent to those external terms that weren't

6    ever referenced.

7            THE COURT:  Let me ask, just so that I know.  Put

8    aside, for a moment, the argument that you just made, and

9    assume with me that, contrary to your argument, I do think it's

10   of some consequence whether or not Mr. Anvari did, in fact --

11   was aware of the forum selection clause or he wasn't.

12       What is the factual -- would you be in a position to aver

13   that he had no actual knowledge or not?  I just want to know

14   what we're dealing with.

15           MR. LIANG:  I would say that whether or not Mr. Anvari

16   knew about those --

17           THE COURT:  I understand that's your argument.  Did he

18   know or not?  I just want to know.

19       It may be I agree with you, at the end of the day, and

20   that it is not of any consequence whether or not he knew or --

21   whether he did or did not.  I just want to know what the fact

22   is so that I can put that into the hopper if I determine that

23   your -- I don't agree with you and I do think it's of

24   consequence whether or not he saw it, then the question is, is

25   there leave to amend to allow for the averment as to whether or

1  not he actually saw it.  What's the answer?

2         MR. LIANG:  I don't know.  I don't have --

3         THE COURT:  Well, does Mr. Ta?

4         MR. TA:  We have to ask him that question, Your Honor.

5         THE COURT:  Okay.

6         MR. LIANG:  And, Your Honor, I would submit that it is

7  immaterial because --

8         THE COURT:  I understand your point.

9         MR. LIANG:  Right.

10        THE COURT:  I understand your point.  And I'm not

11 suggesting I disagree with it.  I have to go back and look at

12 it.  I was just trying to find out what the situation was with

13 respect to any amendment, should it come to that.  Okay.

14        MR. LIANG:  So I would like to address what defendants

15 have argued, that just actual knowledge is sufficient.

16     That argument is taken from *Nguyen versus Barnes & Noble.*

17 And it's based in a browsewrap agreement.  And defendants are

18 trying to extract that and look at it in a vacuum.  But you

19 have to look at it in context.

20     Browsewrap agreements, every single one of them, begin

21 with the first -- one first step and that threshold inquiry, is

22 there a reference on the website, some sort of reference,

23 whether a hyperlink or other language that directs the user to

24 the terms and conditions?

25     Once that's established, then the courts ask, Well, how

1   big was the hyperlink?  How clear was it?  Can we say, based on

2   the fact that the reference is there, that users had knowledge

3   of those terms?

4        And so, fundamentally, there's always -- whether in

5   browsewrap agreements or incorporation by reference, there's

6   always at least some form of reference on the contract itself,

7   on the website, that's used to make the contribution and go

8   through the contribution process.  Otherwise, there's no way a

9   court -- there's no way that we can -- there's no objective

10  measure of what a party's assenting to.

11       So if you were to take defendants' position and play it

12  out, their interpretation of contract law, depending on the

13  actual knowledge of a party, whatever they think that they

14  believed, you would never be able to have a contract.  You'd

15  have an infinite number of different types of contracts.

16       Here's what I mean.  We ask a class member or we ask an

17  investor, Did you visit tezos.ch?

18       I visited tezos.ch, a separate website.  I read the terms.

19  I understood them.  I went to the crowdfund website, separate

20  website, contributed.

21       Defendants would say we have a binding forum selection

22  clause.

23       That same person could say, I went to the tezos.ch

24  website.  I read half the terms.  I didn't read the forum

25  selection cause.  I understood a quarter of the terms.  Then I

1    went to the contribution website.  I contributed.

2        And defendants would -- if you take their argument to

3    conclusion, only a quarter of the terms would be binding.

4            **THE COURT:**  I understand.  Okay.

5            **MR. LIANG:**  So you have to look at the contribution

6    website and the contribution process itself.  No reference,

7    whatsoever, to these terms; and, therefore, they are not

8    binding.  They are not enforceable.

9            **THE COURT:**  Got it.

10       Okay.  Final run through, and then we will call it day.

11           **MR. POTISCHMAN:**  I'll be extremely brief, Your Honor,

12   based on the argument and the briefing.

13       Picking up on the argument just made, first of all, Your

14   Honor, they start from the premise that the contract is the

15   contribution website, and then they say, well, nothing is

16   incorporated; nothing is referenced.

