Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
GGCC, LLC, an Illinois Limited )
Liability Company, individually)
and on behalf of all others    )
similarly situated,            )
                               )
          Plaintiff,           )
                               )
  VS.                          )     NO. C 17-06779 RS
                               )
DYNAMIC LEDGER SOLUTIONS,      )
INC., a Delaware corporation;  )
et al.,                        )
                               )
          Defendants.          )
_____)
                               )
AND RELATED CASES.             )
_____)
```

San Francisco, California
Thursday, April 30, 2020

**TRANSCRIPT OF PROCEEDINGS BY ZOOM**

**APPEARANCES BY ZOOM:**

For Plaintiffs and Trigon Trading Pty Ltd.:
          BLOCK & LEVITON LLP
          260 Franklin Street - Suite 1860
          Boston, Massachusetts  02110
      **BY:  JEFFREY C. BLOCK, ATTORNEY AT LAW**


      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
          Official Reporter

```
 1  APPEARANCES:   (CONTINUED)

 2  For Plaintiffs:
                    HAGENS BERMAN SOBOL SHAPIRO LLP
 3                  715 Hearst Avenue - Suite 202
                    Berkeley, California 94710
 4              BY: DANIELLE SMITH, ATTORNEY AT LAW

 5  For Plaintiffs and named Plaintiffs Artiom Frunze, Pumaro LLC,
    Gijs Master, and Hayden Hsiung:
 6                  HUNG G. TA, ESQ. PLLC
                    250 Park Avenue - 7th Floor
 7                  New York, New York  10177
                BY: HUNG G. TA, ATTORNEY AT LAW
 8
    For State Court Plaintiff Andrew Baker:
 9                  ROBBINS, GELLER, RUDMAN & DOWD LLP
                    655 West Broadway - Suite 1900
10                  San Diego, California  92101
                BY: LUCAS F. OLTS, ATTORNEY AT LAW
11
    For Defendant Tezos Foundation:
12                  DAVIS, POLK & WARDWELL LLP
                    1600 El Camino Real
13                  Menlo Park, California  94025
                BY: NEAL A. POTISCHMAN, ATTORNEY AT LAW
14
    For Defendants Arthur and Kathleen Breitman:
15                  BAKER MARQUART LLP
                    777 S. Figueroa Street - Suite 2850
16                  Los Angeles, California  90017
                BY: BRIAN E. KLEIN, ATTORNEY AT LAW
17
    For Defendant Dynamic Ledger Solutions:
18                  COOLEY GODWARD
                    375 Hanover Street
19                  Palo Alto, California   94304
                BY: PATRICK E. GIBBS, ATTORNEY AT LAW
20                  JESSICA VALENZUELA SANTAMARIA, ATTORNEY AT LAW
                    JESSIE A.R. SIMPSON LAGOY, ATTORNEY AT LAW
21

22

23

24

25
```

| 1 | **Thursday - April 30, 2020**                              **1:30 p.m.** |

**P R O C E E D I N G S**

**---oOo---**

        **THE CLERK:**  17-cv-6779, In Re Tezos Securities
Litigation.

    Counsel for plaintiffs, can you state your appearances
first, please.

        **MR. BLOCK:**  Certainly.  Good afternoon, Your Honor.
Jeffrey Block, Block & Leviton, for Trigon and for the
plaintiffs.

        **THE COURT:**  Good afternoon.

        **MR. TA:**  Good afternoon, Your Honor.  This is Hung Ta
from HGT Law, on behalf -- co-lead plaintiff -- co-lead counsel
for the plaintiffs and also counsel for the named plaintiffs
Artiom Frunze, Pumaro LLC, Gijs Master, and Hayden Hsiung.

        **THE COURT:**  Good afternoon.

        **MR. OLTS:**  Good afternoon, Your Honor.  Lucas Olts on
behalf of the state court plaintiff Andrew Baker.

        **THE COURT:**  Good afternoon.

    Is that everyone on the plaintiffs' side?

        **UNIDENTIFIED SPEAKER:**  This meeting is being recorded.

        **THE CLERK:**  Sorry about that.

        **THE COURT:**  Okay.  Now the recording is now starting.

    The plaintiffs have made their appearances.  So on the
defense side?

1          **MR. POTISCHMAN:**  Good afternoon, Your Honor.

2     Neal Potischman from Davis Polk on behalf of the Tezos

3     Foundation.

4          **THE COURT:**  Good afternoon.

