# Exhibit 7

TAYLOR-COPELAND LAW
JAMES Q. TAYLOR-COPELAND (284743)
501 West Broadway, Suite 800
San Diego, CA  92101
Telephone:  619/400-4944

ROBBINS GELLER RUDMAN
 & DOWD LLP
LUCAS F. OLTS (234843)
SARA B. POLYCHRON (244685)
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

*Attorneys for Plaintiff Andrew Baker*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**05/16/2019**
**Clerk of the Court**
**BY: JUDITH NUNEZ**
**Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.550]<br><br>**TEZOS ICO CASES**<br><br>_____<br><br>Included Actions:<br><br>*Baker v. Dynamic Ledger Solutions, Inc., et al.,* Superior Court of California, County of San Francisco, Case No. CGC-17-562144<br><br>*Trigon Trading Pty. Ltd., et al. v. Dynamic Ledger Solutions, Inc., et al.,* Superior Court of California, County of San Mateo, Case No. 18CIV02045<br><br>_____ | Case No.: CJC-18-004978<br>Judicial Council Coordination Proceeding No. 4978<br><br>SECOND AMENDED COMPLAINT FOR:<br><br>(1) UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF §§5 AND 12(a)(1) OF THE SECURITIES ACT; AND<br><br>(2) VIOLATION OF §15 OF THE SECURITIES ACT<br><br>DEMAND FOR JURY TRIAL<br><br>Complaint Filed: October 25, 2017<br><br>Dept:  305<br>Judge:  Honorable Mary E. Wiss |

**REDACTED**

Plaintiff Andrew Baker ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants Dynamic Ledger Solutions, Inc. ("DLS"), the Tezos Stiftung ("Tezos Foundation"), Kathleen Breitman, Arthur Breitman (together, the "Breitmans"), Johann Gevers ("Gevers"), Timothy Draper ("Draper"), Draper Associates V Crypto LLC ("Draper Associates") (together, the "Draper Defendants"), Bitcoin Suisse AG ("Bitcoin Suisse") and DOES 1-10 (collectively, "Defendants"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases by Defendants and media reports and other publicly disclosed information about Defendants and XTZ (as defined herein).  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein as discovery proceeds.

## SUMMARY OF ACTION

1.      This is a securities class action against Defendants who promoted, sold and solicited the sale of XTZ.  Defendants raised hundreds of millions of dollars through the unregistered sale of XTZ, including to retail investors, in violation of the registration provisions of the securities laws.

2.      This action involves a scheme by Defendants to raise hundreds of millions of dollars through an initial coin offering ("ICO") in violation of the registration provisions of the federal securities laws.  This action is brought on behalf of all investors who purchased Tezos blockchain tokens (dubbed "Tezzies" or "XTZ") from Defendants during the Tezos ICO, which began in early July 2017 (the "Class").

3.      The last few years have seen the explosive growth of blockchain technology and the value of cryptocurrencies.  A blockchain is a decentralized digital ledger (such as Bitcoin) on which transactions (or other information) are recorded and added in chronological order.  It allows participants to keep track of digital currency transactions (or information exchanges) without central record keeping.

4.      There are now hundreds of different crypto-assets worth hundreds of billions of dollars – up from just $12.5 billion in 2016.  These crypto-assets use encryption techniques to regulate the generation of units and facilitate and verify the transfer of assets without the need for an intermediary, like a bank.

5.      Taking advantage of this rapid growth, many blockchain and cryptocurrency startups have attempted to skirt securities regulations by raising funds though an ICO.  In an ICO, tokens are sold to consumers in exchange for legal tender or other cryptocurrencies (most often Bitcoin and Ethereum).  These tokens generally give the purchaser various rights on the blockchain network and resemble the shares of a company sold to investors in an initial public offering.

6.      Against this backdrop, beginning in July 2017, Defendants conducted an ICO in which they sold over 607 million XTZ in exchange for digital currency worth more than $230 million at the time.[1]  At the time, the Tezos ICO was the largest in history, and the value of the Bitcoin and Ethereum raised in the ICO have appreciated significantly since then, reaching a value of more than $1.52 billion on January 7, 2018.  As of the date of this filing the Bitcoin and Ethereum raised by Defendants in the Tezos ICO is worth at least $449,000,000.

7.      Federal securities laws require any security that is offered or sold to be registered with the Securities and Exchange Commission ("SEC").  These laws are designed to protect the public by requiring various disclosures so that investors can better understand the security that is being offered or sold, and risks associated with investment in that security.  Under §2(a)(1) of the Securities Act of 1933 ("Securities Act"), a "security" is defined to include an "investment contract."

8.      The SEC has made it clear that digital tokens, such as XTZ, often constitute "securities and may not be lawfully sold without registration with the SEC or pursuant to an exemption from registration."  *See Investor Bulletin: Initial Coin Offerings*, U.S. Securities and Exchange Commission (July 25, 2017); *see also In re Munchee, Inc.*, No. 3-18304, Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order at 8 (S.E.C. Dec. 11, 2017) ("[T]okens, coins or other digital assets issued on a blockchain may be securities under the federal securities laws, and, if they are securities, issuers and others who offer or sell them in the United States must register the offering and sale with the Commission or qualify for an exemption from registration.").

---

[1]      According to its own site, the Tezos ICO raised 65,703 Bitcoin and 361,122 Ethereum.

9.     Here the XTZ offered and sold by Defendants during the Tezos ICO have all the traditional hallmarks of a security.  XTZ investors, including Plaintiff, provided consideration (in the form of fiat currency, including U.S. dollars, or cryptocurrencies) in exchange for XTZ.  These XTZ purchasers advanced this funding as an investment in a common enterprise, the development of the Tezos network, as described in the Tezos white paper ("Tezos Blockchain").  Defendants in turn used this funding to finance that development.

10.     XTZ investors also reasonably expected to derive profits from their ownership of XTZ, and Defendants themselves have frequently highlighted this profit motive.

11.     Finally, the XTZ sold during the Tezos ICO derive their value from the usefulness and popularity of the Tezos Blockchain.  As the Tezos network was not even functional at the time of the Tezos ICO, the development of the Tezos Blockchain, and the profits investors expected to derive from holding XTZ, were based entirely on the technical, managerial, and entrepreneurial efforts of Defendants and third parties employed by Defendants.

12.     Despite the enormous sums raised in the Tezos ICO, the Tezos Blockchain main net did not launch until September 2018, over a full year after the ICO.  It is situations exactly like this that the federal securities laws were enacted to remedy.

13.     Defendants offered and sold XTZ tokens without filing a registration statement with the SEC in violation of §§5, 12(a)(1), and 15 of the Securities Act.  The Securities Act entitles Plaintiff and the Class to rescission of their purchases of XTZ, and the return of the Bitcoin and Ethereum they invested (including any appreciation in value of these assets).

**JURISDICTION AND VENUE**

14.     The claims alleged herein arise under §§12(a)(1) and 15 of the Securities Act, 15 U.S.C. §§77l(a)(1) and §77o.  Jurisdiction is conferred by §22 of the Securities Act and Article VI, §10 of the California Constitution.  Venue is proper pursuant to §22 of the Securities Act, 15 U.S.C. §77v, and §395(a) of the California Code of Civil Procedure.  This action is not removable under §22 of the Securities Act, which explicitly states that "[e]xcept as provided in section 77p(c) of this title, no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court in the United States."  15 U.S.C. §77v(a).

15.     The violations of law complained of herein occurred in this County, including the unlawful sale of unregistered securities into this County.  In addition, certain Defendants are located and/or conduct business in this County, significant events that led to the sale of unregistered securities occurred in this County, and documents and witnesses are located in this County or can be found in this County.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

17.     Plaintiff Andrew Baker is an individual who at all relevant times was and is a resident of San Diego, California.  Plaintiff purchased XTZ from Defendants during the Tezos ICO on July 12, 2017.  He invested one Bitcoin and in exchange was promised delivery of 5,000 XTZ upon the launch of the Tezos Blockchain.

18.     Defendant Tezos Foundation is a Swiss foundation established in order to collect the ICO funds and skirt U.S. regulations.  This Court has personal jurisdiction over the Tezos Foundation based on its numerous contacts with California.  In early July 2017, the Tezos Foundation conducted the Tezos ICO, during which it solicited and received investments from numerous California residents, including Plaintiff.  The Tezos Foundation received the ICO proceeds through a website domain hosted on a U.S. server located in Phoenix, Arizona:  https://crowdfund.tezos.com.  However, the ICO was effectively carried out in California as many of the acts that allowed the ICO to be completed occurred in California, including development of materials used to solicit investors in the ICO, promotion of the ICO, funding of the ICO, the raising of proceeds in the ICO and purported development of Tezos-related intellectual property that underpinned the investment rationale of the ICO.