17       But you don't have to accept the proposition that the

18   contribution website is the contract.  That's one of the

19   questions that we're considering.

20       There wasn't a contract on the contribution website.  The

21   terms, the only terms appear in the Terms document, which is

22   referenced in the overview document as something that's coming;

23   is referred to on Twitter; is discussed by the community.  The

24   popular community forums they talk about are talking about the

25   terms.

1    Your Honor, clearly contributors knew about this.  Many of
2    them.  It will be interesting to see if Mr. Anvari did.  Again,
3    the lawyer who contributed $50,000, the largest contributor who
4    showed up to litigate this case.

5        The second point completely unrelated on *Morrison*, all I
6    would like to say to Mr. Ta's argument that irrevocable
7    liability attached the moment you clicked "okay," because you
8    weren't going to get the money back, I referred Your Honor to
9    *Cascade* and to *MVP*, but I will also say, Your Honor, if Mr. Ta
10   is right, then anytime a U.S. investor invests in an asset
11   while that investor is in the United States, then the U.S.
12   securities law apply.  If you buy something on a German
13   exchange, and you buy a German security, and it's processed
14   over there, it doesn't matter, because when you click "buy," I
15   want to invest $100 in Audi, that's happened in the
16   United States.

17       And that's clearly wrong.  It's clearly wrong under
18   *Morrison*, which says the U.S. securities laws are not supposed
19   to be sweeping with their extraterritorial obligation.

20       Thank you, Your Honor.

21       **THE COURT:**  Well, the question on that is where the --
22   that begs the question, to some extent, because we could all
23   agree that -- with that proposition, and, indeed, it's the law,
24   and, therefore, it has to be followed.  But the question is
25   where this transaction occurs.  I mean, and that's where I'm

1    not sure any of this gives me all that much guidance, because

2    this is kind of a unique situation.

3        It's easy in the example you just gave about whether

4    you're talking about buying equity in the Audi Corporation or

5    whatever.  I mean, that's sort of a conventional analysis as to

6    where that irrevocable moment occurs.

7        Their argument is this is a different situation.  Because

8    if you don't get your share of Porsche Audi, or whatever the

9    company is, the transaction isn't complete.  It's -- you pay

10   the money in exchange for your equity interest in the company.

11       Here you pay the money and, according to the plaintiffs,

12   you're obligated at that moment.  You may or may not get Tezos'

13   tokens; right?

14           **MR. POTISCHMAN:**  Correct.

15           **THE COURT:**  So the transaction, in a sense, is

16   completed the moment you've committed yourself to paying the

17   money.

18           **MR. POTISCHMAN:**  Your Honor, assuming their world

19   where this is a securities transaction, you've placed an order

20   for the possibility of getting a security down the road.  But

21   that's not -- it still has to be dealt with by the recipient.

22   And that is *Cascade* and *MVP*.  Somebody has to decide what to do

23   with that.

24           **THE COURT:**  Well, in part, is this part of your

25   argument as to why this is not a securities transaction?

1          **MR. POTISCHMAN:**  We've deferred that argument for the

2    time being.

3          **THE COURT:**  I know you have.  But, in a sense, if they

4    win the day, just giving me a preview, do they fall into the

5    argument, perhaps from your side, that if, indeed, the

6    transaction is this complete one-sided commitment on the part

7    of the contributor to pay the money at that moment in time, and

8    they're obligated under the terms to do that, is it going to

9    be, in part, your argument why this isn't a security in the

10   beginning?

11         **MR. POTISCHMAN:**  I suspect that's going to be one of

12   many arguments about why it isn't, Your Honor.

13         **THE COURT:**  Okay.  Very good.

14         **MR. POTISCHMAN:**  Thank you, Your Honor.

15         **THE COURT:**  Okay.  Very useful argument.  Thank you

16   very much.

17      (At 12:14 p.m. the proceedings were adjourned.)

18                          -   -   -   -

19

20

21

22

23

24

25

1

2

3

4

5                    CERTIFICATE OF REPORTER

6          I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9    DATE:    Monday, August 27, 2018

10

11

12

13    _____

14    Katherine Powell Sullivan, CSR #5812, RMR, CRR
                U.S. Court Reporter
15

16

17

18

19

20

21

22

23

24

25