5          **MR. KLEIN:**  Good afternoon, Your Honor.  Brian Klein

6     on behalf of Arthur and Kathleen Breitman.

7          **THE COURT:**  Good afternoon.

8          **MR. GIBBS:**  Good afternoon, Your Honor.  Patrick Gibbs

9     from Cooley on behalf of Dynamic Ledger Solutions, and also on

10    the call are my colleagues Jessica Valenzuela Santamaria and

11    Jessie Simpson Lagoy.

12         **THE COURT:**  Very good.  Good afternoon.

13         **MS. SANTAMARIA:**  Good afternoon, Your Honor.

14         **THE COURT:**  Good afternoon.  So it is obvious we're

15    now in this brave new world of doing things by videoconference.

16    I will tell you this is -- I've done a few on the criminal

17    side, but this is the first civil proceeding I've tried doing

18    this method so bear with me if we have some stumbles.  I have

19    to admit I much prefer my grand courtroom, but we have to

20    adjust.

21         So this is set for hearing on preliminary approval, and I

22    think we all know the standard that I have to apply here is

23    whether or not the proposed settlement is within the general

24    parameters of fair, reasonable, and adequate.

25         I have reviewed what has been submitted, and I have some

1    particular questions as we go through this; but not to keep you
2    in suspense, I do think this -- my initial read certainly is
3    that it's a solid settlement and one that I think we'll be able
4    to proceed forward with.
5          And I do recognize it was negotiated arm's length.  You
6    had a well-known mediator who helped you, and this is a new
7    terrain in this litigation so that is also something to take
8    into account.
9          Rather than my going through all of the particulars -- the
10   $25 million fund, the different aspects of it all -- if it's
11   acceptable to the parties, let me just go right to the
12   questions that I have; and if there's an area that I haven't
13   covered, it means that I really don't have any particular
14   problems with it.
15         By that I mean there are aspects, as you-all know, of the
16   checklist now that we have in the Northern District, things
17   like no reversion of the settlement funds and various other
18   things, and it does appear to me that in most respects you've
19   addressed the issues that I would want to have discussed.
20         So let me just go into a couple of these particular issues
21   that I would like to go over.
22         Actually, before I do that, not to cut off the parties, if
23   there's anything that either plaintiffs or the defense side
24   thinks you want to summarize at this point, I think your papers
25   do a nice job of that, but I don't want to cut you off if

1    there's something you want to make clear on the record.

2         **MR. BLOCK:**  For plaintiffs, Your Honor, Mr. Block.

3         I think we set it out in the papers and it sounds like,

4    you know, you've obviously read them and I think you have a

5    pretty good handle on the settlement so I think we'd just be

6    prepared to address any specific questions that you may have.

7         **THE COURT:**  Okay.  Let me start with your plans with

8    respect to notice.  There is an estimate in your papers as to

9    the percentage you think you can reach through the use of

10   e-mail address, and then I know you've got a proposal through

11   various publication outlets to get the word out.

12        I was curious.  First of all, how did you come up with the

13   estimate on how successful you think the e-mail approach will

14   be?  You have a calculation for me on how many you think you'll

15   reach.  How did you come up with that?

16        **MR. BLOCK:**  Sure, Your Honor.  I think -- I don't

17   think we were as clear as we should have been in the papers.

18   That estimate we referred to, we referred to I think -- I think

19   what you're talking about is it's an estimate of about 7500

20   people submit claim forms.

21        **THE COURT:**  Right.

22        **MR. BLOCK:**  That's the estimate we got from the claims

23   administrator from what they typically see as an estimate of a

24   percentage of our class on how many they will submit -- how

25   many claims forms will be submitted, and that sort of was the

1  basis that drove their cost estimate for the claims

2  administration.

3          **THE COURT:**  So that's just -- that's kind of a generic

4  estimate.  It's not specific to this case or --

5          **MR. BLOCK:**  Exactly.  Exactly.  We actually think in

6  this case because we're going to get all the e-mail addresses,

7  we think we're going to reach almost the entire class directly

8  with, like, direct notice.  I mean, sure, there's some people

9  that probably have changed their e-mail addresses, and that's

10  why we've gone to the other lengths of, you know, putting stuff

11  on Reddit and on Twitter and on the Google website, et cetera,

12  to maybe reach some of those people.  But we feel pretty

13  confident that we're going to get -- at least reach almost

14  everybody, and obviously then they will decide what they will

15  do.