19.     Defendant Gevers is an individual who was the president of the Tezos Foundation at the time of the Tezos ICO.

20.     Defendant DLS is a Delaware corporation with its principal place of business in Mountain View, California.  DLS is owned and controlled by Kathleen Breitman, Arthur Breitman,

1  Draper, and Draper Associates.  According to the Tezos website, DLS owns all of the Tezos-related

2  intellectual property.

3       21.    Defendant Kathleen Breitman is an individual who at all relevant times was a resident of

4  Mountain View, California.  Kathleen Breitman is the Chief Executive Officer ("CEO") of DLS.

5  Kathleen Breitman acknowledged that Defendants marketed the Tezos ICO to U.S. investors, stating

6  "*[w]e didn't do much marketing outside of the U.S*.  Well rather Arthur and I are based in the U.S. and

7  we talk about the technology in mainstream U.S. press outlets . . . ."

8       22.    Defendant Arthur Breitman is an individual who at all relevant times was a resident of

9  Mountain View, California.  Arthur Breitman was previously the CEO of DLS, and is currently its

10  Chief Technology Officer.  Arthur Breitman is the primary developer behind the Tezos Blockchain.

11       23.    Defendant Draper is a venture capitalist who is the founder and managing partner of

12  Draper Associates a venture capital firm operating out of Menlo Park, California.  Draper has a

13  substantial ownership interest in DLS and was actively involved in marketing the Tezos ICO.

14       24.    Defendant Draper Associates is a Delaware limited liability company formed on May 10,

15  2017 with its principal place of business in San Mateo, California.  Draper Associates is a shareholder

16  in DLS.

17       25.    Defendants Kathleen Breitman, Arthur Breitman, DLS, Draper, and Draper Associates –

18  who all reside in California – controlled and directed the actions of the Tezos Foundation in the run up

19  to, and during, the Tezos ICO.  In fact, in October 2017, the Tezos Foundation's then president, Gevers,

20  stated that the Breitmans had been trying to control the Tezos Foundation as if it were their own private

21  entity.

22       26.    Defendant Bitcoin Suisse is a financial services provider with its principal place of

23  business in Zug, Switzerland.  Bitcoin Suisse is engaged in providing brokerage, asset management,

24  trading, payment, and ICO services.  Bitcoin Suisse acts as an asset manager on behalf of institutions,

25  companies and private individuals, with a specific focus on digital/crypto assets and currencies.  Bitcoin

26  Suisse materially assisted the Tezos ICO for its own benefit by acting as an underwriter for the ICO in

27  exchange for fees and commissions.  Bitcoin Suisse acted as a crypto-financial service provider and

28  intermediary in connection with the ICO, providing services to both individual contributors as well as

1   the Tezos Foundation itself.  Since the ICO concluded, Bitcoin Suisse has continued to provide crypto-

2   financial services to the Tezos Foundation, including acting as a mandatory co-signatory on all crypto-

3   asset transactions.

4          27.     At all times mentioned herein, each of the Defendants named herein, including DOES 1

5   through 10 were the co-conspirators, agents, representatives, alter egos, employers, and/or joint

6   venturers of the other Defendants, and, in doing the acts and things herein alleged, were acting within

7   the course, scope, and authority of said agency, service, or employment with knowledge, permission,

8   and consent of the other Defendants and each of them.

9          28.     Plaintiff alleges on information and belief that DOES 1-10, inclusive, were individuals,

10  corporations, companies, partnerships, or other business entities.  DOES 1-10 were co-conspirators

11  with, or alter egos of, other Defendants in the violations alleged in this Complaint and performed acts or

12  made statements in furtherance thereof.  Plaintiffs are presently unaware of the true names and identities

13  of DOES 1-10.  Plaintiffs will amend this Complaint to allege the true names of the DOE Defendants

14  when they are able to ascertain them.

15                              **THE BEGINNINGS OF TEZOS**

16         29.     In the summer of 2014, Arthur Breitman, a self-described crypto-anarchist, released two

17  papers online that presented his concept for the Tezos Blockchain under the pseudonym "L. M

18  Goodman."

19         30.     In early 2015, Arthur Breitman told others that he wanted to start a business based on

20  Tezos, but did not want to be publicly associated with it at the time.  He expressed concern that his

21  activities might conflict with his employment at Morgan Stanley.

22         31.     Also in early 2015, Arthur Breitman wrote a "Tezos Business Plan" which projected that

23  if the company survived 15 years it would be worth between $2 and $20 billion.  The budget called for

24  paying Arthur Breitman $212,180 in salary by year three.

25         32.     In August 2015, Arthur Breitman established DLS and listed himself as its CEO.

26         33.     Although the U.S. Financial Industry Regulatory Authority ("FINRA") requires

27  registered securities professionals, such as Arthur Breitman, to provide prior written notice to their

28

1563354_1

employer to conduct outside business activities if there is "reasonable expectation of compensation," Breitman did not report any "other business activities."

34.     Following the Tezos ICO, Arthur Breitman submitted a Letter of Acceptance, Waiver and Consent, attached hereto as Exhibit A, to FINRA acknowledging that he violated:  (1) FINRA Rules 3270 and 2010 by failing to notify Morgan Stanley of these outside business activities; (2) FINRA Rule 2010 by falsely attesting on questionnaires that he had disclosed all outside business activities to Morgan Stanley; and (3) FINRA Rules 2210(d)(1)(A), 2210(d)(1)(B), and 2210(d)(1)(F) and 2010 by "distributing sales materials to potential investors that failed to comply with FINRA's content standards for member communications with the public."

35.     Arthur Breitman's 2015 business plan called for raising $5 million to $10 million over two to three years.  Breitman pitched "Tezos Inc." in 2015, but failed to attract backers at the time.

### THE LEAD UP TO THE TEZOS ICO

36.     In April 2016, Arthur Breitman left Morgan Stanley, and by that September, he and his wife Kathleen Breitman started working on a new strategy for Tezos:  conducting an online fundraiser to distribute digital tokens (the "Tezos ICO"), whose holders would benefit from and maintain the Tezos Blockchain.

37.     According to the Tezos.com website, over the next six months, the Breitmans received $612,000 from ten early backers, including several cryptocurrency hedge funds.

38.     To conduct the ICO, the Breitmans and DLS helped to create the Tezos Foundation in Zug, Switzerland.   According to documents on the Tezos website, the plan was for the Tezos Foundation to raise money via the ICO, then acquire DLS, the Breitman-controlled company that has been developing Tezos.

39.     In June 2017, Kathleen Breitman told *Reuters* that she and Arthur Breitman opted to use a foundation based in Zug because Switzerland has "a regulatory authority that had a sufficient amount of oversight **but not like anything too crazy**."  This statement indicates that the plan was to raise money from U.S. investors while attempting to skirt U.S. securities laws protecting those investors.

40.     ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████

4 ██████████

5      41.    Months after the conclusion of the Tezos ICO, Kathleen Breitman would describe Swiss

6 regulators as "accommodating," and when asked to compare them to the SEC would say: "I don't know

7 much about how to deal with the SEC, but in general I think it's very easy for me to get an opinion on

8 what we ought to do in Switzerland, here in the US its less obvious how these digital assets are

9 registered and treated." Nevertheless, Defendants marketed and sold XTZ in the U.S. to U.S.-investors

10 and carried out the ICO in large part in California.

11      42.    The Tezos website describes the relationship between DLS and the Tezos Foundation

12 characterizing DLS as "a US-based company currently controlled by its founders, Kathleen & Arthur

13 Breitman. It owns all of the Tezos-related intellectual property ('IP') including the source code of the

14 Tezos cryptographic ledger, logos, and trademark applications associated with the name Tezos, domain

15 names, and goodwill arising from a set of a relationships with several contractors and potential

16 customers in the financial technology market."

17      43.    According to the Tezos Foundation website, DLS advises it "closely on technology," and

18 the Tezos Foundation and DLS "have negotiated a contractual agreement in which the Foundation will

19 acquire DLS and release its IP under a free software license." The Tezos Foundation will "also acquire

20 DLS' existing business relationships with contractors and potential customers, as well as its trademark

21 applications and domain names. This transaction is structured as an earnout, which means the price

22 paid will depend on future performance metrics."