16          **THE COURT:**  Okay.  Just remind me.  When people made

17  their contribution/investments, you know, did they do that by

18  virtue of communications through an e-mail communication?  I

19  know that there was -- one of the issues you have to wrestle

20  with here is that there's a certain anonymous quality to some

21  of the -- how do you say it? -- movement of the funds.  So is

22  that how everyone would make their transfer of money -- or

23  transfer of bitcoin or Ethereum or whatever?

24          **MR. BLOCK:**  Yeah.  My understanding is when everybody

25  made their initial contribution, one of the things they had to

1   do was submit an e-mail address.  Now, you can make up whatever

2   e-mail address you want to protect your identity, but there is

3   an e-mail address associated with each wallet, if you will.  So

4   my understanding is unless those e-mail addresses have changed

5   or been deleted, we should be able to reach pretty much

6   everyone.

7              THE COURT:  So we should do much better than the

8   generic estimate.

9              MR. BLOCK:  I would hope so, yes.

10             THE COURT:  Okay.  All right.

11        This is not in any order of importance, but you've I think

12   explained for me the -- you picked the claims administrator and

13   picked Epiq, it's a name I'm familiar with, after a bid

14   process.

15        I think you said you had six bids, and one of their

16   selling points was the international experience they have, and

17   that makes sense.

18        Was that the lowest bid?  I'm just curious.

19             MR. BLOCK:  They were --

20             THE COURT:  It doesn't have to be, but --

21             MR. BLOCK:  Yeah, I think they were pretty much

22   towards the lowest.  And, you know, one of the things that we

23   do is we don't just look to see who's the cheapest.

24             THE COURT:  Right.

25             MR. BLOCK:  We also want to get who we think is the

1    best.  So we sort of felt that Epiq had the best blend of a

2    really good price along with the experience, and the

3    international aspect was a big selling feature so that was a

4    big part of it.

5           THE COURT:  The *cy pres* part of this process, in what

6    you provided to me, this would be for distributions that

7    despite the hope that the e-mail addresses are going to take

8    care of the bulk of it all, there may be some that you can't

9    get to and so there might be some that -- some instances where

10   the money comes back and you're going to have to distribute

11   that, which is I assume what we're talking about.  There's no

12   separate *cy pres* distribution.  It's for the stuff that can't

13   be distributed; right?

14          MR. BLOCK:  Exactly, Your Honor, yes.

15          THE COURT:  Okay.  Under our guidelines, we do look to

16   have some understanding of either who the -- what entity or

17   entities are being selected or how those entities are going to

18   be selected.  So I wasn't clear on what is it's -- because it's

19   not a separate distribution, I'm not as concerned about it as I

20   would be if that was the centerpiece of the proposed

21   settlement, but how are you going to pick the *cy pres*?  Well, I

22   guess a better question is:  Why didn't you pick one now?  I

23   mean, why are we waiting?

24          MR. BLOCK:  That's a good question, Your Honor.  I

25   think it's probably something that what I've usually done in

1   cases is when we get to the end, if there is some money left

2   over, we'll consult with the defendants as far as what their

3   views are; and then we'll always go to the Court and we will

4   get Your Honor's approval.

5          Oftentimes we try to make it somewhat related to either

6   what the case is about or to something legal related, whether

7   it's --

8          **THE COURT:**  Right.  In fact, there was circuit law

9   that for a long time you had to make sure you had that nexus.

10  I think that's eased up a little bit, but that's a good idea.

11         It's not critical, but I actually would encourage you to

12  go ahead and do that sooner rather than later.  If you happen

13  to be able to identify that and it could go out in the -- with

14  the information about the settlement, I would think it would be

15  good, but it's not critical and you can clean that up at the

16  end of it.

17         Another just general question about your estimate on the

18  number of claim forms you anticipate will be submitted.  As we

19  talked about, hopefully with the e-mail addresses you can get

20  to a large number, and I think the class size is north of

21  30,000 if I read the papers correctly.  But then you're

22  estimating that you think the number of claim forms are going

23  to be in the neighborhood of about 7500 or thereabouts.  So how

24  did you come up with that estimate?