23      44.    The ICO was originally scheduled to be held in May, but was delayed, and the project

24 was running out of cash. So, Kathleen Breitman went to Draper, the founding partner of Silicon Valley

25 venture capital firm Draper Associates. ████████████████████████████████

26 ██████████████████████████████████████████

27      45.   ████████████████████████████████████████

28 ████████████████████████████████████████████████████████████

SECOND AMENDED COMPLAINT

1563354_1

1

2

3

4

5 46.

6

7

8

9

10

11 47.

12

13

14

15

16 48.

17

18

19

20 49.     The Draper Defendants proceeded to invest $1.5 million, which included taking a 10%

21 stake in DLS, the company that controls the Tezos source code.

22

23 50.     Following his acquisition of his 10% stake in DLS, Draper actively marketed XTZ

24 tokens and the Tezos ICO to prospective purchasers, including Plaintiff.

25 51.     The Breitmans hired Strange Brew Strategies LLC ("Strange Brew"), a San Francisco

26 public relations firm, to help promote the ICO, and

27

28

1563354_1

52.     Strange Brew quickly pitched a favorable story to a reporter from *Reuters* regarding Draper's involvement with Tezos, which *Reuters* ran on May 5, 2017. ███████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ On May 10, 2017, Kathleen Breitman acknowledged on *Reddit* that she had asked Draper "to interview with Reuters because I wanted to *raise awareness for more people and he agreed. Tim [Draper] really believes in a lot of users making the network robust*."

53.     On May 17, 2017, the *Wall Street Journal* followed up with another article stating: "Even some big investors are interested. Tim Draper, a well-known Silicon Valley venture capitalist and early bitcoin believer, plans to buy tokens in a coming coin offering for Tezos . . . ." ██████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

54.     ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████

55.     In pitching the story to *Reuters*, Strange Brew made claims about Tezos' progress that promoted the profit potential of an investment in XTZ.  A principal of Strange Brew wrote: "The applications of Tezos, ranging from derivatives settlement to micro-insurance, are real and recognized by industry giants.  Ernst & Young, Deloitte, LexiFi, etc., have adopted Tezos in their development environments and labs."

56.     However, on October 3, 2017, a spokeswoman for the accounting firm Ernst & Young told *Reuters*: "The statement is not correct.  EY has not adopted Tezos."

57.     A spokesman for Deloitte said Tezos' code is "one of many technologies we're considering" with blockchain, but it's "still early stage and we haven't used the technology for a client project."

58.     Jean-Marc Eber, CEO of the French software company LexiFi, said: "The sentence, as stated, isn't accurate and unfortunately exaggerated, to say the least." While there had been "informal contacts," he said, "at this stage, LexiFi has not adopted Tezos' technology in its development environment or labs."

59.     Despite Strange Brew's exaggeration of the development and adoption of the Tezos Blockchain, the Breitmans nevertheless allowed Strange Brew to press on and publish the marketing materials.

## THE TEZOS ICO

60.     The Tezos ICO was opened to public investors beginning on or about July 1, 2017.

61.     The Tezos ICO was "uncapped," meaning that there was "no limit on the amount of contributions that [were] accepted" or the total amount that Defendants could raise through the ICO.

62.     Contributors to the Tezos ICO were informed they would be allocated 5,000 XTZ for each Bitcoin contributed during the ICO.  However, it also encouraged investors to contribute as early as possible by providing for "time-dependent bonus[es]."

63.     The Tezos website described these bonuses:  "From 20% at the outset the bonuses will decrease progressively to 0% over four additional periods (15%, 10%, 5%, and 0%) lasting 400 Bitcoin blocks [approximately two days and eighteen hours] each."  These bonuses had their intended effect, with the vast majority of purchases occurring the first few days of the ICO.

64.     The FAQ section of the Tezos website contained an entry instructing visitors on how to acquire XTZ through the Tezos ICO.  It was titled: "How do I acquire and store Tezos tokens during and after the fundraiser (sometimes called 'ICO')?"  And stated:

> During the fundraiser you will access https://crowdfund.tezos.com and follow instructions to create a wallet and download a backup of that wallet in the form of a pdf document.  We recommend you print, or manually copy this file and place the document in a safe place.  Once the Tezos network launches, you will be able to import this wallet into the Tezos client to access your tezzies.

65.     The Tezos ICO finally began on July 1, 2017.  The Breitmans had wide-ranging expectations about how much they might raise.  In June, Kathleen Breitman told *Reuters* that about a year ago, when the price of Bitcoin was lower, "we were like, 'Hey, we would be lucky if we get 20 million.'"

66.     Thirteen days later, the project had received about 65,703 Bitcoins and 361,122 Ethereum, worth approximately $232 million at the time.  This digital currency is now worth well over twice that – approximately $449 million.  Kathleen Breitman has since stated that this haul significantly exceeded DLS' expectations, and acknowledged the obvious, stating: "that is a lot of money."

67.     According to the Tezos website, once certain conditions (including release of the Tezos main net) are met DLS shareholders will receive 8.5% of funds contributed during the ICO – approximately $47.5 million dollars.  DLS and its shareholders will also receive 10% of all XTZ in the genesis block, with the Tezos Foundation receiving an additional 10% of all XTZ created.

68.     Despite the substantial sums Defendants stand to gain, Kathleen Breitman described participating in the Tezos fundraiser as like contributing to a public television station and receiving "a tote bag" in return.  "That's kind of the same thing here," she said.

69.     This statement was false and contradicted by the facts of the ICO.  Investors invested tens of millions of dollars in the ICO with the expectation that their investments would appreciate in value following the launch of XTZ, allowing them to reap profits from Defendants' development of the XTZ ecosystem.  The day after the ICO, *Forbes* magazine ran a story on the Tezos ICO as the poster child of a "new way to invest" as investors turn to ICOs to "seek their fortunes."[2]  Similarly, an article in cryptocurrency news website, *Hacked*, presented a post-ICO analysis of the investment opportunity presented by XTZ, noting that "[p]ure speculators will argue that XTZ is a lagging price in a hot area."[3]  In May 2017 Draper similarly discussed his plan to purchase XTZ with *Reuters*, saying his firm has specifically carved out money for non-traditional investments.[4]  These articles are just some of many

---

[2]     https://www.forbes.com/sites/omribarzilay/2017/07/15/tezos-232-million-ico-may-just-be-the-beginning/#6354876c4c52.

[3]     https://hacked.com/tezos-a-value-trap-or-just-good-value/.

SECOND AMENDED COMPLAINT
1563354_1

1   that have pointed out the obvious: investors purchased Tezzies with the expectation of receiving a

2   return on their investment.

3        70.    Moreover, this characterization of ICO contributions as a donation is directly

4   contradicted by statements made by Defendants and the significant investments in XTZ made by

5   cryptocurrency hedge funds, which were expressly made with the expectation of reaping profits from

6   the investment.  As described by one news source covering Draper's investment in Tezos, "Famed

7   investor Tim Draper has given a boost to a startup blockchain company called Tezos with a public

8   announcement that he intends to invest in its 'initial coin offering' as well as Dynamic Ledger Solutions

9   Inc., the company behind the offering."[5]

10       71.    Draper characterized acquiring XTZ as a purchase rather than a donation.  A *Wall Street*

11  *Journal* article published on May 17, 2017 quoted Draper as saying "***I think we're going to make a lot***

12  ***money***" – making it clear that Draper did not view his investment as charity.  Asked in October 2017

13  how much he donated during the Tezos fundraiser, he replied via email, "***You mean how much I***

14  ***bought? A lot***."

15       72.    Kathleen Breitman similarly revealed the absurdity of characterizing purchases made

16  during the ICO as donations in a June 2017 interview, stating:   "***We are selling*** . . . rather the

17  Foundation is recommending an allocation of tokens to the genesis block based on donations to a Swiss

18  non-profit . . . ***we are going to sell them*** over the course, uh, rather have them up for donation for the

19  course of two weeks . . . ."

20       73.    Potential purchasers also clearly viewed XTZ tokens as ***investments***, not donations.

21  ███████████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████████████

24

25

---

26  [4]   https://www.reuters.com/article/us-tezos-blockchain-draper/exclusive-billionaire-investor-draper-to-participate-in-blockchain-token-sale-for-first-time-idUSKBN181250.

27  [5]   https://siliconangle.com/blog/2017/05/07/famed-investor-tim-draper-invest-new-blockchain-cryptocurrency/.