25         **MR. BLOCK:**  Well, again, that comes from the claims

1  administrator based on their prior experience, the typical

2  claims submission in the case.  You know, what always happens

3  is you send out the claim form.  A lot of people ignore it.

4  People may say, "Well, I didn't lose any money.  I'm not going

5  to submit anything."  I mean, so it's just sort of that generic

6  estimate --

7          **THE COURT:**  Okay.

8          **MR. BLOCK:**  -- of how many people may submit.

9          **THE COURT:**  Do you have an estimate, if it was 7500 or

10  thereabouts, what would the payout be?

11          **MR. BLOCK:**  That is very difficult to say because what

12  we --

13          **THE COURT:**  It's the number of -- yeah.

14          **MR. BLOCK:**  Yeah.  Did people sell?  What price did

15  they get when they sold?  So what would be their amount?  So

16  it's hard to guess.

17          **THE COURT:**  Yeah, I hear you.  Okay.

18      All right.  Just, you know, because there could be in some

19  instances a significant amount of money involved, I would think

20  you would do perhaps better than the 7500, but we'll see.

21      Okay.  The release looked fine to me.  Just to confirm

22  with you, the release effectively is everything related to the

23  ICO, anything that could have been brought, any claims that

24  could have been brought, but it's confined to the initial coin

25  offering.  It's not anything beyond that.

1          **MR. BLOCK:**  Yes.  Absolutely, Your Honor.

2          **THE COURT:**  All right.  You do a nice job of going

3    over the strengths and weaknesses of the case.  Just to also

4    touch on that, the amount that was initially raised, if I have

5    the numbers right, are about 232 million was initially raised.

6    Then because the value of the cryptocurrency that was used

7    fluctuated rather substantially at various points, but that was

8    a lot of money right out of the box that was raised.  And so

9    the settlement amount, which is the 25 million, is a smaller

10   amount percentagewise of that 230 million.  And I don't know on

11   the plaintiffs' side, if you want to just summarize for me.

12        I took the main theme being, which I don't disagree with,

13   the uncertainty that's associated with the fact that this is a

14   new area, that whether or not the tokens would be deemed to be

15   securities or not, which is the centerpiece of your case, is

16   very much uncertain at not just what I would do if confronted

17   with that question but then there's -- we don't have a lot of

18   circuit law and certainly nothing from the Supreme Court on

19   that.

20        So I take it that is probably the main theme of what drove

21   the settlement?

22          **MR. BLOCK:**  Yes, that's a large part of it,

23   Your Honor.  There is -- you know, in any kind of a litigation

24   like this that's a complex case, there's a lot of risks.  One

25   main was whether these would be considered securities and

should have been registered.

Another question is Morrison and how big the class would be:  Would people who bought overseas actually be part of this class or would the class be smaller, just U.S. purchasers?

Another question that we know would be an issue is certification of a class.  We know that there are certainly going to be some -- there would have been questions raised about whether, you know, you had individual issues that would have prevented certification, and I think it was the contribution agreement and whether people knew that.  So those were some of the legal risks that we certainly were factoring in.

As far as the damages, yeah, the total size of the offering was 232 million, and then we also get to the question of what would actually be the real damages that we could recover at a trial.  And you saw the pretty wide range of an estimate.  We had it, if we hit a home run and got everything, as high as 150 million.  Defendants conversely said, "Well, no, you know, we think it would be maybe a million."  And a lot of that, there were a lot -- of course, any damage model there's always a lot of assumptions baked into it.  Part of it is how many people held these things; when the price of bitcoin shot up, did they sell so they didn't lose money.

Those were all the things that we didn't know, and those were all the factors that we weighed.  And when we looked at a

1   $232 million offering, which would be the max we could recover

2   plus interest, a $25 million settlement, which roughly is a

3   little bit more, a little less than 10 percent, but in a

4   typical securities case people are getting less than

5   10 percent.  So we felt in a case like this 10 percent looking

6   at it that way and when you look at it as our maximum damages

7   that we felt we could get at trial of 150 million, you're now

8   at 16 percent.  So we felt that really was a good recovery.

9              **THE COURT:**  Okay.

10             **MR. POTISCHMAN:**  Your Honor?

11             **THE COURT:**  Yes.

12             **MR. POTISCHMAN:**  This is Neal Potischman on behalf of

13   the Tezos Foundation.

14       I just wanted to circle back to one issue that you raised

15   just to make sure that we're all on the same page.