28

SECOND AMENDED COMPLAINT

1563354_1



74.

75.     While the ICO's purported terms called the contributions "a non-refundable donation" and not a "speculative investment," Defendants' self-serving characterizations are irrelevant.  As the

SECOND AMENDED COMPLAINT

SEC has made clear, merely calling a security something other than a "security" does not insulate

sellers of the security from the federal securities laws.  For example, on December 11, 2017, SEC

Chairman Jay Clayton ("Clayton") confirmed, "Merely calling a token a 'utility' token or structuring it

to provide some utility does not prevent the token from being a security," and warned security offerers

that attempts to "elevate form over substance" could not obviate their obligations under the federal

securities laws.  Clayton continued in pertinent part:

> *. . . [C]ertain market professionals have attempted to highlight utility characteristics of their proposed initial coin offerings in an effort to claim that their proposed tokens or coins are not securities.  Many of these assertions appear to elevate form over substance.  Merely calling a token a "utility" token or structuring it to provide some utility does not prevent the token from being a security*.  Tokens and offerings that incorporate features and marketing efforts that emphasize the potential for profits based on the entrepreneurial or managerial efforts of others continue to contain the hallmarks of a security under U.S. law.  On this and other points where the application of expertise and judgment is expected, I believe that gatekeepers and others, including securities lawyers, accountants and consultants, need to focus on their responsibilities.  I urge you to be guided by the principal motivation for our registration, offering process and disclosure requirements:  investor protection and, in particular, the protection of our Main Street investors.

> *                *                *

> . . . [M]any token offerings appear to have gone beyond this construct and are more analogous to interests in a yet-to-be-built publishing house with the authors, books and distribution networks all to come.  *It is especially troubling when the promoters of these offerings emphasize the secondary market trading potential of these tokens.  Prospective purchasers are being sold on the potential for tokens to increase in value – with the ability to lock in those increases by reselling the tokens on a secondary market – or to otherwise profit from the tokens based on the efforts of others.  These are key hallmarks of a security and a securities offering.*

> *By and large, the structures of initial coin offerings that I have seen promoted involve the offer and sale of securities and directly implicate the securities registration requirements and other investor protection provisions of our federal securities laws.*  Generally speaking, these laws provide that investors deserve to know what they are investing in and the relevant risks involved.

### DEFENDANTS FAIL TO LAUNCH THE TEZOS BLOCKCHAIN AND TIMELY DELIVER XTZ TO INVESTORS

76.       In the lead up to the Tezos ICO, Defendants assured potential investors that the Tezos

Blockchain was far along in its development and could be launched shortly after the end of the ICO.

However, the Tezos Blockchain did not launch until over a full year after the end of the Tezos ICO.

When the Tezos Blockchain finally launched, Defendants refused to allow Plaintiff or members of the

Class to claim the promised XTZ unless they agreed to the "Tezos Tokens (XTZ) Acceptance and Use

Terms and Conditions." These terms purport to limit Defendants' liability and require that any disputes regarding XTZ be resolved in the courts of Zug, Switzerland. As a result, Plaintiff and many other members of the Class have not yet received the XTZ they were promised.

77.     One of the reasons given as the "rationale" for the Breitmans' compensation, was that:

> A large subset of the projects conducting fundraisers (sometimes called "ICOs") today are based on little more than a white paper and will remain in a development phase for years. Participants in those fundraisers have no idea how much of their contributions will be spent bringing those projects to fruition – if they ever reach that point. In contrast, Tezos established a working testnet in February 2017 which can be accessed upon request to assess the state of the completion of the Tezos project. Most of the remaining development consists of performing security audits and improving the test coverage of the project so it can confidently launch as a public blockchain.

78.     In a May 19, 2017 blog post, Arthur Breitman wrote that the he believed the Tezos team could reasonably launch the Tezos network "in a three to four months period." Giving his worst-case projection, Breitman continued, "[i]t's entirely within the realm of possibility that the project takes up to 6 months to ship. Based on my assessment of the remaining development . . . that does not seem *likely*, but it's not *impossible*."

79.     In June of 2017, the Tezos website similarly proclaimed that "[t]he development team estimates that the time to completion [of the Tezos network] is around 4 months."

80.     Following the ICO, neither the Tezos Foundation nor DLS provided significant status updates to participants or the general public for months.

81.     Then, on or about October 18, 2017, Arthur Breitman published a blog post titled "The Path Forward" conceding that progress since the ICO "had fallen short of our expectations."

82.     The blog post acknowledged that the Tezos Blockchain was still in its alpha stage and stated that "[o]ur current best estimate for shipping the [Tezos] main net is now February of 2018, through the firm date remains 'when it's ready.'"

83.     Arthur Breitman's blog post also revealed that development of the Tezos Blockchain was being hampered by serious governance issues. He acknowledged that "despite the resources" raised from investors, Defendants had been unable to "scale the development team."

84.     The blog post described disputes between the Breitmans and the Tezos Foundation's then president, Gevers, stating that in early September, the Breitmans "became aware that the president

1  of the Tezos Foundation, Johann Gevers, engaged in an attempt at self-dealing, misrepresenting to the

2  board the value of a bonus he attempted to grant himself."

3       85.    Gevers responded to these accusations by stating that he would not step down and

4  accusing Arthur Breitman of "attempted character assassination."  He continued by describing the

5  efforts to remove him by the Breitmans and the other board members as an "illegal coup."

6       86.    Gevers stated that the Breitmans had been trying to control the Tezos Foundation as if it

7  were their own private entity.  He said that by bypassing the Tezos Foundations' legal structure and

8  interfering in its operations, the Breitmans caused costly delays in developing and launching the

9  network and currency.  He further accused them of "unnecessarily putting the project at risk."

10       87.    The conflict between the Breitmans and Gevers brought development of the Tezos

11  Blockchain to a halt.  Gevers demanded that he be given a salaried executive role at the Tezos

12  Foundation and attached a proposed contract including compensation in the hundreds of thousands of

13  Swiss Francs as well as an additional allocation of XTZ.

14       88.    Gevers' proposed contract valued the allocation of XTZ at a few hundred thousand

15  dollars, however he simultaneously expressed his belief that they were worth perhaps ten times more.

16  The cumulative value of the contract was potentially worth millions of dollars – all to be paid with

17  funds raised from Plaintiff and the Class in the Tezos ICO.

18       89.    Arthur Breitman was incensed that Gevers would propose such a lavish contract for

19  himself.  He called Gevers incompetent and threatened to contact the press if Gevers did anything

20  improper.  Gevers in turn accused the Breitmans of trying to exert "undue influence" over the Tezos

21  Foundation, and called for a halt to all Tezos Foundation activity until the matter of his own contract

22  was resolved.  As a result, the small team of developers working on the Tezos Blockchain was not being

23  paid and additional developers were not hired.

24       90.    Diego Pons, one of the other two members of the Tezos Foundation board, emailed the

25  board, describing the situation as "dire."  In his view, the Tezos Foundation had accomplished almost

26  nothing and now ran the risks that Swiss authorities would revoke its charter.

27

28

91. █████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████

92.    During this time period, from July through October 2017, the Tezos Foundation took in about $65 million from sales of Bitcoin and Ethereum raised in the Tezos ICO but spent less than a million dollars.  Gevers responded by arguing that the Tezos Foundation's inaction was not his fault, noting that Arthur Breitman had "rejected all my suggestions for candidates for operational roles, instead suggesting candidates that are personal friends of the Breitmans."  Gevers then instructed the Tezos Foundation's teams to stop talking to the Breitmans.

93. █████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████

94.    Against this backdrop the Swiss Foundation Supervisory Authority began an inquiry into the Tezos Foundation.  Gevers submitted a response blaming delays in the development of the Tezos Blockchain on the Breitmans and the media.  Diego Pons presented an exhaustive inventory of the boards mismanagement, inactivity, and conflicts of interest.  He finished, imploring the Swiss Foundation Supervisory Authority: "As a member of the foundation council, I, once again, respectfully request your Authority to take immediate action to safeguard the interests of the foundation."

95.    In February 2018, Gevers remained at the helm of the Tezos Foundation, and released a series of tweets about its future.  The Breitmans believed that Gevers remained prepared to fight a war of attrition for control of the Tezos Foundation.  Describing their dispute, Kathleen Breitman stated, "[i]t's not a corporate-governance matter anymore, it's a hostage negotiation."  And when asked how the situation had deteriorated, Kathleen Breitman said of Gevers, "[h]e's the world's stupidest scorpion, and Arthur is the world's most gullible frog."