16       With respect to the release, I generally agree this is --

17   this release is targeted, you know, to the pleadings and the

18   pleadings are targeted on the claim about what we call the

19   fundraiser, what plaintiffs call an ICO.  Plaintiffs' claims

20   did begin in this case, you may recall, with the filing of a

21   TRO alleging that money was disappearing or was being absconded

22   with, and Your Honor ultimately denied the TRO.

23       I think the release, even at that time the pleadings were

24   focused on the original fundraiser or what plaintiffs call the

25   ICO, but there were claims made about money disappearing.  I

1  believe the release is worded broadly enough to release claims

2  relating to that same topic, which is by design.  I don't think

3  that really changes the scope, but I wanted to make sure that

4  we were direct about the fact that we intend to seek a release

5  of claims in that space as well.

6      THE COURT:  Right.  Although that's still all swept up

7  in the ICO process; right?  I mean, in other words, what I'm

8  obviously looking for is that if there are activities that have

9  nothing to do with the initial coin offering and somehow those

10  are being released in the process, that's a red flag.  But from

11  what you've said -- what you've just said, I think it's -- it

12  would be fair to characterize that as also associated with the

13  ICO; isn't it?  The activities you're talking about sound to me

14  like ICO-related activities.

15      MR. POTISCHMAN:  Your Honor, there's no disagreement.

16  I guess I just wanted to be transparent about the fact that I

17  think the release language here is fairly typical in that it

18  includes anything that was raised or could have been raised in

19  the litigation.

20      THE COURT:  Sure.  Yeah.

21      MR. POTISCHMAN:  And so some of these claims -- okay.

22  Thank you, Your Honor.

23      THE COURT:  And I realize and I recognize that it's

24  claims that were raised or could have been raised so it's

25  obviously broader than the actual operative complaint, and I

1  recognize that if that is, you know, the point that you wanted

2  to confirm.

3          **MR. POTISCHMAN:**  Thank you, Your Honor.

4          **THE COURT:**  I just want to make sure that, you know,

5  personal injury claims and things like that are not being

6  released in the course of this settlement, and they're not.

7          There was reference to the -- and I'm very aware because

8  we had a lot of litigation about it, that there is a state

9  court proceeding, and I guess Mr. Olts is involved in that

10  state court activity.  Does this resolve that, those issues, or

11  do those go on?

12          **MR. BLOCK:**  Your Honor, this resolves the state court

13  case as well.  This will resolve --

14          **THE COURT:**  Okay.

15          **MR. BLOCK:**  -- all litigation involving Tezos in the

16  United States.  So the federal case and the state case.

17          **THE COURT:**  Okay.  Finally, the attorneys' fee

18  request, my understanding is the way this is structured is your

19  provision is that the counsel can seek -- plaintiffs' counsel

20  can seek up to a third.  I do look to see -- to have the

21  lodestar -- we do the lodestar check against a percentage of

22  the fund when that's being requested, and there wasn't a

23  lodestar provided, and I think the putative class members are

24  entitled to take a look at that.  So I would look to see, and I

25  think our guidelines contemplate, that the lodestar will also

1   be available to do the cross-check.  So are you planning to do

2   that?

3          **MR. BLOCK:**  Yes, Your Honor.  We will make our

4   lodestar available.  I will tell you right now that based on

5   information that I received, because I actually asked all our

6   counsel today what our collective lodestar is, and from the

7   information I've received so far, the lodestar that we've

8   incurred collectively will exceed what we're going to ask for,

9   but we will make that available to the class.  We will ensure

10  it's on the website and when we file the papers so everybody

11  will see what it is.

12         **THE COURT:**  Good.

13         And, you know, as we all know, the fees are not -- or the

14  settlement is not contingent on the fee award, and we'll deal

15  with the fee award at final approval.  Just to, you know, make

16  sure you-all are alert to it, I suspect you-all know, the

17  Ninth Circuit law uses as a jumping-off point in a common fund

18  case 25 percent, and that doesn't mean it's only going to be

19  25 percent; but if that being the beginning of the discussion,

20  if you're seeking more than that as a percentage of the fund, I

21  want an explanation for why we would be departing from the

22  25 percent, but we'll deal with that when we get to the final

23  approval.