96.    Kathleen Breitman continued, "I feel like I'm in a hole, so fuck it, the game's afoot.  I'm going to blow this fucking canton up.  I'm going to play the hand I was dealt, and I've got a much better deck.  I keep telling Arthur that the people on the other side are just going to play their game for a

SECOND AMENDED COMPLAINT
1563354_1

1  billion dollars.  It's not about the morality of crypto.  It's about shipping and winning the game.  I've

2  got 60,000 lines of code that will ship with or without those guys in Zug."

3      97.    Soon thereafter, Kathleen Breitman would tell a crowd at UCLA that she and Arthur

4  Breitman were "going rogue, and in the next few weeks we'll release the token.  It's the software

5  equivalent of carrying an ectopic pregnancy to term."

6      98.    A few days later, Gevers resigned from the Tezos Foundation, receiving more than

7  $400,000 in severance, paid for with funds raised from Plaintiff and the Class in the Tezos ICO.

8      99.    As of the date of this filing, Defendants have not delivered the XTZ they promised to

9  Plaintiff.

10                     **THE XTZ TOKENS ARE SECURITIES**

11      100.   The sale of XTZ during the Tezos ICO constituted an offer and sale of securities under

12  applicable law.  Plaintiff and the Class invested in XTZ as a common enterprise with the expectation of

13  profits derived solely from the efforts of Defendants and their agents and employees.  Plaintiff and the

14  Class invested fiat and other digital currencies, such as Bitcoin and Ethereum, to purchase XTZ.

15      101.   The expected profits of Plaintiff and the Class are inextricably intertwined with and

16  directly derived from Defendants' business operations.  Defendants sold XTZ to investors in order to

17  finance the development of the Tezos Blockchain and stand to profit if the Tezos Blockchain is a

18  success.  In addition to the funds raised from investors, DLS and its shareholders were entitled to

19  receive 10% of the initial issuance of XTZ tokens once the Tezos Blockchain launched.  The Tezos

20  Foundation received an additional 10% of the initial issuance of XTZ.

21      102.   Moreover, Defendants' efforts to characterize the substantial sums contributed by

22  investors during the Tezos ICO as mere "donations" or "contributions," are directly contradicted by

23  statements made by Defendants and the significant investments made by cryptocurrency hedge funds.

24      103.   For example, Kathleen Breitman revealed the absurdity of characterizing purchases

25  made during the ICO as donations in a June 2017 interview, stating:  "***We are selling*** . . . rather the

26  Foundation is recommending an allocation of tokens to the genesis block based on donations to a Swiss

27  non-profit . . . ***we are going to sell them*** over the course, uh, rather have them up for donation, for the

28  course of two weeks."

104.     Gevers similarly tweeted, "TEZOS RAISES RECORD-BREAKING $200 MILLION IN THREE DAYS giving it the resources to grow into one of the Big 3 blockchains."[6]

105.     Draper similarly characterized acquiring XTZ as a purchase rather than a donation. Asked in October 2017 how much he donated during the Tezos fundraiser, he replied via email, "You mean how much I bought?  A lot."

106.     Defendants themselves have recognized that investors in the Tezos ICO could reasonably expect to derive profits from Defendants' development of the Tezos Blockchain.  For example, on February 17, 2017, Kathleen Breitman described the investment in Tezos by Polychain Capital, saying "[w]e think this is significant because it represents a new business model.  We created a product [the XTZ token] that was *purchased by VC investors without the traditional equity investment model because of the anticipated appreciation of our token*."

107.     The Tezos Foundation's website similarly acknowledges investors' expectation of profits, stating that depression of XTZ prices "is obviously not in the best interest of our contributors."

108.     Following the ICO, in October 2017, Draper acknowledged that he hoped to make himself and other XTZ investors "rich."

109.     Defendants have also made it clear that the investments they received in return for the promise to deliver XTZ to investors was capital used to finance the development of the Tezos Blockchain.  In fact, in February 2018, while this litigation was pending, Kathleen Breitman explicitly referred to the Tezos ICO as "an alternative financing structure."

110.     It has also been clear from the outset that the profits Plaintiff and Class expect to derive are dependent solely on the entrepreneurial, technical, and managerial efforts of Defendants.

111.     In particular, the value of XTZ depends on Defendants completing the Tezos Blockchain and bringing it online, developing and improving the Tezos Blockchain once operational, providing network security, and promoting the network.  The Breitmans have repeatedly represented that they are experts in blockchain technology and that the success of the Tezos Blockchain depends on their continued involvement.

---

[6]     https://twitter.com/johanngevers/status/882332401862660097.

112.    For example, in his October 18, 2017 blog post, Arthur Breitman acknowledged that: "***The momentum we had prior to the fundraiser has slowed despite the resources now available for supporting the project.***  Some development has continued and we have personally been working to create strong relationships with successful entrepreneurs looking to build with Tezos.  ***Unfortunately other aspects have fallen behind***, such as: . . . ***Scaling up the development team***."

113.    The Tezos ICO site also contained a PDF detailing what funds raised in the ICO would be used for based on the amount raised.  The section, titled "If the foundation is endowed with . . ." details what the Tezos Foundation will do if it raises $6 million, $12 million, $20 million, "moonshot," or "mars-shot."  Having raised well over ten times $20 million, the foundation achieved its "mars-shot."

114.    Under this "mars-shot" scenario, the document claimed the Tezos Foundation would:

- "Deploy and silo several teams of engineers to build different candidates for upgrades."

- "Sponsor a leading computer science department."

- "Acquire mainstream print and TV media outlets to promote and defend the use of cryptographic ledger in society."

- "Fund efforts to digitize and map transaction logic from traditional legal prose to a Tezos language."

- "Negotiate with a small nation-state the recognition of Tezos as one of their official state currencies, which would immediately give Tezos favorable treatment in terms of financial regulation.  Attempt negotiations to purchase or lease sovereign land."

115.    Even under the less optimistic fundraising scenarios, the Tezos Foundation promised to:

- Grow its team to at least 15 members.

- Conduct three annual developer conferences.

- "Retain our counsel to start exploring, as a failsafe, alternative legal structure or advocacy for the Foundation beyond the swiss Cryptovalley."

- "Lobby municipalities and local government to use formally verified smart contracts as a form of binding legal contract."

- "Purchase a banking license and deploy the Tezos block as a backbone for business operations.  Experiment with automation using blockchain for basic processes."

116.    Each of these actions, if successfully completed, was designed to improve the Tezos Blockchain and develop the XTZ ecosystem and thereby cause the price of XTZ tokens to appreciate. Investors in the ICO depended on Defendants to deliver on their promises in order to profit from their investments.

### RECENT SEC GUIDANCE FURTHER ILLUSTRATES THAT XTZ IS A SECURITY

117.    In July 2017, the SEC began to question the legality of unregistered token sales, such as the sales of XTZ, and made clear that sellers of unregistered securities cannot evade their obligations under the federal securities laws by elevating form over substance.  On July 23, 2017, the SEC issued an "Investor Alert" which stated that the agency was "concerned that the rising use of virtual currencies in the global marketplace may entice fraudsters to lure investors into Ponzi and other schemes in which these currencies are used to facilitate fraudulent, or simply fabricated, investments or transactions." The release continued by warning that "the fraud may also involve an unregistered offering or trading platform" and promises of "high returns for getting in on the ground floor of a growing Internet phenomenon."[7]

118.    On July 25, 2017, the SEC released an investor bulletin on ICOs.  The bulletin stated that digital blockchain currencies "may be securities" under the facts and circumstances, and that such "virtual coins or tokens in an ICO *are subject to the federal securities laws*."[8]  The release continued in pertinent part:

> A virtual currency is a digital representation of value that can be digitally traded and functions as a medium of exchange, unit of account, or store of value.  Virtual tokens or coins may represent other rights as well.  Accordingly, in certain cases, *the tokens or coins will be securities and may not be lawfully sold without registration with the SEC or pursuant to an exemption from registration*.

119.    That same day, the SEC issued an investigative report concluding that the tokens issued by a blockchain and distributed ledger organization known as "The Dao" were, in fact, securities.  The press release announcing the report stated that "issuers of distributed ledger or blockchain technology-

---

[7]    *See* https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-alert-bitcoin-other-virtual-currency.

[8]    *See* https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings.