24         Okay.  Anything else that we need to cover today?

25         **MR. BLOCK:**  On the plaintiffs' we don't have anything

1   else, Your Honor.

2          **THE COURT:**  Okay.  Defense side?  Mr. Gibbs?  Anybody

3   else?

4          **MR. GIBBS:**  Nothing from me, Your Honor.

5          **MR. KLEIN:**  Nothing, Your Honor.

6          **THE COURT:**  Okay.  Well, as I say, I do find that the

7   proposed settlement is within the parameter of fair,

8   reasonable, and adequate, and I will preliminarily approve the

9   settlement.

10      I will give you a written order that memorializes the

11  preliminary approval, but we can deem it approved as of now.

12  So in terms of notice and the like, you can -- as I say, I've

13  approved it and I will just give my explanation, if you will,

14  in the written order form.

15      You did submit, I think, a proposed order, didn't you?  I

16  think you did.

17      Okay.  You need to unmute yourself, Mr. Block.

18          **MR. BLOCK:**  Yeah.  That's my first Zoom hearing so I'm

19  not used to it.

20          **THE COURT:**  Yeah.

21          **MR. BLOCK:**  Yes, Your Honor, we did submit a proposed

22  order.

23          **THE COURT:**  Okay.  Well, we'll -- I'll be utilizing

24  that, but it won't -- it will have some of my own gloss on it,

25  but we'll take that into account as well.

1          Okay.  Anything from anyone else?

2          Just as, again, a matter of interest, have there been

3     any -- have you received any communications from putative class

4     members about the settlement?  Do you anticipate that there

5     will be some objections based on what you've seen thus far?

6          **MR. BLOCK:**  To date we have not received any feedback

7     from the class.  I do know, and I think Your Honor may know

8     from the history of the case, this group tends to be a little

9     bit active and voice their opinions, and we thought that once

10    the settlement was announced and there was some publicity when

11    we reached the settlement, that we might hear something

12    negatively but we didn't.  So so far so good.

13         **THE COURT:**  Okay.  With respect to the dates going

14    forward, did you have a proposed date for final approval?  I'm

15    trying to remember.

16         **MR. BLOCK:**  Well, I think, Your Honor, based on the

17    schedule that we proposed, minimum I think was 84 days to allow

18    the notice process to work.  I think the earliest a final

19    approval hearing could be would be July 23rd.  So our

20    preference would be anytime after that, obviously subject to

21    the Court's convenience.

22         **THE COURT:**  Okay.  Well, I will -- I'll set it on a

23    Thursday probably in August sounds like would make sense, and

24    I'll just go look at my schedule.  The schedule is a mess as

25    you can imagine.  So I'll see what it looks like.

1       But is everybody fine with I just pick a Thursday in

2 August?  It's always at 1:30.

3           **MR. KLEIN:**  Your Honor?

4           **THE COURT:**  Yes.

5           **MR. KLEIN:**  I tentatively have vacation planned, who

6 knows if that's going to happen, out of town the first two

7 weeks of August.  I mean, I can call in or video in.  If we're

8 going to do a Zoom one, great, I can definitely view it.

9           **THE COURT:**  Well, I'm hoping that by August we

10 actually can be physically present.  When is it that you

11 were -- because I'm flexible.  We can just avoid the two weeks.

12           **MR. KLEIN:**  It's the first two weeks of August,

13 Your Honor.

14           **THE COURT:**  All right.  Well, we'll go towards the end

15 of August then.

16           **MR. KLEIN:**  Thank you, Your Honor.  I hope we see each

17 other in person.

18           **THE COURT:**  Yeah, I hope so.  I hope so.

19      Okay.  Anything further from anybody?

20                   (No response.)

21           **THE COURT:**  Very good.  Thank you.  That went pretty

22 smoothly, relatively smoothly.

23      So okay.  Thanks very much.  Stay safe, everyone.  See you

24 in August.

25           **ALL:**  Thank you, Your Honor.

1          **THE COURT:**  Bye-bye.

2              (Proceedings adjourned at 1:56 p.m.)

3                      ---oOo---

4

5

6              <u>**CERTIFICATE OF REPORTER**</u>

7          I certify that the foregoing is a correct transcript

8  from the record of proceedings in the above-entitled matter.

9

10  DATE:   Monday, May 11, 2020

11

12

13

14  _____

15      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25