SECOND AMENDED COMPLAINT
1563354_1

based securities *must register offers and sales of such securities unless a valid exemption applies*" and that those organizing unregistered offerings "may be liable for violations of the federal securities laws."[9] In the case of The Dao, the SEC had found that even though the organization labeled its tokens as something other than securities, the virtual currency was subject to the registration requirements of the federal securities laws as, in economic substance, it was a security.

120.   On December 11, 2017, SEC Chairman Clayton issued another statement on digital token.   As discussed in ¶75 above, he warned security offerors that attempts to "elevate form over substance" could not obviate their obligations under the federal securities laws.

121.   Clayton could have been referring directly to XTZ and Defendants' attempts to tout the profit-making potential of investing in XTZ tokens on the one hand, while disclaiming any responsibilities to comply with applicable securities laws on the other.   The SEC has since launched dozens of investigations into cryptocurrency startups.

122.   For the integrity of U.S. securities markets, Defendants' attempts to circumvent important investor safeguards must fail.   Although cryptocurrencies represent something of a new investing frontier, the old adage rings true: "If it looks like a duck, swims like a duck, and quacks like a duck, then it probably is a duck."   Here, XTZ has all of the hallmarks of a security, and Defendants' mere say-so does nothing to diminish their obligations to register these securities under applicable securities laws.

123.   In light of recent SEC guidance, there can now be little doubt that XTZ tokens constitute securities.   Despite this fact, Defendants have failed to register the securities in accordance with applicable laws and regulations before offering and selling them to the investing public.   Further, the sale of XTZ was not subject to any exemption or exceptions to the registration requirements available under state or federal law.   As a result, the offer and sale of XTZ was unlawful, and Defendants are liable to Plaintiff and the Class as purchasers of XTZ as alleged herein.

---

[9]   *See* https://www.sec.gov/news/press-release/2017-131.

SECOND AMENDED COMPLAINT
1563354_1

**PLAINTIFF'S INVESTMENT IN THE TEZOS ICO**

124.     Plaintiff began investing in cryptocurrencies in March 2017.  Before buying Tezos he had bought primarily Bitcoin and Ethereum – the two largest cryptocurrencies.

125.     Plaintiff saw some of the stories detailing Tezos' investment potential and read up on Tezos on its own site and various cryptocurrency blogs and podcasts.

126.     He determined that buying XTZ was a worthwhile investment. This determination was based in large part on the repeated representations that the Tezos network would be operational by December 2017 at latest.

127.     On July 12, 2017, Plaintiff logged onto the Tezos contribution website from his home network in San Diego, California and followed the contribution instructions (which are provided in this YouTube video https://www.youtube.com/watch?v=Uti8-1Y-Wkk).

128.     At no point in this process did Plaintiff see or agree to the Tezos ICO's purported terms and conditions.

129.     The Tezos website provided Plaintiff with a Bitcoin address to send funds to.  Plaintiff then sent one Bitcoin (worth approximately $2,800 at the time) from an account on Coinbase, a cryptocurrency exchange based in San Francisco, California, to the address provided by the Tezos contribution website.  In return he was provided with a private key that he was informed would allow him to access his wallet (containing 5,000 XTZ) when the Tezos network was launched.

**CLASS ACTION ALLEGATIONS**

130.     This suit is brought as a class action pursuant to §382 of the California Code of Civil Procedure, on behalf of a Class of:

> ***All persons who purchased XTZ from Defendants during the Tezos ICO conducted by Defendants beginning in July 2017.  Excluded from the Class are: retail employees; corporate officers, members of the boards of directors, and senior executives of Defendants; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.***

131.     Plaintiff does not, as of yet, know the exact size of the Class.  However, based on records found on the Tezos website, Plaintiff believes that there are approximately 30,000 Class members.  The members of the Class are thus so numerous that joinder of all members is impracticable.

1563354_1

132.    Questions of law and fact common to the Class that predominate over any questions that may affect only individual members of the Class, including, but not limited to:

(a)    Whether the offering and sale of XTZ through the Tezos ICO constituted the sale or offer of "securities";

(b)    Whether Defendants were required to file a registration statement to offer and sell XTZ through the Tezos ICO;

(c)    Whether Defendants are "issuers," "underwriters" and/or "necessary participants" in the Tezos securities offering;

(d)    Whether Defendants Arthur Breitman, Kathleen Breitman, Gevers, Draper, Draper Associates, and DLS (the "Control Person Defendants") are "control persons" within the meaning of the Securities Act;

(e)    Whether Defendants violated the Securities Act through the conduct alleged herein; and

(f)    The type and measure of damages suffered by Plaintiff and the Class.

133.    Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff's claims are typical and representative of the claims of all members of the Class. Plaintiff suffered injury in fact when he purchased 5,000 XTZ for one Bitcoin (then valued at approximately $2,800, and now worth approximately $5,900).

134.    Plaintiff's claims are typical of the claims of all Class members, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws.

135.    There are no unique defenses that may be asserted against Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiff is typical of other members of the Class, does not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and has no conflict with any other members of the Class. Plaintiff has retained competent counsel experienced in securities, consumer protection, and class action litigation to represent himself and the Class.

136.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as

- 26 -

1    the damages suffered by individual Class members may be relatively small, the expense and burden of

2    individual litigation make it impossible for Class members to redress individually the wrongs done to

3    them.  In the absence of a class action, Defendants will retain the benefits of their wrongful conduct.

4    There will be no difficulty in the management of this action as a class action.

5                                    **FIRST CAUSE OF ACTION**

6                          **Unregistered Offer and Sale of Securities**
                           **in Violation of §§5 and 12(a)(1) of the Securities**
7                          **Act - Against All Defendants**

8        137.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates

9    herein by reference each and every allegation contained in the preceding paragraphs of this Complaint,

10   and further alleges as follows:

11       138.    This Count is brought pursuant to §12(a)(1) of the Securities Act, 15 U.S.C. §77l(a)(1),

12   on behalf of the Class, against all Defendants.

13       139.    This Count does not sound in fraud.  Plaintiff does not allege that Defendants had

14   scienter or fraudulent intent, which are not elements of a §12(a)(1) claim.

15       140.    Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or

16   sells a security in violation of §5, which prohibits the sale of unregistered securities absent an

17   exemption, and states that such person,

18           [S]hall be liable . . . to the person purchasing such security from him, who may
             sue either at law or in equity in any court of competent jurisdiction, to recover the
19           consideration for such security with interest thereon, less the amount of any income
             received thereon, upon the tender of such security, or for damages if he no longer owns
20           the security.

21       141.    The Defendants, and each of them, by engaging in the conduct described above, directly

22   or indirectly, made use of means or instruments of transportation or communication in interstate

23   commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be

24   carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

25       142.    The sale of XTZ tokens involved the sale of unregistered securities under controlling

26   federal law.  XTZ exhibits each of the hallmarks of a security under the *Howey* test: (a) in order to

27   receive any XTZ an investment of money, in the form of fiat or cryptocurrency assets, was required;

28   (b) the investment of money was made into the common enterprise that is the Tezos Blockchain and the

1   potential to further the XTZ ecosystem; and (c) the success of the investment and any potential profits

2   from it was reliant on Defendants' ability to successfully promote and develop Tezzies and the XTZ

3   ecosystem.  *See generally SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

4       143.   Defendants promoted, sold and solicited the sale of XTZ to Plaintiff and the Class as

5   detailed herein.

6       144.   Plaintiff and members of the Class purchased XTZ from Defendants.

7       145.   No registration statements have been filed with the SEC or have been in effect with

8   respect to any of the offerings alleged herein and the securities did not qualify for an exemption from

9   registration.

10       146.   By reason of the foregoing, each of the Defendants have violated §§5 and 12(a)(1) of the

11   Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a)(1).

12       147.   As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff

13   and members of the Class have suffered damages in connection with their respective purchases of XTZ

14   securities at the Tezos ICO.

15   <center>**SECOND CAUSE OF ACTION**</center>

16   <center>**Violation of §15 of the Securities Act -**</center>
<center>**Against the Control Person Defendants**</center>

17

18       148.   Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates

19   herein by reference each and every allegation contained in the preceding paragraphs of this Complaint,

20   and further alleges as follows:

21       149.   This Count is asserted against the Control Person Defendants under §15 of the Securities

22   Act, 15 U.S.C. §77o.

23       150.   This Count does not sound in fraud.  Plaintiff does not allege that the Control Person

24   Defendants had scienter or fraudulent intent, which are not elements of a §15 claim.

25       151.   The Control Person Defendants, by virtue of their offices, stock ownership, agency,

26   agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as

27   set forth herein, controlling persons within the meaning of §15 of the Securities Act.  The Control

28

<center>- 28 -</center>
<center>SECOND AMENDED COMPLAINT</center>

1   Person Defendants, and each of them, had the power and influence and exercised the same to cause the
2   unlawful offer and sale of XTZ securities as described herein.

3          152.   The Control Person Defendants, separately or together, possess, directly or indirectly, the
4   power to direct or cause the direction of the management and policies of DLS and/or the Tezos
5   Foundation, through the ownership of voting securities, by contract, subscription agreement, or
6   otherwise.

7          153.   The Control Person Defendants have sufficient influence to have caused DLS and/or the
8   Tezos Foundation to submit a registration statement.

9          154.   The Control Person Defendants jointly participated in DLS and/or the Tezos
10  Foundation's failure to register the XTZ securities.

11         155.   By virtue of the conduct alleged herein, the Control Person Defendants are liable for the
12  wrongful conduct complained of herein and are liable to Plaintiff and the Class for recession and/or
13  damages suffered.

14                                              **PRAYER**

15         WHEREFORE, Plaintiff demands judgment on his behalf and that of the Class as follows:

16         A.     This action may be maintained as a Class action under California Code of Civil
17  Procedure §382 and California Rule of Court 3.760, *et seq*., certifying Plaintiff as representative of the
18  Class and designating his counsel as counsel for the Class;

19         B.     That the unlawful offer and sale of XTZ securities alleged above be adjured and decreed
20  to violate §§5, 12(a)(1), and 15 of the Securities Act;

21         C.     That judgment be entered against Defendants and in favor of Plaintiff and each member
22  of the Class he represents, for restitution and disgorgement of ill-gotten gains as allowed by law and
23  equity as determined to have been sustained by them;

24         D.     For rescission of Plaintiff and each member of the Class' purchase of XTZ;

25         E.     For pre and post-judgment interest;

26         F.     For equitable relief, including a judicial determination of the rights and responsibilities
27  of the parties;

28

1563354_1

G. Requiring an accounting of all remaining assets and funds raised by Defendants through the Tezos ICO;

H. Imposing a constructive trust over the assets and funds raised by Defendants through the Tezos ICO;

I. For attorneys' fees;

J. For costs of suit; and

K. For such other and further relief as may be deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: May 16, 2019

TAYLOR-COPELAND LAW
JAMES Q. TAYLOR-COPELAND


_/s/ James Q. Taylor-Copeland_
JAMES Q. TAYLOR-COPELAND

501 West Broadway, Suite 800
San Diego, CA  92101
Telephone:  619/400-4944
james@taylorcopelandlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUCAS F. OLTS
SARA B. POLYCHRON
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
lolts@rgrdlaw.com
spolychron@rgrdlaw.com
bcochran@rgrdlaw.com

_Attorneys for Plaintiff Andrew Baker_

1563354_1

# Exhibit A

# Exhibit A

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**LETTER OF ACCEPTANCE, WAIVER AND CONSENT**
**NO. 2017056612801**

TO:    Department of Enforcement
        Financial Industry Regulatory Authority ("FINRA")

RE:    Arthur Robert Meunier a/k/a Arthur Robert Breitman a/k/a Arthur Robert Meunier-
        Breitman, Respondent
        General Securities Representative
        CRD Nos. 5726300 and 5090765

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, I, Arthur Robert Breitman ("Breitman" or "Respondent")[1] submit this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against me alleging violations based on the same factual findings described herein.

**I.**
**ACCEPTANCE AND CONSENT**

A.    I hereby accept and consent, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

**BACKGROUND**

Breitman entered the securities industry in January 2006 when he became associated with a FINRA-regulated broker-dealer as a non-registered fingerprint person. From April 2010 to April 2012, Breitman was associated with another FINRA-regulated broker-dealer as a General Securities Representative ("GSR"). Breitman holds the following securities licenses: Series 7 (April 2010) and Series 63 (July 2010).

In August 2013, Breitman became associated with Morgan Stanley & Co., LLC ("Morgan Stanley" or the "Firm"), a FINRA-regulated broker-dealer, as a GSR. In a Uniform Termination Notice for Securities Industry Registration ("Form U5") dated April 21, 2016, Morgan Stanley reported the termination of Breitman's employment and association effective April 1, 2016, due to a business reorganization.

Although Breitman is not currently associated with a FINRA-regulated broker-dealer, he remains subject to FINRA's jurisdiction pursuant to Article V, Section 4 of FINRA's By-Laws.

**RELEVANT DISCIPLINARY HISTORY**

Breitman has no prior disciplinary history.

---

[1] Breitman legally changed his surname from that of his mother to his father in 2013.

## OVERVIEW

During the period of February 2014 to April 2016 (the "Relevant Period"), Breitman engaged in an outside business activity involving Tezos, a blockchain technology. During the Relevant Period, Breitman's Tezos-related business activities included, among other things: (i) launching a website and publishing position papers describing Tezos and its application; (ii) soliciting prospective investors in an attempt to raise $5 to $10 million to finance his business operations; (iii) assembling a team of advisors and retaining a chief operations officer; and (iv) forming a corporate entity known as Dynamic Ledger Solutions, Inc. ("DLS"). During the Relevant Period, outside of his meetings with prospective investors, Breitman promoted Tezos using a pseudonym to publish the website, tweets, and his position papers.

Breitman did not notify Morgan Stanley at any time that he was engaging in these outside business activities. By engaging in outside business activities without providing prior written notice to Morgan Stanley, Breitman violated FINRA Rules 3270 and 2010.

During the Relevant Period, Breitman also falsely attested on two Firm questionnaires that he had disclosed all of his outside business activities to the Firm. By providing false responses on the Firm's annual compliance questionnaires, Breitman violated FINRA Rule 2010.

Breitman also violated FINRA Rules 2210(d)(1)(A), 2210(d)(1)(B), 2210(d)(1)(F) and 2010 by distributing sales materials to potential investors that failed to comply with FINRA's content standards for member communications with the public.

## FACTS AND VIOLATIVE CONDUCT

### *Breitman's Outside Business Activities*

FINRA Rule 3270 provides, in relevant part: "No registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the member, in such form as specified by the member."

FINRA Rule 2010 requires that each FINRA member and its associated persons "observe high standards of commercial honor and just and equitable principles of trade." A violation of FINRA Rule 3270 is also a violation of FINRA Rule 2010.

During the Relevant Period, Morgan Stanley's written supervisory procedures ("WSPs") required that all Firm employees request and receive approval from the Firm prior to engaging in any outside business activity. The WSPs also required Firm employees to ensure that the information regarding their outside business activities remained current and accurate and to report any material changes to the Firm.

In February 2014, Breitman began developing Tezos, a blockchain technology and network originally intended for use in connection with certain over-the-counter securities transactions. In 2014, Breitman invested approximately $80,000 of his own funds into developing Tezos, launched a website and Twitter account, assembled a team of advisors, and published two position papers describing Tezos and its application as a self-amending

2

crypto-ledger. Breitman published his website, Twitter feed and position papers under the name "L.M. Goodman", and used e-mail addresses associated with L.M. Goodman for Tezos-related correspondence.

In 2015, Breitman continued his Tezos-related business activities, retaining a chief operations officer, developing a business plan and valuation (the "Business Plan"), and presenting the Business Plan to twelve prospective individual and institutional investors, including four clients of the Firm. The Business Plan described Breitman as Tezos' chief executive officer and his experience in the securities industry, including at Morgan Stanley. The Business Plan sought to raise $5 to $10 million in working capital and described how Tezos' would use the funds to finance its business operations, which included Breitman's proposed salary of approximately $200,000 per year. Breitman also formed DLS, a Delaware corporation, serving as DLS' sole director and owner during the Relevant Period.

Although Breitman knew he was required to disclose any outside business activity, he did not tell Morgan Stanley about his Tezos-related activities. Outside of his meetings with prospective investors, Breitman only publicly associated himself with Tezos after his employment with Morgan Stanley ended. As a result, Breitman's use of the L.M. Goodman pseudonym to promote Tezos through its website, Twitter and the position papers he authored, effectively concealed Breitman's involvement with Tezos from the Firm.

By engaging in outside business activities without providing prior notice to Morgan Stanley, Breitman violated FINRA Rules 3270 and 2010.

### Breitman's False Statements to the Firm

Providing false statements to a FINRA-registered firm on compliance questionnaires is a violation of FINRA Rule 2010.

In June 2014 and May 2015, Breitman completed annual compliance questionnaires attesting that he had disclosed all of his outside business activities to the Firm when, in fact, that was not true.

By making false statements about his outside business activities to the Firm, Breitman violated FINRA Rule 2010.

### Breitman's Tezos-related Communications

FINRA Rule 2210 addresses FINRA member communications with the public and includes content standards that apply to all member communications. Pursuant to FINRA Rule 0140(a), FINRA Rules apply to all member firms and their associated persons. A violation of FINRA Rule 2210 also constitutes a violation of FINRA Rule 2010.

FINRA Rule 2210(d)(1)(A) provides that all communications must be based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security, industry, or service. No member may omit any material fact or qualification if the omission, in light of the context of the material presented, would cause the communication to be misleading.

FINRA Rule 2210(d)(1)(B) prohibits making any false, exaggerated, unwarranted, promissory or misleading statement or claim in any communication. In addition, no member or associated person may publish, circulate or distribute any communication that

3

they know or have reason to know contains any untrue statement of material fact or is otherwise false or misleading.

FINRA Rule 2210(d)(1)(F) provides that communications may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion or forecast.

During the Relevant Period, Breitman created and distributed the Business Plan to prospective investors on a confidential basis so they could consider an investment in Tezos. The Business Plan failed to provide a balanced presentation and sound basis for evaluating an investment in Tezos, in violation of FINRA Rules 2210(d)(a)(A) and 2010. For example, the Business Plan included Tezos' projected revenues and expenses for the next three years, valued Tezos at a discounted future value of up to $100 million and, conditional on a fifteen-year survival and a price to earnings ratio of 20, projected Tezos' future value as ranging between $2 and $20 billion. Although the Business Plan described its revenue assumptions as "pessimistic," "neutral" and "optimistic," it did not discuss all of the circumstances in which Tezos might not realize the projected revenues and/or future value and failed to balance its positive discussions about the company with adequate risk disclosures that explained the speculative nature of the proposed investment.

The Business Plan also contained forward-looking predictions of the company's performance and potentially misleading statements, in violation of FINRA Rules 2210(d)(1)(B), 2210(d)(1)(F) and 2010. For example, the Business Plan supported its current valuation with a 15-year financial projection and adoption, usage and token appreciation assumptions based on the achievements of established companies, such as Ethereum and Ripple. However, at that time, Tezos was still developing its technology, had no revenues, and its future performance was conditioned on, among other things, building a portfolio of users and raising working capital.

By virtue of the foregoing, Breitman violated FINRA Rules 2210(d)(1)(A), 2210(d)(1)(B), 2210(d)(1)(F) and 2010.

B.  I also consent to the imposition of the following sanctions:

1.  A two-year suspension from association with any FINRA-regulated broker-dealer in any capacity; and

2.  A fine in the amount of $20,000.

I understand that if I am barred or suspended from associating with any FINRA member, I become subject to a statutory disqualification as that term is defined in Article III, Section 4 of FINRA's By-Laws, incorporating Section 3(a)(39) of the Securities Exchange Act of 1934. Accordingly, I may not be associated with any FINRA member in any capacity, including clerical or ministerial functions, during the period of the bar or suspension (*see* FINRA Rules 8310 and 8311).

The fine shall be due and payable either immediately upon reassociation with a member firm, or prior to any application or request for relief from any statutory disqualification resulting from this or any other event or proceeding, whichever is earlier.

I specifically and voluntarily waive any right to claim that I am unable to pay, now or at any time hereafter, the monetary sanction(s) imposed in this matter.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

## II.
## WAIVER OF PROCEDURAL RIGHTS

I specifically and voluntarily waive the following rights granted under FINRA's Code of Procedure:

A.   To have a Complaint issued specifying the allegations against me;

B.   To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.   To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.   To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, I specifically and voluntarily waive any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

I further specifically and voluntarily waive any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## III.
## OTHER MATTERS

I understand that:

A.   Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.   If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against me; and

C.   If accepted:

1.   this AWC will become part of my permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against me;

2.   this AWC will be made available through FINRA's public disclosure program in accordance with FINRA Rule 8313;

3.   FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

5

4.   I may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. I may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects my: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.   I may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. I understand that I may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

I certify that I have read and understand all of the provisions of this AWC and have been given a full opportunity to ask questions about it; that I have agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce me to submit it.

**04/17/2018**
Date (mm/dd/yyyy)

Arthur Robert Breitman, Respondent

Reviewed by:

Sarah M. Lightdale, Esq.
*Counsel for Respondent*
Cooley LLP
1144 Avenue of the Americas
New York, NY 10036
(212) 479-6000

Accepted by FINRA:

**4/18/18**
Date

Signed on behalf of the
Director of ODA, by delegated authority

Richard Chin
Chief Counsel
FINRA Department of Enforcement
One Brookfield Place
200 Liberty Street, 11th Floor
New York, NY 10281

6

DECLARATION OF SERVICE BY FILE & SERVE XPRESS AND EMAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, CA 92101.

2.     That on May 16, 2019, declarant served the SECOND AMENDED COMPLAINT FOR: (1) UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF §§5 AND 12(a)(1) OF THE SECURITIES ACT; AND (2) VIOLATION OF §15 OF THE SECURITIES ACT [REDACTED] and via File & Serve XPress on the recipients designated on the Transaction Receipt located on the File & Serve XPress website.

3.     That on May 16, 2019, declarant served the SECOND AMENDED COMPLAINT FOR: (1) UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF §§5 AND 12(a)(1) OF THE SECURITIES ACT; AND (2) VIOLATION OF §15 OF THE SECURITIES ACT [REDACTED] by delivering via electronic mail to the parties on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 16, 2019, at San Diego, California.

_____
NATALEE HORSTMAN

DYNAMIC LEDGER

**Counsel for Defendant(s)**

Brian E. Klein
Scott M. Malzahn
Donald R. Pepperman
BAKER MARQUART LLP
2029 Century Park East, Suite 1600
Los Angeles, CA  90067
bklein@bakermarquart.com
smalzahn@bakermarquart.com
dpepperman@bakermarquart.com

* Patrick E. Gibbs
  Samantha A. Kirby
  Jessica Valenzuela Santamaria
  David S. Houska
  Jessie A.R. Simpson Lagoy
  COOLEY LLP
  3175 Hanover Street
  Palo Alto, CA  94304
  pgibbs@cooley.com
  skirby@cooley.com
  jvs@cooley.com
  dhouska@ cooley.com
  jsimpsonlagoy@cooley.com

* Christopher L. Wanger
  Ana G. Guardado
  MANATT, PHELPS & PHILLIPS, LLP
  One Embarcadero Center, 30th Floor
  San Francisco, CA 94111
  cwanger@manatt.com
  aguardado@manatt.com

Neal A. Potischman
DAVIS, POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, CA 94025
neal.potischman@davispolk.com

Steven H. Winick
BLAXTER BLACKMAN LLP
601 California Street, Suite 1505
San Francisco, CA 94108
shwinick@blaxterlaw.com

Brian E. Klein
BAKER MARQUART LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
bklein@bakermarquart.com

**Counsel for Plaintiff(s)**

* Lucas F. Olts
  Sara B. Polychron
  Brian E. Cochran
  ROBBINS GELLER RUDMAN & DOWD LLP
  655 West Broadway, Suite 1900
  San Diego, CA  92101
  lolts@rgrdlaw.com
  spolychron@rgrdlaw.com
  bcochran@rgrdlaw.com

* James Q. Taylor-Copeland
  TAYLOR-COPELAND LAW
  501 West Broadway, Suite 800
  San Diego, CA  92101
  james@taylorcopelandlaw.com

* Reed R. Kathrein
  Danielle Smith
  HAGENS BERMAN SOBOL SHAPIRO LLP
  715 Hearst Avenue, Suite 202
  Berkeley, CA 94710
  reed@hbsslaw.com
  danielles@hbsslaw.com

* Joel A. Fleming
  Jacob A. Walker
  BLOCK & LEVITON LLP
  155 Federal Street, Suite 400
  Boston, MA 02110
  joel@blockesq.com
  jake@blockesq.com


* Steve W. Berman
  HAGENS BERMAN SOBOL SHAPIRO LLP
  1918 Eighth Avenue, Suite 3300
  Seattle, WA 98101
  steve@hbsslaw.com


 * Denotes parties authorized to view Protected Material under paragraph 12.3 of the January 24,
2019 Stipulated Protective Order.